IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIC SAFFOLD, | ) | |
| | ) | |
| PETITIONER, | ) | |
| | ) | |
| v. | ) | NO. 1:07-CV-598-MHT |
| | ) | |
| J.C. GILES, *et. al.*, | ) | |
| | ) | |
| RESPONDENTS. | ) | |

**RESPONDENTS' ANSWER**

Come now the Respondents in the above-styled cause, by and through the Attorney General of the State of Alabama, and, in response to this Honorable Court's order to show cause why a writ of habeas corpus should not be granted, state as follows:

1.  Eric Saffold attacks his May 3, 2005, Houston County conviction for first-degree robbery and resulting sentence of twenty-five years' imprisonment. Saffold challenges his conviction on the ground of sufficiency of the evidence presented.

2.  The Respondents acknowledge that Saffold is presently in Ventress Correctional Facility pursuant to his lawful conviction of first-degree robbery, but

deny that Saffold is in custody in violation of the laws or Constitution of the United States.

3. The Respondents aver that Saffold's petition should be denied and dismissed with prejudice based on the law, this answer, and the attached exhibits.

## PROCEDURAL HISTORY

### A. Trial Proceedings and Direct Appeal

Saffold was indicted by a Houston County Grand Jury on January 28, 2005, and charged with one count of first-degree robbery in violation of Section 13A-8-41 of the Code of Alabama (1975). (Exhibit A, C. 6-7[1]) On March 16, 2005, he was arraigned and entered a plea of not guilty and not guilty by reason of mental disease or defect. (Exhibit A, C. 1) A jury found Saffold guilty of first-degree robbery on May 3, 2005. (Exhibit A, C. 31, R. 137-38) On June 10, 2005, Houston County Circuit Judge Larry K. Anderson sentenced Saffold to twenty-five years' imprisonment. (Exhibit A, C. 3) Saffold filed a written notice of appeal on June 22, 2005. (Exhibit A, C. 47, 57)

On October 24, 2005, Saffold filed a brief with the Alabama Court of Criminal Appeals raising two claims:

---

[1] The clerk's record in Exhibit A will be referred to as "C" and the transcript will be referred to as "R" for purposes of clarification.

(1) the trial court erred when it denied his motions for judgment of acquittal because the State failed to present evidence that Saffold used or threatened to use force to commit the robbery; and,

(2) the trial court erred when it denied his motion to suppress because:

    a. his statements to law enforcement were induced; and,

    b. he did not voluntarily and intelligently waive his rights because he was on drugs at the time the statements were made.

(Exhibit B)  The State filed its response on November 29, 2005.  (Exhibit C)

The Alabama Court of Criminal Appeals issued a published opinion on April 28, 2006, denying the claims on their merits, finding: (1) based on the evidence presented, the jury could have reasonably concluded that Saffold threatened the imminent use of force against the victims; and, (2) the appellate court would not reweigh the trial court's credibility choices supporting its decision to deny Saffold's motion to suppress.  (Exhibit D)  See also Saffold v. State, 951 So. 2d 777, 781-83 (Ala. Crim. App. 2006).

Saffold's application for rehearing was overruled by the Alabama Court of Criminal Appeals on June 16, 2006.  (Exhibit G)  The Supreme Court of Alabama denied his petition for writ of certiorari without opinion on September 29, 2006.  (Exhibit I)  Saffold has not filed any postconviction petitions under Rule 32 of the Alabama Rules of Criminal Procedure.

3

**B. Federal Habeas Petition**

Saffold filed the present federal habeas petition, his first, on June 21, 2007.[2] (Exhibit J)

## STATUTE OF LIMITATION

A petitioner has one period to file a federal habeas petition under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See 28 U.S.C. § 2244(d)(1).  See also Ford v. Moore, 296 F. 3d 1035, 1035 (11th Cir. 2002). Saffold had one year from the date his conviction became final with the issuance of a certificate of judgment, September 29, 2006, in state court, plus ninety days to appeal to the United States Supreme Court.  See Wade v. Battle, 379 F. 3d 1254, 1256 (11th Cir. 2004).  Thus, in Saffold's case, the statute of limitation commenced on December 29, 2006, giving him until December 31, 2007[3] to file the present petition.  Because Saffold filed the present petition on June 21, 2007, it is not barred by the statute of limitations.

---

[2] This is the date Saffold's petition is signed.  See Houston v. Lack, 487 U.S. 266, 108 S. Ct. 2379 (1988).

[3] December 29, 2007 is a Saturday.

## EXHAUSTION DOCTRINE

Saffold's claim has been presented to the state courts, and thus, is exhausted for purposes of federal habeas review.

## ARGUMENT

After the AEDPA's enactment, this Court ceased conducting an independent review of claims raised by a petitioner whose claims were adjudicated on the merits in the state courts. *See* <u>Breedlove v. Moore</u>, 279 F. 3d 952, 960 (11th Cir. 2002). Rather, Title 28 U.S.C. § 2254(d)(1) governs federal habeas review of such claims. <u>Id</u>.

> An application for a writ of habeas corpus…shall not be granted with respect to any claim that was adjudicated on the merits in State Court…unless adjudication of the claim - -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This Court's] review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Our review of legal conclusions by the state courts is also especially deferential. A state court decision is contrary to the clearly established precedent of the Supreme Court "(1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent." An unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."

Under the unreasonable application clause of section 2254(d), a federal habeas court may not issue the writ on the ground that, in its independent judgment, the state court applied federal law incorrectly. This clause imposes a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." The habeas applicant must show that the state court applied federal law to the facts of his case in an objectively unreasonable manner. An "unreasonable application of federal law is different from an incorrect application of federal law." Even clear error, standing alone, is not a ground for awarding habeas relief.

Stephens v. Hall, 407 F. 3d 1195 (2005), 1201-1202 (11th Cir. 2005). (internal citations omitted).

For Saffold to be entitled to any relief on federal habeas, he must show that the state court's decision was an unreasonable application of, or contrary to, established federal law. See Henderson v. Campbell, 353 F. 3d 880, 890 (11th Cir. 2003). Saffold has failed to do this. His petition is devoid of any allegation that the state courts' decisions were an unreasonable application of, or contrary to, any established federal law. Saffold does not even cite any federal law in his petition.

6

Likewise, he has also failed to show that the state court's application of the law to the facts was unreasonable. Thus, Saffold is due no relief on his claim.

Furthermore, even if he had correctly met his burden as set forth above, he would be due no relief because the law applied by the state courts in resolving his claim was consistent with established federal law and was not an unreasonable application of the correct law to the facts. In his petition Saffold essentially challenges whether there was sufficient evidence to sustain his conviction for first-degree robbery. In <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979) the United States Supreme Court wrote that the applicable standard for reviewing a claim of sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The language used by the Alabama Court of Criminal Appeals in its opinion is consistent with standard in <u>Jackson</u>. (Exhibit D, pp. 7-8) Applying a standard consistent with <u>Jackson</u>, the state court made specific findings of fact, which are accorded great deference, and held that the prosecution had presented sufficient evidence to support Saffold's first-degree robbery conviction. (Exhibit D) Consequently, Saffold has failed to establish a claim warranting federal habeas corpus review.

## CONCLUSION

For the above-stated reasons, this Court should dismiss Saffold's petition with prejudice.

Respectfully submitted,

Troy King (KIN047)
Attorney General
By:

s/Audrey Jordan
Audrey Jordan
Assistant Attorney General

## EXHIBIT LIST

Exhibit A  -  Copy of the record on direct appeal (2 volumes); CC-05-216; CR-04-2068;

Exhibit B  -  Copy of Saffold's brief on direct appeal. CC-05-216; CR-04-2068

Exhibit C  -  Copy of the State's brief on appeal. CC-05-216; CR-04-2068;

Exhibit D  -  Copy of the Alabama Court of Criminal Appeals's published opinion issued on April 28, 2006. CC-05-216; CR-04-2068;

Exhibit E  -  Copy of Saffold's application for rehearing. CC-05-216; CR-04-2068;

Exhibit F  -  Copy of the State's brief in opposition. CC-05-216; CR-04-2068;

Exhibit G  -  Copy of the Alabama Court of Criminal Appeals's order overruling Saffold's application for rehearing. CC-05-216; CR-04-2068;

Exhibit H  -  Copy of Saffold's petition for writ of certiorari and brief in support of petition. CC-05-216; CR-04-2068; No. 1051393;

Exhibit I  -  Copy of the Alabama Supreme Court's notice of denial of certiorari review and certificate of judgment. CC-05-216; CR-04-2068; No. 1051393;

Exhibit J  -  Copy of Saffold's petition for habeas corpus.

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document (including all exhibits) to the following non-CM/ECF participants: Eric Saffold, AIS # 241510, Ventress Correctional Facility, P.O. Box 767, Clayton, Alabama 36016.

s/Audrey Jordan
Audrey Jordan
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: AJordan@ago.state.al.us

294847/110460-001

COURT OF CRIMINAL APPEALS NO. _CR 04-2068_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC2005-216___

CIRCUIT JUDGE ___Larry K. Anderson___       VOL. I

Type of Conviction / Order Appealed From: ___Robbery 1st___

Sentence Imposed: ___25 yrs, $5,000 fine, $1,000 CVCC plus atty fees and costs___

Defendant Indigent: [X] YES   [ ] NO

SAFFOLD, ERIC

___Thomas K. Brantley___       ___334-793-9009___       **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
___401 N. Oates St.___
(Address)
___Dothan, AL.  36303___
(City)              (State)              (Zip Code)

                                         V.

## STATE OF ALABAMA

(State represented by Attorney General)                    **NAME OF APPELLEE**
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

___A___

CASE ACTION SUMMARY                                                                      1-5

INDICTMENT                                                                               6-7

ORDER DATED 3-16-05, DEFT, FORMALLY ARRAIGNED AND ENTERS PLEA OF                          8
NOT GUILTY BY REASON OF MENTAL DISEASE OR DEFECT. 14 DAYS TO FILE
MOTIONS. SET NEXT AVAILABLE TERM.

RECIPROCAL DISCOVERY ORDER.                                                               9

NOTICE TO DEFENDANT OF REQUEST FOR ADDITIONAL PENALTY                                    10

ORDER DATED 5-3-05, BOND IS RAISED TO $30,000                                            11

MOTION TO SUPPRESS DEFENDANT'S STATEMENTS                                                12

DEFENDANT'S REQUESTED CHARGES                                                            13-30

JURY VERDICT OF GUILTY                                                                   31

JURY CONVICTION REPORT SETTING SENTENCE HEARING 6-10-05                                  32

MOTION TO REMIT DEFENDANT TO TEEN CHALLENGE REHAB CENTER                                 33-38
FOR 12 MONTHS PROGRAM AND AFFIDAVIT OF REV PAUL HOLLMAN

ALABAMA BOARD OF PARDONS AND PAROLES REPORT OF INVESTIGATION                             39-44

SENTENCING ORDER                                                                        45

MOTION FOR SPLIT SENTENCE                                                                46

NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS                                        47

ORDER DATED 6-30-05 APPEAL NOTED                                                         48

CONVICTION REPORT, TRANSCRIPT OF RECORD                                                  49

ORDER DATED 6-30-05, MOTION FOR SPLIT SENTENCE IS SET FOR HEARING                        50
AUGUST 26, 2005 AT 9:00 A.M.

MOTION FOR FREE TRANSCRIPT                                                               51-52

ORDER DATED 7-7-05, FREE TRANSCRIPT ORDERED                                              53

CLERK'S NOTICE OF APPEAL TO CCA                                                          54

COURT REPORTER'S TRANSCRIPT ORDER – CRIMINAL                                             55

COURT OF CRIMINAL APPEALS DOCKETING STATEMENT                                            56-57

MOTION TO TRANSPORT DEFT                                                                 58

ORDER OF TRANSPORT                                                                       59

ORDER DATED 8-26-05, MOTION FOR SPLIT SENTENCE IS DENIED BY OPERATION                    60
OF LAW

COURT REPORTER'S INDEX OF TRIAL EXHIBITS                                                 61

STATE'S EXHIBIT NUMBER 1                                      62

STATE'S EXHIBIT NUMBER 2                                      63

STATE'S EXHIBIT NUMBER 3                                      64

STATE'S EXHIBIT NUMBER 4                                      65

STATE'S EXHIBIT NUMBER 5                                      66

COURT REPORTER'S TRANSCRIPT OF RECORD                        1-169

CERTIFICATE OF COMPLETION                                    236

```
ACR0372              ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2005 000216.00
OPER: PAM                   CASE ACTION SUMMARY
PAGE:   1                   CIRCUIT  CRIMINAL                RUN DATE: 02/04/2005
=================================================================================
IN THE CIRCUIT COURT OF  HOUSTON                                      JUDGE: LKA

STATE  OF  ALABAMA              VS      SAFFOLD ERIC
                                        410 E. WASHINGTON ST
CASE: CC 2005 000216.00
                                        DOTHAN, AL  36301 0000

DOB: 01/23/1983         SEX: M  RACE: B  HT: 6 02  WT: 275  HR: BLK EYES: BRO
SSN: 419178421  ALIAS NAMES:
=================================================================================
CHARGE01: ROBBERY 1ST            CODE01: ROB1  LIT: ROBBERY 1ST    TYP: F #: 001
OFFENSE DATE: 09/26/2004                 AGENCY/OFFICER: 0380100 J DEVAN

DATE WAR/CAP ISS:                        DATE ARRESTED: 09/26/2004
DATE    INDICTED: 01/08/2005             DATE    FILED: 02/04/2005
DATE    RELEASED: 09/28/2004             DATE  HEARING:
BOND      AMOUNT:     $10,000.00 S       SURETIES: TURNER BONDING COMPA
                       30,000.00
DATE 1: 03/16/2005  DESC: ARRG           TIME: 0900 A
DATE 2: 05/02/2005  DESC: JTRL           TIME: 0830 A

TRACKING NOS: DC 2004 002997 00  /  WR 2004 012724 00  /

   DEF/ATY: DAVIS ERIC CLARK          TYPE: C                      TYPE:
            PO BOX 1103
            188 N FOSTER ST,SUI 200-A
            DOTHAN      AL 36302                      00000

PROSECUTOR: VALESKA DOUGLAS A
```

*5-3-05 Bond raised*

```
=================================================================================
OTH CSE: DC200400299700 CHK/TICKET NO: 104008800        GRAND JURY: 40-01
COURT REPORTER:                SID NO:    000000000
DEF STATUS: BOND               DEMAND: Y                       OPER: PAM
=================================================================================
DATE          ACTIONS,  JUDGEMENTS,  AND  NOTES
=================================================================================
```

| | |
|---|---|
| 3-16-05 | *Defendant formally arraigned and enters plea of not guilty and not guilty by reason of mental disease or defect. 14 days to file motions. Set next available term.* *Anderson, Judge* |
| MAR 2 1 2005 | /N: E. Davis   DA |

RECIPROCAL DISCOVERY ORDER

_3-16-_ , 20 _05_

Within 14 days of this order, the State and Defendant will make available for inspection and copying all materials discoverable under the Alabama Rules of Criminal Procedure. In addition, the State will make any exculpatory materials available to the defense. The State will make its materials available at the District Attorney's office and the defense will do likewise at defense counsel's office.

_____
CIRCUIT JUDGE

| | |
|---|---|
| 4-20-05 | NOTICE TO DEFENDANT OF PREVIOUS CONVICTIONS & NOTICE OF INTENT TO USE SUCH CONVICTIONS FOR IMPEACHMENT PURPOSES. |

5-3-05 Bond is raised to $30,000.
E. Davis
JUN 07 2005  n: Brantley DS $30 Jail

Anderson, Judge

6-7-05  Motion to Remit Dependant to Teen
Challenge Rehabilitation Center
For 12 month Program (T. Brantley)

## JURY CONVICTION

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

CRIMINAL DIVISION

VS.

Eric Saffold

CASE NO. CC05-216

The Defendant having been indicted and arraigned upon the Indictment on a charge of _Robbery 1st_, and heretofore having plead not guilty thereto the case was tried before a jury composed of _Michael Hannon_, as foreperson and eleven others. The Jury having been duly empanelled, sworn and charged by the Court according to law, with the Defendant being present in open court with his attorney at each and every stage of proceedings, said jury has now on this date pursuant to their oath found the Defendant guilty of _Robbery 1st_ as charged in the Indictment (a lesser included offense of that charge in the indictment).

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Robbery 1st_. Defendant being asked if he/she had anything to say why sentence of law should not be pronounced upon him/her, and Defendant says nothing. _A presentence investigation is ordered._

**IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT** that the Defendant is guilty of said charge.

(X) A Sentence hearing is set for the _10th_ day of _June_, 20_05_ at 9:00 o'clock _A_. M.

DONE, this the _3rd_ day of _May_, 200_5_

JUN 07 2005   N. Brantley, DA, PO, Jail
E. Davis

_____
CIRCUIT JUDGE

### SENTENCING ORDER

AS PUNISHMENT, DEFENDANT IS HEREBY FORMALLY SENTENCED:

( ) to hard labor for Houston County for a term of _____

(X) to the penitentiary of the State of Alabama for a term of _25_ years. ( ) FHOA

3

On the 30th day after the Clerk transmits to the Department of Corrections a copy of this judgment entry and sentence, if the Department has not directed the Sheriff where the Defendant shall be taken for confinement, the Sheriff is hereby ordered to transport Defendant forthwith to the Department's receiving center at Kilby/Tutweiler (circle) and effectuate the transfer of the Defendant to the custody of the Department. In the event the Department refuses to accept the Defendant in compliance with state law, the Sheriff is ordered to secure the Defendant to the property at the Department's receiving center.

Said sentence shall run ( ) consecutive or ( ) concurrent with case number (s)

_____

( ) said sentence is suspended for _____ years on the condition of good behavior and payment of all fines, costs, and restitution.

( ) The Defendant is hereby given credit for the days spent incarcerated pending trial.

Defendant is also ordered to pay:

(X) A fine of $ 5,000
(X) A Victim Compensation Assessment of $ 1,000
(X) All Court Costs.
( ) Restitution of $ N/A to _____
( ) Drug Demand Reduction Act Assessment of $1,000.00.
( ) Alabama Forensics Sciences Trust Fund $100.00.
( ) Pay direct to Alabama Dept. of Forensic Sciences-Dothan Division
    $_____
( ) Investigation restitution direct to ( )DPD ( ) HCSO $_____

## ADDITIONAL SENTENCE PROVISION ORDERED ARE:

( ) Completion of a substance abuse program CRO
( ) The Department of Public Safety is ordered to comply with Alabama Code 13A-12-290 by suspending Defendant's drivers license for six months.
( ) Continued on same bond.
( ) Appeal bond is set at $_____
( ) Indigency status granted and free transcript is ordered.

## PROBATION:

( ) Defendant applies for probation.
( ) Defendant waives application for probation.
( ) Probation hearing is set for the _____ day of _____ 20__ at _____
( ) Defendant to remain on same bond pending probation hearing

DONE this the 10 day of June ,2005.

_____
CIRCUIT JUDGE

ACR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

## CASE ACTION SUMMARY
## CONTINUATION

CASE: CC 2005 000216.00
JUDGE ID: LKA

STATE OF ALABAMA                    VS    SAFFOLD ERIC

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 6-22-05 | Motion for split sentence. |
| 6-22-05 | Notice of appeal. |
| 6-30-05 | *Appeal noted.* |
| | *Anderson, Judge* |
| 6/30/05 | Motion for split sentence is set for hearing August 26, 2005 at 9:00 a.m. |
| | (7-6-05 N: TB + OA)    *Larry K. Anderson, Judge* |
| 6-29-05 | Motion for free transcript. |
| 7-7-05 | *Free transcript is ordered.* |
| | (7-11-05 N: CCA, AG, AM + TB)    *Anderson, Judge* |
| 7-11-05 | *Clerk's notice of appeal to CCA, AG, TB, AM)* |
| 7-14-05 | Rec'd and mailed CCA docketing statement and CR transcript order to CCA, AG, TB and AM |
| 8-26-05 | *Motion for split sentence is denied by operation of law.* |
| | *Anderson, Judge* |

Grand Jury No. _040_ )

Case No. CC-05 - 216

## INDICTMENT

The State of Alabama

Houston County

}

CIRCUIT COURT
TWENTIETH JUDICIAL
**JANUARY TERM, 2005**

COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, ERIC SAFFOLD, whose name is otherwise unknown to the Grand Jury, did in the course of committing a theft or attempting to commit a theft of U S CURRENCY, the property of PHILLIP JEROME GRADIC use force OR threaten the imminent use of force against the person of PHILLIP JEROME GRADIC, or another person present, with intent to overcome his physical resistance or physical power of resistance, with intent to compel acquiescence to the taking of or escaping with the property, while the said ERIC SAFFOLD was armed with a deadly weapon or dangerous instrument, to-wit: .22 CALIBER RIFLE, in violation of Section 13A-8-41 of the Code of Alabama, against the peace and dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Houston County

Witnesses for Agency No. 04-8800

JEREMY COLLINS, DPD, DOTHAN, AL  36301
JASON DEVANE, DPD, DOTHAN, AL  36301
DAVE ELKINS, DPD, DOTHAN, AL  36301
PHILLIP JEROME GRADIC, C/O DAIRY QUEEN 618 S. ALICE S, DOTHAN, AL 36301

THE CIRCUIT COURT
Twentieth Judicial Circuit

THE STATE
vs.

ERIC SAFFOLD

---

Charges: 1. ROBBERY FIRST DEGREE

6

#40

## A TRUE BILL

_____
Foreman of the Grand Jury

Presented to the presiding Judge in open court foreman of the Grand Jury, in the presence of _____ 14 _____ Grand Jurors and filed in open court by order of the court on this the __28 th__ day of January , 20, _05_ .

_____
CLERK

## INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be admitted to bail on giving bond in the sum of

_____ 10,000 _____ Dollars
With security to be approved by the Sheriff.

_____
Judge Presiding

7

JUDGEMENTS, AND NOTES

| 3-16-05 | Defendant formally arraigned and enter Plea of not guilty and not guilty by reason of mental disease or defect. 14 days to file motions. Set next available term. |
| | Anderson, Judge |

## RECIPROCAL DISCOVERY ORDER

_3-16-_ 20 _05_

Within 14 days of this order, the State and Defendant will make available for inspection and copying all materials discoverable under the Alabama Rules of Criminal Procedure. In addition, the State will make any exculpatory materials available to the defense. The State will make its materials available at the District Attorney's office and the defense will do likewise at defense counsel's office.

_____, Judge

CIRCUIT JUDGE

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA            )
                           )
VS.                        )            CASE NUMBER: _CC05-216  A_
                           )
ERIC SAFFOLD               )

## NOTICE TO DEFENDANT OF REQUEST FOR ADDITIONAL PENALTY

COMES NOW the State of Alabama in the above-styled matter, pursuant to Code of

Alabama § 13A-5-6 (1975), and gives notice to the Defendant that the State intends to seek an

additional penalty for the commission of a felony in which a firearm or deadly weapon was used or

attempted to be used.

Respectfully submitted this the _20th_ day of _April_____, 200_5_.

_____
David M. Atwell
*Assistant District Attorney*


## CERTIFICATE OF SERVICE

This is to certify that I have on this day served a copy of the foregoing Notice of Request for
Additional Penalty upon _Eric Davis_____, by placing a copy in the appropriate courthouse
box in the Houston County Courthouse this the _20th_ day of _April_____, 2005.

_____
Of counsel


# FILED

### APR 2 0 2005

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

5-3-05 Bond is raised to $30,000.

Anderson, Judge

STATE OF ALABAMA,    | IN THE CIRCUIT COURT OF
   PLAINTIFF,     | HOUSTON COUNTY, ALABAMA

 v.          | CC 05-216

ERIC SAFFOLD,     |
   DEFENDANT.    |

*Filed in open Court on 5-3-05 Anderson, Judge*

## MOTION TO SUPPRESS DEFENDANT'S STATEMENTS

  COMES NOW, the Defendant by and through the undersigned Counsel and moves this Honorable Court to suppress any and all statements made by the Defendant as violating the United States and Alabama Constitutions, and as grounds therefore, asserts the following:

1. "[E]xtra judicial statements are *prima facie* involuntary and the duty rests on the trial judge to determine at the outset that the confession was, in fact, voluntary." <u>Walker v. State</u>, 369 So.2d 814, 821 (Ala. Cr. App. 1978).
2. 'Such a confession or inculpatory admission can only be used after proof of a voluntariness predicate." <u>Id</u>.

WHEREFORE, the Defendant respectfully requests a hearing on the motion requiring the State to meets its burden of showing voluntariness for any and all of Defendant's statements.

Respectfully submitted the 3rd day of May 2005.

            Eric C. Davis (DAV 096)
            Attorney at Law
            Post Box 1103
            Dothan, Alabama 36302-1103
            (334) 671-7169

### Certificate of Service

I hereby certify that I have served a copy of this entry of appearance on Douglas Albert Valeska, District Attorney for the 20th Judicial Circuit, Alabama placing a copy in his courthouse box or by serving one of his Assistant District Attorneys a copy in open court, this 3rd day of May 2005.

            Eric C. Davis

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,               *
                                *
    PLAINTIFF,             *
                                *
VS.                             *      CASE NO. CC 2005-216
                                *
ERIC SAFFOLD,                   *
                                *
    DEFENDANT.             *

## DEFENDANT'S REQUESTED CHARGES

*COMES NOW* the Defendant and respectfully requests the Trial Judge to read the following Jury Charges to the Jury and to instruct the Jury that said charges are correct propositions of law and should be considered by the Jury in their deliberations as part of the law in this case.

I hereby certify that true and correct copies of the attached Jury Charges have been served upon Counsel for the State in open Court on this the 3rd day of _____May_____, 2005.

_____
ERIC C. DAVIS DAV09
Attorney for Defendant
Post Office Box 1103
Dothan, Alabama  36302
(334) 671-7169

13

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                   *
                                     *
VS.                                  *        CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
    DEFENDANT.                   *

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 1

    No matter how strong circumstantial evidence seems, if it only arouses your suspicion that Eric Saffold is guilty of robbery in the first degree, it will not serve as a basis for convicting him.

*Jordan v. State*, 229 Ala. 415, 157 So. 485 (1934).

GIVEN    X                     REFUSED

Anderson, Judge

14

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                     *
                                      *
     PLAINTIFF,                      *
                                      *
VS.                                   *
                                      *     CASE NO. CC 2005-216
ERIC SAFFOLD,                         *
                                      *
     DEFENDANT.                      *

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 7

Before you would be justified in finding Eric Saffold guilty of robbery in the first degree based solely on the circumstantial evidence presented in this case, you must find that the evidence excludes all reasonable hypotheses except that he is guilty.

GIVEN _____                     REFUSED   ✕

                                                    *Anderson, Judge*

15

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
      PLAINTIFF,                 *
                                     *
VS.                                  *        CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
      DEFENDANT.                 *

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 3

You cannot convict Eric Saffold on mere possibilities, surmise, suspicions, or speculation, however strong they may be. A verdict of guilty based upon mere possibilities, surmise, suspicion or speculation, would violate the oath that you as a juror have taken. If, after carefully and fairly reviewing the facts, you are not satisfied that Eric Saffold is guilty, without speculation or surmise, then you have a reasonable doubt and you should find him **not guilty**.

GIVEN ___✗___

          Anderson, Judge                    REFUSED

16

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,               *
                                     *
VS.                                  *        CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
    DEFENDANT.               *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 4

You should find Eric Saffold not guilty of robbery in the first degree.

GIVEN _____       REFUSED _____

*Anderson, Judge*

17

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                              *
                                               *
      PLAINTIFF,                         *
                                               *
VS.                                            *        CASE NO. CC 2005-216
                                               *
ERIC SAFFOLD,                                  *
                                               *
      DEFENDANT.                         *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 5

If you believe the evidence in this case, you must find Eric Saffold not guilty of robbery in the first degree.

GIVEN _____        REFUSED ✕

Anderson, Judge

18

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                       *
                                     *
VS.                                  *          CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
    DEFENDANT.                       *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 6

The presumption of innocence with which Eric Saffold has entered into this trial is a fact in this case which must be considered with all the evidence and is not to be disregarded.

GIVEN _____✗_____          REFUSED

Anderson, Judge

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                     *
                                      *
     PLAINTIFF,                 *
                                      *
VS.                                   *      CASE NO. CC 2005-216
                                      *
ERIC SAFFOLD,                         *
                                      *
     DEFENDANT.                 *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 7

There is a presumption of innocence, a cloak of innocence wrapped around the shoulder of Eric Saffold when he walks into this Court as a defendant in this criminal prosecution. That presumption of innocence would not require him to prove anything. This presumption not only walks in the door with him, but it remains wrapped around his shoulder like a cloak, until the burden of proof has been met by the State of Alabama. The State has the burden of proving each charge as a whole and each material allegation thereof beyond a reasonable doubt.

GIVEN _____ . REFUSED ✗

Anderson Judge

20

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　*
　　　　　　　　　　　　　　*
　　　　PLAINTIFF,　　　　　*
　　　　　　　　　　　　　　*
VS.　　　　　　　　　　　　*　　CASE NO. CC 2005-216
　　　　　　　　　　　　　　*
ERIC SAFFOLD,　　　　　　　*
　　　　　　　　　　　　　　*
　　　　DEFENDANT.　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 9

I have no opinion as to the facts of this case; it is not my business to have any. Even if I did have an opinion it would be highly improper for me to intimate or suggest it to you. I do not have an opinion as to the facts of this case and I do not want you to think from anything I have said or ruling I have made determining the law of this case that I think one way or the other about the facts of this case.

GIVEN _____    REFUSED ✕

Anderson, Judge

21

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,          *

                         *

      PLAINTIFF,         *

                         *

VS.                    *    CASE NO. CC 2005-216

                         *

ERIC SAFFOLD,         *

                         *

      DEFENDANT.      *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 9

Each of you must be satisfied beyond a reasonable doubt that Eric Saffold is guilty of robbery in the first degree before there can be a conviction.

If any one of you has one reasonable doubt that he is guilty after a consideration of all of the evidence in this case, then you cannot find him guilty.


GIVEN _____    REFUSED   ✗

                                 _Anderson, Judge_

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                     *
                                     *
VS.                                  *   CASE NO. CC 2005-216
                                     *
EIRC SAFFOLD,                        *
                                     *
    DEFENDANT.                     *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 10

A defendant is never to be convicted on mere suspicion or conjecture. The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. If after careful and impartial consideration of all the evidence in this case, any one of you has a reasonable doubt that Eric Saffold is guilty of robbery in the first degree, then you cannot find him guilty.


GIVEN _____╳_____    REFUSED

_Anderson, Judge_

23

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                       *
                                     *
VS.                                  *     CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
    DEFENDANT.                       *

## DEFENDANT'S REQUESTED JURY CHARGE NO.  "

    It is the policy of the law that no innocent person should be convicted, and it is better that many guilty persons go unpunished than for one innocent person to be convicted.

GIVEN  ___✕___                    REFUSED

Anderson, Judge

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　　　*

　　　　PLAINTIFF,　　　　　　　*

VS.　　　　　　　　　　　　　　*　　　CASE NO. CC 2005-216

ERIC SAFFOLD,　　　　　　　　*

　　　　DEFENDANT.　　　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 12

If you believe that any material part of the testimony of any witness who testified in this trial

was willfully false, you may disregard all of that witness' testimony.

GIVEN _____　　　　　　　　　　REFUSED

w/d

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,       *

VS.      *    CASE NO. CC 2005-216

ERIC SAFFOLD,      *

       DEFENDANT.      *

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 13

You will be the sole and exclusive judges of the facts in this case. It will be your duty to attempt to reconcile the testimony of all the witnesses so as to make them all speak the truth, if this can be done reasonably. If you cannot reasonably reconcile all of the testimony, it is then your duty to consider the testimony with the view of determining what the true facts are. In so doing you may accept or reject any part of the testimony of any witness, and accept only the testimony you consider worthy of belief.

(APJI 1.06)

GIVEN _____    REFUSED _____

w/d

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,               *

                                 *

VS.                           *     CASE NO. CC 2005-216

                                 *

ERIC SAFFOLD,               *

                                 *

     DEFENDANT.           *

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 14

In your deliberations, you must give the evidence the most favorable interpretation in favor of the defense presented by Eric Saffold.

GIVEN _____     REFUSED ✕

                                        *Anderson, Judge*

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                          *
                                           *
VS.                                        *      CASE NO. CC 2005-216
                                           *
ERIC SAFFOLD,                              *
                                           *
        DEFENDANT.                         *

## <u>DEFENDANT'S REQUESTED JURY CHARGE NO. 15</u>

You must consider all of the evidence that has been presented in this case, but you do not have to accept all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part.

Also, the number of witnesses testifying concerning any particular dispute is not controlling. You may decide that the testimony of a smaller number of witnesses concerning any fact in dispute is more believable than the testimony of a larger number of witnesses to the contrary.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: did the person impress you as one who was telling the truth? Did he or she have any particular reason not to tell the truth? Did he or she have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did he or she appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses?

Given _____                              Refused _____

w/d

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *     CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
     DEFENDANT.                     *

## DEFENDANT'S REQUESTED JURY CHARGE NO. _16_

You have heard several witnesses testify in this case. You should ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony he or she gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and that may depend on whether it has to do with an important fact or with only an unimportant detail.

Given _____

Refused _____

29

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *    CASE NO. CC 2005-216
                                     *
ERIC SAFFOLD,                        *
                                     *
        DEFENDANT.                   *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 17

When the State offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care.

It is for you to decide (1) whether the Defendant made the statement and (2) if so, how much weight to give to it. In making those decisions you should consider all of the evidence about the statement, including the circumstances under which the Defendant may have made it.

Given _____X_____          Refused _____

        _Anderson, Judge_

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
          PLAINTIFF,                 )
                                     )
VS.                                  )  CASE NO. CC05-216
                                     )
ERIC SAFFOLD,                        )
                                     )
          DEFENDANT.                 )

We, the Jury, find the Defendant, Eric Saffold, guilty of Robbery in the First Degree, as charged in the Indictment.


__5-3-05__
Date

_____
Foreperson
Michael Hanson

_____
Clerk
Judy Byrd

## JURY CONVICTION

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

VS.                                                    CRIMINAL DIVISION

Eric Saffold                              CASE NO. CC05-216

The Defendant having been indicted and arraigned upon the Indictment on a charge of _Robbery 1st_____, and heretofore having plead not guilty thereto the case was tried before a jury composed of _Michael Hannon_ as foreperson and eleven others. The Jury having been duly empanelled, sworn and charged by the Court according to law, with the Defendant being present in open court with his attorney at each and every stage of proceedings, said jury has now on this date pursuant to their oath found the Defendant guilty of _Robbery 1st____ as charged in the Indictment (a lesser included offense of that charge in the Indictment).

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Robbery 1st_____ . Defendant being asked if he/she had anything to say why sentence of law should not be pronounced upon him/her, and Defendant says nothing. _a presentence investigation is ordered._

**IT IS THEREFORE ORDERED AND ADJUDGED BY THE COURT** that the Defendant is guilty of said charge.

(X) A Sentence hearing is set for the _10th_ day of _June___, 2005 at 9:00 o'clock _A_ M.

DONE, this the _3rd_ day of _May_____, 2005

JUN 0 7 2005   n. Brantley , DA, PO, Jail
              E. David

_____
CIRCUIT JUDGE

| | |
|---|---|
| STATE OF ALABAMA | ) IN THE CIRCUIT COURT |
| PLAINTIFF, | ) ) HOUSTON COUNTY, ALABAMA |
| VS. | ) ) CASE NUMBER: CC-05-216 |
| ERIC SAFFOLD, | ) ) |
| DEFENDANT. | ) ) |

**FILED**

JUN 07 2005

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

### MOTION TO REMIT DEFENDANT
### TO TEEN CHALLENGE REHABILITATION CENTER
### FOR 12 MONTH PROGRAM

Comes now the Defendant by and through his undersigned counsel and moves this Honorable Court for an order transferring the Defendant to the Teen Challenge Drug Rehabilitation Program, 3706 South Sanford Avenue, Sanford, Florida 32773 for the purpose of Defendant receiving long-term drug rehabilitation treatment; and, in support thereof would show this Honorable Court as follows:

1.  That although Defendant was convicted of Robbery 1st Degree his primary problem lies in his drug addiction and in fact Defendant was seeking money to purchase drugs for his drug addiction pursuant to the instant robbery;

2.  That Defendant has no prior convictions;

3.  That Defendant has never received drug rehabilitation treatment;

4.  That Defendant prior to this instant conviction attended the Greater Beulah Baptist Church and was under the supervision of Reverend Paul Hollman and Reverend Paul Hollman still believes this young man needs mostly drug rehabilitation therapy and to a lesser extent penal confinement (Please see attached affidavit of Reverend Paul Hollman.);

5.  That the undersigned counsel has contacted Teen Challenge and Teen Challenge has admitted the Defendant conditional upon Your Honor's Order (Please see attached letter from Teen Challenge);

6.  That Defendant would propose that his sentencing date be continued for 12 months and during that time Defendant would remain out on bond

conditional upon Defendant being at Teen Challenge and would successfully complete the Teen Challenge 12 month drug rehabilitation program and then come back before Your Honor for a sentencing at that time;

7.    That in the event Defendant does not successfully complete the Teen Challenge Drug Rehabilitation Program then he would be immediately returned to the Houston County Jail for an immediate sentencing hearing;

8.    That society would benefit by having this particular Defendant undergo an extensive and intensive long-term drug rehabilitation program as opposed to simple penal confinement.

Respectfully submitted this the ___6___ day of _____, 2005.

BRANTLEY & MCLENDON, L.L.C.

THOMAS K. BRANTLEY (BRA040)
ATTORNEY FOR DEFENDANT
401 N. FOSTER STREET
DOTHAN, ALABAMA 36303
334-793-9009

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon the Honorable Douglas Valeska by placing a copy of the same in the United States Mail, postage prepaid and properly addressed to him on this the ___6___ day of May, 2005.

THOMAS K. BRANTLEY

STATE OF ALABAMA     )     IN THE CIRCUIT COURT

                        )

    PLAINTIFF,        )     HOUSTON COUNTY, ALABAMA

                        )

VS.                  )     CASE NUMBER: CC-05-216

                        )

ERIC SAFFOLD,       )

                        )

    DEFENDANT.       )

## AFFIDAVIT OF REVEREND PAUL HOLLMAN

My name is Paul Hollman and I am the Senior Pastor at Greater Beulah Baptist Church, 280 Headland Avenue, Dothan, AL 36303. I have been the Senior Pastor at Greater Beulah for 10 years and prior to that time I was the executive director of the City of Birmingham Division of Youth Services in Birmingham, Alabama. I was ordained as a Baptist Minister in 1985 and since that time have pastored two churches. I know Eric Saffold who is the Defendant in Case Number CC-05-216 because he attended my church, Greater Beulah Baptist Church. Eric began attending Greater Beulah about 1995, which is when I became the pastor there. He and I immediately became friends and I initially took an interest in him because I learned of his family history. Let me first say that one of my main goals in my ministry has been to deal with children in broken homes. I particularly pay close attention to those young children who grow up in homes without a father or father figure present. Eric Saffold was one of those children. Eric in fact does not even know who his father is and most likely Eric's mother does not even know who Eric's father is. I cannot begin to tell you the problems I experience with children like this in terms of establishing in them self esteem and in terms of the emotional conflicts these children suffer. Eric regretfully turned to drugs when he was about 13 years of age, which was shortly after the time that I first became acquainted with Eric. We worked with Eric but were hampered significantly by the fact that Eric simply had no foundation

at home to strengthen him with regards to what we were telling him at church. When Eric was about 15 his own mother abandoned him and moved to Florida. This completely pulled the rug out from under Eric and significantly hurt us at Greater Beulah in trying to in effect raise Eric in the way that we thought the Lord wanted him to be raised. After his mother abandoned him Eric essentially went from house to house and lived with different friends and truly became a victim of parental abandonment and lived the rest of his life on the streets. Eric was very embarrassed that his mother left him and it was difficult for him to discuss this with us at Greater Beulah. As a result of this embarrassment Eric left our church and attended several other churches and I know that he attended these churches because I would get phone calls from the members of these other churches. I know Eric is a soul that is searching for his place. I know that Eric has done wrong by committing this crime of Robbery. But I also know this as much as I know anything: Eric Saffold's main problem is his addiction to drugs. After he gets help with his drug addiction he then can begin to rehabilitate himself and cleanse his soul and body. I do not think it would accomplish one thing as far as saving Eric Saffold's body for this earth to just send him off and incarcerate him in prison. I agree he may need some incarceration. But first he needs long-term drug treatment. I understand there is a place in Florida called Teen Challenge. I have asked Mr. Brantley to locate that place and to try to get Eric in Teen Challenge. Mr. Brantley has shown me a letter where Teen Challenge has accepted Eric. I now ask this Honorable Court, Judge Anderson, to please grant this motion in this particular case to send this young man first to Teen Challenge for a year and then to do his incarceration. I know that prison has a SAP Program, which treats substance abuse, but I am not impressed with the SAP Program at all. I have many members of my church who have loved ones in prison who have completed the SAP program come back home and simply got back on drugs. I would ask the Court to allow Eric Saffold to do his drug treatment at Teen Challenge. Should you have any questions for me Your Honor I would be most glad to answer them. I would be glad to come talk to you in person. My telephone number is 712-0200. I thank you for your time in reading my affidavit.

This the _____ day of May, 2005.

_____
Reverend Paul Hollman

**STATE OF ALABAMA**
**COUNTY OF HOUSTON**

Before me, the undersigned, a notary public in and for said county and in said State, personally appeared Reverend Paul Hollman, being known to me and being by me first duly sworn, deposes and says that he/she has read the foregoing document and the facts alleged therein are true and correct to the best of his/her knowledge, information and belief.

Sworn to and subscribed before me this the _____ day of May, 2005.

_____
Notary Public
My commission expires: 2-17-07

37



**TEEN CHALLENGE**
**INTERNATIONAL**
CENTRAL FLORIDA

Men's Facility
3706 South Sanford Ave.
Sanford, FL 32773
Phone 407/330-9600
Fax    407/330-0407

**REGIONAL
HEADQUARTERS**
Administrative Office
Phone 407/622-5200

ARCADIA
Juvenile Girls Facility
Arcadia, FL
Phone 863/993-2141

BAY AREA
Men's Facility
Tarpon Springs, FL
Phone 727/937-1033

BILINGUAL
Men's Facility
Sanford, FL
Phone 407/330-9600

GULF COAST
Men's Facility
Pensacola, FL
Phone 850/941-8536

JUPITER
Juvenile Girls Facility
Jupiter, FL
Phone 561/743-7552

LAKELAND
Juvenile Girls Facility
Lakeland, FL
Phone 863/647-1944

SOUTH FLORIDA
Women's Facility
Davie, FL
Phone 954/476-0809

SOUTHWEST FLORIDA
Men's Facility
Ft. Myers, FL
Phone 239/275-1974

SOUTHWEST FLORIDA
Women's Facility
Ft. Myers, FL
Phone 239/939-7705

TCIMI
Ministry Institute
Jacksonville, FL
Phone 904/396-0013

VERO BEACH
Juvenile Boys Facility
Vero Beach, FL
Phone 772/978-4164

WEST FLORIDA
Juvenile Boys Facility
Bonifay, FL
Phone 850/547-9011

May 18, 2005

**RE: Eric Saffold**

To Whom It May Concern:

This letter is to inform you that Eric has been accepted into the Teen Challenge program in Sanford, Florida. He meets the substance abuse eligibility requirements to be admitted into our one-year residential treatment program. We have reserved a bed for Eric hoping you will allow him to enter the program.

Teen Challenge is a 12-month, residential program with emphasis on the treatment and rehabilitation of alcohol and drug addictions. We are a state-licensed, faith-based organization. Teen Challenge is the most successful program of its kind in the world with a documented 86% success rate for those students who complete the one-year residential program.

Please contact our center at (407) 330-9600 Ext. 301, if I can be of further assistance.

Sincerely yours,

Scott Lipinsky
Operations Director
Teen Challenge Sanford

# ALABAMA BOARD OF PARDONS AND PAROLES

## REPORT OF INVESTIGATION

**Type of Investigation**  PreSentence  **Officer:**  Chris Robertson

**Name**  Saffold, Eric  **True name**  Same

**Alias**  None.

**RSA**  BM/22  **DOB**  1-23-83  **Height and Weight**  6'2", 275

**Complexion** _____  **Hair**  Black  **Eyes**  Brown

**Bodily Marks**  Sub. has a tattoo of "ADA" on his left arm and a scar on rt. side of his forehead

**Driver's License #**  AL.9368473 (SUS.)  **SS#**  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

**AIS#** _____  **FBI#**  399453FC3  **SID#**  AL.01908272

**Address**  C/O Houston Co. Jail  **Phone #**
901 E. Main St.  **PR #**  2005 007720
Dothan, AL.  36301

**County**  Houston  **Case #**  CC 2005-216

**Offense(s)**  Robbery I

**Sentence(s)** _____

**Date of Sentence** _____  **Date Sentence Began** _____

**Date of Arrest**  9-26-04  **Date of Bond**  9-28-04  **Bond Amt. $**  10,000

**Judge**  **Larry K. Anderson**  **D.A.**  Douglas Valeska

**Attorney**  Eric Clark Davis  **Retained** _____  **Appointed**  X

**Court Ordered Restitution $** _____

**Barred From Parole**  **Yes** _____  **No**  X

**Date Prepared:**  6-9-05  **Date Sent :** _____

**NOTES:**

## PRESENT OFFENSE(S)

### County, Court, and Case Number

Houston County Circuit Court No. CC2005-216

### Offense:

Robbery I

### Sentence:

### Date of Sentence:

### Details of Offense:

Dothan Police Dept. records indicate that on 9-26-04, Eric Saffold, armed with a 22 caliber rifle, went to the Dairy Queen located at 618 S. Alice St. in Dothan, AL., with the intent of robbing the owner as he exited the building.

Inv. Jason Devane reports that as the owner, Phillip Graddick, exited the building at the close of business, he saw Eric Saffold standing in a dark corner of the building wearing a mask over his head and wearing dark clothing. Mr. Graddick then pulled his 9mm pistol and pointed it at Mr. Saffold and ordered him to get on the ground. Mr. Graddick then contacted the Dothan Police Dept. and advised them that he had a black male at gunpoint behind the Dairy Queen.

When officers arrived, they found that Mr. Graddick did in fact have Mr. Saffold at gunpoint and that Mr. Saffold was in possession of a 22 caliber JC Higgins Automatic Rifle, which was loaded.

Mr. Saffold was then arrested and transported to the Dothan Police Dept. where he gave Inv. Jason Devane a taped statement admitting that his intent was to rob Mr. Graddick as he exited the building.

Mr. Saffold was then charged with Robbery I.

### Serious Physical Injury Barring Parole:

None.

### Subject's Statement:

During my interview with Mr. Saffold, he stated that he did commit this offense because he needed money to support his drug habit. He also stated that he realizes that he made a huge mistake when he committed this offense.

**Case Status of Co-Defendants:**

None.

**Victim Notification Information:**

Phillip Jerome Graddick, 618 S. Alice St., Dothan, AL.  36301.

**Victim Impact:**

N/A

**Location of Offense:**

This offense occurred within the city limits of Dothan, AL.

**Court Ordered Restitution:**

## RECORD OF ARREST(S)

**Prior Arrest Record:**

| ARREST DATE | COURT | OFFENSE | DISP. DATE | DISPOSITION |
|---|---|---|---|---|
| JUVENILE | | | | |
| 6-14-95 | JU95-216.01 | Carrying Pistol W/O Permit | 9-19-95 | Ordered Del./ Put on prob. |
| 6-14-95 | JU95-216.02 | Receiving Stolen Property II | 9-19-95 | Ordered Delin./ Put on prob. |
| 4-14-97 | JU95-216.03 | Carrying Pistol W/O Permit | 7-15-97 | Sus. Comm. To DYS |
| 4-14-87 | JU95.216.04 | Resisting Arrest | 5-29-97 | Dismissed |
| 4-14-97 | JU95.216.05 | Unlawful Dis. Of Firearm W/I City Limits | 7-15-97 | Sus. Comm. To DYS |
| 9-19-97 | JU95-216.06 | Disorderly Conduct | 11-13-97 | Comm. To DYS |

3

| 12-17-98 | JU95-216.08 | Disorderly Conduct | 5-20-99 | Sus. Comm. To DYS |
| 6-18-99 | JU95-216.09 | Disorderly Conduct | 9-27-99 | Sus. Comm. To DYS |
| 8-18-99 | JU95-216.10 | Harassment | 9-27-99 | Sus. Comm. To DYS |
| 8-18-99 | JU95-216.11 | Harassment | 9-27-99 | Dismissed |

ADULT

None.

**Subsequent Arrest Record:**

ADULT

None.

# PERSONAL/SOCIAL HISTORY

## Subject:

Eric Saffold is a twenty-two year old black male who was born in Dothan, AL., on 1-23-83. He reports that he was raised by his Mother, Ada Saffold, in Dothan, AL., and while growing up he was never placed in any type of foster care. He also reports that he is the youngest of three children born to Harry and Ada Saffold of Dothan, AL. He states that he has a great relationship with his family.

## Marital Status History:

The subject reports that he has never been married and that he has fathered no children.

## Health:

The subject reports that he is in good health and that he has never been treated for any mental or emotional problems. The subject reports that he does feel that drugs and alcohol are a major problem in his life. He reports using cocaine, marijuana, and alcohol on a daily basis prior to his incarceration.

## Education:

The subject reports that he graduated from Dothan High School in 2002. He has no further education or training.

## Financial Status:

The subject reports that he owns nothing of value, and he has no debts. He also reports that he received Food Stamps prior to being incarcerated.

## Employment History:

The subject reports that he worked for Blair Staffing for approximately two months prior to his incarceration.

He also reports prior employment with Perdue Farms in 2002, for approximately four months.

The subject also stated that he has worked in various fast food restaurants; however, he does not recall the dates of employment.

## Military Record:

This individual has never served.

## OFFENDER'S FAMILY:

## Father:

The subject reports that his Father is Harry Saffold of 2820 Glanton St. in Dothan, AL. He reports that his Father is retired and that he has never been convicted of a felony.

## Mother:

The subject reports that his Mother is Ada Saffold of Orlando, FL. He reports that his Mother has never been convicted of a felony.

## Siblings:

Harry Saffold Jr. Pled Guilty to Robbery I in Houston Co., AL., on 8-14-97. He is currently incarcerated in the AL. Dept. of Corrections.

April Saffold resides in Dothan, AL., and she has never been convicted of a felony.

## EVALUATION OF OFFENDER

**Psychological Reports:**

None.

**Reputation and Community Activities:**

Mr. Saffold is well known to law enforcement and juvenile officials in Houston Co., AL.

**Probation and Parole Officer's Remarks:**

A medium to maximum range sentence is recommended in this case.

## PROBATION PLAN

**Home:**

If granted probation, the subject stated that he would have to find a place to live.

**Employment:**

If granted probation, the subject stated that he would seek employment.

**Educational/Vocational Needs:**

I feel that this subject would benefit from some type of vocational training.

**Mental Health/Substance Abuse Needs:**

I recommend that Mr. Saffold be ordered to complete the SAP Program in the AL. DOC.

**Signed and dated in Dothan, Alabama on June 9, 2005.**

**CHRISTOPHER B. ROBERTSON**
**State Probation & Parole Officer**

CBR/jh

AS PUNISHMENT, DEFENDANT IS HEREBY FORMALLY SENTENCED:

( ) to hard labor for Houston County for a term of _____

(X) to the penitentiary of the State of Alabama for a term of **25** years. ( ) FHOA

On the 30th day after the Clerk transmits to the Department of Corrections a copy of this judgment entry and sentence, if the Department has not directed the Sheriff where the Defendant shall be taken for confinement, the Sheriff is hereby ordered to transport Defendant forthwith to the Department's receiving center at Kilby/Tutweiler (circle) and effectuate the transfer of the Defendant to the custody of the Department. In the event the Department refuses to accept the Defendant in compliance with state law, the Sheriff is ordered to secure the Defendant to the property at the Department's receiving center.

Said sentence shall run ( ) consecutive or ( ) concurrent with case number (s)
_____

( ) said sentence is suspended for _____ years on the condition of good behavior and payment of all fines, costs, and restitution.

( ) The Defendant is hereby given credit for the days spent incarcerated pending trial.

Defendant is also ordered to pay:

(X) A fine of $ **5,000**
(X) A Victim Compensation Assessment of $ **1,000**
(X) All Court Costs.
( ) Restitution of $ **N/A** to _____
( ) Drug Demand Reduction Act Assessment of $1,000.00.
( ) Alabama Forensics Sciences Trust Fund $100.00.
( ) Pay direct to Alabama Dept. of Forensic Sciences-Dothan Division
$ _____
( ) Investigation restitution direct to ( )DPD ( ) HCSO $_____

**ADDITIONAL SENTENCE PROVISION ORDERED ARE:**

( ) Completion of a substance abuse program CRO
( ) The Department of Public Safety is ordered to comply with Alabama Code 13A-12-290 by suspending Defendant's drivers license for six months.
( ) Continued on same bond.
( ) Appeal bond is set at $_____
( ) Indigency status granted and free transcript is ordered.

**PROBATION:**

( ) Defendant applies for probation.
( ) Defendant waives application for probation.
( ) Probation hearing is set for the _____ day of _____ 20__ at _____
( ) Defendant to remain on same bond pending probation hearing

DONE this the **10** day of **June**, 20**05**.

_____
CIRCUIT JUDGE

45

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | IN THE CIRCUIT COURT |
| | ) | |
| PLAINTIFF, | ) | HOUSTON COUNTY, ALABAMA |
| | ) | |
| VS. | ) | CASE NUMBER: CC-05-216 |
| | ) | |
| ERIC SAFFOLD, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MOTION FOR SPLIT SENTENCE

Comes now the Defendant by and through his undersigned counsel and moves this Honorable Court to split his sentence as follows: 25 years split to serve 2 years and then to complete Teen Challenge 12 Month Drug Rehabilitation Program and then to be placed on probation.

Respectfully submitted this the ⁄⁄ day of June, 2005.

**FILED**

JUN 2 2 2005

*Judy Byrd*

. JUDY BYRD, CLERK
HOUSTON CO., AL

BRANTLEY & MCLENDON, L.L.C.

_____
THOMAS K. BRANTLEY (BRA040)
ATTORNEY FOR DEFENDANT
. 401 N. FOSTER STREET
DOTHAN, ALABAMA 36303
334-793-9009

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon the Honorable Douglas Valeska by placing a copy of the same in the United States Mail, postage prepaid and properly addressed to him on this the ⁄⁄ day of June, 2005.

_____
THOMAS K. BRANTLEY

46

| | |
|---|---|
| STATE OF ALABAMA, | ) IN THE CIRCUIT COURT OF |
| | ) |
| PLAINTIFF, | ) HOUSTON COUNTY, ALABAMA |
| | ) |
| VS. | ) CASE NUMBER: CC-05-216 |
| | ) |
| ERIC SAFFOLD, | ) |
| | ) |
| DEFENDANT. | ) |

## NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS

COMES NOW the Defendant, ERIC SAFFOLD, in the above styled cause, by and through his present attorney of record, Thomas K. Brantley, and gives notice to this Honorable Court that he/she is appealing the Judgment of this Court to the Alabama Court of Criminal Appeals.

WHEREFORE, Defendant hereby gives notice of appeal.

Respectfully submitted,
BRANTLEY & MCLENDON, L.L.C.

**FILED**

JUN 2 2 2005

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL.

_____
THOMAS K. BRANTLEY (BRA040)
ATTORNEY FOR DEFENDANT
401 NORTH FOSTER STREET
DOTHAN, ALABAMA 36303
(334) 793-9009

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing motion upon Douglas A. Valeska, District Attorney, by placing a copy of same properly addressed and postage prepaid, on this the _22_ day of June, 2005.

_____
THOMAS K. BRANTLEY

47

| 6-30-05 | Appeal noted. |
| | Anderson, Judge |

ACR359    **COPY**    ALABAMA JUDICIAL DATA CENTER
HOUSTON COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2005 000216.00 01
LARRY K ANDERSON

| CIRCUIT COURT OF HOUSTON COUNTY | COURT ORI: 038015 J |

STATE OF ALABAMA    VS.
SAFFOLD ERIC        ALIAS:
410 E. WASHINGTON ST    ALIAS:
DOTHAN  AL  36301

DC NO: DC 2004 002997.00
G J: 40-01
SSN: 419178421
SID: 000000000
AIS: 000000

DOB: 01/23/1983  SEX: M  HT: 6 02   WT: 275  HAIR: BLK   EYE: BRO
RACE: ( )W (X)B ( )O  COMPLEXION:    AGE:   FEATURES:

DATE OFFENSE: 09/26/2004  ARREST DATE: 09/26/2004  ARREST ORI: 0380100

| CHARGES @ CONV | CITES | CT CL COURT ACTION | CA DATE |
| ROBBERY 1ST | 13A-008-041 | 01 A  CONVICTED | 05/03/2005 |
| | | 0 | 00/00/0000 |
| | | 0 | 00/00/0000 |

JUDGE: LARRY K ANDERSON        PROSECUTOR: ATWELL DAVID MICHAEL

PROBATION APPLIED   GRANTED   DATE    REARRESTED DATE  REVOKED  DATE
( )Y(✓)N          ( )Y( )N         ( )Y( )N              ( )Y( )N

15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED   TOTAL  : JAIL CREDIT
( )Y (X)N  CONFINEMENT:  25 00 000   00 00 000   25 00 000   00 00 041
           PROBATION :  00 00 000               00 00 000
DATE SENTENCED: 06/10/2005     SENTENCE BEGINS: 06/10/2005

| PROVISIONS | COSTS/RESTITUTION | DUE | ORDERED |
|---|---|---|---|
| PENITENTIARY | RESTITUTION | $0.00 | $0.00 |
| CONSECUT SENT | ATTORNEY FEE | $1000.00 | $1000.00 |
| | CRIME VICTIMS | $1000.00 | $1000.00 |
| | COST | $281.00 | $281.00 |
| | FINE | $5000.00 | $5000.00 |
| | MUNICIPAL FEES | $0.00 | $0.00 |
| | DRUG FEES | $0.00 | $0.00 |
| | ADDTL DEFENDANT | $0.00 | $0.00 |
| | DA FEES | $0.00 | $0.00 |
| | COLLECTION ACCT | $0.00 | $0.00 |
| | JAIL FEES | $0.00 | $0.00 |
| | TOTAL | $7281.00 | $7281.00 |

APPEAL DATE      SUSPENDED       AFFIRMED           REARREST
(✓)Y( )N 6-22-05   ( )Y( )N        ( )Y( )N           ( )Y( )N

REMARKS:

THIS IS TO CERTIFY THAT THE
ABOVE INFORMATION WAS EXTRACTED
FROM OFFICIAL COURT RECORDS
AND IS TRUE AND CORRECT.

*Judy Byrd*

JODY BYRD
06/28/2005

OPERATOR: RHM
PREPARED: 06/28/2005

| 6/30/05 | Motion for split sentence is set for hearing August 26, 2005 at 9:00 a.m. |

_Larry K. Anderson, Judge_

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | HOUSTON COUNTY, ALABAMA |
| | ) | |
| VS. | ) | CASE NUMBER: CC-05-216  **FILED** |
| | ) | |
| ERIC SAFFOLD, | ) | JUN 2 9 2005 |
| | ) | |
| DEFENDANT. | ) | *Judy Byrd* |

JUDY BYRD, CLERK
HOUSTON CO., AL

## MOTION FOR FREE TRANSCRIPT

COMES NOW the Defendant, ERIC SAFFOLD, in the above styled cause, by and through his present attorney of record, Thomas K. Brantley, and moves this Honorable Court to grant a free transcript in this matter and as grounds would show as follows:

1.    That presently on file in this case in an affidavit of indigency of Defendant and Defendant was appointed a State Contract Attorney for his trial and Defendant remains indigent and incarcerated at the present time;

2.    That Defendant's sister, April Hollis, has paid the undersigned counsel a retainer for attorney fees for appeal but cannot afford to pay attorney fees and purchase a transcript;

3.    That therefore Defendant requests that he be provided a free transcript for his appeal.

Respectfully submitted this the 26 day of June, 2005.

BRANTLEY & MCLENDON, L.L.C.

_____
THOMAS K. BRANTLEY (BRA040)
ATTORNEY FOR DEFENDANT
401 NORTH FOSTER STREET
DOTHAN, ALABAMA 36303

(334) 793-9009

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing motion upon Douglas A. Valeska, District Attorney, by placing a copy of same properly addressed and postage prepaid, on this the _____ day of June, 2005.

_____
THOMAS K. BRANTLEY

7-7-05 : Free transcript is ordered.

Anderson, Judge

ACR371                    ALABAMA JUDICIAL DATA CENTER
            NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                            BY THE TRIAL COURT CLERK
                    IN THE CIRCUIT COURT  OF  HOUSTON COUNTY
STATE OF ALABAMA VS SAFFOLD ERIC                JUDGE: LARRY K ANDERSON
---------------------------------------------------------------------------
| APPEAL DATE: 06/30/2005
|--------------------------------------------------------------------------
| INDIGENCY STATUS:
|   GRANTED INDIGENCY STATUS AT TRIAL COURT:         _X_  YES  _____  NO
|   APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:   _X_  YES  _____  NO
|   INDIGENT STATUS REVOKED ON APPEAL:               ___  YES  _X_    NO
|   INDIGENT STATUS GRANTED ON APPEAL:               _X_  YES  _____  NO
|
| DEATH PENALTY: NO
|
| APPEAL TYPE: STATE CONVICTION
|--------------------------------------------------------------------------
| THIS IS AN APPEAL FROM A CONVICTION.
|
| DATE OF CONVICTION: 05/03/2005          DATE OF SENTENCE: 06/10/2005
|
| YOUTHFUL OFFENDER STATUS: DENIED
|
| CO/CASE NUMBER: 38/CC 2005 000216.00
| CODE: ROB1   CONVICTION: ROBBERY 1ST        ACTION: CONVICTED
|                                             STATUTE: 13A-008-041
| SENTENCE:   CONF: 25 YRS 00 MOS 000 DAYS
| SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS      LIFE: NO   LIFEWO: NO
|--------------------------------------------------------------------------
| POST-JUDGMENT MOTIONS FILED:   DT FILED    DT DENIED    CON BY AGREE
| ___  MOTION FOR NEW TRIAL       --------    ---------    -----------
| ___  MOTION FOR JUDG. OF ACQUIT --------    ---------    -----------
| ___  MOTION TO W/D GUILTY PLEA  --------    ---------    -----------
| ___  MOTION FOR ATTY TO W/DRAW  --------    ---------    -----------
| ___  OTHER                      --------    ---------    -----------
|--------------------------------------------------------------------------
| COURT REPORTER(S):              MARTIN, ANDREA E.
| ADDRESS:                        C/O HON. LARRY K ANDERSON
|                                 DOTHAN          ,   AL  36302
|
| APPELLATE COUNSEL #1:           BRANTLEY THOMAS K JR
| ADDRESS:                        401 N FOSTER ST
|
| PHONE NUMBER:                   DOTHAN          ,   AL  36303
|                                 334-793-9009
| APPELLATE COUNSEL #2:
| ADDRESS:                        ----------------------------
|                                 ----------------------------
|                                 ----------------------------
| PHONE NUMBER:                   ----------------------------
|
| APPELLANT (PRO SE):             SAFFOLD ERIC
| ADDRESS:                        410 E. WASHINGTON ST
|                                 DOTHAN          ,   AL  363010000
| AIS #:                          000000
|
| APPELLEE (IF CITY APPEAL):
| ADDRESS:                        ----------------------------
|                                 ----------------------------
|                                 ----------------------------
---------------------------------------------------------------------------
I CERTIFY THAT THE INFORMATION PROVIDED                    OPERATOR: RHM
ABOVE IS ACCURATE TO THE BEST OF MY             PREPARED: 07/11/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 11th DAY OF July   05     ____ CIRCUIT COURT CLERK ____

| State of Alabama Unified Judicial System Form ARAP-1C      8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _Houston Co_ COUNTY

_Eric Saffold_ , Appellant

V. ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number _CC-05-216_ | Date of Judgment/Sentence/Order _5/3/05_ |
|---|---|
| Date of Notice of Appeal Oral: _____ Written: _6/22/05_ | Indigent Status Granted: ☒ Yes  ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

_____    _____    _____
Signature                    Date                         Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

COURT REPORTER(S)
_ANDREA MARTIN_
_P.O. Drawer 6406_
_Dothan AL 36302_

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED          DATE          COURT REPORTER(S)

D. _____

E. _____

F. _____

G. _____

**FILED**
**JUL 14 2005**
_Judy Byrd_
JUDY BYRD, CLERK
HOUSTON CO., AL

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_Brantley_          _7/13/05_          _THOMAS K. BRANTLEY_
Signature            Date               Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>_____ - _____ |

## A. GENERAL INFORMATION:

☑ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF _____ Houston _____ COUNTY

Eric Saffold _____, Appellant

v. ☑ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC-05-216 | Date of Complaint or indictment<br>01-08-05 | Date of Judgment/Sentence/Order<br>05/03/05 |
| Number of Days of Trial/Hearing<br>2        Days | Date of Notice of Appeal<br>Oral: | <br>Written: 06-22-05 |

Indigent Status Requested: ☑ Yes ☐ No          Indigent Status Granted: ☑ Yes ☐ No

## B. REPRESENTATION:

Is Attorney Appointed or Retained ? ☐ Appointed ☑ Retained          If no attorney, will appellant represent self? ☐ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) Attach additional pages if necessary )<br>Thomas K. Brantley | Telephone Number<br>334-793-9009 |
| Address<br>401 N. Foster Street | City<br>Dothan | State<br>AL | Zip Code<br>36303 |

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number:

| Codefendant | Case Number |
| Codefendant | Case Number |
| Codefendant | Case Number |

**FILED**

**JUL 1 4 2005**

Judy Byrd

JUDY BYRD, CLERK
HOUSTON CO., AL

## D. TYPE OF APPEAL : Please check the applicable block

1 ☑ State Conviction
2 ☐ Post-Conviction Remedy
3 ☐ Probation revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify)

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section d, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping /Unlawful imprisonment § _____
5 ☐ Drug Possession- § _____
6 ☐ Trafficking in Drugs -§ _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape -§ _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic – DUI - § _____
14 ☐ Traffic – Other - § _____
15 ☑ Miscellaneous (Specify) :
Robbery 1st   - § 13A-08-41

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?    ☐ Yes ☑ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?   ☑ Yes ☐ No
2. If the answer to question "1"is"yes, " state the date the Reporter's Transcript Order was filed. _____ 07-13-05
3. If the answer to question"1"is"no":
   (a) will a stipulation of facts be filed with the circuit clerk?   ☐ Yes ☐ No
   (b) will the parties stipulate that only questions of law are involved and will the trail court certify the questions?   ☐ Yes ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1"is"No," then a positive
Response is required for question 3(a)  or 3(b).

| From ARAP-26 (back) | 8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|---|

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rule 20.3 and 24.4 9(ARCrP))

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 07 | 07 | 05 | Motion For Split Sentence | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case

Eric Saffold was charged with Robbery 1st degree on 9-26-04. He was indicted by the Houston County Grand Jury on 01-08-05. He was convicted of this charge on 05-03-05 and was sentenced on 06-10-05 to 25 years in prison. He appealed this conviction on 06-22-05.

**J. ISSUE (S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary)

Whether there was insufficient evidence for conviction.

**K. SIGNATURE:**

07-13-05

Date

_Signature of Attorney/Party Filing this Form_

57

| STATE OF ALABAMA , | ) | IN THE CIRCUIT COURT OF |
|---|---|---|
| PLAINTIFF, | ) | HOUSTON COUNTY, ALABAMA |
| VS. | ) | |
| | ) | CASE NUMBER: CC-05-216 |
| ERIC SAFFOLD, | ) | |
| DEFENDANT. | ) | |

## MOTION TO TRANSPORT DEFENDANT

**COMES NOW** the Thomas K. Brantley, and hereby moves this Honorable Court for an

Order to transport the Defendant, Eric Saffold, to the Houston County Courthouse, Dothan,

Alabama, for the Motion Hearing scheduled herein on the 26th day of August, 2005, at 9:30 a.m.

**WHEREFORE,** Thomas K. Brantley, moves this Honorable Court to enter an Order

allowing the Defendant to be transferred to the Houston County Courthouse, Dothan, Alabama.

Respectfully submitted,

**FILED**

AUG 0 3 2005

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

BRANTLEY & MCLENDON, L.L.C.

**THOMAS K. BRANTLEY (BRA040)**
**ATTORNEY FOR DEFENDANT**
**401 NORTH FOSTER STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-9009**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the
Honorable Douglas Valeska, District Attorney, by placing a copy of same in the United States Mail,
properly addressed and postage prepaid, on this the 2nd day of August, 2005.

**THOMAS K. BRANTLEY**

STATE OF ALABAMA ,          )     IN THE CIRCUIT COURT OF

                          )

        PLAINTIFF,       )     HOUSTON COUNTY, ALABAMA

VS.                      )

                          )     CASE NUMBER: CC-05-216 A

ERIC SAFFOLD,         )

                          )

        DEFENDANT.     )

## ORDER OF TRANSPORT

The matter before the Court is the "Motion To Transport Defendant" filed herein by the Defendant;   This Court has read, understood, and considered said Motion and is of the opinion that said Motion should be **GRANTED**;   accordingly, it is hereby

**ORDERED, ADJUDGED AND DECREED** as follows:

1.       That the Sheriff of Houston County, Alabama shall transport the Defendant from The State Department of Corrections to the Houston County Courthouse on August 26, 2005 for the purpose of a Motion Hearing before the Honorable Larry Anderson, Circuit Judge;

2.       That immediately after said trial, the Sheriff of Houston County, Alabama shall transport the Defendant back to The State Department of Corrections.

This the 3 day of August, 2005.

**FILED**

AUG 0 3 2005

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

_____
CIRCUIT JUDGE

8/3/05
N Doc, Culliston

8-26-05 Motion for split sentence is denied by operation of law.

Anderson, Judge

COURT REPORTER'S INDEX OF TRIAL EXHIBITS – ARAP RULE 11(e)
IN THE CIRCUIT COURT OF HOUSTON COUNTY
DOTHAN, ALABAMA – COUNTY SEAT

ERIC SAFFOLD,

                 Appellant,

VS.

STATE OF ALABAMA,

                 Appellee.

CCA CR-04-2068
Case No. CC-05-216
State Criminal

TO:   Judy Byrd, Clerk of the Circuit Court of Houston County.
FROM: Andrea E. Martin, Official Court Reporter of the 20th
       Judicial Circuit of Alabama

REPORTER'S INDEX TO EXHIBITS

     The following UNDERLINE EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes all exhibits (herein assembled or separately housed – or – other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc.

[NOTE: (√) check appropriate]

| Party | Ex. No. | Description | Admit Yes | Admit No | Iden. Only | With-Drawn | Remarks |
|-------|---------|-------------|-----------|----------|------------|----------|---------|
| S | 1 | MASK | X | | | | |
| S | 2 | GUN | X | | | | |
| S | 3 | BULLETS | X | | | | |
| S | 4 | BOX OF AMMUNITION | X | | | | |
| S | 5 | WAIVER OF RIGHTS | X | | | | |
| D | 1 | JURY OCCUPATION LIST | X | | | | FOR MOTION ONLY |
| D | 2 | HOUSTON COUNTY DEMOGRAPHICS | X | | | | FOR MOTION ONLY |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

1) ABOVE INDEX RECEIVED & FILED _Aug 24_____, 2005.   DATED THIS _24th_ DAY OF _Aug._____, 2005.
2) EXHIBITS IN FILE AND/OR CONTAINER VERIFIED (except as noted)

/S/ _Judy Byrd_ _lfm_              /S/ _Andrea E. Martin_
    Clerk-Register-or Authorized Assistant         Court Reporter-20th Judicial Circuit

STATE'S EXHIBIT NUMBER 1

CERTIFICATION OF EVIDENCE


I, JUDY BYRD, CLERK OF THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA,
DO HEREBY CERTIFY THAT STATE'S EXHIBIT NUMBER 1 IS OF SUCH SIZE AND BULK
THAT IT IS INCAPABLE OF BEING INCLUDED IN THE TRANSCRIPT BUT WILL BE
FORWARDED TO THE COURT OF CRIMINAL APPEALS IF REQUESTED BY THE COURT.


_____
JUDY BYRD, CLERK


EVIDENCE: MASK

STATE'S EXHIBIT NUMBER 2

CERTIFICATION OF EVIDENCE


I, JUDY BYRD, CLERK OF THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA, DO HEREBY CERTIFY THAT STATE'S EXHIBIT NUMBER 2 IS OF SUCH SIZE AND BULK THAT IT IS INCAPABLE OF BEING INCLUDED IN THE TRANSCRIPT BUT WILL BE FORWARDED TO THE COURT OF CRIMINAL APPEALS IF REQUESTED BY THE COURT.


JUDY BYRD, CLERK


EVIDENCE: GUN

STATE'S EXHIBIT NUMBER  3

CERTIFICATION OF EVIDENCE


I, JUDY BYRD, CLERK OF THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA, DO HEREBY CERTIFY THAT STATE'S EXHIBIT NUMBER  3  IS OF SUCH SIZE AND BULK THAT IT IS INCAPABLE OF BEING INCLUDED IN THE TRANSCRIPT BUT WILL BE FORWARDED TO THE COURT OF CRIMINAL APPEALS IF REQUESTED BY THE COURT.


_____
JUDY BYRD, CLERK


EVIDENCE: BULLETS

STATE'S EXHIBIT NUMBER 4

CERTIFICATION OF EVIDENCE


I, JUDY BYRD, CLERK OF THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA,
DO HEREBY CERTIFY THAT STATE'S EXHIBIT NUMBER 4  IS OF SUCH SIZE AND BULK
THAT IT IS INCAPABLE OF BEING INCLUDED IN THE TRANSCRIPT BUT WILL BE
FORWARDED TO THE COURT OF CRIMINAL APPEALS IF REQUESTED BY THE COURT.


_____
JUDY BYRD, CLERK


EVIDENCE:  BOX OF AMMUNITION

## Dothan Police Department

**Name** ERIC SAFFOLD                **Place** CID

**Case Number** 04-008800            **Date/Time** 09/26/04 2325

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT.

YOU HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM WITH YOU DURING QUESTIONING.

IF YOU CANNOT AFFORD A LAWYER ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONING, IF YOU WISH.

IF YOU DECIDE TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME. YOU WILL ALSO HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.

### WAIVER OF RIGHTS

I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OF ANY KIND HAS BEEN USED AGAINST ME TO GET ME TO MAKE A STATEMENT.

SIGNED _____

EDUCATION 12th _____

WITNESS Cpl Jason _____

WITNESS _____

TIME 2326 _____

I HAVE EXPLAINED THE RIGHT TO REMAIN SILENT AND THE RIGHT TO COUNSEL TO _____ AS WELL AS ALL OTHER RIGHTS WHICH HE/SHE IS ENTITLED PRIOR TO QUESTIONING OR INTERROGATION BY LAW ENFORCEMENT OFFICERS. AFTER HAVING THESE RIGHTS EXPLAINED, HE/SHE REFUSED TO SIGN THIS STATEMENT.

SIGNED _____

WITNESS _____

TIME _____



| State of Alabama Unified Judicial System Form ARAP- 1C.    8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL** See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number **04 - 2068** |

) BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF PPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _Houston Co_ _____ COUNTY

_Eric Saffold_ _____, Appellant

V.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number **CC - 05 - 216** | Date of Judgment/Sentence/Order **5/3/05** |
| Date of Notice of Appeal Oral: _____  Written: **6/22/05** | Indigent Status Granted: ☒ Yes   ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT.**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_____          _____          _____
Signature              Date                    Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**

A. ☒ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

COURT REPORTER(S)
_ANDREA MARTIN_
_P.O. Drawer 6406_
_Dothan AL 36302_

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _____ | | FILED |
| E. _____ | | JUL 14 2005 |
| F. _____ | | _Judy Byrd_ JUDY BYRD, CLERK |
| G. _____ | | HOUSTON CO., AL |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_T.K. Brantley_          **7/13/05**          _THOMAS K. BRANTLEY_
Signature                      Date                      Print or Type Name

**DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:**  (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

1           IN THE STATE OF ALABAMA

2          FOR THE COUNTY OF HOUSTON

3         TWENTIETH JUDICIAL CIRCUIT

4             CRIMINAL DIVISION

5

6    STATE OF ALABAMA,

7              Plaintiff,

8    vs.                    Case No. CC-05-216

9    ERIC SAFFOLD,

10              Defendant.

11    ─────────────────────────────

12

13         REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

14

15

16

17            Before the Honorable

18            Larry K. Anderson

19       at the Houston County Courthouse

20             Dothan, Alabama

21

22

23

24         Andrea E. Martin, RMR, CRR
                Official Court Reporter

25

INDEX

MAY 3, 2005 - JURY TRIAL                          5

PHILLIP GRADIC
    DIRECT BY MR. ATWELL                         42
    CROSS BY MR. DAVIS                           53

KEVIN GUERRA
    DIRECT BY MR. ATWELL                         59
    CROSS BY MR. DAVIS                           64

JASON DeVANE
    DIRECT BY MR. ATWELL                         67
    BY MR. ATWELL                               74
    BY MR. DAVIS                                78

ERIC SAFFOLD
    BY MR. DAVIS                                82
    BY MR. ATWELL                               84

JASON DeVANE
    CONTINUED DIRECT BY MR. ATWELL              89

STATE RESTS                                     94

MOTIONS                                         95

JURY CHARGE                                    114

VERDICT                                        137

JUNE 10, 2005 - SENTENCING HEARING             141

PAUL HOLMAN
    DIRECT BY MR. BRANTLEY                      143
    CROSS BY MR. ATWELL                         149
    REDIRECT BY MR. BRANTLEY                    154

SENTENCING                                     165

CERTIFICATE                                    167

CERTIFICATE OF COMPLETION                      169

4

```
 1                    EXHIBIT INDEX

 2                                     MAR   /   ADM
         State's
 3        1       Ski mask                 38        47

 4        2       Gun                      52        52

 5        3       Bullets from gun         72        72

 6        4       Box of Winchester ammunition  72   72

 7        5       Waiver of Rights         74        88

 8
         Defendant's
 9        1       Strike/Occupation list of jurors   39    40

10        2       Federal statistics and       39        40
                  demographics of Houston County
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                 IN THE STATE OF ALABAMA

2              FOR THE COUNTY OF HOUSTON

3           TWENTIETH JUDICIAL CIRCUIT

4               CRIMINAL DIVISION

5

6   STATE OF ALABAMA,

7         Plaintiff,

8   vs.                Case No. CC-05-216

9   ERIC SAFFOLD,

10        Defendant.

11   ——————————————————

12

13               MAY 3, 2005

14               JURY TRIAL

15

16

17         Before the Honorable

18          Larry K. Anderson

19      at the Houston County Courthouse

20          Dothan, Alabama

21

22

23

24       Andrea E. Martin, RMR, CRR
          Official Court Reporter

25

```
 1                   A P P E A R A N C E S
 2      ON BEHALF OF THE STATE:
 3              Mr. David M. Atwell
 4              Assistant District Attorney
 5              Dothan, Alabama
 6
 7      ON BEHALF OF THE DEFENDANT:
 8              Mr. Eric C. Davis
 9              Attorney at Law
10              Dothan, Alabama
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PROCEEDINGS

1

2      THE COURT:   Court calls the case of the

3  State of Alabama versus Eric Saffold.

4      State ready, Mr. Atwell?

5      MR. ATWELL:   State is ready, Your Honor.

6      THE COURT:   Defense ready, Mr. Davis?

7      MR. DAVIS:   Yes, sir.

8      THE COURT:   Good morning, again, ladies and

9  gentlemen.  As you know, I am Judge Anderson.

10  I'll be presiding over the trial of the State

11  Alabama versus Eric Saffold.  Actually, this

12  worked out pretty well because we finished the

13  other case probably around 10 o'clock and the

14  jury returned with a verdict about 10:15, so

15  that case is disposed of.

16      We're going to start this case momentarily.

17  As you've been told, I'm going to ask you a

18  number of questions that touch on your

19  qualifications to serve with respect to this

20  specific case.  After I am through, the

21  attorneys will be allowed to question you as

22  well.

23      Please remember that if any question is

24  asked of you that is sensitive in nature or

25  might tend to embarrass, you need not answer it

1    publicly, but I'll give you an opportunity to

2    come forward and take it up with the Court at

3    the appropriate time.

4        I guess before we begin, I want to make sure

5    everyone is here.  I saw a couple of jurors

6    headed this way.  I think they have all made it

7    now to the courtroom.  Also, these attorneys

8    have not had an opportunity to see you, so I'm

9    going to ask Ms. Brown to call the roll.  As

10   your name is called, if you will please stand

11   and announce your presence, if you are able.

12            (The roll was called.)

13       THE COURT:  Is there anyone here whose name

14   was not called?  If so, please raise your hand.

15       Everyone is here.

16       Ladies and gentlemen, as I said, I'm going

17   to ask you some questions.  If the question

18   applies to you, please raise your hand.

19       Before I ask you any question, I want to

20   read the indictment to you.  Please understand

21   that I am reading the indictment to you because

22   I need to ask you a couple of questions

23   concerning this indictment and for no other

24   reason.

25       The indictment is not any evidence against

1   the defendant.  It is merely the formal means or

2   method by which charges are brought against the

3   defendant and he is placed on trial before you.

4       The indictment in CC-05-216 reads as

5   follows:

6           (The indictment was read.)

7       THE COURT:  That indictment charges the

8   defendant with robbery in the first degree.

9   Now, the two questions which I need to ask you

10  regarding this indictment are these:  First, did

11  any of you serve on the January 2005 term of the

12  Houston County Grand Jury that returned this

13  indictment?

14      If you did, please raise your hand.

15      By your silence then, I take it you did not.

16      The second question -- and I recognize that

17  the indictment contains allegations which are

18  sketchy at best.  But from me reading this

19  indictment to you or from whatever source you

20  may have gotten this information, do any of you

21  know anything about the facts of this particular

22  case?  Does that apply to anyone?  If it does,

23  please raise your hand.  Anybody?

24      Again, I see no hands.

25      Ladies and gentlemen, are any of you related

1      by blood or by marriage, or do you know the
2      defendant in this case, Eric Saffold?
3          Mr. Saffold, if you will please stand.
4          Any of you related by blood or by marriage,
5      or do you know the defendant, Eric Saffold, who
6      is standing before you?  Anybody?
7          You may have a seat, Mr. Saffold.
8          If you do, please raise your hand.
9          Again, I see no hands.
10         It is anticipated that the following
11     individuals will testify in this case.  And I
12     want to ask you the same question regarding
13     these individuals.  Any of you related by blood
14     or by marriage, or do you know Jason DeVane, a
15     corporal with the Dothan Police Department?
16     Anybody?  If you do, please raise your hand.
17         How about Dave Elkins, also with the Dothan
18     Police Department?  Anybody know or -- are you
19     related by blood or by marriage, or do you know
20     Dave Elkins?  Anyone?
21         Yes, sir, your name?
22         PROSPECTIVE JUROR:  I know Jason DeVane.
23         THE COURT:  You know Jason DeVane?
24         PROSPECTIVE JUROR:  Yes, sir.
25         THE COURT:  And your name, sir?

```
1         PROSPECTIVE JUROR:  Keith Lee or Roy Lee.

2         THE COURT:  I'm sorry.

3         PROSPECTIVE JUROR:  Roy Lee.

4         THE COURT:  Roy Lee.  Thank you, Mr. Lee.

5    I'm going to have to come back to you in just a

6    moment.  Let me get through this list.  And I'm

7    not trying to single you out.  I just need to

8    ask some follow-up questions.

9         Any of you related by blood or by marriage,

10   or do you know Jeremy Collins with the Dothan

11   Police Department?  Anybody?

12        I'm sorry.  Yes, ma'am?

13        PROSPECTIVE JUROR:  I know Jeremy Collins.

14        THE COURT:  Your name, ma'am?

15        PROSPECTIVE JUROR:  Susan Henderson.

16        THE COURT:  Susan Henderson.  Thank you,

17   Ms. Henderson.  Anybody else?

18        Okay.  What about Phillip Jerome Gradic who

19   is alleged to be the victim in this case?

20   Anybody?  I think that's Mr. Gradic there who is

21   standing before you.

22        Yes, ma'am, your name?

23        PROSPECTIVE JUROR:  Kendall Lay.

24        THE COURT:  Ms. Lay.  And you know

25   Mr. Gradic; is that correct?
```

1              PROSPECTIVE JUROR:  Uh-huh.

2              THE COURT:  Anybody else?

3           Now, let me go back to the three of you who

4      know some of the potential witnesses in this

5      case and ask some follow-up questions.  And as I

6      said to Mr. Lee, I'm not trying to single you

7      out, but I do have to ask these questions.

8          The fact that you know these potential

9      witnesses and in all likelihood they are going

10     to testify, would that in any way influence your

11     judgment for or against the defendant or for or

12     against the State of Alabama?  Mr. Lee?

13            PROSPECTIVE JUROR:  No, sir.

14            THE COURT:  Let's see.  Ms. Henderson?

15            PROSPECTIVE JUROR:  No, sir.

16            THE COURT:  And Ms. Lay?

17            PROSPECTIVE JUROR:  No.

18            THE COURT:  Okay.  Could you then set aside

19     the fact that you know these respective

20     witnesses and base your decision solely on the

21     evidence and the law as I charge it and render a

22     fair and impartial verdict being equally just to

23     both sides?  Can you do that, Mr. Lee?

24            PROSPECTIVE JUROR:  Yes, sir.

25            THE COURT:  And Ms. Henderson?

1     PROSPECTIVE JUROR:  Yes, sir.

2     THE COURT:  And Ms. Lay?

3     PROSPECTIVE JUROR:  Yes.

4     THE COURT:  One last question.  The fact

5     that you know these individuals and, as I said,

6     they will testify -- would you give their

7     testimony more weight and credit or, conversely,

8     less weight and credit than you would some other

9     witness who might testify?

10     Now, I know that's a convoluted question.

11     What I'm getting at is this:  Can you consider

12     their testimony along with all the other

13     testimony in the case without giving it undue

14     weight and credit because you know them or

15     sometimes, conversely, less weight and credit?

16     Can you do that, Mr. Lee?

17     PROSPECTIVE JUROR:  Yes.

18     THE COURT:  And let's see.  Ms. Henderson?

19     PROSPECTIVE JUROR:  Yes.

20     THE COURT:  And Ms. Lay?

21     PROSPECTIVE JUROR:  Yes.

22     THE COURT:  Thank you all.

23     Ladies and gentlemen, any of you expect to

24     be called as a witness in this case either for

25     the State or for the defense?  If so, raise your

1    hand.

2        I know that's an odd question and you're

3    probably thinking why would we have jury service

4    if we're going to be a witness in the case.  It

5    has happened before.  In fact, I tried a case a

6    couple of months ago in Troy and one of the

7    jurors was going to be a witness in that case.

8        You are probably thinking why are you up in

9    Troy trying cases.  The judges up there recused

10    and the Chief Justice sent me to Troy to try

11    that case.

12        Any of you make any bond on behalf of the

13    defendant, any appearance bond?  Any of you

14    signed an appearance bond for the defendant?  If

15    you did, please raise your hand.

16        Okay.  Again, I see no hands.

17        Do any of you have an interest in the

18    conviction or the acquittal of the defendant?

19    Does that apply to anyone?  If it does, please

20    raise your hand.

21        How about this?  Have any of you made any

22    promises or given any assurances that you will

23    either convict or acquit the defendant?  That

24    is, have you told anybody that you intend to

25    convict or acquit the defendant in this case?

1    Does that apply to any juror?  If it does,

2    please raise your hand.

3    Do any of you have a fixed opinion as to the

4    guilt or as to the innocence of the defendant

5    which would bias your verdict in this case?

6    As the defendant sits before you, he is

7    presumed to be innocent of this offense.  Have

8    any of you made up your minds right now that he

9    is either guilty or not guilty of this offense?

10    Does that apply to anyone?  If it does, please

11    raise your hand.

12    Representing the State through its assistant

13    district attorney, Mr. David Atwell, who is

14    standing before you.  Any of you related by

15    blood or by marriage, or do you know

16    Mr. Atwell?  Does that apply to anyone?

17    THE COURT:  Yes, sir.  And for the record,

18    your name, sir?

19    PROSPECTIVE JUROR:  Jay Hare.

20    THE COURT:  Jay Hare?

21    PROSPECTIVE JUROR:  I just know David

22    through tennis.

23    Jeanene Knighton.

24    THE COURT:  Yes, ma'am, Ms. Knighton.

25    Anybody else?

1     Representing the defendant through his

2     attorney, Mr. Eric Davis, who is standing before

3     you.  Any of you related by blood or by

4     marriage, or do you know Mr. Davis?  Does that

5     apply to anyone?  And I do see some hands.  Of

6     course, Mr. Hare, you know him.

7          And, ma'am, your name?

8          PROSPECTIVE JUROR:  Fowler, Stephanie

9     Fowler.

10          THE COURT:  Ms. Fowler.  Okay.  And let's

11    see.  I saw -- yes, sir.

12          PROSPECTIVE JUROR:  Frank Manning.

13          THE COURT:  Mr. Manning?

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  Thank you, Mr. Manning.  Yes,

16    ma'am.

17          PROSPECTIVE JUROR:  He lives in my

18    neighborhood.

19          THE COURT:  I'm sorry.

20          PROSPECTIVE JUROR:  He just lives in my

21    neighborhood.

22          THE COURT:  No.  I'm sorry.  I'm kidding, of

23    course, and you know that I'm kidding.

24          He's a fine fellow.  What is your name,

25    ma'am?

1    PROSPECTIVE JUROR:  Opal Joyce.

2    THE COURT:  Ms. Joyce, okay.  Did I miss any

3    hands?

4    Okay.  Now, let me go back again to those of

5    you who indicated you know these attorneys.  And

6    they will not be testifying in this case, so I

7    do -- but I do have to ask you two questions.

8    The fact that you know the lawyers in this case,

9    would that in any way affect your judgment for

10   or against either side?  Mr. Hare?

11   PROSPECTIVE JUROR:  No, sir.

12   THE COURT:  Ms. Knighton?

13   PROSPECTIVE JUROR:  (Shakes head

14   negatively.)

15   THE COURT:  Let's see.  Ms. Fowler?

16   PROSPECTIVE JUROR:  No, sir.

17   THE COURT:  Mr. Manning?

18   PROSPECTIVE JUROR:  No.

19   THE COURT:  Okay.  And let's see.

20   Ms. Joyce?

21   PROSPECTIVE JUROR:  No, sir.

22   THE COURT:  Then you all could set aside the

23   fact that you know these lawyers and base your

24   decision solely on the evidence and the law as I

25   charge it and be fair to both sides.  Can you do

1      that, Mr. Hare?

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  And Ms. Knighton?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  And Ms. Fowler?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  And Mr. Manning?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  And Ms. Joyce?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Thank you all.

12         Now, I asked you this question yesterday.

13     Now you are faced with the real possibility of

14     actually sitting on a case and having to decide

15     a case.

16         Do any of you have any religious convictions

17     or moral convictions which would prohibit you

18     from sitting in judgment on your fellow man?

19     Does that apply to anyone?  If it does, please

20     raise your hand.

21         Okay.  I see no hands then.

22         Ladies and gentlemen, those are all the

23     questions that I have of you presently.  I'll

24     now turn to the State.

25         Mr. Atwell, any questions for the State?

1    MR. ATWELL:  Thank you, Your Honor.

2    (Voir dire examination was conducted by

3    Mr. Atwell on behalf of the State.)

4    THE COURT:  Let me interrupt you for just a

5    second, please, sir.  Mr. Hall, please forgive

6    me.  Let me see if I understand.

7    Of course, every juror that hears a case

8    wants to be certain that a person is guilty of a

9    particular offense.  The State is required to

10    prove guilt beyond a reasonable doubt, as I will

11    later define that term.

12    Mr. Atwell is somewhat correct.  It's a

13    doubt for which you have a reason arising from

14    the evidence, any part thereof or any lack of

15    evidence, but the State is not required to prove

16    guilt beyond all doubt, to a mathematical

17    certainty.

18    I think Mr. Atwell's question may be a

19    little confusing.  But could you set aside

20    perhaps a preconceived notion and follow the law

21    as will be given to you by the Court regarding

22    the standard of beyond a reasonable doubt, or

23    would you require more, that is, beyond all

24    doubt to a mathematical certainty?

25    PROSPECTIVE JUROR:  If I have a doubt, I

1    couldn't find someone guilty.

2        THE COURT:  Right.  And I think that goes

3    along with reasonable doubt to a great extent.

4    But would you use the phrase or apply the law

5    beyond a reasonable doubt?  Or would you require

6    the State to prove guilt beyond all doubt to a

7    mathematical certainty?

8        PROSPECTIVE JUROR:  In my mind, it would

9    have to be proved without doubt.

10       THE COURT:  Okay.  Then I think you've

11    answered my question.  Thank you so much.

12          (Voir dire examination was continued by

13            Mr. Atwell.)

14       THE COURT:  Thank you, Mr. Atwell.

15    Mr. Davis, any questions for the defense?

16       MR. DAVIS:  Thank you, Your Honor.

17          (Voir dire examination was conducted by

18            Mr. Davis on behalf of the defendant.)

19       THE COURT:  Thank you, Mr. Davis.

20    Ladies and gentlemen, I told you I'd give

21    you an opportunity to come forward with any

22    question that you deem private.  If you need to

23    see me, please come forward now.  Anybody?  No?

24    Yes?

25          (A prospective juror approached the

```
 1              bench and the following proceedings
 2              were held outside the hearing of the
 3              jury venire:)
 4         THE COURT:  Are you Ms. Lay?
 5         PROSPECTIVE JUROR:  Yes.
 6         THE COURT:  Yes, ma'am.
 7         PROSPECTIVE JUROR:  I know Phillip.  Our
 8    sons went to preschool together and I'm friends
 9    with his wife.
10         THE COURT:  Who now?
11         PROSPECTIVE JUROR:  Mr. Gradic --
12         THE COURT:  Yeah.
13         PROSPECTIVE JUROR:  -- and his wife.  And I
14    don't know any facts about the case, but she did
15    call me after it happened and told me what
16    happened.  So I don't know if that would
17    interfere.
18         THE COURT:  Okay.  The fact that you have
19    had this discussion with his wife and also the
20    fact that you know the family, would that
21    influence your judgment for or against either
22    side?
23         PROSPECTIVE JUROR:  No.
24         THE COURT:  Could you put aside all of that
25    and base your decision solely on the evidence
```

1    and the law as I charge it and be fair to both

2    sides in this case?

3             PROSPECTIVE JUROR:  Uh-huh.

4             THE COURT:  You can do that.

5        Any questions, Mr. Atwell?

6        MR. ATWELL:  No, sir.

7             THE COURT:  Any questions, Mr. Davis?

8        MR. DAVIS:  No, sir.

9             THE COURT:  Okay.  Thank you.

10                (The prospective juror left the bench

11                and the proceedings continued in open

12                court.)

13             THE COURT:  Anybody else?  Mr. Henderson,

14    didn't you need to see me?  Eddie, didn't you

15    need to see me?

16                (A prospective juror approached the

17                bench and the following proceedings

18                were held outside the hearing of the

19                jury venire:)

20        PROSPECTIVE JUROR:  I am not the owner, but

21    I've worked for an automobile dealership that

22    has had cars stolen.

23             THE COURT:  Also, he had indicated to me

24    that his wife is going out of town -- I think

25    what?  Thursday and Friday?

1          PROSPECTIVE JUROR:  Yeah, she's going to be

2     out of town for two days.

3          THE COURT:  Yeah.  And then he'll have to be

4     there and he needs to be off after today.  So I

5     mean if we can get through this case today, yes;

6     but, otherwise, he needs to be excused.

7          PROSPECTIVE JUROR:  Thank you.

8          MR. DAVIS:  Yes, sir.

9          THE COURT:  Any questions you all have?

10         MR. ATWELL:  No, sir.

11         THE COURT:  Thank you.

12              (The prospective juror left the bench

13              and the proceedings continued outside

14              the hearing of the jury venire.)

15         THE COURT:  Any strikes for cause from the

16    State?

17         MR. ATWELL:  No, sir.

18         THE COURT:  From the defense?

19         MR. DAVIS:  No, sir.

20         THE COURT:  Okay.  How long will this case

21    take to try?

22         MR. DAVIS:  Probably finish today.

23         MR. ATWELL:  Should be able to.

24         THE COURT:  Today?

25         MR. DAVIS:  I would think by five or six.

1      THE COURT:    Thank you.

2                   (The attorneys and the court reporter

3                    left the bench and the proceedings were

4                    continued in open court.)

5      THE COURT:    Ladies and gentlemen, the

6      process which is about to begin is that of

7      striking a jury.  A lot of times people think

8      that the attorneys actually select a jury or

9      pick a jury.  It's not quite that simple.  They

10     really strike individuals that they don't want

11     on the jury until they get down to 12

12     individuals -- actually 13 because it is my

13     practice to keep an alternate in any jury trial,

14     whether it be criminal or civil.

15          It is the process in which you and I are

16     only indirectly involved.  While they do that,

17     you are welcome to stay in the courtroom or go

18     out into the hall or even outside the building,

19     if you like.

20          But I only ask two things of you:  First,

21     that you not discuss this case with anyone or

22     allow anyone to discuss it with you or even

23     remain within the hearing and presence of anyone

24     discussing it.  And if that does happen, bring

25     that to my attention immediately; and secondly,

1    the attorneys have not longer than 20 minutes.

2    So if you will, report back to this

3    courtroom at 11:40 and we'll have a jury

4    selected in this case.  So we will be adjourned

5    until then.  Thank you.

6    Gentlemen, 20 minutes.

7    (A recess was had for the purpose of

8    striking the jury.)

9    THE COURT:  It's 11:40.  Ladies and

10    gentlemen, we have a jury selected in the case

11    of the State of Alabama versus Eric Saffold.  As

12    your name is called, if you will, please come

13    forward and have a seat in the jury box to my

14    left, which, of course, would be to your right.

15    (The jury was seated in the jury box.)

16    THE COURT:  Gentlemen, approach.

17    (The following proceedings were held at

18    the bench outside the hearing of the

19    jury:)

20    THE COURT:  Any motions from either side?

21    MR. ATWELL:  No, sir.

22    MR. DAVIS:  Yes.  I object to the jury panel

23    as a whole.  There's only one African-American

24    out of 37 jurors.  And the two African-Americans

25    out there are not jurors, one of 37 when Houston

1    County is approximately 23 to 24 percent black.

2        It denies my client a right to a trial by

3    jury under the U.S. and State of Alabama

4    Constitutions.  And it's not a fair

5    cross-section of the general population.

6        THE COURT:  Do you have any evidence you

7    want to present in that regard?

8        MR. DAVIS:  I'd offer the copy of the strike

9    list and the occupation list that shows the race

10   of each and every venire member.  And one of 37

11   is not a fair cross-section.

12       THE COURT:  Well, there's no requirement

13   that it be in direct correlation with the

14   percentage of the population.  And this Court is

15   aware of not only how the venire members are

16   summonsed for jury duty, but also aware that the

17   Circuit Court clerk, Judy Byrd, just goes down

18   the list so there's no bias involved, no

19   intentional discrimination against

20   African-Americans.

21       Certainly, the Court will allow you to --

22   and in fact, it's a part of the record, the

23   strike list.  And the occupation list, you

24   probably need to get that marked and put it into

25   evidence.  But unless you have any other

1    evidence, your motion is denied.

2         MR. DAVIS:  Judge, I'd also ask for leeway

3    to submit additional documentation.  Also, the

4    method by which our jurors are chosen now, which

5    is by voter registration, as opposed to driver's

6    license is constitutionally impermissible

7    because it overrepresents Caucasians; it

8    underrepresents African-Americans.

9         THE COURT:  Are you saying African-Americans

10   don't have driver's license?

11        MR. DAVIS:  No, sir.  They are chosen by

12   voter roll now.  They are not chosen by driver's

13   license any more.

14        THE COURT:  You mean by registered voters?

15   Yeah.  That's right.  I'm sorry.

16        MR. DAVIS:  And that overrepresents

17   Caucasians and underrepresents

18   African-Americans.

19        THE COURT:  Okay.  And that's your argument?

20        MR. DAVIS:  Yes, sir.  And I'd ask for leave

21   to submit documentation.

22        THE COURT:  That's fine.  Anything you want

23   to say?

24        MR. ATWELL:  No, sir.

25        THE COURT:  Your motion is denied.

```
 1          MR. DAVIS:  Yes, sir.

 2                (The attorneys and the court reporter

 3                left the bench and the proceedings were

 4                continued in open court.)

 5          MS. BROWN:  Call the names again?

 6          THE COURT:  Yes.

 7                (The roll was called.)

 8          THE COURT:  Ladies and gentlemen, if you all

 9    will, please stand and raise your right hand as

10    Ms. Brown administers the oath.

11                (The jury was duly sworn.)

12          THE COURT:  How about that accent?  I think

13    that's Geneva County.  If you will, please have

14    a seat.

15          Ladies and gentlemen, for you fortunate

16    souls that were not selected for the trial of

17    this case, I have got good news for you.  And

18    no, you're not leaving for the week, but you

19    are -- well, except for you, Mr. Henderson.  And

20    there was one other.  Hogan -- I'm sorry, Ed.

21    There was one other person.  I thought there was

22    a lady.

23          And you were through today, right?

24          PROSPECTIVE JUROR:  Correct.

25          THE COURT:  If you all will, go next-door
```

1    and give your names to my secretary so that we

2    can take you all off.  And that will excuse you

3    all for -- or from jury service for the week.

4    Just turn in your buttons with my secretary and

5    give her your names.

6         Now, for the rest of you, you are free to go

7    for the day.  Unfortunately, you must come back

8    in the morning at 9 o'clock to the Jury Assembly

9    Room, of course, downstairs on the first floor.

10   So with that, you are free to go for the day.

11   Thank you so much.

12        Now, ladies and gentlemen, for you

13   unfortunate souls that were selected for the

14   trial of this case, take heart, we are going to

15   adjourn for lunch in just a few minutes.  But

16   before we do, I wanted to cover three topics

17   with you very quickly:  The first I call

18   housekeeping instructions; the second is to give

19   you a Reader's Digest version, if you will, of

20   how this trial will proceed after lunch; and

21   then, of course, the third matter is to discuss

22   with you briefly your duties and

23   responsibilities as jurors or fact-finders in

24   this case.

25        Now, the housekeeping chores.  Ladies and

1   gentlemen, it is my practice to take a recess

2   approximately every hour and a half.  Now, in

3   the event we go a little longer than that, which

4   we are apt to do sometimes, or in the event an

5   hour and a half is too long, all you need do is

6   raise your hand and I'll stop immediately.  So

7   just keep that in mind as we go through this

8   trial.

9        And while we're on the subject of time,

10  after discussions with the attorneys, it is my

11  belief that we will finish this case today.  But

12  if we don't, we'll devote whatever time is

13  necessary to try the case properly.  But I do

14  believe that we can finish today.

15       You heard me say earlier do not discuss the

16  case among yourselves or allow others to discuss

17  it with you.  There are good reasons for that

18  instruction and those reasons are grounded in

19  the law and in common sense.

20       And I think if we all thought about it, we'd

21  probably come to the same conclusion.  You see,

22  the reason I say not to discuss it among

23  yourselves is the law says that it's only after

24  you've heard all the evidence in the case, that

25  is both for the State and the defense, and I

1     have charged you with the law and released the

2     alternate, only then would the 12 you be able to

3     go back and discuss the case among yourselves

4     and not until then.

5          As to discussing it with others, well

6     there's a good reason for that, too.  You see,

7     as jurors, you're going to decide this case

8     based on legal evidence before you, and not

9     something that you hear out in the hall or out

10    in the parking lot.  So if that happens or if

11    people are talking about it in your presence,

12    bring that to my attention immediately, please.

13         I think during voir dire, there was some

14    mention of the scene of where these events

15    allegedly occurred.  The attorney is right.  You

16    are not to go by there and make any independent

17    examination of the scene because the law says it

18    would be improper for you to do so.

19         Ladies and gentlemen, there is an

20    alternate.  There are 13 of you.  And as I think

21    I told you, it is my practice to keep an

22    alternate in any jury trial, whether it be

23    criminal or civil.  In the event that one of

24    your number becomes ill or a family emergency

25    takes one of you away from us, then the

1    alternate would stand in the place of the

2    missing juror.  So that's why there are 13.

3        Now, I want to tell you this.  In any trial,

4    in any jury trial, there are times when the

5    attorneys must take up certain matters with the

6    Court and the Court alone.  They involve legal

7    issues.  It will happen in this case.  We try to

8    keep those to a minimum and the time that we

9    spend on those at a minimum as well.  But it

10   will happen and I want you to be forewarned that

11   it will happen.  And when it does, of course,

12   you will have to go back to the jury

13   deliberation room while the Court addresses

14   those matters.

15       Let me move on and give you a thumbnail

16   sketch of how this trial will proceed -- not

17   now, but right after lunch the attorneys will

18   make their opening statements to you.  The State

19   will go first and then will be followed by the

20   defense.  In the opening statements, the

21   attorneys are going to tell you what they expect

22   the evidence to be.  Just keep in mind that what

23   the attorneys say is not any evidence in the

24   case.

25       After the opening statements, we'll begin

1    with the presentation of evidence.  And again,

2    the State goes first because the State has the

3    burden of proof in this case, as in every

4    criminal case, which is beyond a reasonable

5    doubt.

6        After the State presents all of its evidence

7    and rests, then you will have heard all you're

8    going to hear from the State.  After that, we'll

9    turn to the defense for any evidence that he

10   desires to present.  After he presents his

11   evidence and rests, then that will close the

12   evidence in the case.

13       After that, the attorneys will make their

14   closing arguments to you.  And again, the State

15   would go first and would be followed by the

16   defense.  And then the State would get one last

17   opportunity to address you.  And again, that's

18   because the State has the burden of proof.

19       After all of that, I will charge you with

20   the law, release the alternate and then submit

21   the case to you for your deliberation.

22       That's basically how the trial is going to

23   proceed.  You know, the third issue that I

24   wanted to address with you has to do with your

25   duties and responsibilities as jurors or

1    fact-finders in this case.

2       I talked about opening statements and

3    closing arguments by the attorneys.  These are

4    designed or intended to help you in

5    understanding the evidence and in applying the

6    law.  But keep in mind what the attorneys say is

7    not evidence and what they say is not the law in

8    the case.  You would take your instructions

9    concerning the law from the Court and the Court

10   alone.  And, of course, it would be your duty to

11   follow those instructions as given to you by the

12   Court.

13      Now, it is your duty as jurors to determine

14   the facts and determine the facts from the

15   testimony and evidence and any reasonable

16   conclusions arising from this evidence.  And in

17   so doing, you must not engage in any guesswork

18   or speculation.

19      In determining what the true facts are from

20   the evidence in the case, you may take into

21   consideration any interest or bias a witness may

22   have as a result of any connection with the

23   case.  You may take into consideration any

24   interest or bias a witness may have shown while

25   testifying.  You may take into consideration the

1    demeanor of any witness as to whether the

2    witness apparently testified frankly or

3    evasively.

4        You may take into consideration any matter

5    which you would in your own everyday affairs in

6    passing upon the truthfulness and the accuracy

7    of the testimony in this case.

8        Weigh the testimony in the light of your own

9    common observation and experience and reach a

10    verdict that will be based upon the truth as you

11    determine it from all of the evidence.

12        We talked about what's not evidence.  Let's

13    take a moment and talk about what is evidence.

14    You know, the evidence which you are to consider

15    will be any witness who appears live before you

16    and testifies.  And it also includes any

17    exhibits that are admitted into evidence.  Now,

18    that would be like any document, object,

19    photograph, something of that nature that is

20    admitted into evidence.

21        The admission of evidence in court is

22    governed by rules of law.  And from time to

23    time, it may be the duty of the attorneys to

24    make certain objections to certain evidence.

25    And it is my duty to rule upon these objections

1    as to whether or not you can consider that

2    evidence.

3        You must not concern yourself with the

4    attorneys' objections or my reasons for these

5    rulings.  And you must not consider testimony or

6    evidence to which an objection has been

7    sustained or which has been ordered stricken.

8    No statement or ruling or remark which I may

9    make during the course of this trial is intended

10   to indicate my opinion as to what the facts

11   are.  I have no opinion as to what the facts

12   are.

13       As I said, you alone determine the facts.

14   In this determination, you alone must decide

15   upon the believability of the evidence and its

16   importance and value.

17       In considering the importance and value of

18   the testimony of any witness, you may take into

19   consideration the appearance, attitude, behavior

20   of the witness, the interest of the witness in

21   the outcome of the case, the relation of the

22   witness to any parties in the case, the

23   inclination of the witness to speak truthfully

24   or not, the probability or improbability of the

25   witness's statements and all other facts and

1    circumstances in evidence.

2        Therefore, you may give the testimony of any

3    witness just such weight and credit or

4    importance and value that you deem it entitled

5    to.   You must not be influenced to any degree by

6    any personal feelings of sympathy for or

7    prejudice against either party in this case.

8    Each party is entitled to the same fair and

9    impartial consideration.

10       As I said to you, you shall keep an open

11   mind and you shall not decide any issue in this

12   case until after all the evidence has been

13   presented and I have charged you with the law,

14   released the alternate and submitted the case to

15   you for your deliberation.

16       Now, ladies and gentlemen, that's what I

17   wanted to take up with you this morning.   And

18   having done so, it's a good time to adjourn for

19   lunch.   It is 11:55.   We're going to adjourn for

20   lunch now and report back at 1:10.   That will

21   give you have an hour and 15 minutes.

22       Report back at 1:10 to the jury deliberation

23   room, which is behind me.   It's the last room on

24   the right in this hall behind me.   While you're

25   away, of course, do not discuss the case among

1 yourselves or allow others to discuss it with

2 you.  And please do not go by that Dairy Queen.

3 Alice Street, I think, is what the allegation

4 is.  With that, you're free to go to lunch.

5 Have a pleasant lunch.  You have a question,

6 sir?

7   JUROR:  I was going to ask you -- can I

8 drive by it to a restaurant close?

9   THE COURT:  You can drive by it.

10   JUROR:  Thank you, sir.

11   (The jury exited the courtroom.)

12   THE COURT:  If there's nothing else, we're

13 adjourned until 1:10.

14   (A lunch recess was taken.)

15   (State's Exhibits 1-4 were marked for

16   identification.)

17   THE COURT:  Let me address something.

18 Mr. Saffold, it is 1:20.  You were to be back at

19 1:10.  Do you have a reason for getting here

20 late?

21   THE DEFENDANT:  Sorry I'm late, Your Honor.

22 My ride is coming up now.  He was parking the

23 car.  We had got jammed in traffic out on the

24 circle.

25   THE COURT:  Well, you need to leave earlier.

1    THE DEFENDANT:  Yes, sir.  But he dropped me

2    off and he was going to come back and get me,

3    but he was kind of late coming back to get me.

4    We didn't take lunch together.  He had somewhere

5    he had to run, so he dropped me off.  I'm sorry,

6    Your Honor.

7    THE COURT:  Then you should have eaten

8    within a block of the courthouse.

9    THE DEFENDANT:  Yes, sir.

10    THE COURT:  Now, if it happens again, I'll

11    going to revoke that bond and you'll be

12    incarcerated.

13    THE DEFENDANT:  I understand, Your Honor.

14    THE COURT:  Okay.  Everybody ready?

15    (Defendant's Exhibits 1-2 were marked

16    for identification.)

17    MR. DAVIS:  Judge, I've got two exhibits

18    regarding the issue of race.  Defense Exhibit 1

19    is the occupation list.  Defense 2 is federal

20    statistics and demographics of Houston County.

21    THE COURT:  Any objections?

22    MR. ATWELL:  No, sir.

23    THE COURT:  Defendant's Exhibits 1 and 2 are

24    admitted for the purposes of the hearing only,

25    and not to go back to the jury.

1               (The aforementioned exhibits were

2               admitted into evidence.)

3        MR. DAVIS:  Yes, sir.  And just so you know

4     what the statistics are by occupation list,

5     African-Americans are only 19.5 percent of the

6     venire persons when they are 24.6 percent of

7     Houston County.

8        THE COURT:  Thank you.  Both sides ready?

9        MR. DAVIS:  Yes.

10       MR. ATWELL:  Judge, I noticed today we've

11    got a motion to suppress the statement of the

12    defendant.

13       THE COURT:  Yeah.

14       MR. ATWELL:  I plan on talking about that in

15    opening.  Are we going to hear that beforehand?

16       THE COURT:  We're keeping the jury back

17    there.

18       MR. DAVIS:  Judge, I'd ask that he not refer

19    to it in opening.  It's not going to take long.

20    Essentially, when we get to that point, if he

21    puts on Officer DeVane, I would want to hear the

22    foundation laid outside their presence.  I don't

23    expect it to be lengthy.

24       THE COURT:  Okay.  Just try to refrain from

25    addressing it until such time as the statement

1    comes in.  Okay?

2         With that, is everybody ready?

3              (The jury entered the courtroom.)

4    THE COURT:  We're back within the hearing

5    and presence of the jury.  All 13 jurors have

6    returned.  The parties and their respective

7    attorneys are present.

8         Good afternoon, ladies and gentlemen.  I

9    trust you all had a pleasant lunch.  I apologize

10    to you for the brief delay.  As I told you a few

11    minutes ago, there was someone who was essential

12    in this trial that was late.  I've taken care of

13    that.  I know that you wanted to hear that, but

14    I chose to do it otherwise.

15         And as I told you just prior to the recess

16    for lunch, the attorneys will now begin with

17    their opening statements.

18         Mr. Atwell, you may make your opening

19    statement to the jury.

20              (An opening statement was given by

21              Mr. Atwell on behalf of the State.)

22    THE COURT:  Thank you.  Mr. Davis, you may

23    make your opening statement to the jury.

24    MR. DAVIS:  May it please the Court.

25              (An opening statement was given by

```
 1              Mr. Davis on behalf of the defendant.)
 2              THE COURT:  Thank you, Mr. Davis.
 3              Call your first witness, Mr. Atwell.  If you
 4         will have a seat next to me.  Be careful as you
 5         take your seat.  You were sworn earlier,
 6         correct?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Please proceed.
 9                        PHILLIP GRADIC
10    having been first duly sworn, was examined and
11    testified as follows:
12                     DIRECT EXAMINATION
13    BY MR. ATWELL:
14    Q.   Would you introduce yourself to the jury?
15    A.   Phillip Gradic, owner of Dairy Queen on South
16         Alice Street.
17    Q.   That's in Dothan?
18    A.   Yes.
19    Q.   Houston County?
20    A.   Yes.
21    Q.   How long have you owned the Dairy Queen?
22    A.   About a year and four months.
23    Q.   So you owned it back on September 26th of last
24         year?
25    A.   That's correct.
```

```
 1    Q.   All right.  And you work there as well as own
 2         it?
 3    A.   Yes, sir.
 4    Q.   And were you working on September 26th?
 5    A.   That's correct.
 6    Q.   What time did you get off or close up that
 7         night?
 8    A.   It was around 10 o'clock.
 9    Q.   All right.  And how many people were there when
10         you closed up?
11    A.   One.
12    Q.   Yourself and someone else?
13    A.   That's correct.
14    Q.   Who was that?
15    A.   Kevin Guerra, he's a cook for me.
16    Q.   So you close up around 10 o'clock.  And where do
17         you go?
18    A.   Usually just head home.
19    Q.   Okay.  Do you go out the front door, back door?
20    A.   I go out the side door.
21    Q.   All right.  And it opens up to where?
22    A.   The south side of the building.
23    Q.   Is that -- does that face the street?
24    A.   It faces the day care on the side of the
25         building.
```

```
 1     Q.   What's back there?
 2     A.   On that side, I've got a little bit of parking
 3          lot and a dumpster and then the day care on that
 4          side.
 5     Q.   Is there lighting out there?
 6     A.   Yes, a little bit.
 7     Q.   Not a lot?
 8     A.   There's a -- not on the side.  There's a
 9          streetlight in the back of the building.
10     Q.   Does it illuminate the whole area?
11     A.   Not well.
12     Q.   All right.  So you come out of the side door and
13          you're headed to where?  Your car?
14     A.   My car in the rear of the building.
15     Q.   What, if anything, happens as you're walking to
16          your car?
17     A.   Like --
18     Q.   Do you see anything unusual?
19     A.   When I come out of the building, I'm looking.  I
20          had been previously robbed about six months
21          earlier so, you know, I'm very alert, checking
22          things out, you know, making sure nobody is --
23          nobody is around.
24     Q.   All right.  Is Kevin with you?
25     A.   Yes, he is.
```

1   Q.   So you're walking out.  Are you headed to your

2        car?

3   A.   That's correct.

4   Q.   But you're looking?

5   A.   Yes.

6   Q.   What do you see?

7   A.   Went around the back of the building.  There's a

8        cooler that extends out of the back of the

9        building a little bit.  And went around the

10       corner.  I'm looking around.  And I see Eric

11       Saffold up between the cooler and some bread

12       racks.  He's wearing a mask and a trench coat.

13  Q.   This is in September?

14  A.   That's correct.

15  Q.   Still pretty warm out in September?

16  A.   Fairly warm, T-shirt weather.

17  Q.   You see him between the bread rack and what?

18  A.   A cooler, like a walk-in cooler that extends out

19       the back of the building.

20  Q.   There's no door into it from the outside?

21  A.   No.  No, there's not.

22  Q.   Just pokes out the back?

23  A.   Just extends out the back of the building.

24  Q.   And this looks unusual to you?

25  A.   Very.

1   Q.   Why is that?

2   A.   No one should be there.  He's wearing a ski

3        mask.  It's 10 o'clock at night.  Trench coat.

4        He's -- when I come around the corner, he was

5        facing the back door.  Me and my cook had been

6        out back and forth through that back door

7        several times before we done our initial

8        lockup.

9            We were working on changing our sign out out

10       front.  And we had been from the back door to a

11       building that I've got out back -- I don't

12       know -- two or three times getting signage for

13       the sign, to change it.

14  Q.   He wasn't there then?

15  A.   He was not there then.

16  Q.   So as you come out, he's standing in this little

17       area between the bread racks and the coolers.

18       And let me show you what we've marked as State's

19       Exhibit 1.  I'll ask if you can identify this.

20  A.   That's the mask he was wearing.

21  Q.   All right.  He actually had this over his head?

22  A.   That's correct.

23  Q.   This is what you saw on his head when he came

24       out?

25  A.   That's correct.

1          MR. ATWELL:  We'd move to admit State's

2    Exhibit 1.

3          THE COURT:  Any objections?

4          MR. DAVIS:  No, sir.

5          THE COURT:  State's Exhibit 1 is admitted

6    without objection.

7            (The aforementioned exhibit was

8            admitted into evidence.)

9          MR. ATWELL:  Thank you.

10   CONTINUED BY MR. ATWELL:

11   Q.  So he had this over his head looking out these

12      eye holes?

13   A.  That's correct.

14   Q.  All the way down over his head?

15   A.  That's correct.

16   Q.  And what do you do when you see this man

17      standing there with the -- with this mask over

18      his head and the trench coat?  What do you do

19      then?

20   A.  I had a nine millimeter in my hand.  I lifted it

21      up.  And as I recall, I lifted it up before he

22      had actually seen me.  So when he turned around,

23      he was looking at it pointed at him.

24   Q.  You were that -- how close were you to him?

25   A.  Probably from here to that pylon there.

| | | |
|---|---|---|
| 1 | Q. | Back here? |
| 2 | A. | Uh-huh. |
| 3 | Q. | Okay. |
| 4 | A. | Maybe just a tad closer. |
| 5 | Q. | All right.  So you notice him.  Is he standing, |
| 6 | | crouched?  What? |
| 7 | A. | He's standing. |
| 8 | Q. | Standing.  Was the bread rack between you and |
| 9 | | him? |
| 10 | A. | No, it was not. |
| 11 | Q. | So you point the gun at him? |
| 12 | A. | Yes. |
| 13 | Q. | Did you pull this out of a pocket?  Or did you |
| 14 | | have it out? |
| 15 | A. | I had it in my hand. |
| 16 | Q. | Okay.  So you were -- you come out -- |
| 17 | A. | Well, it was kind of -- my hand was on it in my |
| 18 | | pocket. |
| 19 | Q. | So you pull it out and point it at him.  Do you |
| 20 | | say something to him? |
| 21 | A. | No, not initially. |
| 22 | Q. | But what does he do?  He turns and looks at you? |
| 23 | A. | He looks at me and he says, "I see you've got a |
| 24 | | gun, I'm not going to try to rob you." |
| 25 | Q. | Okay.  And what do you do? |

1    A.    I tell him to take his mask off.  And I asked
2          him if he had a gun, and he said he did not.
3          And I told him to lay down on the ground while I
4          call the police.
5    Q.    Did he pull his mask off when you told him?
6    A.    Yes, he did pull his mask off.
7    Q.    What did he do when he pulled it off?
8    A.    He threw it on the ground.
9    Q.    And you told him to get on the ground?
10   A.    Yes, I did.
11   Q.    Did he comply?
12   A.    He complied.
13   Q.    You said he had a coat on?
14   A.    A trench coat, yes.
15   Q.    How long was the trench coat?
16   A.    I don't know.  I believe it was maybe about knee
17         length.
18   Q.    When he lays down on the ground, is he on his
19         back or what?
20   A.    He's on his stomach.
21   Q.    And where are his hands?
22   A.    Out front of him.  I instructed him to put his
23         hands out where I could see them.
24   Q.    Who calls the police?
25   A.    I do.

1    Q.    How do you do that?

2    A.    With my left hand and my cell phone.

3    Q.    So you stayed right there?

4    A.    Yes.

5    Q.    You had a cell phone.  All right.  So you are

6          waiting on the police to come?

7    A.    That's correct.

8    Q.    What are you doing while you're waiting for the

9          police to come?

10   A.    Watching him.  He had stated that there was

11         other people watching him from around the

12         buildings behind my store.  And my cook was kind

13         of watching for that, watching my back.  And

14         he -- a number of times he kept trying to pull

15         his hands up under him.

16   Q.    What would you do when he'd try to do that?

17   A.    I'd tell him to put them back out in front of

18         him.

19   Q.    At this point, do you have any idea whether he's

20         armed or not?

21   A.    No, I did not.

22   Q.    So how long before the police get there?

23   A.    Seemed like three hours, but it was -- I don't

24         know.  I don't know how long it was.  Minutes.

25   Q.    Minutes?

| | | |
|---|---|---|
| 1 | A. | They responded fairly quick. |
| 2 | Q. | When the police get there, what do they do? |
| 3 | A. | They come up on him with their guns drawn.  And |
| 4 | | he stated, "Don't shoot me, I'm laying on a |
| 5 | | gun." |
| 6 | Q. | All right.  And so what do they do when he says |
| 7 | | that? |
| 8 | A. | They come up on him and grab his hands and cuff |
| 9 | | him and roll him over.  And the gun was on like |
| 10 | | a -- looked kind of like a shoestring.  They cut |
| 11 | | it off and get the gun away from him. |
| 12 | Q. | It's strapped to him? |
| 13 | A. | It's like a sling. |
| 14 | Q. | It's under his coat? |
| 15 | A. | Uh-huh. |
| 16 | Q. | And when they roll him over and expose that, do |
| 17 | | you see it? |
| 18 | A. | Yes. |
| 19 | Q. | Let me show you what we've marked as State's |
| 20 | | Exhibit 2.  For the benefit of the jury, I've |
| 21 | | already done this, but I've ensured it is |
| 22 | | unloaded.  Let me ask you if you can identify |
| 23 | | State's Exhibit 2. |
| 24 | A. | That's it. |
| 25 | Q. | What do you recognize this as? |

1    A.    The gun that he had that night.

2    Q.    Okay.  And this was up underneath him?

3    A.    That's correct.

4    Q.    Tied with some more of this kind of string?

5    A.    That's right.

6    Q.    Around his shoulder.  Okay.

7            MR. ATWELL:  Move to admit State's

8        Exhibit 2.

9            THE COURT:  Any objections?

10           MR. DAVIS:  No, sir.

11           THE COURT:  State's Exhibit 2 is admitted

12       without objection.

13                  (The aforementioned exhibit was

14                  admitted into evidence.)

15   CONTINUED BY MR. ATWELL:

16   Q.    All right.  So the police take this off of him.

17       They cut the string and pull it away from him?

18   A.    Uh-huh.

19   Q.    And what do they do next?

20   A.    They brought it over to the side there and

21       checked it.  And it was loaded.

22   Q.    Do you actually see bullets in it?

23   A.    Yes, I did.

24   Q.    Do you see them unload it?

25   A.    Yes, I did.

1    Q.   You don't know how many bullets there were?

2    A.   I do not recall.

3    Q.   They unloaded it?

4    A.   Yes.

5    Q.   Did you see any other bullets, besides what they

6         took out of the gun?

7    A.   I don't recall seeing any other bullets.

8    Q.   All right.  What did they do then?

9    A.   They put him in the police car and hauled him

10        off and took a report from me and my cook.

11             MR. ATWELL:  All right.  That's all I have

12        right now.

13             THE COURT:  Okay.  Thank you.

14             Cross, Mr. Davis?

15             MR. DAVIS:  Yes, sir.

16                      CROSS-EXAMINATION

17   BY MR. DAVIS:

18   Q.   Mr. Gradic, you said you went out the side door;

19        correct?

20   A.   That's correct.

21   Q.   When you go out the side door, you've kind of

22        got -- what?  A drive-thru lane and some parking

23        on that side?

24   A.   That is correct.

25   Q.   Between the building and the day care?

1 A. That's correct.

2 Q. Okay.  Where had you parked in relation to that

3   side door?

4 A. In the back of the building.  I've got

5   parking -- the drive-thru lane wraps around the

6   building.  And on the other side of the

7   drive-thru lane, I have parking in the back.

8 Q. Okay.  And you said you were walking back

9   towards your vehicle?

10 A. Yes.

11 Q. If this were the corner of the building, this

12   corner of the table, the side like you're facing

13   Dairy Queen and you're walking toward the back,

14   at what point did you see him?  How far past the

15   corner of the building were you?

16 A. I was well past the corner.

17 Q. Okay.  If I walk out here?  That far or farther?

18 A. A little bit further over.  My car was parked

19   kind of center of the building straight back,

20   somewhere in there.

21 Q. What, if anything, drew your attention to

22   Mr. Saffold?

23 A. Just a person standing there.  Like I said, I'm

24   alert when I come out due to a previous

25   attempted robbery.

```
 1    Q.   Okay.  But you were just looking, right?

 2    A.   That's correct.

 3    Q.   You didn't look because he made a sound?

 4    A.   That's correct.

 5    Q.   You didn't look because he said anything?

 6    A.   That's correct.

 7    Q.   And when you saw him, you said he's facing the

 8         back door to the store?

 9    A.   That's correct.

10    Q.   And the walk-in cooler, do you get to it from

11         inside the store or outside?

12    A.   Inside.

13    Q.   Inside.  It just sticks out in the back?

14    A.   That's right.  It's like an add-on.

15    Q.   And you've got bread racks by the back door.

16         These are just those rolling bun racks?

17    A.   Right, rolling.

18    Q.   When you saw him, you've described the mask and

19         a coat.  When you first saw him, was there --

20         did he give you any reason to believe he was

21         armed?

22    A.   No.

23    Q.   When is the first time you actually knew he was

24         armed?

25    A.   When he told the police that he was armed.
```

```
 1    Q.   Okay.  He never pointed the gun at you, did he?
 2    A.   I don't understand your question.  I mean, I
 3         didn't see the gun until the police --
 4    Q.   Okay.  So he never pointed it?
 5    A.   That's correct.
 6    Q.   As far as you know, it's -- like Mr. Atwell
 7         said, it was hanging down by a string?
 8    A.   That's correct.
 9    Q.   Okay.  You never saw it?
10    A.   That's correct.
11    Q.   And he didn't point it at you or Kevin?
12    A.   That's correct.
13    Q.   Before you drew your nine millimeter down on
14         him, did he say anything to you before he turned
15         around and saw the gun?
16    A.   No, he did not.
17    Q.   He didn't say:  Give me all your money?
18    A.   No, he did not.
19    Q.   He didn't say:  Give it up or I'm going to blow
20         your head off; anything like that?
21    A.   Nothing.
22    Q.   He never threatened any force against you, did
23         he?
24    A.   No.
25    Q.   Did he threaten any force against Kevin?
```

1    A.    No.

2    Q.    Did he use any force against you?

3    A.    No.

4    Q.    Did he use any force against Kevin?

5    A.    No.

6              MR. DAVIS:  No more questions.

7              THE COURT:  Thank you.  Redirect?

8              MR. ATWELL:  No, sir.

9              THE COURT:  Okay.  You all -- of course,

10    Mr. Gradic is going to be with you here.  So if

11    you will, you may step down.  Be careful with

12    those steps there and just have a seat over

13    there.

14         Call your next witness.

15         Who is this?

16              MR. ATWELL:  Kevin.  What's your last name,

17    Kevin?

18              THE WITNESS:  Guerra.

19              MR. ATWELL:  Guerra.

20              THE WITNESS:  Yeah.

21              THE COURT:  Thank you.  Let's see.  Were you

22    sworn in earlier?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  You were.  Okay.  What is your

25    name again?

1           THE WITNESS:  Kevin Guerra.

2           THE COURT:  Can you spell that last name,

3      please?

4           THE WITNESS:  G-U-E-R-R-A.

5           THE COURT:  G-U-E-R-R-A.

6           THE WITNESS:  G-U-E-R-R-A.

7           THE COURT:  I don't think I had you on the

8      witness list.  Beg your pardon.

9           MR. ATWELL:  He wasn't on there?

10          THE COURT:  Here it is, in case you want to

11     look at it.  Ladies and gentlemen, I don't think

12     I asked you all during voir dire whether or not

13     you were related to or you know Kevin Guerra.

14          THE WITNESS:  Guerra.

15          THE COURT:  Guerra, I'm sorry.  Does anyone

16     know this gentleman?  If you do, raise your

17     hand.

18          Okay.  Nobody knows him then.

19          MR. ATWELL:  I'm sorry.

20          THE COURT:  There is your witness list if

21     you want to --

22          MR. ATWELL:  Yeah, I did leave it off.  I

23     was looking at the indictment.  I don't know how

24     I did that.  I apologize.

25          THE COURT:  Please proceed.

```
 1                        KEVIN GUERRA
 2        having been first duly sworn, was examined and
 3        testified as follows:
 4                        DIRECT EXAMINATION
 5        BY MR. ATWELL:
 6        Q.    Would you introduce yourself to the jury,
 7              please?
 8        A.    Kevin Guerra.
 9        Q.    Kevin, are you employed?
10        A.    Sir?
11        Q.    How are you employed?
12        A.    As a cook.
13        Q.    Where?
14        A.    Dairy Queen.
15        Q.    You work for Mr. Gradic here?
16        A.    Yes, sir.
17        Q.    And were you so employed back in September on
18              the 26th of last year?
19        A.    Yes, sir.
20        Q.    Were you working that evening?
21        A.    Yes, sir.
22        Q.    Were you there until it closed?
23        A.    Yes, sir.
24        Q.    And what, if anything, did you do when y'all
25              closed up?
```

```
 1    A.   I can't hear you.
 2    Q.   What, if anything, did y'all do when you closed
 3         up the store?  Where did you go?
 4    A.   Oh, I was helping with the letters up on the
 5         sign.
 6    Q.   When you got through with all that, did y'all
 7         close the store up?
 8    A.   Yes, sir.
 9    Q.   Where did you go?
10    A.   To his car.
11    Q.   All right.  How did you go from the store to his
12         car?
13    A.   Well, we left the side door to go to his car
14         because he was going to take me home that
15         night.  Then he observed Eric hiding between the
16         bread rack and the coolers.  And that's when he
17         took his gun out and told him to get on the
18         ground.
19    Q.   All right.  Are you walking beside him?
20    A.   He was parked behind the building.
21    Q.   I'm talking about you in relation to Phillip.
22    A.   Oh, no.
23    Q.   Are y'all walking out together?
24    A.   Yeah.  Phillip was in front of me.
25    Q.   He was in front of you?
```

1    A.   Yeah.

2    Q.   Take a deep breath.  You seem nervous.

3    A.   Yeah.  I am nervous.

4    Q.   Okay.  Try not to wiggle too much.

5    A.   Okay.  I'm sorry.

6    Q.   All right.  So you're behind -- walking behind

7        Phillip?

8    A.   Yes.

9    Q.   Do you notice anybody standing back there?

10    A.   Not at first, until Mr. Gradic pulled his gun

11        out.  Then that's when I observed a man with a

12        mask on.

13    Q.   Okay.  So the first thing you know about it is

14        when Phillip pulls out his gun?

15    A.   Yeah.  Phillip pulls out his gun and he starts

16        saying something.  And then when I looked to the

17        side, I saw a man with a mask on.  So I'm like:

18        Oh, my God, here we go again.

19    Q.   Did it scare you?

20    A.   Yeah, yeah.  Because, I mean, somebody with a

21        mask on, so --

22    Q.   Where do you see this man with the mask

23        standing?

24    A.   There's a bread rack and there's a cooler.  And

25        he was standing like right there on the corner.

```
 1              So I told Phillip to go ahead and keep an eye on
 2              him and I'll go ahead check the store and make
 3              sure there's not more than one person.
 4       Q.    All right.  So you look around?
 5       A.    Yeah.
 6       Q.    Where did Eric go when he pulled the gun on him?
 7       A.    He really didn't go near there because Phillip
 8              told him to get on the ground, lay down.
 9       Q.    Did he comply?
10       A.    Yeah.
11       Q.    Did he take the mask off?
12       A.    He took his own mask off.
13       Q.    Okay.  Right there in front of you is a thing
14              marked State's Exhibit 1.  Do you recognize
15              that?
16       A.    Yeah.
17       Q.    What do you recognize that as?
18       A.    That's when I saw him take it off.  That's the
19              mask.
20       Q.    Okay.  And the person that was under the mask,
21              do you see him in court here today?
22       A.    Yes, sir.
23       Q.    Where is he at?
24       A.    Sitting right over there (indicating).
25                   MR. ATWELL:  The record reflect he
```

1        identified the defendant.

2  Q.  So does he go anywhere or does he stay right

3      there on the ground?

4  A.  He stayed right there on the ground.  And I

5      observed Eric moving his hand like this.  And I

6      told Phillip -- I said, "Phillip, he's moving

7      his hand closer to his chest."  So Phillip told

8      him to move his arm.  So as he was doing that,

9      he was calling 911.  And I kept on going around

10      the building to make sure there was not more

11      than one person, you know.  So I told Phillip to

12      watch his back and I'll watch your back.

13  Q.  You never saw anybody else then?

14  A.  No, sir.

15  Q.  Did the police come?

16  A.  Yeah.

17  Q.  Did they pretty much take over from there?

18  A.  Yeah, they took over from there.

19  Q.  Did you know he had a gun before the police

20      came?

21  A.  No.

22  Q.  How did you first discover that he did have a

23      gun?

24  A.  That's when the police came.  And Eric kept on

25      saying something about he was running from

| | |
|---|---|
| 1 | somebody or he was hiding from somebody. And he |
| 2 | kept on saying: I'm not going to rob you, blah, |
| 3 | blah, blah, and all that. But there was only a |
| 4 | few things I heard because I was basically going |
| 5 | around side to side. So when the police came, |
| 6 | that's when I noticed he had a rifle. |
| 7 | Q. Did you see it, or what? |
| 8 | A. I saw it when the police came. |
| 9 | Q. Let me show you -- |
| 10 | A. Because Eric was wearing a -- some dark clothing |
| 11 | so I couldn't see the gun until the police came. |
| 12 | Q. All right. Let me show you what's been marked |
| 13 | State's Exhibit 2 and ask if you recognize that. |
| 14 | A. Yes. I remember that. |
| 15 | Q. Okay. What do you remember this as? |
| 16 | A. As the one that he had. |
| 17 | Q. Okay. |
| 18 | A. The rifle that he was holding. |
| 19 | MR. ATWELL: All right. That's all I have |
| 20 | of this witness. |
| 21 | THE COURT: Thank you. Cross, Mr. Davis? |
| 22 | CROSS-EXAMINATION |
| 23 | BY MR. DAVIS: |
| 24 | Q. Mr. Guerra, when you saw Mr. Saffold, how close |
| 25 | were you to Mr. Gradic? |

1    A.    What?  The first time when I saw him?

2    Q.    The very first -- well, the first time

3          Mr. Gradic turns and draws his gun.

4    A.    How far was I from him?

5    Q.    How far were you from Mr. Gradic at this point?

6    A.    I'd say about maybe three or four feet.

7    Q.    Like I am to Mr. Gradic now?

8    A.    Yeah.  Probably a little closer because, you

9          know, I wasn't like right behind him.

10   Q.    Okay.  How far was Mr. Saffold from y'all?

11   A.    I guess 20 feet, 25.  I couldn't really tell

12         you, but --

13   Q.    From me to you?

14   A.    Yeah, pretty much.

15   Q.    And the time you first saw Mr. Saffold, was he

16         facing y'all or facing the store?

17   A.    He was facing us.

18   Q.    Okay.  Mr. Gradic had already pulled his pistol?

19   A.    Right.

20   Q.    Mr. Saffold didn't use any force against y'all,

21         did he?

22   A.    No.  He was just basically complying to

23         Mr. Gradic, you know.  Mr. Gradic was telling

24         him to lay on the ground, lay on the ground.

25         And I was basically like going around the store

```
 1        and making sure there wasn't nobody else, you
 2        know, besides him.
 3   Q.   He didn't threaten you with the use of force?
 4   A.   Well, I know -- well, not to me.  Now, I don't
 5        know to Mr. Phillip, but I know he didn't, you
 6        know --
 7   Q.   Put it this way.  You didn't hear him threaten
 8        either one of you, did you?
 9   A.   The only thing I can tell you, Mr. Gradic told
10        him to lay down, to lay down.  And I told
11        Phillip, I'll watch your back, I'm going to
12        check the store.  Then Eric was up there, kept
13        on saying something about, I'm not going to rob
14        you, I'm not going to rob you, I'm running from
15        somebody, I'm trying to hide from somebody, you
16        know.  So what I was doing was going around the
17        building to make sure there wasn't nobody else.
18   Q.   So the answer to the question about whether he
19        threatened you is no?
20   A.   Well, no, not really.  But I was scared because
21        I wasn't sure if there was more than one person.
22   Q.   Right.  But he didn't threaten you?  I'm not
23        talking about anybody else anywhere on Alice
24        Street or the blocks behind Fortner or anywhere
25        else.
```

1     A.    He didn't say nothing to me.

2              MR. DAVIS:   Thank you.   No more questions.

3              THE COURT:   Thank you.   Redirect,

4        Mr. Atwell?

5              MR. ATWELL:   No, sir.

6              THE COURT:   You all have further need of

7        Mr. Guerra?

8              MR. ATWELL:   No, sir.

9              MR. DAVIS:   No, sir.

10             THE COURT:   Mr. Guerra, thank you so much

11       for coming.   You are free to go.   Be careful as

12       you leave your seat.   There are a couple of

13       steps there.

14             Call your next witness.

15             Corporal, if you will have a seat beside

16       me.   Please proceed.

17                        JASON DeVANE

18       having been first duly sworn, was examined and

19       testified as follows:

20                      DIRECT EXAMINATION

21       BY MR. ATWELL:

22       Q.    Would you introduce yourself to the jury?

23       A.    My name is Corporal Jason DeVane with the Dothan

24             Police Department.

25       Q.    In what capacity are you with the Dothan Police

```
 1              Department?
 2    A.    Criminal investigator.
 3    Q.    And how long have you been with Dothan Police
 4              Department?
 5    A.    Six and a half years.
 6    Q.    How long as an investigator?
 7    A.    Three years.
 8    Q.    And have you been assigned to a specific unit in
 9              investigations?
10    A.    The violent crimes unit.
11    Q.    That includes robberies?
12    A.    Yes, sir, it does.
13    Q.    And you were so employed back on September 26th
14              of 2004?
15    A.    I was.
16    Q.    And did you have an occasion to go out to the
17              Dairy Queen on South Alice Street sometime on or
18              about that day?
19    A.    Yes, sir.
20    Q.    What time did you go out there?  Do you recall?
21    A.    It was a little after 10 o'clock.
22    Q.    Were you responding to a call out there?
23    A.    I was called out to that location, yes, sir.
24    Q.    And you responded?
25    A.    Correct.
```

1    Q.   And who, if anybody, was at the scene when you

2         got there?

3    A.   There were several officers.  Officer Elkins and

4         Officer Wise.  I believe Officer Collins was

5         also there for a short time.

6    Q.   What about civilians?

7    A.   Mr. Gradic and another employee that worked

8         there at Dairy Queen.

9    Q.   That would be Kevin that was just in the

10        hallway?

11   A.   Yes, sir.

12   Q.   And anybody else?

13   A.   Mr. Saffold.

14   Q.   That would be the defendant over here?

15   A.   It is, yes, sir.

16   Q.   Where was Mr. Saffold when you got there?

17   A.   When I arrived, he was in the back of a patrol

18        unit.

19   Q.   And did you take control of some evidence with

20        regard to this case when you got there?

21   A.   Yes, sir, I did.

22   Q.   Let me show you what's marked there in front of

23        you, State's Exhibit 1.

24   A.   Yes, sir.

25   Q.   Do you recognize that?

1    A.   I do.

2    Q.   What do you recognize that as?

3    A.   As being a homemade mask that I collected from

4         the scene.

5    Q.   And then State's Exhibit 2 here, do you

6         recognize it?

7    A.   I do.

8    Q.   What do you recognize this as?

9    A.   It was a rifle that was also recovered at the

10        scene.

11   Q.   Okay.  Were you able to -- did you make any

12        attempt to try and run down anything on this

13        rifle as far as ownership or --

14   A.   Yes, sir.  We were unable to locate any owner

15        information on that rifle.

16   Q.   Why is that?  Do you know?

17   A.   Serial number was not able to be run at the

18        time.  We could not find a good serial number to

19        run completely through the system.

20   Q.   Most guns have serial numbers; is that correct?

21   A.   Correct.

22   Q.   Where was the serial number on that one?

23   A.   There was a partial, I believe, on the

24        underside.  There was a marking where it says

25        J.C. Higgins.  There was a letter that was

1    unable to be read.  I would have to look at it

2    again to find exactly.

3         MR. DAVIS:  Judge, I'm going to object to

4    the line of questioning.  Whether that gun has a

5    serial number on it is not material to this

6    robbery.

7         THE COURT:  Overruled.

8    A.   The number is right here beside J.C. Higgins.

9         There should be -- for our computer to be able

10        to run it, there should be an alpha character

11        there.  These numbers were not listed in there

12        because of the age of the rifle.

13   Q.   Okay.  All right.  So let me show you what we've

14        marked as State's Exhibit 3 and ask if you can

15        tell the jury what this is.

16   A.   That is the bullets that were located inside the

17        rifle that I retrieved from Officer Wise at the

18        scene.

19   Q.   When you say inside the rifle, there's a tube

20        that holds the shells?

21   A.   Correct.

22   Q.   And was there one actually in the chamber ready

23        to fire?

24   A.   There was one in the chamber, yes, sir.

25   Q.   So the tube was loaded and there was one in the

```
 1              chamber?
 2     A.    That is correct.
 3     Q.    All right.  And up there also is State's
 4              Exhibit 4?
 5     A.    Yes, sir.
 6     Q.    Could you tell the jury what that is?
 7     A.    It's a box of Winchester Super X ammunition that
 8              was also located at the scene.
 9     Q.    Where at the scene exactly?
10     A.    Whenever I arrived, it had already been removed
11              from the suspect's pockets.
12     Q.    All right.  So you unloaded the gun and secured
13              it and secured the bullets?
14     A.    No, sir.  Officer Wise unloaded the gun at the
15              scene and I retrieved the bullets from him.
16     Q.    And all of this stuff has been secured by you
17              pending trial?
18     A.    Correct.
19              MR. ATWELL:  I would move to admit State's
20              Exhibit 3 and 4 at this time, Judge.
21              THE COURT:  Any objections?
22              MR. DAVIS:  No.
23              THE COURT:  Three and 4 are admitted without
24              objection.
25                   (The aforementioned exhibit was
```

1                        admitted into evidence.)

2    BY MR. ATWELL:

3    Q.    All right.  So after the defendant here is

4          placed in a patrol car, what did you do with him

5          at that point?

6    A.    I had him transported down to the police

7          department for an interview.

8    Q.    All right.  And did you go back to the police

9          department to perform that interview?

10   A.    I did.

11   Q.    All right.  And what -- where does this take

12         place at?

13   A.    It all occurred in my office in the Criminal

14         Investigations Division.

15   Q.    He's under arrest at this point?

16   A.    No, sir.  Not at that point, he was not.

17              MR. DAVIS:  Judge, at this time, I'd ask

18         that we hear the motion to suppress outside the

19         hearing of the jury.

20              THE COURT:  Ladies and gentlemen, this is

21         one of those times when I must take up a matter

22         outside your presence.  If you will, go back to

23         the jury deliberation room.  We'll be with you

24         shortly.

25              Do you have coffee back there?  Yes.

1                    (The jury exited the courtroom.)

2               THE COURT:  Out of the hearing and presence

3          of the jury.

4               MR. ATWELL:  Why don't we go ahead and mark

5          this as State's Exhibit 5.

6                    (State's Exhibit 5 was marked for

7                    identification.)

8                         EXAMINATION

9     BY MR. ATWELL:

10    Q.   Corporal DeVane, you took the defendant here

11         back to your office.  You sat him down.  And did

12         you advise him of his rights at this point?

13    A.   I did, sir.

14    Q.   How did you go about advising him of his rights?

15    A.   I took the piece of paper and held it over my

16         desk.  And we went over the rights as I read

17         them to him.

18    Q.   What exactly did you read to him?

19    A.   The entire rights, including the Waiver of

20         Rights on this form.

21    Q.   Okay.  If you could, read into the record what

22         it is you read to the defendant.

23    A.   Before we ask you any questions, you must

24         understand your rights.  You have the right to

25         remain silent.  Anything you say can be used

1    against you in court.  You have the right to

2    talk to a lawyer for advice before we ask you

3    any questions and to have him with you during

4    questioning.

5         If you cannot afford a lawyer, one will be

6    appointed for you before any questioning if you

7    wish.  If you decide to answer questions now

8    without a lawyer present, you will still have

9    the right to stop answering at any time.  You

10   will also have the right to stop answering at

11   any time until you talk to a lawyer.

12        Waiver of Rights.  I have read this

13   statement of my rights and I understand what my

14   rights are.  I am willing to make a statement

15   and answer questions.  I do not want a lawyer at

16   this time.  I understand and I know what I am

17   doing.  No promises or threats have been made to

18   me and no pressure of any kind has been used

19   against me to make a statement.

20   Q.   All right.  Now, you actually read each one of

21        these to him?

22   A.   Yes, sir.

23   Q.   As you read it to the Court?

24   A.   Yes, sir.

25   Q.   Did he indicate that he understood each and

| | | |
|---|---|---|
| 1 | | every one of those rights? |
| 2 | A. | He did. |
| 3 | Q. | Did he indicate to you that he wanted to make a |
| 4 | | statement at this time? |
| 5 | A. | He did. |
| 6 | Q. | And how did he acknowledge that he was ready to |
| 7 | | make a statement and understood his rights? |
| 8 | A. | He signed the form. |
| 9 | Q. | All right.  That's his signature? |
| 10 | A. | That is his signature. |
| 11 | Q. | You were present when he made this signature? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Underneath that, it says education twelfth. |
| 14 | A. | Yes, sir. |
| 15 | Q. | Did you go over something with him with regard |
| 16 | | to any education that he had? |
| 17 | A. | Yes, sir.  I asked him the highest level of |
| 18 | | education that he had completed and to enter |
| 19 | | that into the education line of the form. |
| 20 | Q. | So he stated he had a twelfth-grade education? |
| 21 | A. | That is correct. |
| 22 | Q. | Was it apparent to you that he understood his |
| 23 | | rights as you read them to him? |
| 24 | A. | Yes, sir. |
| 25 | Q. | All right.  And then he made a statement to you? |

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | What did he tell you about the incidences that |
| 3 | | occurred on that evening? |
| 4 | A. | When I questioned him about the occurrence, he |
| 5 | | stated that he had arrived at the south side |
| 6 | | Dairy Queen with the intent to scare the people |
| 7 | | coming from the Dairy Queen to receive money. |
| 8 | Q. | Did he say anybody specific? |
| 9 | A. | Well, he said the employees that were there. |
| 10 | Q. | Was there any more conversation other than that? |
| 11 | A. | Yes, sir.  We talked in detail about exactly how |
| 12 | | he planned to do that or what means.  And he |
| 13 | | stated that he was going to show them a gun in |
| 14 | | an attempt to get them scared enough to give him |
| 15 | | the money. |
| 16 | Q. | And the fact of the matter was y'all took a gun |
| 17 | | off of him? |
| 18 | A. | That is correct. |
| 19 | Q. | And that gun was loaded? |
| 20 | A. | Yes, sir. |
| 21 | Q. | Did y'all discuss that at all? |
| 22 | A. | Just asked him about where the location of the |
| 23 | | gun was and what his plans were with that gun. |
| 24 | Q. | Did he tell you why he -- |
| 25 | | THE COURT:  Excuse me just a second.  Let's |

```
 1              not get too far afield.  This is just the
 2              foundation for a statement --
 3                   MR. ATWELL:  Okay.  Well, that's all.
 4                   THE COURT:  -- because we're going to have
 5              to do all this again in front of the jury.
 6                   MR. ATWELL:  Okay.  That's all I have.
 7                   THE COURT:  All right.  Mr. Davis, cross?
 8                              EXAMINATION
 9         BY MR. DAVIS:
10         Q.   Corporal DeVane, you taped this statement;
11              right?
12         A.   That's correct.
13         Q.   And did you bring that tape with you today?
14         A.   Yes.
15         Q.   So that would be the best evidence of what
16              actually happened, right?
17         A.   Correct.
18         Q.   Did you ask Mr. Saffold -- did you inquire
19              whether he had been drinking?
20         A.   Yes, sir.
21         Q.   Do you recall what he said?
22         A.   He stated that he had not.
23         Q.   Did you ask him whether or not he was under the
24              influence of any drugs?
25         A.   I did.
```

1    Q.   And what did he tell you?

2    A.   He stated that he was not.

3    Q.   Did he have any outward appearance despite him

4          saying that, that he might have been under the

5          influence of anything?

6    A.   No, sir.

7    Q.   Okay.  You had never been around Mr. Saffold

8          before?

9    A.   No, sir.

10   Q.   In your experience as a police officer, have you

11        been around people that you knew to be under the

12        influence of crack cocaine before?

13   A.   Yes, sir.

14   Q.   Did he exhibit any of those signs to you?

15   A.   No outward signs, no, sir.

16   Q.   Did you ever tell him if he cooperated, things

17        would be better?

18   A.   No, sir.

19   Q.   Did you make him any promises or offer him any

20        rewards or inducements to get him to make a

21        statement?

22   A.   No, sir.

23        MR. DAVIS:  Can I have just a second,

24        Judge?

25        THE COURT:  Sir?

```
 1              MR. DAVIS:  If I can have just a second.
 2                   (Brief pause.)
 3      BY MR. DAVIS:
 4      Q.   Did you ever tell Mr. Saffold that if he
 5           cooperated, it would look better to the D.A. or
 6           to the judge?
 7      A.   I told him that if he cooperated and they asked,
 8           I would tell them whether he was cooperative and
 9           gave a statement or uncooperative in not giving
10           a statement.
11              MR. DAVIS:  Thank you.  No more questions.
12              THE COURT:  Thank you.  Mr. Atwell?
13              MR. ATWELL:  That's all.
14              THE COURT:  Let me ask you all this,
15           gentlemen.  Do you intend to introduce the
16           statement, taped statement?
17              MR. ATWELL:  No, sir.
18              THE COURT:  Do you have a transcript --
19              MR. ATWELL:  Yes, sir.
20              THE COURT:  -- of what's on that tape?
21              MR. ATWELL:  Yes, sir.
22              THE COURT:  Okay.  You'll need to get it
23           marked.  Do you intend to give the jurors copies
24           of that transcript?
25              MR. ATWELL:  That wasn't my plan.
```

1      THE COURT:  It was not?

2      MR. ATWELL:  No.

3      THE COURT:  That's fine.  Sometimes the

4      assistant D.A.s do that, and I just wanted to

5      make sure that they were clean copies.

6          Okay.  Anything else?

7      MR. ATWELL:  No, sir.

8      THE COURT:  Mr. Davis, anything else?

9      MR. DAVIS:  If I can have just a second.

10     THE COURT:  There's not anything in that

11     statement that would otherwise be inadmissible,

12     like criminal history or anything like that, is

13     there?

14     MR. ATWELL:  Oh, no, no.

15     THE COURT:  I assume Mr. Davis has a copy of

16     it.

17     MR. ATWELL:  Yes, sir.

18     MR. DAVIS:  Yes, sir.  Judge, can I ask him

19     one -- did he say he was or wasn't going to use

20     it -- the transcript?

21     THE COURT:  He said he was, but he was not

22     going to pass out copies to the jury.

23     MR. ATWELL:  I wasn't going to introduce it.

24     MR. DAVIS:  Okay.  That takes care of that.

25     THE COURT:  Okay.  Any other evidence for

| | |
|---|---|
| 1 | the State? |
| 2 | MR. ATWELL:  On the suppression issue? |
| 3 | THE COURT:  Correct. |
| 4 | MR. ATWELL:  No, sir. |
| 5 | THE COURT:  Any evidence for the defense |
| 6 | regarding suppression? |
| 7 | MR. DAVIS:  Yes, sir.  I'd call Mr. Saffold |
| 8 | for the limited purpose of addressing this |
| 9 | issue. |
| 10 | THE COURT:  Okay.  Mr. Saffold, come up and |
| 11 | have a seat beside me.  There are a couple of |
| 12 | steps there.  Be careful as you take your seat. |
| 13 | ERIC SAFFOLD |
| 14 | having been first duly sworn, was examined and |
| 15 | testified as follows: |
| 16 | EXAMINATION |
| 17 | BY MR. DAVIS: |
| 18 | Q.  State your name for the record, please. |
| 19 | A.  Eric. |
| 20 | Q.  Scoot up.  You've got to talk into the |
| 21 | microphone so everybody can hear you. |
| 22 | A.  Eric. |
| 23 | Q.  What's your last name? |
| 24 | A.  Saffold. |
| 25 | Q.  I know you've heard what Corporal DeVane said |

```
 1              about you being arrested and taken to the police

 2              department; correct?

 3      A.      Yes.

 4      Q.      Were you under the influence of any drugs at the

 5              time you made that statement?

 6      A.      Yes.

 7      Q.      Okay.  What drug?

 8      A.      Cocaine, crack.

 9      Q.      Okay.  How long had you been smoking crack that

10              day?

11      A.      All that day.  I woke up early and started

12              smoking.

13      Q.      Okay.  You heard what he said about you denying

14              using drugs.  Is there some reason why you told

15              him you weren't on drugs?

16      A.      Yes.

17      Q.      Why is that?

18      A.      Because I wanted him to, you know, understand

19              that I wanted to cooperate because I didn't want

20              him to raise my bail so high so my family

21              couldn't get me out.

22      Q.      Did he ever offer you anything or rewards or

23              inducements to get you to make a statement?

24      A.      Yes.

25      Q.      And what was it he said?
```

1   A.   Well, he said if I cooperated, that, you know --

2         that the Waiver of Rights, that was a part of my

3         cooperation, to sign that, you know.  And I

4         can't really remember what really happened that

5         night.  I can't remember too much.  But you know

6         what I'm saying?

7   Q.   What, if anything, did he say to you to get you

8         to make a statement?

9   A.   He just said if I cooperated, it would look

10        good -- you know what I'm saying? -- for the

11        judge and the D.A. if I cooperated.  And me

12        signing the sheet -- the Waiver of Rights, that

13        was just a part of my cooperation and the

14        statement given.

15   Q.   Okay.  Is there any other reason that you gave

16        Corporal DeVane a statement?

17   A.   Is there any other reason?

18   Q.   Yes.

19   A.   To cooperate.

20           MR. DAVIS:  No more questions.

21           THE COURT:  Thank you.  Cross?

22           Hang on.  Don't go anywhere.

23                EXAMINATION

24   BY MR. ATWELL:

25   Q.   Let me show you State's Exhibit 5 here.  Do you

```
 1              remember that?
 2    A.    Yes.
 3    Q.    Do you remember going --
 4    A.    That's my signature.
 5    Q.    Okay.  You remember going over that rights form
 6              with him?
 7    A.    It seems like I do.  I had to because that's my
 8              signature, but I don't remember too much that
 9              night.
10    Q.    All right.  And it is true that you have a
11              twelfth-grade education?
12    A.    Well, I have a -- I have a certificate, but, you
13              know -- I actually walked, but I don't have a
14              twelfth-grade education.  But, you know, I
15              walked.  I graduated from the twelfth grade.
16    Q.    Are you saying when you say you walked, that
17              means you went to a graduation ceremony?
18    A.    I went to the graduation and everything, but I
19              don't have a diploma.  I graduated with a
20              Certificate of Attendance.
21    Q.    All right.  But you understood what was read to
22              you on this rights form and you signed it?
23    A.    At the time, I did because I was nervous.  At
24              the time when he was reading it, you know, I was
25              just so shook up, man, I was scared, you know.
```

```
 1              And I was just ready to get out of there.  I was

 2              up there by myself and I was just cooperating.

 3              He said if I cooperated, you know, it's a

 4              possibility that things could go good for me.

 5              And that's all I was trying.

 6      Q.      I think you said that one of the reasons that

 7              you gave a statement was that you wanted your

 8              bond low enough that you could make bond and

 9              help your family out?

10      A.      I said that I didn't want him to make my bond --

11              the type of case it was, I was trying -- well,

12              you know what I'm saying, with the type of case

13              it was, that I know it's outstanding bonds for

14              that.

15                   But I can't really think straight right

16              now.  You know what I'm saying?  As you know, as

17              you can tell, my conversation -- my words is

18              kind of twisted up.  You know what I'm saying?

19      Q.      But he never promised you anything as to bond or

20              anything of that nature, did he?

21      A.      No.  Right.  He never promised it.

22              MR. ATWELL:  That's all I have.

23              THE COURT:  Anything else?

24              MR. DAVIS:  Nothing further.

25              THE COURT:  You may step down.  Anything
```

1     else?

2          MR. DAVIS:  No, sir.

3          THE COURT:  Rebuttal?

4          MR. ATWELL:  No, sir.

5          THE COURT:  Argument?

6          MR. DAVIS:  No, sir.

7          THE COURT:  All right.  As you all are

8     aware, all statements are deemed involuntary

9     until such time as there is proof that the

10    statement was freely and voluntarily given.

11         Based on the evidence before the Court, this

12    Court finds that the statement was freely and

13    voluntarily given.  There is a Miranda form.  It

14    is basically an issue regarding credibility.

15         You have a police officer who testified that

16    there are no threats, no coercions, no offers,

17    no promises.  And then you've got Mr. Saffold

18    who testified that he told him he was not on

19    drugs at the time, but he really was on drugs.

20    So it's hard to put a lot of credibility into

21    that.

22         Said that the officer offered him a reward,

23    but couldn't really remember much about it.  He

24    identified State's Exhibit 5 and remembers it;

25    that was his signature on the form.  He

1   understood the rights form at the time and the

2   officer never promised anything regarding bond.

3       So, you know, weighing and considering all

4   that evidence, the Court finds that the officer

5   complied with Miranda, and that said statement

6   was voluntary, overcoming any presumption to the

7   contrary.

8       Anything else?

9       MR. ATWELL:  Just move to admit State's

10  Exhibit 5.  I don't know if I did that.

11      MR. DAVIS:  Which is 5?

12      MR. ATWELL:  The rights form.

13      MR. DAVIS:  I think he's going to do it in

14  front of the jury, but I'm not going to object.

15      THE COURT:  You are offering it now?

16      MR. ATWELL:  Sure.

17      THE COURT:  All right.  And no objection

18  then as I understand it?

19      MR. DAVIS:  No, sir.

20      THE COURT:  State's Exhibit 5 is admitted.

21          (The aforementioned exhibit was

22          admitted into evidence.)

23      THE COURT:  But now, you are saying for more

24  than the suppression hearing?  For the purposes

25  of trial?

1          MR. ATWELL:  I'm going to go over it again

2     when he's on the stand.

3          THE COURT:  That's fine.  That's fine.  All

4     right.  You all ready?

5          MR. DAVIS:  Yes, sir.

6          MR. ATWELL:  Yes, sir.

7          THE COURT:  Bring in the jurors, please.

8               (The jury entered the courtroom.)

9          THE COURT:  We're back within the hearing

10     and presence of the jury.  All 13 jurors have

11     returned.  The parties and their respective

12     attorneys are present.

13          Ladies and gentlemen, I apologize to you for

14     the brief delay.  That has been addressed and

15     we're now ready to go forward.

16          Corporal Jason DeVane remains on the stand

17     and remains under oath.  And I'm going to let

18     the assistant D.A. pick up with his direct

19     examination.

20          You may proceed, Mr. Atwell.

21                    JASON DeVANE

22     having been previously duly sworn, was examined and

23     testified as follows:

24               CONTINUED DIRECT EXAMINATION

25     BY MR. ATWELL:

```
 1    Q.   Corporal DeVane, you were saying that you had
 2         the defendant in your office?
 3    A.   That is correct.
 4    Q.   At that time, did you indicate you wanted to
 5         speak to him?
 6    A.   I did.
 7    Q.   And before doing so, did you advise him of his
 8         Miranda warnings?
 9    A.   I did, sir.
10    Q.   Direct your attention to State's Exhibit 5
11         there.  Would you tell the jury what that is?
12    A.   Yes, sir.  It is our Waiver of Rights form.
13    Q.   Okay.  Did you go over that Waiver of Rights
14         with the defendant?
15    A.   I did.
16    Q.   How did you go over it with him?
17    A.   I read each statement of the waiver and asked
18         him to sign it if he understood the statement
19         and agreed to give a statement.
20    Q.   If you would, please tell the jury exactly what
21         you read.
22    A.   Before we ask you any questions, you must
23         understand your rights.  You have the right to
24         remain silent.  Anything you say can be used
25         against you in court.  You have the right to
```

1    talk to a lawyer for advice before we ask you

2    any questions and to have him with you during

3    questioning.  If you cannot afford a lawyer, one

4    will be appointed for you before any questioning

5    if you wish.

6         If you decide to answer questions now

7    without a lawyer present, you will still have

8    the right to stop answering at any time.  You

9    will also have the right to stop answering at

10   any time until you talk to a lawyer.

11        Waiver of Rights.  I have read this

12   statements of my rights and I understand what my

13   rights are.  I am willing to make a statement

14   and answer questions.  I do not want a lawyer at

15   this time.  I understand and know what I am

16   doing.  No promises or threats have been made to

17   me and no pressure of any kind has been used

18   against me to get me to make a statement.

19   Q.  All right.  Did he sign that form?

20   A.  He did.

21   Q.  Did he indicate to you that he freely understood

22       everything you had read to him?

23   A.  He did.

24   Q.  And did he indicate to you that he had proper

25       education to understand what was being read to

1            him?

2    A.    He did.  He stated he had a twelfth-grade

3            education.

4    Q.    And did you promise him or coerce him in any way

5            to make a statement?

6    A.    No, sir.

7    Q.    So he signed that State's Exhibit 5 and agreed

8            to talk to you about the incident at Dairy Queen

9            for that evening?

10   A.    Yes, sir.

11   Q.    All right.  What time was that?  Do you know?

12   A.    The statement -- the waiver was signed at 2325

13           which is 11:25 p.m.

14   Q.    So you took him from the scene directly back to

15           the police department?

16   A.    Correct.

17   Q.    Now, I guess there wasn't any question about

18           what you wanted to talk to him about.  This was

19           an incident at Dairy Queen.

20   A.    Correct.

21   Q.    And did he, in fact, make a statement to you as

22           to what he was doing at Dairy Queen?

23   A.    He did.

24   Q.    And what did he tell you his reason for being

25           there was?

| | | |
|---|---|---|
| 1 | A. | He stated he was there to scare the employees to |
| 2 | | get them to give him money. |
| 3 | Q. | Okay.  There in front of you is State's |
| 4 | | Exhibit 1 again.  Did you talk to him about |
| 5 | | that? |
| 6 | A. | Yes, sir, I did. |
| 7 | Q. | All right.  Did he acknowledge that -- what did |
| 8 | | he tell you about the mask? |
| 9 | A. | He stated it was what he was wearing when he was |
| 10 | | standing in the corner awaiting the employees to |
| 11 | | exit the store. |
| 12 | Q. | Okay.  And State's Exhibit 2, this rifle that's |
| 13 | | laying here, did you talk to him about that? |
| 14 | A. | I did. |
| 15 | Q. | What did he tell you about that? |
| 16 | A. | He stated that that was the rifle that he had |
| 17 | | tied around his shoulder underneath his jacket. |
| 18 | Q. | Did he say what he was going to do with that |
| 19 | | rifle? |
| 20 | A. | That was what he was going to use to scare the |
| 21 | | employees to give him -- to give him the money. |
| 22 | Q. | This rifle was fully loaded? |
| 23 | A. | Correct. |
| 24 | Q. | Did he appear to be under the influence of any |
| 25 | | drugs or alcohol at the time? |

```
 1    A.    No, sir.

 2               MR. ATWELL:  I think that's all I have right

 3          now.

 4               THE COURT:  Thank you.  Cross?

 5               MR. DAVIS:  No questions.

 6               THE COURT:  Thank you.  You all have further

 7          need of Corporal DeVane?

 8               MR. ATWELL:  No, sir.

 9               MR. DAVIS:  No, sir.

10               THE COURT:  Corporal, thank you so much for

11          coming.  You are free to go.

12               State's Exhibit 5, it had been introduced

13          and admitted earlier.  And that's for the trial

14          proper.

15               MR. ATWELL:  Okay.  Of course, I'd say at

16          this time, Judge, State's Exhibit 1 through 5,

17          if I missed any, I move to admit all those

18          exhibits at this time.

19               THE COURT:  One, 2, 3, 4 and 5, they have

20          already been admitted.

21               MR. ATWELL:  Okay.  And at this time, State

22          would rest.

23               THE COURT:  State rests.

24               All right, ladies and gentlemen.  This is,

25          again, one of those times where you've got to go
```

1     back. I'm sorry. Just if you will, do not

2     discuss the case while you're away or allow

3     anyone to discuss it with you. We'll be with

4     you very shortly hopefully.

5              (The jury exited the courtroom.)

6        THE COURT: We're out of the hearing and

7     presence of the jury.

8        Motions?

9        MR. DAVIS: Judge, at this time, the defense

10     moves for motion for judgment of acquittal on

11     the State's failure to prove a prima facie case

12     of each of the elements of robbery in the first

13     degree or any other robbery in any other

14     degree.

15        Specifically, the State has failed to show

16     that there is use of force or threatened the

17     imminent use of force. All we have factually is

18     Mr. Saffold facing the back door of Dairy Queen,

19     at which time Mr. Gradic draws down on him with

20     his own nine millimeter weapon.

21        Both Mr. Gradic and Mr. Guerra testified

22     that there is no use of force against either.

23     There is no threat of force against either one

24     of them.

25        Even if you take the defendant's statement

1    in the light most favorable to the State, that's

2    evidence of what may have been intended, but

3    it's not evidence of what happened.

4        Once Mr. Gradic pointed his weapon at him

5    and got Mr. Saffold on the ground, any criminal

6    offense on Mr. Saffold's part was over.  So we

7    have absolutely no threat of force or use of

8    force against either one of them; therefore, it

9    cannot be robbery in the first degree.

10       THE COURT:  Okay.  Of course, you know,

11   there are four elements to robbery in the first

12   degree, the first being that the defendant

13   committed or attempted to commit theft.  I mean,

14   all it requires is an attempt.

15       Two, that in the course of committing or

16   attempting to commit the theft, the defendant

17   either used force against a person with intent

18   to overcome his physical resistance or physical

19   power of resistance or threatened imminent use

20   of force against the person with intent to

21   compel acquiescence to the taking of the

22   property; and that the defendant was armed with

23   a deadly weapon.

24       You want to respond, Mr. Atwell?

25       MR. ATWELL:  Judge, as I stated earlier in

1    opening, that's why I addressed it.  You have to

2    read 13A-8-40.

3         THE COURT:  Or threatened imminent use of

4    force against the person.

5         MR. ATWELL:  There's three statutes,

6    13A-8-43 and 13A-8-41 and 13A-8-40.

7         THE COURT:  Hang on just a second.  What is

8    it in 13A-8-40?

9         MR. ATWELL:  To start with, 8-41, of course,

10   is robbery first degree.

11        THE COURT:  Correct.

12        MR. ATWELL:  Which is defined as -- the

13   elements are in 8-43, but you add the additional

14   of a weapon and it makes it 8-41.

15        THE COURT:  Yeah, right.

16        MR. ATWELL:  But the way it reads in 8-43 is

17   in the course of committing a theft.  So you

18   have to go to the definition section of 13A-8-40

19   to understand what that means.  And it says in

20   Subsection B:  In the course of committing a

21   theft embraces acts which occur in an attempt to

22   commit, or --

23        What our position is that when this man

24   armed himself with a firearm, placed a ski mask

25   over his head and hid behind the Dairy Queen,

1     that that embraces acts which occur in an

2     attempt to commit.  And then it's obvious, also,

3     from those actions what he was attempting to

4     commit.  And it is further obvious by the fact

5     that he gave a statement saying that, in fact,

6     his intent was to commit a robbery.

7          THE COURT:  Response?

8          MR. DAVIS:  Judge, that's an enormous

9     stretch.  Attempted theft, even if going by

10    evidence in the most -- light most favorable to

11    the State, arguably there's an attempted theft.

12    The attempt deals with the theft.  It's not

13    attempt to threaten anybody.  It's attempt to

14    commit theft.

15         He's got to threaten the use of force,

16    threaten the imminent use of force or use

17    force.  There's absolutely no way around that.

18    They are asking you to ignore that element

19    altogether because it was an attempted theft.

20         There is absolutely -- Mr. Atwell uses the

21    word "obvious."  Well, it's not obvious.  It's

22    their burden of proof.

23         Even the subsequent statement, if you

24    believe it and put it in the light most

25    favorable to the State, it still has no threat.

1        The threat has got to be made to Mr. Gradic or

2      another person present, which is Mr. Guerra.

3          They both said there was no threat, there

4      was no use of force.

5          This is a robbery first degree.  This case

6      has to fail because I think you referred to it

7      as element number two:  Use of force or

8      threatened the imminent use of force.

9          THE COURT:  Thank you, gentlemen.

10         MR. DAVIS:  Judge, I would also offer Ex

11    parte James which is 468 So.2d 889.

12         (Brief pause.)

13         THE COURT:  Mr. Davis, certainly, certainly,

14    that is a good argument.  I've given this some

15    thought.  And to some extent, the argument, at

16    least in the Court's mind, is sophistry.

17        I think, you know, based on the cases you've

18    supplied and then looking at the elements of

19    robbery, not only in the patterned charge, but

20    in the Alabama Code, and in considering James v.

21    State -- and I quote directly from said case,

22    "In addition to the criminal intent requisite,

23    the offense of robbery in the first degree

24    consists of two concomitant -- meaning existing

25    or occurring at the same time -- two concomitant

1    elements:  One, theft, the taking of personal

2    property of another from his person or in his

3    presence."  And then it goes on to say that now

4    an attempted theft would suffice for that.

5        "And two, when the person committing theft

6    is armed with a deadly weapon or a dangerous

7    instrument."

8        So you can have an attempted theft.  And, of

9    course, it goes on to say you can also have

10    robbery when there's just a threat of

11    violence -- a threat.

12        Looking at the Code, it said there are four

13    elements.  The defendant committed or attempted

14    to commit theft.  You say he didn't do anything

15    but stand between the cooler and the bread

16    racks.  But, you know, what was his intent?

17        I mean, does it make sense that a man would

18    stand with a trench -- stand there, the

19    inference being that he's hiding between those

20    two things with a trench coat and a mask on in

21    September in south Alabama.  South Alabama, I'm

22    talking about the heat there.

23        And you say, well, you know, he never

24    threatened anybody.  He never said a word.  In

25    fact, he got on the ground.  But now, as I

1    recall the testimony, there was a statement made

2    by him, "I see you have a gun, I'm not going to

3    rob you."  Now, that indicates at least to the

4    Court an intent to rob.  You said, well, he

5    never threatened anybody.  But he said, "I'm not

6    going to rob you."  Well, there seems to me

7    there was an intent to rob.

8        Now, also, during all of this time, the

9    victim was unaware that your client was armed,

10   yet he kept putting his hands up to the coat or

11   around the coat.  And they had to keep telling

12   him to move his hands away from the coat, which

13   at least an inference could be made that he was

14   moving his hands towards that weapon.

15       And then in light of all of that a statement

16   is given.  And he basically tells the officer

17   that he was just there to scare employees to get

18   money, an attempt to rob with the use of a

19   firearm.

20       Like I say, you know, certainly an ingenious

21   argument, but in light of the facts and

22   circumstances and inferences that might be drawn

23   from those circumstances, it is clear to the

24   Court that it is robbery in the first degree, an

25   attempted theft, an attempted robbery.

1    And, of course, you know, your argument is

2    he never said anything.  If I walked up to you

3    with a gun in my hand, you know, depending on

4    the facts and circumstances and never said

5    anything, you know, robbery.  Depends on the

6    facts and circumstances, doesn't it?

7        MR. DAVIS:  Depends on whether I know it's

8    there.

9        THE COURT:  Huh?

10       MR. DAVIS:  Depends on whether I know it's

11   there.  Do you have one in your hand?  Can I see

12   it?

13       THE COURT:  I don't know.  If I make

14   threatening gestures, if I have my hand behind

15   my back, you know.  I mean, it just depends on

16   the facts and circumstances of each individual

17   case.  But I think there has to be some, as the

18   Code says, threat of force against the person

19   implied or otherwise.  And, you know, at least

20   in the Court's mind, you know, standing between

21   a bread rack and a cooler in a trench coat with

22   a mask on at least is a threat of force.

23       MR. DAVIS:  At this distance, though.

24       THE COURT:  Huh?

25       MR. DAVIS:  At this distance.  He was

1    facing --

2         THE COURT:  I think what you're asking is

3    that we all throw common sense out the window

4    and just say, oh, well, since he never said

5    anything and since they never saw the gun, you

6    know, they are just lucky that, you know, they

7    weren't shot.

8         It just turned out that later on they found

9    the gun inside his coat and he gave a statement

10   that, you know, he was just there to scare them

11   and take their money.  He was there to rob

12   them.

13        So I mean, you know, he did a number of acts

14   towards the commission of the robbery itself, a

15   number of acts, you know, from wearing the

16   trench coat to having the gun on him to having

17   the mask on, to having himself hidden from view,

18   all of those acts in furtherance of the crime of

19   robbery.

20        MR. DAVIS:  Even if you accept all that,

21   there's still no threat.  It's incomplete as a

22   crime.  Even if -- it doesn't matter what he

23   confesses to -- if you take it as a confession,

24   it doesn't matter what his statement is if

25   you're still missing an element.

1     It's a subjective thing on the point of the

2     victim.   It's not what's going on in

3     Mr. Saffold's mind.   It's a subjective -- it's

4     subjective to him:  Am I being threatened?  The

5     answer was:  No.  Did he use force?

6          MR. GRADIC:  I felt threatened.

7          MR. DAVIS:  No.

8          THE COURT:  Oh.  Then I guess he pulled a

9     gun -- a nine millimeter on a private citizen

10    for no apparent reason at all, that there was

11    certainly no fear from him that anything was

12    amiss which caused him to pull the gun.

13         As I indicated when I first addressed this

14    issue, your case says:  In addition to the

15    criminal intent requisite -- and I think that's

16    what we're looking at here, is the intent --

17    there are two concomitant elements, theft or

18    attempted theft; and the person committing theft

19    or attempted theft is armed with a deadly weapon

20    or dangerous instrument.

21         Those elements are there.  You're saying,

22    well, he never threatened anybody, so his intent

23    wasn't really to commit robbery.  I think, you

24    know, the inferences are there that, yes, it

25    was.

1    MR. DAVIS:  It doesn't say intent.  It says

2    he has to use force or threaten it.  It never

3    happened.  And in James, you at least have a

4    statement.  And it was reversed.

5    THE COURT:  Let's read the rest of it.  The

6    defendant either used force against the person

7    with intent to overcome his -- with the intent

8    to overcome his physical resistance or physical

9    power to resist or threatened the imminent use

10    of force against the person with the intent to

11    compel acquiescence to the taking of the

12    property.

13    You know, there again, I think the focus is

14    it on the intent.  And you're saying, well, you

15    know, it's an incomplete crime, so shouldn't be

16    charged with anything.  You can't charge

17    somebody with attempted robbery.  An attempted

18    robbery is robbery, correct?

19    MR. DAVIS:  If you have all the elements of

20    attempted robbery, yes, sir.

21    THE COURT:  As you well know, at this

22    juncture the evidence must be viewed in the

23    light most favorable to the State and the State

24    must be afforded all inferences thereby.  Based

25    on what the Court has said, your motion is

1     denied.

2              All right.   Are you ready?

3              MR. DAVIS:   We'll rest.

4              THE COURT:   You rest.   Requested charges?

5              MR. DAVIS:   Nobody at the office.

6              THE COURT:   And?

7              MR. DAVIS:   If you give me 10 minutes, I can

8     get them.   Five minutes, I can get them.

9              THE COURT:   All right.   Take five minutes.

10                   (A recess was taken.)

11             THE COURT:   Okay.   You have handed to the

12    Court Defendant's Requested Charges.

13             The defendant's requested charge number one

14    will be given.

15             Two is refused, in that the Court generally

16    does not give that because it discusses

17    reasonable doubt and that's sufficient.

18             The Court will give three.

19             Four is refused.   It's an affirmative

20    charge, as is the same with five.

21             Six will be given.

22             The Court basically gives seven almost using

23    the same language in some respects; so it won't

24    be given twice and therefore refused.

25             Same is true of eight.   The Court basically

1  gives a similar charge which covers the same

2  principle of law and won't be given twice, so

3  it's therefore refused.

4      What says the State regarding nine?

5      MR. ATWELL:  If any one of you has

6  reasonable doubt that he is guilty after

7  consideration of all the evidence in this case,

8  then you cannot find him guilty.

9      THE COURT:  That's true, but that doesn't

10  mean they find him not guilty.  It just means it

11  could be a mistrial or something to that effect.

12      MR. ATWELL:  I think that's covered by

13  saying that all 12 of you must agree.

14      THE COURT:  Anything you want to say?

15      MR. DAVIS:  It's true.  They can't find him

16  guilty, but, I mean, I got it from Derek and I

17  altered it to make it more acceptable in its

18  current form.

19      THE COURT:  It's still unacceptable.  It's

20  refused because it is somewhat misleading and

21  confusing, you know.  Now, if all 12 of them

22  have a reasonable doubt, then he's not guilty.

23  But if one of them has a reasonable doubt or,

24  you know, five of them and, you know, you may

25  end up with a mistrial.

1         I'll give 10.

2         We may be getting a little bit repetitious

3   on some of these.

4         What says the State regarding 11?

5         MR. ATWELL:  That's not the one that you

6   like to give.  I think you refused that last

7   time we came up.

8         THE COURT:  No, I didn't.

9         MR. DAVIS:  You gave it when I was sitting

10  at that table.

11        THE COURT:  I know.  I know.  And I always

12  ask the D.A.

13        MR. ATWELL:  It was a different one, though.

14        THE COURT:  Huh?

15        MR. ATWELL:  It was a different one.  I

16  think -- I can't remember who it was that pulled

17  this one up.

18        THE COURT:  Wait, wait, wait.  You may be

19  right about that.  It's the one that --

20  something about the State has an interest --

21        MR. ATWELL:  Yeah, the State has no

22  interest.

23        THE COURT:  -- in a not guilty verdict as

24  well as it does a guilty verdict.

25        MR. ATWELL:  In this particular one you

1    stated, no, I don't give them one, I give the

2    other one.

3         THE COURT:  I think he's right about that,

4    Mr. Davis.  Anything you want to say?

5         MR. DAVIS:  I know you've given it in this

6    form when I was sitting on that side.

7         THE COURT:  I did?

8         MR. DAVIS:  Yes, sir.  I always objected to

9    the other one because when I was sitting over

10   there, I was interested in the conviction.

11        THE COURT:  I don't know.  I'll think about

12   it.

13        MR. DAVIS:  I withdraw 12.

14        THE COURT:  Twelve is withdrawn.

15        MR. DAVIS:  I'll withdraw 13.

16        THE COURT:  Thirteen is withdrawn.

17        MR. ATWELL:  Do you want 14?

18        MR. DAVIS:  Sure.

19        THE COURT:  The Court, in essence, gives

20   something similar.  If conflicting inferences

21   may be drawn from the same evidence, the jury

22   should draw an inference consistent with

23   innocence, so it's basically saying the same

24   thing.

25        MR. DAVIS:  I'll withdraw 15.

1    THE COURT:  Fifteen is withdrawn.

2    MR. DAVIS:  Withdraw 16.

3    THE COURT:  Sixteen is withdrawn.  Yeah.

4    Seventeen is a correct statement of the

5    law.  You know, the Court does not generally

6    comment on such.  But whenever that charge is

7    requested, I've given it because, I mean,

8    basically the law says if such a request is

9    made, the Court ought to give it because the

10    jury may consider such.

11    How much time do you all need to argue your

12    respective cases?

13    MR. ATWELL:  Fifteen minutes.

14    THE COURT:  You're learning.  But I will say

15    this:  In a complicated case, I would give

16    you --

17    MR. ATWELL:  Seventeen?

18    THE COURT:  Yeah.

19    MR. DAVIS:  I don't think there's anything I

20    can say that will take more than 15 minutes.

21    THE COURT:  All right.  Let's bring the

22    jurors in then.

23    (The jury entered the courtroom.)

24    THE COURT:  We're back within the hearing

25    and presence of the jury.  All 13 jurors have

1    returned.  The parties and their respective

2    attorneys are present.

3        Ladies and gentlemen, again, let me

4    apologize to you for the delay.  It was a matter

5    that I had to take up outside your presence.  It

6    lasted a little longer than I thought.  There

7    will be an explanation for that momentarily.

8        The State has rested.  You've heard all the

9    evidence you're going to hear from the State.

10        I'll now turn to the defense, Mr. Davis.

11        MR. DAVIS:  The defense rests.

12        THE COURT:  And I knew that while you were

13    in the jury deliberation room, so that caused me

14    to take up another matter.  And I tried to kill

15    two birds with one stone and keep you out.

16    That's the reason it was a little longer than I

17    wanted it to be.

18        So you've heard all the evidence you're

19    going to hear in this case.  The only thing that

20    remains is for the attorneys to make their

21    closing arguments to you.  As I said, the State

22    would go first and would be followed by the

23    defense.  And then the State would get one last

24    opportunity to address you because the State has

25    the burden of proof, which is beyond a

1    reasonable doubt.

2    Each side has not longer than 15 minutes to

3    argue its respective case to you.  The State can

4    divide its time up however it chooses.

5    Mr. Atwell, you may argue your case to the

6    jury.  It is 3:15.

7    MR. ATWELL:  Thank you, Your Honor.

8    (A closing argument was given by

9    Mr. Atwell on behalf of the State.)

10    THE COURT:  Thank you, Mr. Atwell.

11    Mr. Davis, you may make your final closing

12    argument to the jury.  It is 3:17.  You've got

13    15 minutes.

14    MR. DAVIS:  May it please the Court.

15    (A closing argument was given by

16    Mr. Davis on behalf of the defendant.)

17    THE COURT:  Thank you, Mr. Davis.

18    Mr. Atwell, you may make your final closing

19    argument.  It's 3:25.

20    MR. ATWELL:  Thank you, Your Honor.

21    (A rebuttal closing argument was given

22    by Mr. Atwell on behalf of the State.)

23    MR. DAVIS:  Judge, I'm going to object.

24    It's not perception of a threat.  It's use force

25    or threaten the imminent use of force.  There's

1   nothing in the law about perception of the

2   threat.

3          THE COURT:  Gentlemen, approach.

4              (The following proceedings were held at

5              the bench outside the hearing of the

6              jury:)

7          MR. ATWELL:  You know, it occurred to me

8   under 13A-8-41(b) possession then and there of

9   an article used or fashioned in a manner to lead

10  any person who is present reasonably to believe

11  it to be a deadly weapon or dangerous

12  instrument; or any verbal or other

13  representation by the defendant that he is then

14  and there so armed is prima facie evidence under

15  subsection (a) of this section that he was so

16  armed.  So it says or any verbal or other

17  representation by the defendant which would, to

18  me, mean nonverbal as well.

19         MR. DAVIS:  That part is fine because it

20  says threat.  It doesn't matter what he

21  thought.  Absolutely does not matter what he

22  thought.

23         THE COURT:  Well, I'm going to address this.

24         MR. DAVIS:  It's an act on Mr. Saffold's

25  part.

1    THE COURT:  I'm going to address it this
2    way.  Listen, gentlemen.  I've not released you
3    yet.  I'm going to address it this way.  What
4    y'all say is not the law.  It's going to be what
5    they hear from me.
6         (The attorneys and the court reporter
7         left the bench and the proceedings were
8         continued in open court.)
9    THE COURT:  Ladies and gentlemen, what the
10   attorneys say is not the law in this case.  You
11   would take your instructions concerning the law
12   from the Court and the Court alone.  They can
13   argue the law, but it's not the law -- either
14   side or both sides.  Go ahead.
15        (The rebuttal closing argument was
16        continued by Mr. Atwell on behalf of
17        the State.)
18   THE COURT:  Thank you, Mr. Atwell.
19        Ladies and gentlemen, it's now my duty to
20   charge you with the law that is applicable in
21   this case.  Before I do that, I think I'd be
22   remiss if I did not commend the attorneys to
23   you, Mr. Atwell for the State and Mr. Davis for
24   the defense.  I think they have done an
25   admirable job in representing their respective

1    clients.

2        Monday morning I had indicated to you that

3    you are an integral part of the judicial system,

4    that we could not operate without you.

5        You know, I've been in the this system, the

6    legal profession, now for 21, 22 years.  And

7    I've sat where Mr. Atwell sits as an assistant

8    district attorney and I've sat where Mr. Davis

9    sits as a defense attorney.  I've been your city

10   attorney for seven years and your circuit judge

11   now for nine years.

12       The longer that I am in the system, the more

13   I begin to appreciate how it works.  You see, it

14   only works if everybody performs their duty.

15   These attorneys have done their duty and

16   performed their duty admirably.

17       In a moment, I'll move on and do my duty,

18   after which time I will hand this case over to

19   you for you to do your duty.  I hope by now, at

20   least by sitting on this case, you have come to

21   appreciate your role in the judicial system, and

22   that what I told you all Monday did not fall on

23   deaf ears.  You are an integral part of our

24   system and we could not operate without you.

25       Let me move on now and charge you with the

1   law applicable in this case.  You know, every

2   offense made a crime by the laws of the State of

3   Alabama is comprised of elements.  And it is the

4   State's burden to prove to you each and every

5   element of the charged offense.

6        In this case, the defendant is charged with

7   robbery in the first degree.  Now, I'm going to

8   read the indictment to you a second time.  You

9   remember I read it to you this morning because I

10  needed to ask you a couple of questions

11  regarding the indictment and for no other

12  reason.  I'm going to read it to you this time

13  for a different reason, because, you see, that

14  indictment contains the elements of robbery in

15  the first degree.

16       Now, it does collapse them all together;

17  that's true.  But during the course of the

18  Court's oral charge, we're going to go over

19  them.  We're going to break them out, go over

20  them one at a time and define any terms that are

21  applicable to those elements.

22       The indictment in CC-05-216 reads as

23  follows:

24            (The indictment was read.)

25       THE COURT:  As I said, that indictment

1    charges the defendant with robbery in the first

2    degree.  We'll go over those elements

3    momentarily.

4         Now, I also told this to you this morning:

5    The indictment in this case is not any evidence

6    in the case.  And the fact that I have read the

7    indictment to you and the fact that the

8    defendant is charged with this offense by

9    indictment is not to be considered by you as any

10   evidence or any circumstance against the

11   defendant.  It is merely the formal means by

12   which charges are brought against the defendant

13   and he is placed on trial before you.

14        Now, as to the charge in that indictment,

15   the defendant has entered a plea of not guilty.

16   The defendant says that he is not guilty of the

17   offense contained within that indictment.

18        Now, ladies and gentlemen, there have been

19   terms used in this courtroom that are legal

20   terms or words of art, even when they began

21   asking questions of you early this morning,

22   terms like presumption of innocence, burden of

23   proof, reasonable doubt or beyond a reasonable

24   doubt.  Let's take a moment and talk about those

25   terms.

1       First, presumption of innocence.  The

2  defendant is presumed to be innocent until he is

3  proven guilty beyond a reasonable doubt by the

4  evidence in this case.  He comes in court

5  cloaked with this presumption.  And this

6  presumption follows him throughout the course

7  and proceedings of the trial until the evidence

8  produced by the State convinces each of you

9  beyond a reasonable doubt of his guilt.

10      The presumption of innocence is to be

11  regarded by the jury as a matter of evidence to

12  the benefit of which the accused is entitled.

13  In the defendant's case, as in all other cases

14  where a defendant pleads not guilty, the burden

15  of proof -- that's another one of those terms

16  and we'll talk about it in just a moment -- the

17  burden of proof is upon the State to convince

18  each member of the jury beyond a reasonable

19  doubt as to the truth of the material

20  allegations contained in the indictment.

21      So what is this burden of proof.  And who

22  has it?  Well, this burden of proof is beyond a

23  reasonable doubt.  And this burden of proof lies

24  with the State.

25      Now, reasonable doubt, what does that mean?

1    The doubt which would justify an acquittal must

2    be a doubt for which you have a reason arising

3    from the evidence, any lack thereof or any part

4    thereof and remaining after a careful

5    consideration of the testimony such as

6    reasonable, fair-minded and conscientious men

7    and women would entertain under all

8    circumstances.

9        The State is not required to prove guilt

10    beyond all doubt, but it is required to prove

11    guilt beyond a reasonable doubt.

12        If conflicting inferences may be drawn from

13    the same facts, the jury should draw an

14    inference consistent with innocence.

15        This morning we touched on briefly your

16    duties as jurors in this case or

17    responsibilities as jurors.  Forgive me if I

18    repeat some of that, but it is important and I

19    want to take a moment and cover some of it

20    again.

21        You should base your decision only on the

22    evidence admitted into this courtroom.  Not

23    everything you heard and saw in this courtroom

24    is evidence.

25        Now, of course, the testimony, writings,

1    objects and other things presented during a

2    trial are evidence.  But as I told you this

3    morning and again this afternoon, the statements

4    made by the attorneys are not evidence and

5    should not be used by you as evidence.

6        Once evidence is admitted, only the jury can

7    decide two essential things about this

8    evidence:  First, whether it should be believed

9    and, second, how important is it.  You should

10   make these two decisions about each part of the

11   evidence by using your own common sense as

12   reasonable men and women.

13       You should not imagine things that cannot be

14   proven by the evidence.  Of course, you must

15   consider all the evidence in this trial without

16   bias, prejudice or sympathy to either side.  You

17   must be equally just to both sides in this

18   case.  Your verdict must not be based on

19   suspicion, speculation or conjecture.

20       You are the sole judges of the evidence and

21   of the credibility of any of the witnesses.  You

22   may accept or reject any part of the testimony

23   you consider worthy or unworthy of belief.

24       In determining the weight to be afforded the

25   testimony of any witness, you may consider the

1   demeanor of the witness on the witness stand,

2   his or her apparent candor or evasion, or the

3   existence or nonexistence of any bias or

4   interest.  As I said to you earlier, you may

5   take into consideration any matter which you

6   would in your own everyday affairs in passing

7   upon the truthfulness and accuracy of the

8   testimony in this case.

9       Weigh the testimony in the light of your own

10  common observation and experience and reach a

11  verdict that will be based upon the truth as you

12  determine it from all of the evidence.

13      Now, in Alabama, the law recognizes two

14  types of evidence.  It recognizes eyewitness

15  evidence -- sometimes we think of it as

16  eyewitness evidence or direct evidence or

17  positive evidence.  And it recognizes

18  circumstantial evidence.

19      The guilt of a defendant may be proven by

20  circumstantial evidence as well as by direct

21  evidence or by a combination of both types of

22  evidence.

23      Now, circumstantial evidence means that it

24  is not any direct, positive, eyewitness evidence

25  of any person who saw the commission of a crime;

1    but it is the events, the happenings, the

2    circumstances surrounding it.

3        Where the State relies on circumstantial

4    evidence, either in whole or in part, to convict

5    a party charged with the commission of a crime,

6    the degree of proof must be the same, that is,

7    beyond a reasonable doubt.

8        That does not mean, however, that because

9    evidence is circumstantial, that you should

10   disregard it and not consider it because it is

11   circumstantial.

12       But it does mean this:  It means that you

13   must be satisfied beyond a reasonable doubt as

14   to the guilt of the party on trial regardless of

15   what kind of evidence is relied upon by the

16   State to establish the guilt of the defendant.

17       Now, ladies and gentlemen, we are at that

18   point where I want to go over with you the

19   elements of robbery in the first degree.  As I

20   said, the defendant is charged with robbery in

21   the first degree.

22       A person commits the crime of robbery in the

23   first degree if, in the course of committing a

24   theft, he uses or threatens the imminent use of

25   force against the person of the owner of the

1    property or any person present with the intent

2    to overcome that person's physical resistance or

3    physical power of resistance and, in so doing,

4    he is armed with a deadly weapon or dangerous

5    instrument.

6        Okay.  Now, let's break them out.  All

7    right.  I'm going to go over these now.  Number

8    one, that the defendant, Eric Saffold, committed

9    or attempted to commit theft of U.S. currency;

10   and -- it has to be all of them -- and number

11   two, that in the course of committing or

12   attempting to commit the theft, the defendant

13   either used force against the person of

14   Mr. Gradic with the intent to overcome his

15   physical resistance or physical power to resist,

16   or threatened imminent use of force against the

17   person of Mr. Gradic or another person present,

18   which is Kevin Guerra, with the intent to compel

19   acquiescence to the taking of the property.

20       Let me go back over that again.  That in the

21   course of committing or attempting to commit

22   theft, the defendant either used force against

23   the person of Mr. Gradic or another person

24   present with the intent to overcome his physical

25   resistance or physical power to resist, or

1    threatened imminent use of force against the

2    person of Mr. Gradic or another person present

3    with the intent to compel acquiescence to the

4    taking of the property; and number three, that

5    the defendant was armed with a deadly weapon or

6    dangerous instrument; and number four, that it

7    occurred in Houston County, Alabama.

8        Those are the four elements of robbery in

9    the first degree.  I wish it were that simple

10   because contained in those elements are some

11   words that are used, and I've got to go over

12   some of the definitions in those elements.

13       Let me say a couple of things.  The Code has

14   this to say about robbery.  In the course of

15   committing a theft, embraces acts which occur in

16   an attempt to commit or the commission of theft

17   or in the immediate flight after the attempt or

18   commission.

19       The Code also has this to say:  Possession

20   then and there of an article used or fashioned

21   in a manner to lead any person who is present

22   reasonably to believe it to be a deadly weapon

23   or a dangerous instrument; or any verbal or

24   other representation by the defendant that he is

25   then and there so armed is prima facie evidence

1    under subsection (a) of this section that he was

2    so armed.

3        And subsection (a) is the robbery in the

4    first degree statute.  And basically says a

5    person commits the crime of robbery in the first

6    degree if he violates Section 13A-8-43 -- and

7    we've gone over that -- and he is armed with a

8    deadly weapon or dangerous instrument.  So I've

9    collapsed those two together for you, but that's

10   basically what it says.

11       Talk about theft of property.  A person

12   commits the crime of theft of property if he

13   knowingly obtains or exerts unauthorized control

14   over the property of another with the intent to

15   deprive the owner of his property.

16       A deadly weapon is a firearm or anything

17   manifestly designed, made or adapted for the

18   purposes of inflicting death or serious physical

19   injury.

20       This is a specific intent crime.  And a

21   person acts intentionally with respect to a

22   result or to conduct when his purpose is to

23   cause that result or to engage in that conduct.

24   A person acts knowingly with respect to conduct

25   or to a circumstance when he is aware that his

1    conduct is of that nature or that the

2    circumstance exists.

3        Ladies and gentlemen, if you find from the

4    evidence that the State has proved beyond a

5    reasonable doubt each of the elements of robbery

6    in the first degree as charged in the

7    indictment, then you shall find the defendant

8    guilty of robbery in the first degree.

9        However, if you find that the State has

10    failed to prove beyond a reasonable doubt any

11    one or more of the elements of robbery in the

12    first degree, then, of course, you cannot find

13    the defendant guilty and must, therefore, acquit

14    him.   Those are the elements of robbery in the

15    first degree.

16        Ladies and gentlemen, the defendant did not

17    testify in his own behalf in this case.   That

18    must not and you cannot take that into

19    consideration either for or against the

20    defendant.

21        The defendant has the right to either

22    testify in his own behalf or to not testify in

23    his own behalf.   And the fact that he does stay

24    off the witness stand and does not testify

25    cannot be taken and considered by the jury when

1    it goes out to weigh and consider all the

2    testimony in this case and makes up its verdict

3    as to the guilt or innocence of the defendant.

4        Ladies and gentlemen, a judge is not

5    permitted by law to express his opinion or

6    comment on the effect of the evidence presented

7    to you or the credibility of any of the

8    witnesses.

9        Therefore, any ruling, statement, or

10    expression which may have been made by me during

11    the course of this trial is not to be considered

12    by you as any effort on my part to convey to you

13    any feelings or opinions about the facts in this

14    case or the credibility of any of the witnesses.

15        Now, my office has taken the opportunity to

16    prepare verdict forms for your use.  There are

17    only two possibilities and I have two verdict

18    forms.  Each verdict form is the same as to the

19    style of the case, and that's that bold language

20    which appears at the top.

21        And I'll just read that quickly.  It says:

22    In the Circuit Court of Houston County, Alabama,

23    State of Alabama, plaintiff, versus Eric

24    Saffold, defendant, Case Number CC-05-216.

25    Appears on both verdict forms.

1    I'm going to go over these with you.  Do not

2  place any significance on the order in which

3  these are read because none is intended by the

4  Court.  One possibility reads as follows:  We,

5  the jury, find the defendant, Eric Saffold,

6  guilty of robbery in the first degree as charged

7  in the indictment.

8    If this is the verdict of the jury or

9  corresponds with the jury's verdict, then your

10  foreperson shall sign and date this form.

11    However, if you are not convinced beyond a

12  reasonable doubt that the defendant is guilty of

13  robbery in the first degree as charged in the

14  indictment, that brings us to the second

15  possibility.  And it reads as follows:  We, the

16  jury, find the defendant, Eric Saffold, not

17  guilty.

18    If this is the verdict of the jury or

19  corresponds with the jury's verdict, then your

20  foreperson shall sign and date this form.  Those

21  are the only two possibilities.

22    Ladies and gentlemen, when you go back to

23  the jury room to begin your discussions about

24  this case, you will take with you any material

25  presented as evidence.  And there were some

1    exhibits that were admitted.  You'll take with

2    you the verdict forms which I've gone over and

3    will give to you in just a moment.  And you'll

4    take with you any notes that you may have taken

5    during the course of the trial.

6        Did any of you take any notes?  If you did,

7    raise your hand.  Anybody?

8        I see no hands.

9        Once you have entered the jury room to begin

10   your discussions about this case, you should

11   first choose a foreperson who may be either a

12   man or a woman.  The foreperson's duties are

13   these:  First, to keep order and make sure that

14   everyone who wants to has an opportunity to

15   speak; second, to represent the jury in any

16   communications you may wish to make with the

17   Court and the Court alone; and third, to sign

18   and present your verdict.

19       However, the verdict will be the verdict of

20   all 12 of you and the foreperson does not have

21   any more power than any other juror.

22       As I said, your verdict must be unanimous,

23   that is, all 12 of you would have to agree.

24       Each juror's verdict must be his or her own

25   and it should not be made out of a need to agree

COURT OF CRIMINAL APPEALS NO. _CR 04-2068_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC2005-216___

CIRCUIT JUDGE ___Larry K. Anderson___    VOL. II

Type of Conviction / Order Appealed From: ___Robbery 1st___

Sentence Imposed: ___25 yrs, $5,000 fine, $1,000 CVCC plus atty fees and costs___

Defendant Indigent: [XX] YES  [ ] NO

SAFFOLD, ERIC
_____

Thomas K. Brantley       334-793-9009                    NAME OF APPELLANT
(Appellant's Attorney)                (Telephone No.)
401 N. Oates St.
(Address)
Dothan, AL. 36303
(City)            (State)            (Zip Code)

                              V.

STATE OF ALABAMA
(State represented by Attorney General)                  NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.
_____
_____

(For Court of Criminal Appeals Use Only)

EXHIBIT
A

with everyone else.  Yet in order to bring 12 minds to the same decision, jurors have to respect and listen to one another's opinions honestly.

You do not have to give up a conscientious conclusion which might be different from your fellow jurors, but it is your duty to discuss it with them carefully and honestly.  It is your duty to be absolutely just to both sides in this case.

In summary then, you should remember these two rules when you disagree with other jurors: First, respect and consider the opinions of other jurors; but secondly, in the end, reach your own conclusion.  As I said, all 12 of you would have to agree before you can reach any verdict in this case.

Before you go to the jury room, I'm going to give you the verdict forms.  And when you've reached a verdict, your foreperson, of course, will sign and date the verdict form that correctly corresponds with the verdict of the jury.  And the verdict will be the verdict of all 12 of you.

Let's see.  Ladies and gentlemen, the

1    following charges are also correct statements of

2    the law and are to be considered by you with

3    what I've already said to you as the law in this

4    case.

5        No matter how strong circumstantial evidence

6    seems, if it only arouses your suspicion that

7    Eric Saffold is guilty of robbery in the first

8    degree, it will not serve as a basis for

9    convicting him.

10        Ladies and gentlemen, you cannot convict

11    Eric Saffold on mere possibilities, surmise,

12    suspicions or speculation, however strong they

13    may be.  A verdict of guilty based upon mere

14    possibilities, surmise, suspicion or speculation

15    would violate the oath that you as a juror have

16    taken.

17        If, after carefully and fairly reviewing the

18    facts, you are not satisfied that Eric Saffold

19    is guilty without speculation or surmise, then

20    you have a reasonable doubt and you should find

21    him not guilty.

22        Ladies and gentlemen, the presumption of

23    innocence with which Eric Saffold has entered

24    into this trial is a fact in this case which

25    must be considered with all the evidence and is

1   not to be disregarded.

2         Ladies and gentlemen, a defendant is never

3   to be convicted on mere suspicion or

4   conjecture.  The burden is always on the

5   prosecution to prove guilt beyond a reasonable

6   doubt.  This burden never shifts to a defendant

7   for the law never imposes upon a defendant in a

8   criminal case the burden or duty of calling any

9   witness or producing any evidence.

10         If, after careful and impartial

11   consideration of all the evidence in this case,

12   any one of you has a reasonable doubt that Eric

13   Saffold is guilty of robbery in the first

14   degree, then you cannot find him guilty.

15         It is the policy of the law that no innocent

16   person should be convicted.  And it is better

17   that many guilty persons go unpunished than for

18   one innocent person to be convicted.

19         Ladies and gentlemen, when the State offers

20   testimony or evidence that a defendant made a

21   statement or admission to someone after being

22   arrested or detained, the jury should consider

23   the evidence concerning such a statement with

24   caution and great care.  It is for you to decide

25   whether the defendant made this statement; and

1    if so, how much weight to give it.  In making

2    those decisions, you should consider all of the

3    evidence about the statement, including the

4    circumstances under which the defendant may have

5    made it.

6            Gentlemen, approach.

7                    (The following proceedings were held at

8                    the bench outside the hearing of the

9                    jury:)

10    THE COURT:  Exceptions to the Court's oral

11    charge from the State?

12            MR. ATWELL:  No, sir.

13            THE COURT:  From the defendant?

14            MR. DAVIS:  Yes, sir.  The defense would

15    except to adding the annotations from the Code

16    and adding them in addition to the patterned

17    jury instruction.

18            THE COURT:  And what?

19            MR. DAVIS:  And adding them to the patterned

20    jury instruction.

21            THE COURT:  Oh.  You have your exception.

22            MR. DAVIS:  Yes, sir.

23                    (The attorneys and the court reporter

24                    left the bench and the proceedings were

25                    continued in open court.)

1    THE COURT:  Ladies and gentlemen, there are

2    13 of you.  There's an alternate.  Let me see if

3    I can dig it out here.  Let's see.

4    Let me name the alternate.  As I call your

5    name, if you will, please stand.  William Ivey.

6    Mr. Ivey, you were the alternate in this

7    case.  I don't know.  You may have wanted to go

8    back there to decide this case or not.  But, of

9    course, the law says that only 12 can go back

10    there.  You have served nonetheless and you've

11    been very patient by listening to all of the

12    evidence and this Court's lengthy oral charge.

13    I guess the only good news I've got for you

14    is you get to leave a little bit earlier than

15    your colleagues here.  If you will, have a seat

16    over here.  Let me check.  I think -- well, let

17    me just do this.  You are free to go.  Just come

18    back in the morning at 9 o'clock.  I think

19    that's what I was told earlier.  Thank you so

20    much.

21    Ladies and gentlemen, you may now retire to

22    make up your verdict in this case.

23    (The jury exited the courtroom.)

24    THE COURT:  We're out of the hearing and

25    presence of the jury.

1          Any exceptions to the Court's oral charge or

2     anything you want to put on the record?

3          MR. DAVIS:  Yes, sir.  I just renew my

4     objection to the Court adding from the

5     annotations definitions in addition to the

6     Court's -- well, the patterned jury instruction

7     regarding robbery in the first degree.

8          THE COURT:  I have given those same

9     annotations for you when you were on the other

10    side.  And in fact, I knew there was something

11    inherently wrong with that argument about no

12    threats or any gun -- imminent use of force or

13    any threats or attempted threats.  Just somehow

14    it seemed wrong.  And I think -- you know, I

15    basically think that 13A-41(b) addresses that

16    when it talks about any verbal or other

17    representation by the defendant.  And this, you

18    know, would be nonverbal representations.

19         MR. DAVIS:  We weren't under that section,

20    though.

21         THE COURT:  Huh?

22         MR. DAVIS:  That wasn't the section charged,

23    though.

24         THE COURT:  13A-8-41(b)?

25         MR. DAVIS:  I mean the indictment didn't say

1    anything about suggesting he had a gun or

2    anything.  That's outside the facts.

3         THE COURT:  I'm not the jury.

4         MR. DAVIS:  I understand.

5         THE COURT:  You have your exception for the

6    record.  Anything else?

7         MR. DAVIS:  No, sir.

8         THE COURT:  All right.  We're adjourned

9    until the jury returns with a verdict.  It is

10    4 o'clock.

11            (A recess was taken while the jury

12              considered its verdict.)

13         THE COURT:  Gentlemen, I understand they

14    have a verdict in this case.  Are you all ready?

15         MR. ATWELL:  Yes, sir.

16         MR. DAVIS:  Yes, sir.

17            (The jury entered the courtroom.)

18         THE COURT:  Back within the hearing and

19    presence of the jury.  All 12 jurors have

20    returned.  The parties and their respective

21    attorneys are present.

22         Ladies and gentlemen, I have been informed

23    that you all have reached a verdict in this

24    case; is that correct?

25         THE FOREPERSON:  That's correct.

1    THE COURT:  I guess my first question is:
2    Who is the foreperson?  You are?
3    THE FOREPERSON:  Yes, sir.
4    THE COURT:  And your name for the record?
5    THE FOREPERSON:  My name is Michael Hannon.
6    THE COURT:  I'm sorry.
7    THE FOREPERSON:  Michael Hannon, Hannon.
8    THE COURT:  Okay.  Mr. Hannon, have you
9    signed and dated the verdict form that correctly
10   corresponds with the verdict of the jury?
11   THE FOREPERSON:  Yes, I have.
12   THE COURT:  Will you hand it to the deputy,
13   please, sir?
14   And I know it's obvious to everyone in here,
15   but have you handed it to the deputy who has now
16   handed it to me?
17   THE FOREPERSON:  Yes.
18   THE COURT:  Thank you.  Defendant shall
19   rise.  I'll now read the verdict of the jury.
20   In the Circuit Court of Houston County,
21   Alabama, State of Alabama, plaintiff, versus
22   Eric Saffold, defendant, Case Number CC-05-216,
23   verdict of the jury reads as follows:  We, the
24   jury, find the defendant, Eric Saffold, guilty
25   of robbery in the first degree as charged in the

1   indictment.

2       It is signed by Mr. Hannon and dated this

3   the 3rd day of May, 2005.

4       Gentlemen, would you like for me to poll the

5   jurors individually?

6       MR. DAVIS:  Yes, sir.

7       THE COURT:  Ladies and gentlemen, I'm going

8   to poll you individually and see if that is your

9   individual verdict as well as the collective

10  verdict of the jury.

11          (The jury was polled by the Court.)

12      THE COURT:  Let the record reflect that the

13  Court has polled each individual juror, and that

14  he or she has indicated to the Court that that

15  is his or her individual verdict as well as the

16  collective verdict of the jury.

17      The defendant shall approach.  You are Eric

18  Saffold?

19      THE DEFENDANT:  Yes, sir.

20      THE COURT:  The jury having returned a

21  verdict of guilty of robbery in the first

22  degree, it is the judgment of this Court that

23  you are guilty of said offense.  Do you have

24  anything to say as to why sentence of law should

25  not be pronounced upon you at this time?

1      MR. DAVIS:   We request a presence report.

2      THE COURT:   Under Alabama law, if either

3  side requests a presentence investigation, the

4  Court shall order one.  What's that date?

5      MS. BROWN:   Is June the 10th too soon?

6      THE COURT:   No.  That's fine.  The Court

7  will order a presentence investigation, which

8  will be done by the probation and parole

9  office.  They will report their findings back to

10  this Court.

11      What says the State regarding bond?

12      MR. ATWELL:   Your Honor, the defendant is

13  looking at 20 to life with the firearm

14  enhancement on this.

15      THE COURT:   Correct.  And he didn't show up

16  after lunch like he was supposed to.

17      MR. DAVIS:   Judge, he was only 10 minutes

18  late.  He's been in court every time.

19      THE COURT:   He was 10 minutes late.  These

20  12 people were waiting on him.  You were waiting

21  on him.  They were waiting on him.  I was

22  waiting on him as though it's no big deal.  It

23  is a big deal.

24      MR. DAVIS:   Judge, if the Court is offended

25  by that, I would ask you to merely impose your

1    typical punishment for being late to court as

2    opposed to revoking his bond.  He's not

3    committed any new offenses.  He's made all his

4    court appearances.

5         THE COURT:  He has, but now he's been

6    convicted of an offense.

7         MR. DAVIS:  Understood.

8         THE COURT:  Which carries 20 to life.  The

9    Court will up the bond in this case to $30,000.

10        MR. DAVIS:  Yes, sir.

11        THE COURT:  He's in custody.

12                    END OF PROCEEDINGS

IN THE STATE OF ALABAMA

FOR THE COUNTY OF HOUSTON

TWENTIETH JUDICIAL CIRCUIT

CRIMINAL DIVISION

STATE OF ALABAMA,

        Plaintiff,

vs.                    Case No. CC-05-216

ERIC SAFFOLD,

        Defendant.

_____

JUNE 10, 2005

SENTENCING

Before the Honorable

Larry K. Anderson

at the Houston County Courthouse

Dothan, Alabama

Andrea E. Martin, RMR, CRR
Official Court Reporter

1                   A P P E A R A N C E S

2       ON BEHALF OF THE STATE:

3              Mr. David M. Atwell

4              Assistant District Attorney

5              Dothan, Alabama

6

7       ON BEHALF OF THE DEFENDANT:

8              Mr. Thomas K. Brantley

9              Attorney at Law

10             Dothan, Alabama

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2   THE COURT:  You say you want to call

3   witnesses?

4   MR. BRANTLEY:  Yes.  I call Reverend Paul

5   Holman.

6   THE COURT:  Okay.

7   MR. BRANTLEY:  Come up here.

8   THE COURT:  Reverend Holman, come up and

9   have a seat beside me.  There are a couple of

10   steps there.  Be careful as you take your seat.

11   Good morning.

12   PAUL HOLMAN

13   having been first duly sworn, was examined and

14   testified as follows:

15   DIRECT EXAMINATION

16   BY MR. BRANTLEY:

17   Q.  You are Reverend Paul Holman?

18   A.  Yes, sir.

19   Q.  What do you do for a living, sir?

20   A.  Pastor, Greater Beulah Baptist Church.

21   Q.  How long have you been a pastor of Greater

22   Beulah?

23   A.  1995, ten years.

24   Q.  And do you know Eric Saffold?

25   A.  Yes, sir, I do.

1    Q.   How do you know him?

2    A.   He's been with the church and his family has

3         been with the church since I've been there.

4    Q.   Okay.  Now, would you tell us -- you understand

5         he's been convicted of robbery first degree and

6         we're here today to give him a sentence.  And we

7         have filed a motion to remit him to Teen

8         Challenge drug program down in Pensacola or

9         Sanford, Florida.  Do you understand that?

10   A.   Yes.

11   Q.   And that he's already been admitted to Teen

12        Challenge subject to this Court's approval.

13        Now, you understand robbery first degree is a

14        serious offense --

15   A.   (Nods head affirmatively.)

16   Q.   -- and that he was convicted of this, and he had

17        a .22 rifle over at the Dairy Queen and he was

18        going to rob that store, but the man that he was

19        going to rob pulled a nine millimeter on him and

20        talked him back down, so the robbery didn't

21        happen.

22           Now, would you tell Judge Anderson why you

23        think this man should be sent to Teen Challenge

24        as opposed to sent off to the SAP program?

25          And first, let me get this straight.  You

1        are here not to get him out of serving

2        incarceration, are you?

3    A.   No, sir, I'm not.

4    Q.   You're here first to send him to Teen Challenge,

5        then to the state prison system?

6    A.   Yes, sir.  Can I say this?

7    Q.   Yes.

8    A.   I was in this court about six years ago with

9        somebody else pleading their case, and we got

10       them some help.  I think the young man got 12

11       years, split six or something like that.  And I

12       told the judge if he didn't do right, that's on

13       him.  So he went to boot camp for three months.

14       And at the end of boot camp, he didn't do

15       right.  He's been in the penitentiary for seven

16       years.  I won't return the letters.

17           I'm not here -- you commit a crime, he's got

18       to do the time.  I'm not here to set him free

19       because we don't believe in that.  What we're

20       here today to do, to try to get him some help

21       because I believe there was some brokenness in

22       the family.  When this came, there was some

23       brokenness in the family ongoing.

24           I don't know if his mother is here today.

25       But his mother moved away, abandoned the

1    situation.  He's pretty much been living on his

2    own.  And I think there was a cry for help.  So

3    that's why I'm here today, cry to get him help.

4    I think he got him some drugs, trying to replace

5    his mama, his daddy.

6  Q.  Tell us about his broken home dealing with his

7    mother.

8  A.  Well, they got divorced.  They got divorced in a

9    tragic situation and the kids are having to

10    choose mama and daddy.  I don't know really if

11    he knows who the biological father is.  I don't

12    know that to be true.

13    And his mother is trying to live her own

14    life.  She hasn't been here with him either.  So

15    he's really been raising himself.

16  Q.  His mother abandoned him?

17  A.  Yes.

18  Q.  And at that point in time, was he a member of

19    your church?

20  A.  Yes.

21  Q.  And after his mother left him, was he by himself

22    up here?

23  A.  Yes.

24  Q.  Did he live on the streets after that?

25  A.  I think he lived on the streets.  His sister

1     tried to help, but pretty much on his own.

2  Q.  How old was he when his mother left him?

3  A.  Eighteen, 19.

4  Q.  Did the church try to care for him at that point

5     in time?

6  A.  Yeah.  A few churches tried to care for him.

7  Q.  Has he been receptive to your spiritual

8     counseling?

9  A.  He's been very receptive to spiritual

10    counseling.  I think he loves the Lord.  We've

11    been to see him in jail and we prayed together.

12    I think he knows the seriousness of this

13    matter.  But I think drugs is a major factor

14    here, that they turn to.  And anything we can

15    get him to get off of those drugs I think will

16    help him.

17  Q.  You understand the prison system has a SAP

18    program?

19  A.  Yes.

20  Q.  Substance Abuse Program.

21  A.  Uh-huh.

22  Q.  Have you had experience with members of your

23    church, families in your church, of people who

24    have come back from the SAP program?

25  A.  Yes.

Q.  Have you been impressed with what the SAP
program does?

A.  Well, I don't want to knock any type program.
But, you know, when you go to prison, prison is
still prison.  And prison can zap a lot out of
you before you get to SAP to get some help.  So
what we're trying to do is get him the help he
needs before he enters total darkness.

Q.  All right.  He's been accepted to Teen
Challenge.  Do you believe the fact that Teen
Challenge is a Christian-based, 12-month program
will help him when he completes that, when he
does go off to prison?

A.  Yes, I believe that because it would be
uninterrupted help.  I think he needs to be
locked down.  I think he needs to be in a
program where he can't have the influences of
society at him, where he can think about and
pray about what he's done and get some real
serious help that he hasn't had.

        MR. BRANTLEY:  That's all I have of Reverend
Holman, if the D.A. does.

        THE COURT:  Thank you, Mr. Brantley.
Anything, Mr. Atwell?

        MR. ATWELL:  Yes, sir.  I have a few

1    questions.

2                    CROSS-EXAMINATION

3    BY MR. ATWELL:

4    Q.   Have you been verified with this individual

5         since you came there in '95 or just his family?

6    A.   No.  I have been involved with him some.

7    Q.   Were you there in June of '95 when he was placed

8         on probation for carrying a pistol without a

9         permit and receiving stolen property?

10   A.   That wasn't brought to me.  I have to really

11        look back in '95 -- that's when I came, so I

12        can't say exactly what month I came in '95.

13   Q.   Was he a regular at your church back in '95?

14   A.   Well, he was a regular member, but he wasn't a

15        regular every-Sunday member.

16   Q.   What about in '97 when he was committed -- or

17        got a suspended commitment to the Department of

18        Youth Services for carrying a pistol without a

19        permit?

20             MR. BRANTLEY:  Judge, he's not asking -- I

21        object.  He's not telling Reverend Holman these

22        are juvenile offenses as opposed to adult

23        offenses.

24             MR. ATWELL:  I think that goes --

25             THE COURT:  Well, I mean --

1          MR. ATWELL:  He was a kid.

2          THE COURT:  Reverend Holman may not know

3    about it since it's a juvenile offense and the

4    record is sealed.  He may not know anything

5    about it.

6          MR. ATWELL:  Well, that's why I'm asking.

7          THE COURT:  You can ask him, but, you know,

8    do preface it by indicating it was a juvenile

9    conviction.

10   BY MR. ATWELL:

11   Q.  Of course, he was a juvenile back in '95.

12   A.  Right.  I'm understanding -- I don't know

13     anything about no pistols.  But I'm

14     understanding there has been some problems with

15     his behavior.  And I know that his mama and his

16     daddy and outside forces -- because we really

17     don't know if his daddy is his daddy.

18      But that was going on.  And so I know there

19     was some stuff going on with him, but I don't

20     know about any of the offenses.  But I do know

21     that he was a problem child.

22   Q.  I'm reading his report, I guess, when he met

23     with the probation office.  And what he told the

24     probation officer apparently was he states that

25     he has a great relationship with his family.

1    A.   Uh-huh.

2    Q.   He's told you something different than that?

3    A.   It's all in how you define family.  I think he

4        has a great relationship with his church

5        family.  I think he -- those that he considers

6        his family that's been reaching out to him.

7            And usually in these cases, we don't want to

8        say that we got problems in our families, but we

9        do.  And no one wants to say I've got a problem

10       with my mama, so we reach out in different

11       areas.

12    Q.   Did you tell the Court that it was your

13       understanding he had been married previously?

14    A.   No, I didn't know that.

15           THE COURT:  No.  And I don't think he said

16       that.  I don't think Reverend Holman said that.

17           MR. ATWELL:  I missed that.  I thought he

18       said he had.

19   BY MR. ATWELL:

20    Q.   What -- I guess he indicates his mother lives in

21       Orlando, Florida, Ada Saffold?

22    A.   Yes.

23    Q.   And Harry lives here in Dothan?

24    A.   Yes.

25    Q.   Is Harry Saffold still a member of your church?

```
 1    A.   Yes, sir.  You know, I'm here to tell you the
 2         truth and nothing but the truth.  And I don't
 3         care.
 4    Q.   I understand.
 5    A.   And I'm here in open court.  That's part of the
 6         problem, where you're going at.  See, we don't
 7         know if Harry Saffold is his biological daddy.
 8    Q.   Does he treat him as his son?
 9    A.   He got his name.
10    Q.   When did you become involved more than just him
11         as being a church member?  Was it after his
12         arrest for the robbery?
13    A.   No.  This has been ongoing.  This has been
14         ongoing.  This has been -- I think it climaxed
15         with the robbery.  But we've been trying to help
16         Harry.  We've been trying to help the family.  I
17         think his biggest caretaker is not his mama.
18         His biggest caretaker is not Harry Saffold.
19         It's his sister.  She's here today.  That's his
20         biggest caretaker.  She's got him in to stay
21         with a couple of families.  She's tried to help
22         him in all that that she can, but she can't help
23         the drug problem.
24    Q.   When did you become aware of the drug problem?
25    A.   Three, four years ago.
```

1   Q.   You've tried to help him with it with no

2        success?

3   A.   No.  We tried to help the family.  And I knew it

4        was drugs because I deal with people on drugs

5        all the time, but, you know, reaching out in

6        different areas.  And I don't know if we

7        directly said it was drugs, but we knew it was

8        drugs.

9   Q.   She didn't have any success in helping him out?

10   A.   She was successful in helping her brother all

11        that she could.  But once again, she's a young

12        lady.  And she wasn't a mama and she wasn't a

13        daddy, so she did all that she could.  And I

14        can't say here that she was successful in

15        helping him out because if I say that, he

16        wouldn't have done what he did.

17            So I'm here today because I'm not asking for

18        forgiveness for what he has done.  I mean, he

19        walked in Dairy Queen with a gun -- a shotgun.

20        So I'm not here to discount that.  And I can't

21        say if she was successful in helping him out or

22        he would have never been in Dairy Queen with a

23        gun.

24   Q.   I wasn't really asking about her.  I was asking

25        about you.

1    A.    Well, that's what I'm trying to say.  If we were

2          totally successful, that wouldn't have

3          happened.  But we're saying this has happened

4          and we're seeking a chance for him to go and get

5          some real help.  Because I tell people at the

6          church all the time I am the pastor, the

7          minister, I do all I can for them, but I'm not

8          the psychiatrist, I'm not the psychologist and

9          I'm not the drug counselor.

10              So he needs more than prayer.  He needs some

11          structured help, where he can deal with his

12          problem and get off of these drugs and go on and

13          do his time.

14              MR. ATWELL:  That's all I have.  Thank you.

15              THE COURT:  Thank you.

16              Mr. Brantley, anything else?

17              MR. BRANTLEY:  That's all I have.

18                        REDIRECT EXAMINATION

19    BY MR. BRANTLEY:

20    Q.    Do you -- knowing Eric Saffold, as you know him

21          as a member of your church, do you believe that

22          once he gets off of drugs, that his behavior

23          will change?

24    A.    I believe -- I believe his behavior will change

25          once you get the demon drugs out of him.  I

1          think that will help.

2     Q.   And do you believe that Teen Challenge, based on

3          what you know of Teen Challenge, will be more of

4          a benefit to him right now for the next 12

5          months than the SAP program or hard

6          incarceration in the state penitentiary?

7     A.   I believe that.  And I believe since it's away

8          from here and it's an environment, he will still

9          be incarcerated.  But getting help, I think that

10         will be the best thing for him.

11    Q.   And once again, you're not asking this Court to

12         set him free after he completes his Teen

13         Challenge?  You're just asking to let him do

14         that first and then go do his state time?

15    A.   I'm more than saying that.  Because if I come

16         back, I'm telling you I'm going to be on this

17         side of the table.  I mean, the young man

18         that -- he's serving more time.  I'm not going

19         to get him out.  I mean, we tried to help.  We

20         can't save everybody.  We try to save one when

21         we get a chance.  That's on you.  You have to

22         tote it.  So whatever he get, let him tote it.

23         I've got other folks to help.

24              MR. BRANTLEY:  Thank you very much.

25              THE COURT:  Thank you, Reverend Holman.

1    MR. BRANTLEY:  Judge, I'd like to point out

2    I've got an affidavit of Reverend Holman's

3    attached to my motion --

4    THE COURT:  Correct.

5    MR. BRANTLEY:  -- to send the defendant to

6    Teen Challenge.  And also, I've got an exhibit

7    from the operations director, Mr. Lapenski, down

8    at Teen Challenge saying that Eric has been

9    accepted into the Teen Challenge program.

10    I would ask this Court --

11    THE COURT:  I don't even think we've

12    sentenced him yet, have we?

13    MR. BRANTLEY:  No, sir.  I would ask this

14    Court -- what we're asking is that he not be

15    sentenced today.  Go ahead and send him down to

16    Teen Challenge and then bring him back after he

17    completes it and sentence him then; or in the

18    alternative, sentence him --

19    THE COURT:  What do you mean?  If there's

20    not a sentence, I have no control or authority

21    to do anything.

22    MR. BRANTLEY:  Well, Judge, whichever way

23    you want to do it.  We had asked --

24    THE COURT:  We're going forward with the

25    sentencing today.

1    MR. BRANTLEY: Okay, Your Honor. And we're

2    ready to be sentenced.

3    THE COURT: Okay. You want to be heard with

4    respect to sentencing?

5    MR. BRANTLEY: Well, I'd ask the Court to

6    take into consideration Reverend Holman's

7    comments.

8    THE COURT: Certainly I will. And I place

9    great weight and emphasis on Reverend Holman's

10   testimony.

11   MR. BRANTLEY: And, Judge, I think based on

12   Reverend Holman's testimony that -- you know,

13   we've got a young man here. And goodness

14   gracious, I'm not belittling, you know, an armed

15   robbery. No, I'm not, not for one second.

16   But I think what I'm trying to point out to

17   this Court is that his main problem, his

18   problem -- so many times we see people in this

19   system. Quite frankly, they are just mean.

20   They are just mean folks.

21   THE COURT: Meaning -- you mean a lot of gun

22   play?

23   MR. BRANTLEY: Well, not caring about

24   society or they are thinking about themselves,

25   they are selfish, they are omnipotent and they

1    are just what I call mean folks.  He is not a

2    mean person.  He's made some bad choices, and

3    that's been because of his drugs.

4         THE COURT:  Well, I'm going to tell you

5    something.  I mean, you know, like I say, I

6    place great weight and emphasis on Reverend

7    Holman's testimony.  I consider him a friend and

8    I listen to what Reverend Holman says.

9         I don't necessarily agree with the position

10   that your client is all that deserving because I

11   look at this report and I see going back to 1995

12   carrying a pistol without a permit.

13        Now, how old was your client at that time

14   when he was carrying a pistol?

15        MR. BRANTLEY:  How old was he?

16        THE COURT:  Yeah.

17        MR. BRANTLEY:  In '95 he was -- how old were

18   you in '95?  Ten years ago.

19        THE COURT:  Well, I'll look at the report.

20   If he's --

21        MR. BRANTLEY:  How old are you now?

22        THE COURT:  -- 22 now --

23        MR. BRANTLEY:  He was 12 -- 12, 13.  But you

24   know what, Your Honor --

25        THE COURT:  Carrying a pistol at 12 or 13

1  years of age.  And then in '97, carrying a

2  pistol, resisting arrest, unlawful discharge of

3  a firearm, disorderly conduct -- albeit a

4  misdemeanor, disorderly conduct, disorderly

5  conduct, harassment, harassment.

6      These -- and I understand that, you know,

7  the disorderly conducts and the harassment

8  charges are misdemeanors, but it also indicates

9  a pattern of, you know, not getting along with

10  folks, being rowdy, pushing people around.

11      You know, you couple that with somebody

12  that's going to carry a pistol, and then here we

13  are, here we are, where it's an armed robbery

14  involving a rifle.  It's not a good history nor

15  a good set of circumstances in my mind, it is

16  more of a prediction of things to come.

17      MR. BRANTLEY:  I think two things have

18  happened here.  Number one, this young man -- I

19  would offer as mitigation, not as an excuse, but

20  as mitigation, this horrible broken home he came

21  from.  Now, a lot of us came from broken homes.

22  And, you know, a lot of us didn't get in

23  trouble.

24      But, you know, here is a young man I think

25  but for the lack of guidance in his teenage

1    years wouldn't be here today.

2         THE COURT:  Well, now, again, you offer it

3    as mitigation and I'll accept it as mitigation,

4    but it is in the nature of an excuse.  It is an

5    excuse for bad conduct.

6         You are right.  Clarence Thomas of the

7    United States Supreme Court came from, you know,

8    a bad -- at least poor environment and he sits

9    on the United States Supreme Court.  There are

10   examples of individuals who rise above that.

11        You know, if I were to accept these excuses,

12   then any bad conduct could be excused and there

13   would be no choice or no free will in this

14   world.  It could all be blamed on a bad home

15   environment.  His daddy didn't love him.  His

16   mama didn't love him.

17        I mean, there's -- it could be blamed on any

18   of that.  Life is about choices and the

19   ramifications of those choices.  And we have to

20   live with those choices.  And he's made some

21   choices in life.

22        MR. BRANTLEY:  I understand that.  And once

23   again, we're not asking that he not go to

24   prison.  We're just asking to try this

25   particular situation out by sending him to Teen

1      Challenge first.

2          THE COURT:  And I've done a little research

3      on Teen Challenge.  And it's my understanding on

4      some of that, I have very little authority over

5      them.  And they, that is the prison system, has

6      very little authority over them in some of those

7      programs, particularly Teen Challenge, as I

8      recall.

9          MR. BRANTLEY:  We've sent folks down there

10     before on bond.  I can see the guy's face right

11     now, but went down there for a year.  And

12     brought him back and then he entered his plea.

13         THE COURT:  I just think the Board of

14     Corrections has very little -- I mean, they

15     consider it a probationary status on Teen

16     Challenge, as I recall.

17         MR. BRANTLEY:  Right.  Well, I talked

18     with --

19         THE COURT:  And I don't really recall any

20     situation where I have given probation to an

21     individual who has committed a crime of

22     violence, robbery first certainly being a crime

23     of violence.

24         MR. BRANTLEY:  We've got him accepted into

25     Teen Challenge.  That's not a problem.

1    THE COURT:  Congratulations.

2    MR. BRANTLEY:  But I think what we can do is

3    send him down there either before or after

4    sentencing on bond.  Just continue him on the

5    same bond.  And, you know --

6    THE COURT:  What's he doing over there in

7    jail if he's on bond?

8    MR. BRANTLEY:  Well, we could call it a

9    reverse split; send him to Teen Challenge for a

10   year and then after that he'll go to the state

11   penitentiary.  I think it's a good idea in this

12   particular respect for this young man.

13   THE COURT:  You are putting the cart before

14   the horse.  All I'm interested in right now is

15   the sentencing aspect of it.

16   MR. BRANTLEY:  Yes, sir.  I'd ask that the

17   Court sentence him to a -- at the lower end of

18   his --

19   THE COURT:  You understand that the minimum

20   is 20 years, don't you?

21   MR. BRANTLEY:  Yes, sir.

22   THE COURT:  Okay.

23   MR. BRANTLEY:  Yes, sir.  I'd ask the Court

24   to sentence him to the minimum.

25   THE COURT:  Thank you.  Response?

1    MR. ATWELL:  Your Honor, I don't think this

2 case merits a 20-year sentence.  It's an armed

3 robbery where this individual took a rifle and

4 hid out behind the Dairy Queen with the intent

5 to rob the owner as he came out.  He had the gun

6 strapped to his side.  He was wearing a ski

7 mask.  He admitted his intent was to rob him.

8    And to do any of the things that are

9 suggested by defense counsel, it would require a

10 20-year sentence.  And it just -- under these

11 circumstances, it needs to be more than 20 is

12 our position.

13    THE COURT:  Thank you.  All right.

14 Approach.

15    You are Eric Saffold, the defendant in this

16 case; is that correct?

17    THE DEFENDANT:  This is true.

18    THE COURT:  Mr. Saffold, this Court tried

19 your case May the 3rd of this year.  A jury

20 found you guilty of robbery in the first degree

21 as charged in the indictment.  It is the

22 judgment of this Court that you are guilty of

23 said offense.

24    Do you have anything to say as to why

25 sentence of law should not be pronounced upon

1     you at this time?

2          THE DEFENDANT:  Your Honor, I'd just like to

3     say, you know, I'm not trying -- I was just

4     saying that I was wrong.  I'm not trying to

5     justify my wrongdoing.  But this has been a very

6     disturbing and embarrassing experience for me

7     and my family.  And I just, you know, ask for

8     the mercy of the Court.  Judge Anderson, you my

9     last chance and in your hands --

10          THE COURT:  No.  You are your last chance.

11          THE DEFENDANT:  Yes, sir.  And in your

12     hands, you hold my future.  And, you know, I'd

13     ask that you just, you know, please be lenient

14     on me.  And I promise you, you won't ever see me

15     in the courtroom again if you could just, you

16     know, just -- I made a mistake and sometimes

17     people make mistakes and sometimes they are very

18     costly mistakes.

19          THE COURT:  You've got a history of

20     mistakes, and particularly with firearms.

21          THE DEFENDANT:  Yes, sir.  I understand.

22     And, you know, I'm trying -- I'm trying to

23     change.  I mean, I'm changing.  Really I am.

24     I've got in church and, you know, I'm just doing

25     the right thing.  If you could just -- just

1   think if I was your son and if he made mistakes,

2   you know.  Just think about it because, you

3   know, you hold my future in your hands.

4       But I made a decision and I put myself

5   here.  And we made -- we make -- sometimes we

6   make messed-up decisions.  But, I mean, God

7   grant me the serenity to accept the things I

8   cannot change, the courage to change the things

9   I can and the wisdom to know the difference.

10  That's all I have to say.

11      THE COURT:  Thank you.  It is the judgment

12  and sentence of this Court that you be

13  imprisoned in the penitentiary of the State of

14  Alabama for a term of 25 years.  Additionally,

15  you are ordered to pay a fine of $5,000 and an

16  assessment to the Victim's Compensation Fund of

17  $1,000 as well as costs of court.

18      Was there any restitution in this case?

19      MR. ATWELL:  No, sir.

20      THE COURT:  Okay.  You have 42 days from

21  this date to appeal this decision if you so

22  choose.  You are in custody.

23      MR. BRANTLEY:  Thank you very much,

24  Your Honor.

25      THE COURT:  I will order SAP because I do

1          understand that there is a drug problem.

2                    MR. BRANTLEY:  Okay.  Thank you.

3                    THE COURT:  And then we'll order the Crime

4          Bill Program.

5                    MR. BRANTLEY:  Thank you.  Thank you, Judge.

6                    THE COURT:  Yes, sir.

7                              END OF PROCEEDINGS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### REPORTER'S CERTIFICATE

STATE OF ALABAMA

HOUSTON COUNTY

I, Andrea E. Martin, RMR, CRR, and Official Court Reporter in and for the Twentieth Judicial Circuit of Alabama, do hereby certify that the above-styled and numbered cause was reported stenographically by me and is a true and correct transcript of the proceedings and rulings of the Court, and was transcribed by me or under my direction and control.

I further certify that I have filed all exhibits offered in the trial of this cause, if any, with the Circuit Clerk of Houston County, Dothan, Alabama, for incorporation into the record on appeal.

I further certify that I have, on this day, filed with the Court of Criminal Appeals, and parties here involved, a copy of the reporter's index to the testimony and Certificate of Completion of the transcript of said cause.

I further certify that I have filed the original and three copies of this transcript in

1     the Office of the Circuit Clerk of the Circuit

2     Court of Houston County, Dothan, Alabama.

3          Dated this 17th day of August, 2005.

4

5

6

7               ANDREA E. MARTIN, RMR, CRR

8               Official Court Reporter
                 Notary Public, State of

9               Alabama at Large

10              My Commission Expires:
                 August 12, 2008

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:07-cv-00598-MHT-CSC    Document 6-3    Filed 07/20/2007    Page 41 of 43

| State of Alabama<br>Unified Judicial System | **CERTIFICATE OF COMPLETION**<br>**REPORTER'S TRANSCRIPT** | Page Number |
|---|---|---|
| Form ARAP 13 | | **169** |

**TO:** The Clerk of the Court of Criminal Appeals        Fax: (334)242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

**Criminal Appeals Case Number**        CR <u>04</u> - <u>2068</u>

<u>ERIC SAFFOLD</u>        v.    <u>STATE OF ALABAMA</u>
**Appellant's Name**                **Appellee**

On appeal from the:

| | | |
|---|---|---|
| **X** | Circuit Court of | ] |
| | District Court of | ] |
| | Juvenile Court of | ] |

Houston County

**Trial Court Case Number**  <u>CC-05-216</u>

**Notice of Appeal Date**  <u>06-22-05</u>

  I, <u>Andrea E. Martin</u>, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and testimony of the witnesses. The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice. The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

  Done this the <u>17th</u> day of <u>August</u>, 2005.

_Andrea E. Martin_
Court Reporter

**FILING AND SERVICE OF THIS FORM:  Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.**

| State of Alabama<br>Unified Judicial System<br><br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO: THE CLERK OF<br>      THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: | 06-22-05 |
|---|---|---|

APPELLANT

ERIC SAFFOLD

v. STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of _____ pages) (___1___ volumes of 200 pages each and one volume of __36__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___29TH___ day of ___AUGUST___, ___2005___.

Circuit Clerk

Case 1:07-cv-00356-MHT-CSC    Document C-4    Filed 07/24/2007    Page 1 of 5?

83354
11/14

IN THE ALABAMA COURT OF CRIMINAL APPEALS

ERIC SAMPSON,
        APPELLANT,

VS.

STATE OF ALABAMA,
        APPELLEE.


ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA

CIRCUIT CASE NUMBER CC-05-716

CRIMINAL APPEALS COURT NUMBER CR-04-2069

_____

BRIEF FOR APPELLANT

_____


Thomas K. Brankley, Attorney at Law (BRA 040)
Brantley & McLendon, LLC
Ala. State Bar # ASB-
401 North Foster Street
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

EXHIBIT
B
PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested in this matter.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES CITED........................4

STATEMENT OF THE CASE ...........................7

STATEMENT OF ISSUES PRESENTED FOR REVIEW..........8

STATEMENT OF THE FACTS...........................9

STATEMENT OF THE STANDARD OF REVIEW (applicable to each issue).33

SUMMARY OF THE ARGUMENT..........................34

ARGUMENT........................................35

CONCLUSION......................................50

CERTIFICATE OF SERVICE...........................51

**APPENDIX:** TABLE OF ADVERSE DECISIONS..............52

3

## TABLE OF CITATIONS

Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967)........................................44

Ballenger v. State, 720 So.2d. 1033, 1034 (Ala.Cr.App. 1998)..........................................39,41

Bram v. United States, 168 U.S. 532, 18 S. Ct. 183, 42 L.Ed. 568 (1897)........................................43

Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Cr.App. 1993);. ..........................................41

Boulden v. Holman, 394 U.S. 478, 480, 89 S. Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969)........................................44

Culombe, 367 U.S. at 602, 81 S. Ct. at 1879...........43,45

Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert denied, 368 So.2d 877 (Ala. 1979)..............................42

Daniels v. State, 581 So.2d. 536 (Ala.Cr.App. 1990)writ denied;. ..........................................36

Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978)...45

Ex parte Matthews, 601 So.2d 52, 54 (Ala. cert. denied, 505 U.S. 1206, 112 S. Ct. 2996, 120 L.Ed.2d 872 (1992);...........44

Ex parte Perkins, 646 So.2d 46, 47(Ala. 1994)............. 33

Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988))...........45

Faircloth v. State, 471 So.2d. 485, 488 (Ala.Cr.App. 1984),
aff'd, 471 So.2d. 493 (Ala. 1985))......................39,41

Gaddy, 698 So.2d at 1154...........................45

Garrison v. State, 372 So.2d 55 (Ala.Cr.App. 1979)....48

Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.
1990)..............................................44,45,46

Linzy v.State, 455 So.2d 260, 26[2] (Ala. Crim. App. 1984)
..................................................33

McFarland v. State, 581 So.2d 1249, 1253 (Ala. Crim. App.
1991)..............................................33

McLeod v. State, 718 So.2d 727, 729-30 (Ala. 1998) (footnote
omitted)...........................................46

Metzger v. State, 565 So.2d 291, 292 (Ala.Cr.App. 1990)...42

Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986);..........47

Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415
So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S. Ct. 459,
74 L.Ed.2d 610 (1982)..............................48

Newsome v. State, 570 So.2d 703,710 (Ala.Cr.App. 1989)....41

Nunn v. State, 697 So.2d. 497, 498 (Ala.Cr.App. 1997).....39

O'Neal v. State, 602 So.2d 462, 464 (Ala.Cr.App. 1992))...39

Palmer v. State, 401 So.2d 266, 268  (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S. Ct. 1280,71 L.Ed.2d 463 (1982).....................48

Poole v. State, 645 So.2d. 330, 331 (Ala.Cr.App. 1994)....36

Powe v. State, 597 So.2d 721, 724 (Ala. 1992)............36

Seaton v. State, 645 So.2d 341,343 (Ala.Cr.App. 1994);....36

Stewart v.State, 350 So.2d 764 (Ala. Crim. App. 1977).....33

Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala.  1980)...........................48,49

Thomas v. State, 363 So.2d. 1020 (Ala.Cr.App. 1978)....40,41

Ward v. State, 557 So.2d 848, 850 (Ala.Cr.App. 1990)......40

Williams v. State, 695 So.2d 644 (Ala.Crim.App. 1996).....36

Willis v. State, 447 So.2d. 199 (Ala.Cr. App. 1983).......40

Young v. State, 283 Ala. 676, 220 So.2d 843 (1969).......41

## STATUTES, RULES, AND CONSTITUTIONS

§ 13A-8-41, Ala. Code 1975.  ......................... 37

§ 13A-8-43, Ala. Code 1975.  ......................... 37

Rule 20.2(a), Ala.R.Crim.P.  ......................... 42

§ 13A-3-2(e)(1), Ala. Code 1975. ..................... 47

## STATEMENT OF THE CASE

The Grand Jury of Houston County, Alabama, January Term, 2005, issued an indictment charging the Defendant with Robbery in the First degree (CR 6-7). On the advice of his attorney, Eric Davis, the Defendant was formally arraigned, and plead not guilty and not guilty by reason of mental disease or defect. (CR 8).

A trial was held on the merits before a duly qualified, struck and empaneled jury, resulting in a verdict of Guilty as charged. Judgment was entered thereon by the Honorable Larry Anderson, and the case was continued for sentencing. (CR 32).

At the sentencing hearing, Judge Anderson sentenced the Defendant on Robbery in the First degree to imprisonment in the penitentiary for a term of 25 years, fine of $5,000 dollars, $100 dollars to the Alabama Forensic Sciences Trust Fund, and $1,000 dollars to the Victim's Compensation Assessment. (CR 45). The Defendant gave written Notice of Appeal on June 22, 2005, (CR 47). This Appeal follows.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.    WHETHER THE TRIAL COURT ERRED IN DENYING THE
      DEFENDANT'S MOTION FOR JUDGMNET OF AQCUITTAL BASED
      UPON THE STATE'S FAILURE TO PROVE A PRIMA FACIE CASE
      OF ROBBERY IN THE FIRST DEGREE AGAINST THE DEFENDANT.
      <u>YES</u>


II.   WHETHER THE TRIAL COURT ERRED BY DENYING THE
      DEFENDANT'S "MOTION TO SUPPRESS"? YES

## STATEMENT OF THE FACTS

This matter was tried before the Honorable Larry Anderson, Circuit Judge, on May 3rd, 2004. The Honorable David Atwell, Assistant District Attorney for the 20th Judicial District represented the State. The Honorable Eric Davis, Dothan, represented the Defendant saffold at trial, and the Honorable Thomas K. Brantley, Dothan, represented the Defendant Saffold at the Sentencing hearing.

After a jury was duly struck and qualified, and opening statements made by the respective counsel, the following testimony of evidence was presented.

The State's first witness was Phillip Gradic, the owner of a local Dairy Queen located on South Alice Street in Dothan. Mr. Gradic owned the Dairy Queen for about a year and four months, and he was the owner on or about September 26th, 2004. (R 42). Mr. Gradic was working that night and he got off work about 10:00 p.m. Mr. Gradic then said that one of his employees, a Mr. Guerra, was the only other person there with him. (R 43). Mr. Gradic continued by saying that when he left the Dairy Queen he exited out of the side door and was headed towards his car. Then Mr. Gradic stated that

when he came out of the building, he was looking around for people because he had been robbed about six months before. (R 44).

Mr. Gradic said that he is very alert when he leaves the store and that he is always checking things out in order to make sure nobody is around. (R 44). Mr. Gradic also said that at this time Mr. Guerra was with him as they left the building. (R 44). Mr. Gradic then proceeded to explain that he was walking towards his car in the back of the store and as he went around the corner of the building where the cooler extends out he saw Mr. Saffold between the cooler and a bread rack. Mr. Gradic saw that Mr. Saffold was wearing a mask and a trench coat at this time. (R 45).

Mr. Gradic then testified that he and Mr. Guerra had been back and forth from the back door of the store to a building in the back a couple of times as they were working on changing the sign in front of the store. He also said that this was while they were closing up and they had not seen anyone out back of the store until they were leaving. (R 46). Mr. Gradic then identified the mask that the suspect was wearing, and it was admitted into evidence. (R 46-47).

When the State asked Mr. Gradic what he did when he saw the man, Mr. Gradic stated that he had a 9-millimeter pistol in his hand and he aimed it at the suspect before the suspect saw him. (R 47). Mr. Gradic then continued to say that when the suspect turned around and saw the gun pointed at him he said, "I see you've got a gun, I'm not going to try and rob you." (R 48). Mr. Gradic proceeded to say that he told the suspect to take his mask off and lay down on the ground while he called the police and that the suspect complied with him. (R 49). Mr. Gradic then made the suspect lay on his stomach with his hands out in front of him while he called the police. (R 49). Mr. Gradic used his cell phone to call the police and while he was waiting for them to arrive he just kept watching the suspect because he still did not know if he was armed or not. (R 50).

Mr. Gradic then told the jury that when the police arrived they came up with their guns drawn and that the suspect told them not to shoot because he was lying on a gun. He told the jury that the police then handcuffed the suspect and saw that he did have a gun on him so they quickly took the gun away from him. (R 51). At this time the gun was identified by Mr. Gradic and admitted into

evidence. (R 52). Mr. Gradic saw the police check the gun for bullets and he saw them unload the gun. (R 52). He then stated that the police put the suspect in a patrol car and hauled him away. (R 53).

On cross-examination Mr. Gradic stated that the only thing that drew his attention to the suspect was the fact that there was someone standing there and that he had been robbed before. (R 54). Mr. Gradic stated that the suspect did not make a sound or say anything. (R 55). Mr. Gradic said the suspect gave him no reason at all to believe that he was armed, and that he first found out he was armed when the police found the gun on him. (R 55).

Mr. Gradic then said that the suspect never pointed a gun at him or Mr. Guerra, he never said, "give me all of your money", he never said "give it up or I'll blow your head off" or anything like that. (R 56). Mr. Gradic the testified that the suspect never threatened any force or used any force against himself or Mr. Guerra. (R 56).

The state then called Kevin Guerra as their next witness. Mr. Guerra was employed as a cook at Dairy Queen, and he was working on the evening of September 26, 2004 with Mr. Gradic until the store closed. (R 59). Mr. Guerra

stated that when they closed up they left out of the side door and headed for Mr. Gradic's car, because he was going to give him a ride home. (R 60). Mr. Guerra then noticed the suspect standing between the bread rack and the cooler when Mr. Gradic pulled his gun on him and told him to lie down on the ground. (R 60). Mr. Guerra also stated that he did not notice anyone standing out there until he saw Mr. Gradic pull his gun out and then he first saw the suspect standing there with a mask on. (R 61).

Mr. Guerra then looked around for other people to make sure that no one else was hiding out there. Mr. Guerra also stated that the suspect complied with Mr. Gradic's order and did not try anything at all. (R 62). Mr. Guerra then stated that the suspect just lay there on the ground until the police came and took over. Mr. Guerra also said that he did not know the suspect was armed until the police arrived and located the gun on the suspect. (R 63). Mr. Guerra said that the suspect told them he was running and hiding from someone and that he was not going to rob them. (R 64).

Mr. Guerra was only a couple of feet away from Mr. Gradic when he first saw the suspect behind the store. When Mr. Guerra first saw the suspect he was facing them

and Mr. Gradic was telling him to get on the ground. (R 65). Mr. Guerra then said that the suspect did not use any force against them and that he simply complied with Mr. Gradic's orders. (R 65). Mr. Guerra said the suspect just kept saying that he was not going to rob them he was just running from somebody and he was trying to hide from somebody. (R 66). Mr. Guerra concluded his testimony by stating that the suspect never did threaten him at all. (R 66-67).

Corporal Jason DeVane was then called to testify for the state. Corporal DeVane was a member of the Dothan Police Department as a criminal investigator. He had been with the Dothan Police Department for six and one half years and three years as an investigator. Corporal Devane had been assigned to the specific unit on investigations dealing with violent crimes called the "Violent Crimes Unit". Corporal Devane had the occasion to go out to the Dairy Queen on South Alice Street on September 26, 2004 in response to a robbery call. (R-68) Corporal Devane and several officers were on the scene that night Officer Elkins and Officer Wise and Officer Collins were there for a short time. Corporal Devane then testified that Mr.

Gradic and another one of his employees that worked at the Dairy Queen were also present. (R-69).  Corporal Devane testified that the Defendant was in the back of a patrol unit when he arrived and that he took some evidence with regard to this case when he arrived on the scene. (R-69).

Corporal DeVane recognized the mask that was State's Exhibit #1 and he also identified State's Exhibit #2 as being the gun that was recovered from the Defendant. (R-70) Corporal DeVane tried to run down the serial numbers as far as ownership to the rifle but they were unable to locate any information that would lead them to the ownership of the rifle.  Corporal Devane was not able to run the serial number at that time and they could not find a good serial number to run it completely through the system.  (R-70) Corporal Devane then testified that there was a partial serial number that he believed was on the underside of the gun where the marking says J C. Higgins.  There was letter that he was unable to read and he would have to look at it again to find out exactly where it was at which Defense Counsel objected to the line of questioning stating that the guns serial number was not material to this robbery. Then the Court overruled the objection. (R-71).

Corporal Devane recognized the bullets located inside the rifle were the same as the ones he had retrieved from Officer Wise at the scene of the crime. Corporal Devane then testified that there was a tube on the gun where the bullets were loaded into and these were the same shells that had been recovered from the rifle at the scene of the crime. (R-71) Corporal Devane identified a box of Winchester Super-X ammunition that was also located at the scene, and stated that the box of shells had been removed from the suspect's pockets at the scene. When asked whether or not he actually unloaded the gun and secured it and secured the bullets Corporal Devane stated that he did not and that it was Officer Wise that unloaded the gun at the scene and that he retrieved the bullets from Officer Wise. (R-72). At this time the State moved to admit the bullets retrieved from the gun and the bullets that were taken from the Defendant as State's Exhibits #3 & #4 and the Court admitted these into evidence. (R-72).

Corporal Devane then testified that after the Defendant was placed in the patrol car he was transported down to the Police Department for an interview. Corporal Devane said that interview occurred in his office in the

16

Criminal Investigations Division at the Dothan Police Department. Corporal Devane stated that when the interview was taking place that the Defendant was not under arrest at this point. Defense counsel then approached the Judge and asked that their Motion to Suppress be held outside the jury at this time. The Court then told the jury that the Court had to take care of this matter outside of their presence and for them to return to the jury deliberation room until these proceedings were done. (R-73).

The State resumed its examination or Corporal Devane outside the presence of the jury at this time. Corporal Devane sat the Defendant down and advised him of his rights at this point and after advising him of his rights he took a piece of paper from his desk and he went over the rights as he read them to the Defendant. After he read his rights to the Defendant he explained the waiver of rights form to the Defendant. (R-74). Corporal Devane then proceeded to testify what rights he actually read the Defendant and how he explained the waiver of rights form to the Defendant. (R-75). Corporal DeVane was under the impression that the Defendant acknowledged that he understood each and every one of these rights that he was just read. Corporal DeVane

then stated that the Defendant made a statement at this time and he acknowledged this by signing the waiver of rights form that he understood that. (R-76).

Corporal Devane stated that on the waiver of rights form that he asked the Defendant to fill out his education level in the blank provided for it and the Defendant filled out that his highest level of education that he had completed was a 12th grade education. Corporal Devane then stated that it was apparent to him that the Defendant understood his rights as he read them to him and that he wanted to make a statement to Corporal Devane. (R-76). Corporal Devane then questioned the Defendant about the occurrence and the Defendant told him that he had arrived on the South side of Dairy Queen with the intent just to scare the people from the Dairy Queen to try and receive some money. Corporal Devane then stated that the Defendant talked in detail about how he planned to scare the people and he stated that he was just going to show them the gun in an attempt to get them scared enough to give him some money. At this time the Court interrupted and said that lets not get too far a field since this is only a foundation for a statement that needs to be laid and the

State concluded their examination their examination of
Corporal Devane and passed the witness to Defense Counsel.
(R-77-78).

Corporal Devane taped the statement with the
Defendant and the tape would actually be the best evidence
of what actually happened during the interview.  Defense
counsel then asked if he inquired as to whether or not the
Defendant has been drinking and Corporal Devane then stated
that he did.  The Defendant also stated that he had not
been drinking and Corporal Devane asked him whether or not
he was under the influence of any drugs and the Defendant
stated that he was not at this time. (R-78-79).  Corporal
Devane, in his experience as a police officer, has been
around people that he knew to be under the influence of
crack cocaine and the Defendant did not exhibit any of
these outward signs to him.  He also said that he did not
make him any promises or offer him any reward or inducement
to get him to make this statement. (R-79).  Corporal Devane
then stated that he told the Defendant that if he
cooperated and if they asked him whether or not he was
cooperative in giving a statement or uncooperative in

giving a statement he would tell them that he was cooperative in giving the statement.  (R-79-80).

Defense Counsel then called the Defendant Eric Saffold to the stand to testify for the limited purposes of addressing the issue of his statement.  (R-82).  Mr. Saffold was under the influence of drugs at the time that he made the statement and specifically he was under the influence of cocaine (crack). (R-83).  Mr. Saffold had been smoking crack all day long.  Mr. Saffold explained to the Court that he lied to the police officer about being under the influence of any drugs because he wanted them to understand that he wanted to cooperate and he didn't want them to raise his bail so high that his family could not get him out. (R 83-84).   Mr. Saffold said that there was a rewards or inducement made to him in order to get him to make the statement. (R-83).  Mr. Saffold was told if he did cooperate that it would look good to the DA and the Judge if he cooperated and that by him signing the waiver of rights that it was part of the cooperation in order to give the statement.

Mr. Saffold remembered going over the rights form with Corporal Devane because it was his signature on it but he

doesn't remember too much about that night. Saffold had a certificate and had actually walked at the graduation ceremony but that he didn't actually have a 12th grade education. In explaining further he stated that he went to the graduation but he did not have a diploma. He graduated with a certificate of attendance. Saffold did understand what was being read to him for him to sign. Saffold was nervous at the time he was reading it and he was so shook up and scared that he was just ready to get out of there. He was up there by himself and was just trying to cooperate any way he could because he was told that if he cooperated it was a possibility that things could go good for him and that is all that he was trying to do. (R-85-86).

At this time the Court addressed the State and Defense Counsel and stated that all statements were deemed involuntary until such a time as there is proof that the statement was given freely and voluntarily. Based on the evidence before the Court he found that the statement was freely and voluntarily given through his Miranda form it basically an issue involving the credibility of the statement. The Court then stated that the police Officer testified that there were no threats, no coercion, on

offers or promises made and he had Mr. Saffold to testify that he told him that he was not on drugs at the time but he really was on drugs so it is hard to put a lot of credibility into that.  The Court stated that Mr. Saffold told the Officer  that he was offered a reward but couldn't really remember much about it but he identified State's Exhibit 5 and he remembers that it was his signature on the waiver of rights form and that he understood those rights at the time and that the officer never really promised him anything regarding his bond.  So in weighing and considering all the evidence the Court found that the officer complied with Miranda and that the said statement was voluntary overcoming any presumption to the contrary. (R-87-88).

The State then continued their examination with Corporal Devane in the presence of the Jury.  Corporal Devane had the Defendant in his office and that he indicated to the Defendant that he wanted to speak with him and before doing so he advised him of his Miranda Rights and he read them to him.  He also stated that he went over a waiver of rights form with the Defendant and he read each statement of the waiver and asked him to sign it and if he

understood the statement and he agreed to give a statement. (R-90).  Corporal Devane then proceeded to tell the jury exactly what he reads to the Defendant in explaining his Miranda rights and the waiver of rights form.  He told the jury that he read the standardized Miranda warnings and then he went over the waiver of rights form explaining each of his rights and asked if he was willing to make a statement and answer questions.  He acknowledged that he did by signing the form. (R-91).  Corporal Devane stated that the Defendant indicated to him that he freely understood everything that was read to him and he indicated to him that he had a proper education to understand what was being read to him. (R-91).  Corporal Devane then told the jury that he did not promise or coerce the Defendant in any way to make the statement after signing the waiver of rights form the Defendant voluntarily agreed to talk with him about the incident that occurred at the Dairy Queen that evening. (R-92).

Corporal Devane then stated that the Defendant did make a statement regarding the incident that occurred at the Dairy Queen that evening.  Corporal Devane said the Defendant told him the reason he was there was that he just

wanted to scare the employees and try and get some money. Corporal Devane said that the Defendant was wearing the mask when he was standing on the corner waiting for the employees to exit the store. (R-93). Corporal Devane then stated that the Defendant told him that he had the rifle tied around his shoulder underneath his jacket and he said that he was just going to use it to scare the employees into giving him the money and he also testified that the rifle was fully loaded at this time. (R-93-94).

At this time the State moved to admit State's Exhibits 1 through 5 and the Court admitted them into evidence. The State rested. The Judge then instructed the jury that some matters had to be taken up outside of their presence and asked them to return to the deliberation room until they were notified to come back.

Defense Counsel moved for a Motion For Judgment of Acquittal based on the fact that the State had failed to prove a prima facia case of each of the elements of Robbery 1st or any other Robbery in any other degree. Specifically the State failed to show that there was a use of force or threat of imminent use of force. Defense counsel stated that all that they had factually was that Mr. Saffold was

facing the back of the of the Dairy Queen at the time that Mr. Gradic draws a gun down on him but Mr. Gradic and Mr. Guerra both testified that there was use of force against either one of them, there was no threat of force against either one of them and even if you take the statement of the Defendant in a light most favorable to the State there is no evidence of what may have been intended but it is not evidence of what happened. (R-95-96). Defense Counsel then proceeded to state that once Mr. Gradic had pointed his weapon at him and gotten Mr. Saffold on the ground any criminal offense on Mr. Saffolds part was over. So there is absolutely no threat of force of use of force against either one of them therefore it cannot be Robbery in the first degree. (R-96).

The State then responded by stating that their position was that when this man armed himself with a firearm, placed a ski mask over his head and hid behind the Dairy Queen that that embraces acts which occurred in an attempt to commit and then it is obvious also from these actions what he was attempting to commit and it is further obvious by the fact that he gave a statement saying that in fact that his intent was to commit a robbery is sufficient

25

to prove a prima facia case in the first degree.  (R-97-98).

Defense counsel then responded that it was an enormous stretch from attempted theft even if by going by the evidence in the light most favorable to the State's arguably there might be an attempted theft but the attempt deals with the theft it is not an attempt to threaten anybody it is an attempt to commit theft.  He has got to threaten the use of force, threaten the imminent use of force or use force there is absolutely no way around that. The State is asking you to ignore that element altogether because it was an attempted theft.  The State uses the word "obvious" well it is not obvious it is their burden of proof.  Even the subsequent statement if you believe it and put it in a light most favorable to the State still has no threat.  The threat has got to be made to Mr. Gradic or another person present, which is Mr. Gareth.  They both said that there was no threat that there was no use of force.  This is a Robbery 1st degree.  This case has to fail because I think you referred to it as an element number 2 use of force or threatening eminent use of force. (R-98-

99). Defense counsel then offered Ex parte James, 468 So.2d 889 in support of his argument.

After addressing both defense counsel and the State regarding the elements of the crime of Robbery in the first degree the Court found that there was evidence that a robbery was committed in the light most favorable to the State therefore Defendant's Motion For Judgment of Acquittal was denied. (R-106). The State rested.

The Court then proceeded to go over the Defendant's requested jury charges before the closing arguments were given. (R-106). The Defense then rested (R-111).

The Court then addressed the jury that they had heard the evidence that they were going to hear in this case and the only thing that remained was for the State and the Defense to make their closing arguments to the jury. At this time the State began its closing argument. The Defense then gave their closing argument and the State then made their final rebuttal closing argument. (R-112). During the State's rebuttal closing argument Defense counsel objected stating that is was not a perception of a threat it is the use of force or threaten the eminent use of force. There is nothing in the law about perception of a

threat.   Then the Court stated to the attorneys that he would address this issue by stating to the jury that what the attorneys say is not the law.   The law is going to be what they hear from me and what he charges them on. (R-113-114). The Court then proceeded to charge the ladies and gentlemen of the jury with the law in this case and the reading of the indictment. (R-114-134). Court then reconvened as all twelve jurors returned from their deliberations at which time the foreperson of the jury stated that the jury had unanimously reached a verdict. (R-136-137).

The Court then proceeded to read the verdict to the jury and he said that in the Circuit Court of Houston County State of Alabama Plaintiff vs. Eric Saffold Defendant Case Number CC-05-216 the verdict of the jury reads as follows: We the Jury find the Defendant Eric Saffold guilty of Robbery in the first degree as charged in the indictment and it was signed by the foreperson of the jury and then the jury was polled.   Defense counsel then requested a sentencing hearing and a pre-sentence investigation report be ordered and the Court addressed that under the current law if either side requests a pre-

sentence investigation then the Court would order one and the sentencing hearing was set for June 10, 2005. (R-138-139).

On June 10, 2005 a sentencing hearing was held before the Honorable Judge Larry Anderson, Circuit Judge, Houston County Alabama. Mr. David Atwell represented the State and the Honorable Thomas K. Brantley represented the Defendant in the sentencing hearing. The Defendant called Reverend Paul Holman to the stand. (R-143). Reverend Holman is the pastor at Greater Beulah Baptist Church and he has been the pastor of Greater Beulah Baptist Church for about ten years. Reverend Holman knew the Defendant Eric Saffold because he had been in his church with his family ever since Reverend Holman had been there. Reverend Holman understood that Eric Saffold had been convicted of Robbery 1st degree and they were here at the sentencing hearing today to give him a sentence and the Defense had filed a motion to remit him to Teen Challenge Drug Program in Pensacola Florida, and Reverend Holman understood why they were in Court today. (R-143-144).

Reverend Holman stated that he was not here to try and get Mr. Saffold out of incarceration but he believes

that if you commit a crime you have got to do the crime.
He is not here to set him free because we do not believe in
that.  What we are here to do is to try and get him some
help because he believes that there was some brokenness in
his family.  Reverend Holman doesn't know if his mother is
here but he knows his mother moved away and abandoned him
and he has pretty much been living on his own ever since.
(R 145-146).  Reverend Holman believed that he had gotten
into some drugs and was trying to replace his mom and daddy
and just turned the wrong way.  Reverend Holman stated that
his parents had gotten a divorce and it was a tragic
situation. The kids had to choose between their mom and
daddy and he didn't really know who his biological father
was. His mother was trying to live her own life and didn't
care about him therefore he pretty much was having to raise
himself and at that point he was a member of the church but
his mother left him so he was by himself up there. (R-146).

   Reverend Holman believed that Mr. Saffold was
receptive to spiritual counseling and that he believed that
he loved the Lord.  He had actually been to see him in jail
and they had prayed together but he thinks that drugs may
be the major factor here that Mr. Saffold turns to and

anything that he can do and try and help him get off the drugs will help him.  Reverend Holman understood the prison had a substance abuse program but he didn't think that the prison environment was the best place for him to get drug treatment.  Reverend Holman stated that prison could take a lot out of you and that he believed that what he was trying to do here in Court was trying to help this man get some help at Teen Challenge before he entered the total darkness of prison. (R 147-148).

Reverend Holman then agreed that the 12 month Teen Challenge Program of uninterrupted help would be the best thing for him.  He needed to be locked down at this time and he needed to be in a program where he can't have the influence of society on him or where he can think about what he has done. (R 154). He needs to pray about what he has done and get some real serious help that he hasn't ever had before.  Reverend Holman then stated that he believed Eric Saffold's behavior would change once he got the demon drugs out of him. He believes that if he was remitted to Teen Challenge based on his personal knowledge that it would be more of a benefit right now to Mr. Saffold for the

next twelve months rather than waiting in prison in order to enter the SAP Program. (R-155).

Defense counsel then asked the Court to remit the Defendant to Teen Challenge and stated that they had an affidavit from Reverend Paul Holman and letter from the Operations Director, Mr. Lipinsky, down from Teen Challenge stating that Eric has been accepted in the Teen Challenge Program. Defense counsel then asked that the Defendant not be sentenced today but to go on and send him down to Teen Challenge and then bring him back after he completes it and sentence him then or in the alternative sentence him and then remit him down to Teen Challenge before sending him to prison. (R 156). The Court then proceeded to sentence the Defendant.

The Court sentenced the Defendant to be imprisoned in the penitentiary of the State of Alabama for a term of 25 years. Additionally he was ordered to pay a fine of $5,000.00 and an assessment to the victim's compensation fund of $1,000.00 as well as cost of court. (R 165). The Court then told the Defendant he had 42 days from this date to appeal his decision if he so chooses. This appeal follows.

## STATEMENT OF THE STANDARD OF REVIEW
## APPLICABLE TO EACH ISSUE PRESENTED FOR REVIEW

"`Appellate courts are limited in reviewing a trial court's denial of a motion for judgment of acquittal grounded on insufficiency.' McFarland v. State, 581 So.2d 1249, 1253 (Ala. Crim. App. 1991). `The standard of review in determining sufficiency of evidence is whether evidence existed at the time [the defendant's] motion for acquittal was made, from which the jury could by fair inference find the [defendant] guilty.' Linzy v.State, 455 So.2d 260, 26[2] (Ala. Crim. App. 1984) (citing Stewart v. State, 350 So.2d 764 (Ala. Crim. App. 1977),. In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State. Linzy, supra."

"In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. `When evidence is presented *ore tenus* to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47(Ala. 1994);

## SUMMARY OF THE ARGUMENT

Mr. Saffold argues that the trial court abused its' discretion by denying his Motion of Judgment for Acquittal. Specifically, Mr. Saffold contends that the State failed to prove a prima facie case against him on the charge of Robbery in the First degree.  Mr. Saffold argues that the State failed to prove that he used force or threatened the imminent use of force with the intent to compel the owner or another person to acquiesce there property. The State offered no evidence that Mr. Saffold used any force or threatened the imminent use of force upon Mr. Gradic or Mr. Guerra, therefore this element of the crime fails and Mr. Saffold should have been acquitted of Robbery in the First Degree.

Mr. Saffold contends that the evidence presented at trial did not prove a prima facie case for the State and that the judge should have granted his Motion for Judgment of Acquittal.

34

# ARGUMENT

## ISSUE ONE

**WHETHER THERE WAS INSUFFICIENT EVIDENCE TO WARRANT A JUDGMENT OF ACQUITTAL OF ROBBERY IN THE FIRST DEGREE AS CHARGED IN THE INDICTMENT? YES**

The first issue presented for review by the Appellant concerns the sufficiency of the evidence warranting the Appellant's conviction for robbery in the first degree. The Appellant contends that there was insufficient evidence to sustain the conviction. After the State rested, defense counsel made a motion for judgment of acquittal based on the fact that the State failed to prove a prima facie case on the charge in the indictment. After the court denied the motion, the defense rested.

The Appellant argues that the State failed to prove the indictment, specifically, the part of the indictment that reads that the Appellant used force or threatened the imminent use of force against Phillip Jerome Gradic, or another person. The State offered no evidence to support this argument. Mr. Gradic himself stated that the Appellant

did not use any force or threaten him with any force at all.

If the Appellant raises an argument that is based on a sufficiency of evidence issue, then the Court in reviewing that issue must view the evidence presented at trial in a light most favorable to the state. Seaton v. State, 645 So.2d 341,343 (Ala.Cr.App. 1994); Daniels v. State, 581 So.2d. 536 (Ala.Cr.App. 1990)writ denied; Poole v. State, 645 So.2d. 330, 331 (Ala.Cr.App. 1994).

Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust. Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985)." Powe v. State, 597 So.2d 721, 724 (Ala. 1992).

Williams v. State, 695 So.2d 644 (Ala.Crim.App. 1996).

The Appellant in this case was charged with robbery in the first degree as set out in § 13A-8-41, which states as follows;

36

## § 13A-8-41. Robbery in the first degree.

(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:

   (1) Is armed with a deadly weapon or dangerous instrument;
or
   (2) Causes serious physical injury to another.

(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.

(c) Robbery in the first degree is a Class A felony.

The underlying offense of robbery is set out in § 13A-8-43, which states;

## § 13A-8-43. Robbery in the third degree.

(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

   (1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

   (2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.

(b) Robbery in the third degree is a Class C felony.

It is clear from the reading of the statute that the Appellant's motion for judgment of acquittal should have

been granted based on the evidence that was before the court at the time the motion was made. The State failed to prove that there was a use of force or the threat of imminent force. (R 95). Furthermore, the only evidence submitted to the court was the fact that the Appellant was standing behind the store when Mr. Gradic pulled his gun on him and made him get on the ground. (R 95). The defendant argued further that Mr. Gradic and Mr. Guerra both testified under oath that there was no use of force or threat of force against either one of them. (R 95).

There was insufficient evidence to support his conviction. The Appellant was convicted of robbery in the first degree. The State did not prove an essential element of the crime of robbery first degree. The testimony at trial even shows that there was no evidence of force or the threat of imminent force. (R 56-57) The evidence in this case was mostly circumstantial and there was no evidence offered to show that the appellant used any force or threatened any force at all. This Court has previously addressed the viewpoint an appellate must follow in reviewing a conviction based on sufficiency of the evidence.

"'In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.'" <u>Ballenger v. State</u>, 720 So.2d. 1033, 1034 (Ala.Cr.App. 1998); (quoting <u>Faircloth v. State</u>, 471 So.2d. 485, 488 (Ala.Cr.App. 1984), aff'd, 471 So.2d. 493 (Ala. 1985)). " The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." <u>Nunn v. State</u>, 697 So.2d. 497, 498 (Ala.Cr.App. 1997) (quoting <u>O'Neal v. State</u>, 602 So.2d 462, 464 (Ala.Cr.App. 1992)). It is clear in the present case that based on the facts a rational fact finder could not find the appellant guilty of robbery in the first degree because the State failed to prove the elements of the offense of robbery first degree.

The trial court's denial of a motion for judgment of acquittal must be reviewed by determining if there was legal evidence in existence before the jury at the time the

motion was made, in which a jury, by fair inference, could have found the appellant guilty. Thomas v. State, 363 So.2d. 1020 (Ala.Cr.App. 1978). The appellate court, in reviewing the denial of a judgment of acquittal, will only determine if the legal evidence presented was such that a jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d. 199 (Ala.Cr. App. 1983).

It is customary that when a defendant moves for a judgment of acquittal, that the trial court must examine the evidence in order to determine its sufficiency in light of the charges contained in the indictment. Ward v. State, 557 So.2d 848, 850 (Ala.Cr.App. 1990).

The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v.State, 363 So.2d 1020 (Ala.Cr.App. 1978).

A motion for judgment of acquittal tests the sufficiency of the evidence to support a conviction, "when the evidence raises a question of fact for the jury and

such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal by the trial court does not constitute error. Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Cr.App. 1993); Young v. State, 283 Ala. 676, 220 So.2d 843 (1969). This is not the case here because the evidence was insufficient to prove that the appellant was guilty of the offense he was charged with. However, such a determination and ruling by a trial court would not prevent the appellate court from reviewing the issue. Newsome v. State, 570 So.2d 703,710 (Ala.Cr.App. 1989). The review by an appellate court requires that " in determining the sufficiency of the evidence to sustain a conviction, the reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." Ballenger v. State, 720 So.2d. 1033, 1034 (Ala.Cr.App. 1998); (quoting Faircloth v. State, 471 So.2d. 485, 488 (Ala.Cr.App. 1984), aff'd, 471 So.2d. 493 (Ala. 1985)). Furthermore, if an appellate court does discover that there is the existence of conflicting evidence, then it will prevent any appellate review of the evidence or its

sufficiency. <u>Metzger v. State</u>, 565 So.2d 291, 292 (Ala.Cr.App. 1990).

The Appellant understands that it is necessary to protect the record for review, and that to protect this record for review the defendant must file a motion for new trial or a motion for judgment of acquittal. Rule 20.2(a), Ala.R.Crim.P. In the case at bar, the Appellant filed a motion for judgment of acquittal. (R 95).

Therefore, the question to be answered is whether a jury might find that the evidence excluded every reasonable hypothesis except that of guilt? <u>Cumbo v. State</u>, 368 So.2d 871 (Ala.Cr.App. 1978), cert denied, 368 So.2d 877 (Ala. 1979). The Appellant contends that a jury could not reasonably do so here, and that the Appellant's case should be reversed and remanded with the appropriate instructions.

### ISSUE 2

**WHETHER THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S "MOTION TO SUPPRESS"? YES**

The Appellant argues that the trial court erred in denying his "Motion to Suppress". During the testimony at the Supression Hearing the Appellant stated that Corporal

DeVane lead him to believe that it would be better for him if he would give a statement. Appellant further argues that Corporal DeVane told him that by signing his waiver of rights form was simply part of his cooperation. Appellant also said that Corporal DeVane told him that it would look better to the DA and to the Judge if he cooperated, and that by him signing the waiver form was just part of his cooperation. (R 84). The Appellant also told the court during the Suppression Hearing that he was under the influence of crack cocaine and had been all day long, but he just gave the statement to cooperate so the police would not raise his bail so high that his family could not help him. (R 83).

The Appellant contends that the continuing questioning and pressure from Corporal DeVane that he should cooperate and it would look better for him induced him into making an incriminating statement.

"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S. Ct. 183, 42 L.Ed. 568 (1897). In Culombe,

43

367 U.S. at 602, 81 S. Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his *will has been overborne*' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. *Id.* (emphasis added).

"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S. Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S. Ct. 189, 191, 19 L.Ed.2d 35 (1967).

Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S. Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990)

(stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) (stating that the true test to be employed is `whether the defendant's will was *overborne* at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency. ".

. . .

". . . Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602, 81 S. Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he

45

defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."

McLeod v. State, 718 So.2d 727, 729-30 (Ala. 1998) (footnote omitted).

It is clear in the present case that the Appellant gave his statement to the police with the hope of favor that he was told he could receive if he just cooperated with the police. The Appellant clearly states at the Suppression Hearing that the only reason he gave his statement was so that the police would not raise his bail so high that his family could not help him out. (R 83). The Appellant also told the court that Corporal DeVane told him that if he would cooperate and give a statement that it would look better for his case to the DA and the Judge if he cooperated. This is why Appellant cooperated and signed the waiver of rights form because he hoped for a favor from the police since he cooperated with them and gave them a statement. (R 84).

The trial judge even acknowledged that the Appellant testified that he was on drugs at the time of the statement so it is hard to put a lot of credibility into it. (R 87). The trial judge also stated that the Appellant testified that the officer offered him a reward to give his statement but that he could not remember the details of it. (R 87). The trial judge then essentially denied the "Motion to Suppress" stating that it was freely and voluntarily given. (R 88). The Appellant contends that this was error on the part of the trial judge due to the fact that he was on drugs at the time the statement was given and the fact that he only gave a statement in hope of a favor from the police based on statements the police that it would look better for him to cooperate and give a statement.

The Legislature has defined "intoxication" to include "A disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala. Code 1975.

"In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986);

Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S. Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. `Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980). See also Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S. Ct. 1280,71 L.Ed.2d 463 (1982).

"The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v. State, supra; Garrison v. State, 372 So.2d 55 (Ala.Cr.App. 1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185."

Therefore, due to the Appellant's admitted intoxication of crack cocaine at the time of the statement, the statements made to the Appellant about his cooperation and the pressures and circumstances stemming from the interrogation by Corporal DeVane the Appellant was essentially induced to make an incriminating statement. The statements made by the Appellant during the interrogation are due to be suppressed. The Appellant respectfully requests that this court reverse the decision of the trial court.

## CONCLUSION

Wherefore, the Appellant prays that this Honorable Court will grant him relief by reversing and remanding this matter to the Trial Court with instructions to enter a judgment of acquittal, or in the alternative, reverse the Trial Court and render a verdict of not guilty.

Respectfully submitted this the *24* day of *October* 2005.

_____

Thomas K. Brantley, Attorney at Law (BRA040)
Ala. Bar# ASB-
Brantley & McLendon, L.L.C.
401 North Foster Street
Dothan, AL 36303
334-793-9009
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Brief of Appellant upon the Attorney General for the State of Alabama, Alabama State House, 11 South Union Street, Montgomery, Alabama 36130, Eric Saffold, Kilby Correctional Facility, P.O. Box 150, Mt. Meigs, Alabama 36057, by placing a copy of same in the U. S. Mail, postage prepaid and properly addressed, on this the _24_ day of _October_, 2005.


Thomas K. Brantley, Attorney at Law (BRA 040)
Ala. Bar #, ASB-
Brantley & McLendon, L.L.C.
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

51

**APPENDIX**

## TABLE OF ADVERSE DECISIONS

1. Defense counsel objected to the jury panel as a whole due the fact that it was only one African-american out of 37 jurors. Motion denied. (R 27).

2. Defense counsel's Motion to Suppress was essentially denied by the court. (R 87-88).

3. Defense counsel's Motion for Judgment of Acquittal was denied by the court. (R 105-106).

4. Defense counsels objection to improper closing argument was addressed by the court. (R 114).

5. Defense counsel's Motion for Split Sentence was denied by operation of law. (CR 60).

CR-04-2068

## In the *COURT of CRIMINAL APPEALS of ALABAMA*

◆

ERIC SAFFOLD,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

*On Appeal From the Circuit Court of* Houston County, Alabama (CC-05-216)

### BRIEF OF APPELLEE

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300*

November 29, 2005



EXHIBIT

C

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. "The facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided" by an additional evaluation of the evidence and case law. Ala. R. App. P. 34(a)(3).

i

## TABLE OF CONTENTS

STATEMENT OF ORAL ARGUMENT.................................. i

TABLE OF CONTENTS......................................... ii

TABLE OF CASES AND AUTHORITIES........................... iii

STATEMENT OF THE CASE..................................... 1

ISSUES PRESENTED FOR REVIEW.............................. 2

STATEMENT OF THE FACTS................................... 3

STANDARDS OF REVIEW...................................... 6

SUMMARY OF THE ARGUMENT.................................. 7

ARGUMENT................................................. 8

I.   The Trial Court Properly Denied Saffold's Motion For
     Judgment Of An Acquittal Because The State Presented
     A Prima Facie Case Of First-Degree Robbery Which
     Made The Case Proper For Submission To The Jury...... 8

II.  The Trial Court Properly Denied Saffold's Motion To
     Suppress Because His Statement Was Voluntarily Made. 12

CONCLUSION.............................................. 18

CERTIFICATE OF SERVICE................................. 19

## TABLE OF CASES AND AUTHORITIES

**Cases**

Barber v. State, CR-03-0737, 2005 WL 1252745,
 at *34-35 (Ala. Crim. App. May 27, 2005) .............. 13

Cook v. State, 582 So. 2d 592, 594 (Ala. Crim.
 App. 1991) ......................................... 9

Eggers v. State, CR-02-0170, 2004 WL 3190213,
 at *11 (Ala. Crim. App. Nov. 24, 2004) ................ 16

Kent v. State, 504 So. 2d 373, 376 (Ala. Crim. App. 1987). 9

Mims v. State, 816 So. 2d 509, 512 (Ala. Crim. App. 2001). 8

Minor v. State, CR-00-1300, 2004 WL 1909380, at *7
 (Ala. Crim. App. Aug. 27, 2004) ...................... 13

Parrish v. State, 494 So. 2d 705, 709 (Ala. Crim.
 App. 1985) ........................................... 8

Robinson v. State, 865 So. 2d 457, 469 (Ala. Crim.
 App. 2003) .......................................... 13

Williams v. State, 795 So. 2d 753, 767 (Ala. Crim.
 App. 1999) .......................................... 12

Williams v. State, 795 So. 2d 753, 768 (Ala. Crim.
 App. 1999) .......................................... 13

**Other Authorities**

Ala. Code (1975),

 §§ 13A-8-41, 13A-8-43 .................................. 9

## STATEMENT OF THE CASE

This is an appeal from the conviction of first-degree robbery in the Circuit Court of Houston County, Alabama (CC-2005-216).  Judge Larry K. Anderson presided.

Eric Saffold, the appellant in this case, was indicted by a Houston County Grand Jury on January 28, 2005, and charged with one count of first-degree robbery in violation of Section 13A-8-41 of the Code of Alabama (1975).  (C. 6-7)  On March 16, 2005, Saffold was arraigned and entered a plea of not guilty and not guilty by reason of mental disease or defect.  (C. 1)

On May 3, 2005, trial commenced and the jury found Saffold guilty of first-degree robbery.  (C. 31; R. 137-38) On June 10, 2005, the trial court sentenced Saffold to twenty-five years' imprisonment.  (C. 3)  The trial court ordered Saffold to pay a fine of $5,000, $1,000 to the Alabama Crime Victim's Fund and court costs.  (C. 4)  On June 22, 2005, Saffold filed a written notice of appeal citing objection to the trial court's denial of his motion for judgment of an acquittal.  (C. 47, 57)

## ISSUES PRESENTED FOR REVIEW

I.  Did the trial court properly deny Saffold's motion for judgment of an acquittal?

II.  Did the trial court properly deny Saffold's motion to suppress oral statements made to law enforcement officers?

## STATEMENT OF THE FACTS

On September 26, 2004, Phillip Gradic, the owner of the Dairy Queen ("D.Q.") on South Alice Street, and his employee, Kevin Guerra, were closing the D.Q. around 10:00 p.m. (R. 42-43, 59) Before the initial lockup, Gradic and Guerra walked past the side exit of the D.Q. several times, replacing letters on the D.Q.'s front sign. (R. 46, 60) After locking the building, Gradic, followed by Guerra, exited the D.Q. from the side doorway. (R. 43-44, 60) As Gradic walked toward the back of the business, he cautiously looked around because he had been robbed six months earlier. (R. 44) Gradic observed Saffold standing between the cooler and several bread racks. (R. 45) Though it was warm weather, Saffold was dressed in a ski mask, which covered everything but his eyes, and a trench coat. (R. 45-47) Gradic, immediately alarmed by Saffold's appearance and the fact that it was after closing time, "lifted" his nine millimeter gun and pointed it at Saffold. (R. 47, 60) When Saffold turned around and faced Gradic, he stated "I see you've got a gun, I'm not going to try to rob you." (R. 48)

3

Gradic instructed Saffold to take off his ski mask and lay down on the ground. (R. 48-49, 62)  Saffold complied and laid down on his stomach. (R. 48, 62)  Gradic asked Saffold if he had a weapon and Saffold assured him that he did not. (R. 49)  While lying on the ground Saffold attempted to move his hand near his chest. (R. 49, 63)  Guerra warned Gradic, "he's moving his hand closer to his chest." (R. 63)  Gradic instructed Saffold to keep his hands visible. (R. 49, 63)  Saffold told Gradic and Guerra that "there w[ere] other people watching him from around the buildings behind" the D.Q. (R. 50)  Scared, Guerra began to walk around the D.Q. to ensure no one else was present. (R. 61-62)  While watching Saffold, Gradic called the police on his cellular telephone. (R. 50)

A few minutes later officers arrived with their weapons drawn. (R. 51)  Saffold told officers "Don't shoot me[;] I'm laying on a gun." (R. 51)  The officers handcuffed Saffold and rolled him over, exposing a rifle attached to what appeared to be a shoestring. (R. 51, 64)  The officers cut the string and removed the weapon from Saffold. (R. 51)  The rifle appeared to be strapped to

4

Saffold "like a sling" underneath his trench coat.  (R. 51)

Saffold was placed inside a patrol vehicle.  (R. 53)

Several minutes after 10:00 p.m., Corporal Jason DeVane
of the Dothan Police Department arrived at the D.Q.  (R.
68)  When he arrived, Saffold was already inside the patrol
vehicle.  (R. 69)  Corporal DeVane transported Saffold to
the Dothan Police Department where DeVane advised Saffold
of his <u>Miranda</u> warnings.  (R. 73, 90-91)  Once Saffold
confirmed that he understood his rights and signed a waiver
form, Saffold told Corporal DeVane that he went to the D.Q.
"to scare the employees to get them to give him money."
(R. 93)  Saffold told Corporal DeVane that he was wearing a
ski mask "when he was standing in the corner awaiting the
employees to exit the store."  (R. 93)  He further stated
that he had a rifle "tied around his shoulder underneath
his jacket" and intended to use the rifle to "scare the
employees to give him...the money."  (R. 93)

5

## STANDARDS OF REVIEW

I.   This Court, in reviewing the trial court's denial of a motion for judgment of an acquittal, must determine "whether there existed legal evidence before the jury, at the time the motions were made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt."  Kabat v. State, 867 So. 2d 1153, 1160 (Ala. Crim. App. 2003).  This Court must view the evidence in the light most favorable to the State.  See Fitch v. State, 851 So. 2d 103, 120 (Ala. Crim. App. 2001).

II.  This Court will not reverse the trial court's decision to deny a motion to suppress based on conflicting evidence absent a clear abuse of discretion.  See Lee v. State, 898 So. 2d 790, 832 (Ala. Crim. App. 2001).

## SUMMARY OF THE ARGUMENT

The trial court properly denied Saffold's motion for judgment of an acquittal and properly submitted the issue of guilt to the jury because the State presented a prima facie case of first-degree robbery.  Based on Saffold's appearance and location, the timeframe, and Saffold's statements, Gradic and Guerra were scared that Saffold would utilize imminent physical force against them. Moreover, the trial court did not abuse its discretion by denying Saffold's motion to suppress oral statements made to law enforcement.  The record shows that no promises were made to induce Saffold or that Saffold was so intoxicated that he could not comprehend the situation.

**ARGUMENT**

I.  **The Trial Court Properly Denied Saffold's Motion For Judgment Of An Acquittal Because The State Presented A Prima Facie Case Of First-Degree Robbery Which Made The Case Proper For Submission To The Jury.**

Saffold contends that the trial court erroneously denied his motion for judgment of an acquittal. He argues that the State failed to present evidence that he used or threatened to use force to commit the robbery. This contention is without merit.

When reviewing a sufficiency of the evidence claim, this Court must "review the evidence in the light most favorable to the prosecution." Mims v. State, 816 So. 2d 509, 512 (Ala. Crim. App. 2001). This Court will not reverse the trial court when "the evidence raises a question of fact which, if believed by the jury would be sufficient to sustain the conviction." Parrish v. State, 494 So. 2d 705, 709 (Ala. Crim. App. 1985).

To establish a prima facie case of first-degree robbery the State must establish that, during the course of committing a theft, the defendant "[u]ses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of

8

resistance" or "[t]hreatens the imminent use of force against the person of the owner or any person with intent to compel acquiescence to the taking of or escaping with the property" and is armed with a deadly weapon.  Ala. Code §§ 13A-8-41, 13A-8-43 (1975).

> To constitute robbery, it is not necessary for the robber to use actual physical force against his victim. 'In robbery, the force or intimidation employed is the gist of the offense. The manner of taking is in the alternative; if force or violence is used, fear is not an essential ingredient. Conversely, if fear is used, there need be no violence.' [citation omitted] In order to sustain a conviction for first degree robbery, the test to be applied is a 'subjective' one which focuses on the 'reaction of the victim to the threats of the robber.'

Kent v. State, 504 So. 2d 373, 376 (Ala. Crim. App. 1987). See also Cook v. State, 582 So. 2d 592, 594 (Ala. Crim. App. 1991) ("The proper inquiry is how the victim reacted to and perceived the threat.").

The evidence viewed in the light most favorable to the State established that around 10:00 p.m. on September 26, 2004, Phillip Gradic, the owner of the Dairy Queen ("D.Q."), and Kevin Guerra were closing the D.Q for the night.  (R. 42-43)  After exiting the side door, Gradic observed Saffold hiding between the cooler and bread racks wearing, in warm weather, a trench coat and ski mask.  (R.

9

45-47)  Alarmed by Saffold's presence and appearance, Gradic brandished his nine millimeter gun and pointed it at Saffold.  (R. 47, 60)  As Saffold turned around and saw the weapon, he stated "I see you've got a gun, I'm not going to try to rob you."  (R. 48)

Gradic instructed Saffold to take off his ski mask and lie down on the ground.  (R. 48-49, 62)  Gradic also asked Saffold if he was armed.  (R. 48)  Though Saffold assured Gradic that he was not armed, he was in fact armed.  (R. 51, 64)  While lying on the ground, Saffold attempted several times to move his hands closer to his chest.  (R. 49, 63)  Guerra warned Gradic of Saffold's hand movement and Gradic instructed Saffold to keep his hands visible. (R. 49, 63)  Saffold warned Gradic and Guerra that "other people [were] watching him from around the buildings behind" the D.Q.  (R. 50)  Sacred, Guerra began to walk around the D.Q. to ensure no one else was present.  (R. 61-62)

After the police arrived, Saffold asked that they not shoot because he is lying on a rifle.  (R. 51)  Officers found a rifle attached to Saffold's shoulder by some type of string.  (R. 51, 64)  Once transported to the police

10

station and informed of his rights, Saffold admitted to
Corporal DeVane that "he arrived at the court side Dairy
Queen with the intent to scare the people from the Dairy
Queen to receive money." (R. 77) Saffold stated that "he
was going to show them a gun in an attempt to get them
scared enough to give him the money." (R. 77)

Saffold does not argue in his brief that he was not
armed with a weapon; rather, the crux of his argument is
because the victim did not give him the opportunity to
brandish his weapon or verbally demand money, the State
failed to establish a prima facie case of first-degree
robbery. The evidence proves otherwise. The facts proved
that Gradic perceived Saffold's presence – hiding between
the cooler and bread racks – along with his dress, the
timeframe, and Saffold's statement "I see you've got a gun,
I'm not going to try to rob you" as a threat of imminent
force. Furthermore, Saffold's admission that he intended
to "show them" his gun so Gradic would give him the money
established a prima facie case of first-degree robbery.
Therefore, the trial court properly denied Saffold's motion
for judgment of an acquittal.

11

## II.  The Trial Court Properly Denied Saffold's Motion To Suppress Because His Statement Was Voluntarily Made.

Saffold contends that the trial court erroneously denied his motion to suppress oral statements given to law enforcement officers.  He argues that his statements were induced and that he did not voluntarily and intelligently waive his rights because he was on drugs at the time the statements were made.  (Saffold's brief, pgs. 43, 46.) This contention is without merit.

This Court has previously recognized that "a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency."  Williams v. State, 795 So. 2d 753, 767 (Ala. Crim. App. 1999).

> [F]or a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess.  If his capacity has been impaired, that is, 'if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence.

Id.

When determining whether an inculpatory statement is made voluntarily, this Court must examine the totality of the circumstances.  Id.  This Court has noted that "the

12

mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement." Robinson v. State, 865 So. 2d 457, 469 (Ala. Crim. App. 2003). See also Williams v. State, 795 So. 2d 753, 768 (Ala. Crim. App. 1999).

This Court has also noted that:

'Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' [citation omitted] 'The voluntariness of an alleged confession is a question of law addressed to the trial court and, depending upon its ruling, then to the jury for its consideration.' [citation omitted] Further, '[m]ere emotionalism and confusion do not dictate a finding of mental competency or insanity' so as to render a statement inadmissible. [citation omitted] Finally, '[c]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' [citation omitted] '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.'

Barber v. State, CR-03-0737, 2005 WL 1252745, at *34-35 (Ala. Crim. App. May 27, 2005). See also Minor v. State, CR-00-1300, 2004 WL 1909380, at *7 (Ala. Crim. App. Aug. 27, 2004).

13

In this case, Corporal DeVane testified during the suppression hearing that he read Saffold his <u>Miranda</u> warnings, and that Saffold signed a waiver-of-rights form indicating that he understood his rights and that he was waiving them. (R. 74-76) At the time he was informed of his rights, Corporal DeVane asked Saffold if he was under the influence of alcohol or drugs and Saffold said "no" he was not. (R. 78-79) Corporal DeVane also testified that, based on his experience, Saffold did not appear to be under the influence of drugs or alcohol. (R. 79) Corporal DeVane further testified that he did not make any promises or offer Saffold any rewards or inducements in exchange for Saffold's statement. (R. 79) Corporal DeVane testified that he did, however, tell Saffold "that if he cooperated and [the District Attorney or trial judge] asked, [he] would tell them whether [Saffold] was cooperative and gave a statement or uncooperative in not giving a statement." (R. 80)

Saffold testified at the suppression hearing that at the time of his arrest he was under the influence of crack cocaine. (R. 83) He stated that he had smoked cocaine throughout the day. (R. 83) Saffold admitted that he

14

informed Corporal DeVane that he was not under the influence of drugs. (R. 83) He testified that he lied to Corporal DeVane because he "wanted to cooperate because [he] didn't want [Corporal DeVane] to raise [his] bail so high [that Saffold's] family couldn't get [him] out." (R. 83) Saffold understood that based on the "type of case it was" he knew there was "outstanding bond for" first-degree robbery. (R. 86) Saffold also testified that Corporal DeVane told him that if Saffold cooperated by signing the waiver of rights form and providing a statement "it would look good...for the judge and the [District Attorney] if [he] cooperated." (R. 84) Corporal DeVane, however, never promised Saffold "anything as to bond." (R. 86) Saffold stated that he could not "really remember what really happened that night", however, he did remember Corporal DeVane "going over" the waiver of rights form. (R. 84-85) Saffold testified that he signed the form because he was "nervous", "shook up", and "scared." (R. 85)

After hearing the evidence presented, the trial court held:

> Based on the evidence before the Court, this Court finds that the statement was freely and voluntarily given. There is a <u>Miranda</u> form. It is basically an issue regarding credibility.

15

You have a police officer who testified that
there were no threats, no coercions, no offers, no
promises. And then you've got [] Saffold who
testified that he told him he was not on drugs at
the time, but he really was on drugs. So its hard
to put a lot of credibility into that.

Said that the officer offered him a reward, but
couldn't really remember much about it. He
identified State's Exhibit 5 and remembers it;
that was his signature on the form. He understood
the rights form at the time and the officer never
promised anything regarding bond.

So, you know, weighing and considering all that
evidence, the Court finds that the officer
complied with Miranda, and that said statement was
voluntary, overcoming any presumption to the
contrary.

(R. 87-88)

The trial court's ruling was not manifestly contrary to

the great weight of the evidence presented at the

suppression hearing.  *See generally* Eggers v. State, CR-02-

0170, 2004 WL 3190213, at *11 (Ala. Crim. App. Nov. 24,

2004) ("[A]ny conflicts in the testimony or credibility of

witnesses during a suppression hearing is a matter for

resolution by the trial court.").  Rather, there is no

evidence that Corporal DeVane made any specific promises of

leniency.  Saffold also conceded that he was not promised

any help with his bond.  Furthermore, there was no evidence

presented that suggested Saffold was so intoxicated and

16

impaired that he did not fully appreciate and understand the situation. On the contrary, Saffold testified that he remembered Corporal DeVane going over the waiver of rights form and that he signed the form. He also testified that he was aware the charges were severe and that he cooperated with law enforcement in hope that he would receive a lower bond amount. Thus, the trial court did not abuse its discretion by denying Saffold's motion to suppress.

## CONCLUSION

Based on the foregoing, this case should be affirmed on appeal.

Respectfully submitted,

Troy King
*Attorney General*

Audrey Jordan
*Assistant Attorney General*

18

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>29th</u> day of November,

2005, I did serve a copy of the foregoing on the attorney

for Saffold, by placing the same in the United States Mail,

      Thomas K. Brantley
      Brantley & McLendon, L.L.C.
      401 North Foster Street
      Dothan, Alabama 36303

      Audrey Jordan
      Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300

229838



APR 28 2006

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CRIMINAL APPEALS

### OCTOBER TERM, 2005-2006

---

### CR-04-2068

---

### Eric Saffold

### v.

### State of Alabama

### Appeal from Houston Circuit Court
### (CC-05-216)

SHAW, Judge.

Eric Saffold was convicted of first-degree robbery, a violation of § 13A-8-41, Ala. Code 1975, and was sentenced to 25 years' imprisonment. On appeal, Saffold contends (1) that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to prove a prima

EXHIBIT

D

CR-04-2068

facie case of first-degree robbery, and (2) that the trial court erred in denying his motion to suppress the statement he made to the police.

Our review of the record reveals the following pertinent facts: At approximately 10:00 p.m. on September 26, 2004, Phillip Gradic, the owner of the Dairy Queen restaurant on South Alice Street in Dothan, and Kevin Guerra, who was employed as a cook at the Dairy Queen, were heading home after they had locked up for the evening. They exited the side door of the restaurant and headed toward Gradic's automobile. As they rounded the corner to the back of the building, Gradic, who testified that he had been robbed a few months earlier and tended to be more alert to his surroundings, saw someone standing in the area between where the walk-in cooler extended out of the back of the building and some bread racks, and this person was facing toward the back door of the building  -- the door that they had used several times that evening while they were changing the letters on the advertising sign. At trial, both Gradic and Guerra identified Saffold as the person they saw that evening. Gradic testified that he noticed that Saffold had a mask pulled over his face and that he was

2

CR-04-2068

wearing a trench coat even though it was "T-shirt weather" that evening.  (R. 45.)

Gradic had a 9mm. gun in his pocket, and he pulled it out and pointed it at Saffold.  When Saffold turned around, he stated, "I see you've got a gun, I'm not going to rob you." (R. 48.)  Gradic asked Saffold if he was armed, and Saffold told him that he was not.  Gradic told Saffold to take off his mask, to lie down on the ground, and to place his hands where Gradic could see them.  Saffold complied.  Then Gradic telephoned the police on his cellular telephone.  While Saffold was lying on the ground on his stomach, he kept trying to pull his hands under his chest, but Gradic told him to put his hands back where he could see them.  Guerra looked around the area to make sure that there were not any other people waiting to help Saffold rob them because Saffold "had stated that there [were] other people watching him from around the buildings behind [the Dairy Queen]."  (R. 50.)  Although both Gradic and Guerra testified that Saffold made no oral threats against them, Guerra testified that he was afraid during the encounter:

> "Q.  All right.  So you're behind -- walking behind
>      Phillip?

3

CR-04-2068

"A.  Yes.

"Q.  Do you notice anybody standing back there?

"A.  Not at first, until Mr. Gradic pulled his gun
     out.  Then that's when I observed a man with a
     mask on.

"Q.  Okay.  So the first thing you know about it is
     when Phillip pulls out his gun?

"A.  Yeah.  Phillip pulls out his gun and he starts
     saying something.  And then when I looked to
     the side, I saw a man with a mask on.  So I'm
     like: Oh, my God, here we go again.

"Q.  Did it scare you?

"A.  Yeah, yeah.  Because, I mean, somebody with a
     mask on, so --

"Q.  Where do you see this man with the mask
     standing?

"A.  There's a bread rack and there's a cooler.  And
     he was standing like right there on the corner.
     So I told Phillip to go ahead and keep an eye
     on him and I'll go ahead check the store and
     make sure there's not more than one person.

"Q.  All right.  So you look around?

"A.  Yeah.

"....

Q.  Put it this way.  You didn't hear him threaten
     either one of you, did you?

"A.  The only thing I can tell you, Mr. Gradic told
     him to lie down, to lie down.  And I told
     Phillip, 'I'll watch your back, I'm going to

4

CR-04-2068

> check the store.' Then Eric was up there, kept
> on saying something about, 'I'm not going to
> rob you, I'm not going to rob you, I'm running
> from somebody, I'm trying to hide from
> somebody,' you know. So what I was doing was
> going around the building to make sure there
> wasn't nobody else.

"Q. So the answer to the question about whether he
threatened you is no?

"A. Well, no, not really. But I was scared because
I wasn't sure if there was more than one
person.

"Q. Right. But he didn't threaten you? I'm not
talking about anybody else anywhere on Alice
Street or the blocks behind Fortner or anywhere
else.

"A. He didn't say nothing to me."

(R. 61-62, 66-67.)

When the police officers arrived, Saffold told them,
"Don't shoot me, I'm laying on a gun." (R. 51.) The police
officers handcuffed Saffold and when they rolled him over,
they discovered that Saffold had a loaded rifle concealed in
his trench coat, which was somehow attached to him by a
string.

Saffold was transported to the police station where Jason
DeVane, a corporal with the Dothan Police Department, read

CR-04-2068

Saffold his <u>Miranda</u>[1] rights.   Cpl. DeVane testified that Saffold indicated that he understood his rights; that Saffold indicated that he had not been drinking alcohol and that he was not under the influence of drugs; that Saffold did not appear to be under the influence of drugs or alcohol; that no promises, inducements, or threats were made; and that Saffold signed the waiver-of-rights form and gave a statement regarding the incident at the Dairy Queen restaurant.   Cpl. DeVane stated that Saffold told him that "he was there to scare the employees to get them to give him money."   (R. 93.) Cpl. DeVane further testified that Saffold identified the mask (State's Exhibit 1) as the mask "he was wearing when he was standing in the corner awaiting the employees to exit the store" (R. 93); that Saffold also told him that the rifle (State's Exhibit 2) "was the rifle that he had tied around his shoulder underneath his jacket" (R. 93); and that Saffold told him that he had been going to use the rifle to scare the employees so that they would give him money.

_____

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966).

6

CR-04-2068

I.

Saffold argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to prove a prima facie case of first-degree robbery. Specifically, Saffold contends that "[t]he State offered no evidence that Mr. Saffold used any force or threatened the imminent use of force upon Mr. Gradic or Mr. Guerra; therefore, this element of the crime fails and Mr. Saffold should have been acquitted of Robbery in the First Degree." (Saffold's brief at p. 34.)  In response, the State argues:

> "Saffold does not argue in his brief that he was not armed with a weapon; rather, the crux of his argument is because the victim did not give him the opportunity to brandish his weapon or verbally demand money, the State failed to establish a prima facie case of first-degree robbery.  The evidence proved otherwise."

(State's brief at p. 11.)

"'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'"  Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting

7

CR-04-2068

Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985).  "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992).  "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990).  "The role of appellate courts is not to say what the facts are.  Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978).

CR-04-2068

Section 13A-8-41, Ala. Code 1975, states:

"(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:

"(1) Is armed with a deadly weapon or dangerous instrument."

Section 13A-8-43, Ala. Code 1975, states:

"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

"(2) <u>Threatens the imminent use of force against the person of the owner or any person present</u> with intent to compel acquiescence to the taking of or escaping with the property."

(Emphasis added.)

Section 13A-8-40(b), Ala. Code 1975, states:

"'In the course of committing a theft' embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after the attempt or commission."

Section 13A-8-1(13), Ala. Code 1975, which is applicable to § 13A-8-43, see § 13A-8-40(a), Ala. Code 1975, defines "threat" in part as "[a] menace, <u>however communicated</u>, to ... [c]ause physical harm to the person threatened or to any other

9

CR-04-2068

person."    (Emphasis added.)    "Menace" is defined in the Compact Oxford English Dictionary 1062 (2d ed. 1994) in part as "[a] declaration or indication of hostile intention, or of a probable evil or catastrophe" (emphasis added); Merriam-Webster's Collegiate Dictionary 774 (11th ed. 2003), defines "menace" in part as "a show of intention to inflict harm." (Emphasis added.)

In Cook v. State, 582 So. 2d 592 (Ala. Crim. App. 1991), this Court stated:

> "Section 13A-8-41 does not require that actual force be used to commit the theft; evidence of threatened or imminent force is sufficient.  The proper inquiry is how the victim reacted to and perceived the threat.  Kent v. State, 504 So. 2d 373 (Ala.  Cr.  App.  1987).    The statutory robbery provisions likewise do not require proof of an actual taking of property to support a conviction. Breedlove v. State, 482 So. 2d 1277 (Ala. Cr. App. 1985)."

582 So. 2d at 593-94 (emphasis added).  Likewise, consistent with § 13A-8-1(13), this Court has held that evidence of a verbal threat is not necessary to establish the "threat of force" element necessary to support a robbery conviction, see, e.g., Coleman v. State, 552 So. 2d 156 (Ala. Crim. App. 1988); the actions of the defendant, even when the defendant does not appear to possess a deadly weapon, may suffice to establish

10

CR-04-2068

the threat of force if it appears to the victim that the defendant has the intention, ability, and means to inflict harm, see, e.g., Welch v. State, 630 So. 2d 145 (Ala. Crim. App. 1993).

The evidence presented in this case, viewed in the light most favorable to the State, indicated that Gradic saw Saffold hiding behind the building between the cooler and the bread racks; that even though it was a warm September evening, Saffold was wearing a mask and a trench coat; that Saffold was watching the back door of the Dairy Queen restaurant -- which had been the door the employees had been using that evening while they were changing the letters on the advertising sign -- waiting for the employees to leave after locking up for the evening; and that Gradic perceived at the time of his unexpected encounter with Saffold that, in light of Saffold's furtive presence at that time of night and the way he was dressed, Saffold intended to rob him and could use force to take his money.

Contrary to Saffold's contention, we do not think that it is relevant for purposes of our inquiry that Gradic and Guerra fortuitously saw Saffold before Saffold could expressly state

CR-04-2068

his intentions or take any additional overt actions toward completion of the theft. Saffold's attire and his actions signaled his obvious purpose -- he was lying in ambush waiting for someone to exit the rear door of the restaurant so that he could commit a robbery -- and the potential and dangerous threat he posed was immediately apparent to both Guerra and Gradic, who felt the need to immediately pull his gun for protection. The threat posed by Saffold was in no way eliminated by the steps Gradic was able to take to apprehend Saffold and then to contact the police. It is also significant, we think, that even after Gradic had pulled his weapon and required Saffold to lie down on the ground on his stomach with his arms extended, there was still a threat of imminent force -- Saffold attempted to pull his arms under his chest where Gradic could have reasonably (and, it turns out, correctly) believed he had concealed a loaded gun under the trench coat, and Saffold suggested to Gradic and Guerra that there were accomplices present at the scene who could have come to Saffold's aid.

In addition, Cpl. DeVane testified that Saffold admitted during the statement he gave to Cpl. DeVane that "he was

CR-04-2068

wearing [a mask] when he was standing in the corner awaiting the employees to exit the store" (R. 93); that "he was there to scare the employees to get them to give him money" (R. 93); and that he had been going to use the loaded rifle concealed under his trench coat to scare the employees so that they would give him money. (R. 93.)

The State presented sufficient evidence from which the jury could have inferred that Saffold threatened the imminent use of force against Gradic and Guerra. Therefore, we find no error in the trial court's denial of Saffold's motion for a judgment of acquittal.

II.

Saffold also argues that the trial court erred in denying his motion to suppress his statement to the police. Specifically, Saffold argues that his statement to Cpl. DeVane should have been suppressed because, he says, he did not voluntarily and intelligently waive his rights. He argues that he was under the influence of crack cocaine at the time he signed the waiver-of-rights form and gave his statement and that he signed the waiver-of-rights form and gave a statement only because, he says, Cpl. DeVane said that the district

13

CR-04-2068

attorney and the trial court would look more favorably on his case if he cooperated.

At the suppression hearing, Cpl. DeVane testified that before he took Saffold's statement, he asked Saffold if he was under the influence of drugs or alcohol and that Saffold told him that he was not. Cpl. DeVane further testified that, based upon his experience, Saffold did not appear to be under the influence of drugs or alcohol. Saffold testified at the suppression hearing that he had been smoking crack cocaine the entire day before he appeared at the Dairy Queen restaurant, but that he did not tell Cpl. DeVane that he was under the influence of crack cocaine because, he said, he wanted to cooperate with the authorities so that his bail would be set at a reasonable amount.

Saffold also testified at the suppression hearing that he signed the waiver-of-rights form and gave a statement because, he said, Cpl. DeVane told him that "it would look good ... [to] the judge and the D.A. if [he] cooperated" (R. 84), but Saffold admitted that Cpl. DeVane "never promised [him] anything as to bond or anything of that nature." (R. 86.) Cpl. DeVane testified at the suppression hearing that he did

14

CR-04-2068

not make any promises or offer any rewards or inducements to get Saffold to give a statement, but that he did tell Saffold "that if he cooperated and they asked, [he] would tell them whether [Saffold] was cooperative and gave a statement or uncooperative in not giving a statement." (R. 80.)

In denying Saffold's motion to suppress the statement, the trial court stated:

> "You have a police officer who testified that there are no threats, no coercions, no offers, no promises. And then you've got Mr. Saffold who testified that he told [Cpl. DeVane] he was not on drugs at the time, but he really was on drugs. So it's hard to put a lot of credibility into that.

> "Said that the officer offered him a reward, but couldn't really remember much about it. He identified State's Exhibit 5 [the waiver-of-rights form] and remembers it; that was his signature on the form. He understood the rights form at the time and the officer never promised anything regarding bond.

> "So, you know, weighing and considering all that evidence, the Court finds that the officer complied with <u>Miranda</u>, and that said statement was voluntary, overcoming any presumption to the contrary."

(R. 87-88.)

In <u>Eggers v. State</u>, 914 So. 2d 883 (Ala. Crim. App. 2004), this Court stated:

> "'"The question of whether a confession was voluntary is initially to be determined by the trial

15

CR-04-2068

court."' <u>Minor v. State</u>, 914 So. 2d 372, 388 (Ala. Crim. App. 2004), quoting <u>Jackson v. State</u>, 562 So. 2d 1373, 1381 (Ala. Crim. App. 1990). '[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' <u>Sheely v. State</u>, 629 So. 2d 23, 29 (Ala. Crim. App. 1993) (citations omitted). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion.' <u>Jackson v. State</u>, 589 So. 2d 781, 784 (Ala. Crim. App. 1991). 'When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be manifestly contrary to the great weight of the evidence."' <u>Ex parte Matthews</u>, 601 So. 2d 52, 53 (Ala. 1992), quoting <u>Williams v. State</u>, 456 So. 2d 852, 855 (Ala. Crim. App. 1984). '"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."' <u>Kennedy v. State</u>, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting <u>Bradley v. State</u>, 494 So. 2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 772 (Ala. 1986)."

914 So. 2d at 899.

We find no error in the trial court's denial of Saffold's motion to suppress his statement to Cpl. DeVane.

For the foregoing reasons, the judgment of the trial court is affirmed.

16

CR-04-2068

AFFIRMED.

McMillan, P.J., and Cobb and Wise, JJ., concur.  Baschab, J., dissents, with opinion.

BASCHAB, JUDGE, dissenting.

To sustain a conviction for first-degree robbery pursuant to §§13A-8-41(a)(1) and 13A-8-43(a)(2), Ala. Code 1975, the State must establish that the defendant was armed and threatened to use force <u>in the course of committing a theft</u>. In this case, the State did not present any evidence that the appellant performed any actions that would constitute a theft or an attempted theft.  In fact, both Gradic and Guerra specifically stated that the appellant did not say anything to them; that the appellant did not use or threaten to use force against them; and that they did not see the rifle until after law enforcement officers arrived.  Also, the appellant specifically told Gradic and Guerra he was not going to rob them.  The majority relies on the appellant's suspicious actions and his admission to officers that he intended to use

17

CR-04-2068

the rifle to scare the employees so they would give him money to affirm the conviction. However, many conclusions as to intent -- both criminal and noncriminal -- could be drawn based on the appellant's suspicious behavior. Accordingly, because the State did not establish that the appellant was armed and threatened to use force <u>in the course of committing a theft</u>, I must respectfully dissent.

IN THE ALABAMA COURT OF CRIMINAL APPEALS

**ERIC SAFFOLD**,
 APPELLANT

**VS.**

**STATE OF ALABAMA**,
 APPELLEE

ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA

CASE NO. CC-05-216
**CRIMINAL APP. NO. CR-04-2068**

---

**APPLICATION FOR REHEARING**

---

Thomas K. Brantley, Attorney at Law
Ala. Bar #, (BRA049)
Brantley & Amason
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT


EXHIBIT
E

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................... i

APPLICATION FOR REHEARING..............................ii

TABLE OF CITATIONS AND AUTHORITIES....................iii

STATEMENT OF THE CASE.................................. 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW............... 2

MOTION TO ADOPT STATEMENT OF  FACTS.................... 3

STATEMENT OF THE FACTS................................. 4

SUMMARY OF THE ARGUMENT ............................... 29

ARGUMENT ............................................. 30

CONCLUSION............................................ 45

CERTIFICATE OF SERVICE................................ 46

i

## APPLICATION FOR REHEARING

COMES NOW the Appellant, Eric Saffold, in the above-styled cause, and moves this Honorable Court to grant him a rehearing in this cause and to reconsider, revise, reverse, and withdraw its judgment rendered on April 28, 2006 affirming the judgment of the Circuit Court of Houston County, Alabama and to enter an order reversing said judgment.  Submitted herewith is a brief and argument in support of said application.

Respectfully submitted this the ⊥⊥ day of May, 2006.

Thomas K. Brantley, Attorney at Law
Ala. Bar #, (BRA049)
Brantley & Amason
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

ii

## TABLE OF CITATIONS AND AUTHORITIES
### TABLE OF CITATIONS

Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967)......................................39

Ballenger v. State, 720 So.2d. 1033, 1034 (Ala.Cr.App. 1998)............................................34,36

Bram v. United States, 168 U.S. 532, 18 S. Ct. 183, 42 L.Ed. 568 (1897). 38

Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Cr.App. 1993);.  36

Boulden v. Holman, 394 U.S. 478, 480, 89 S. Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969)   39

Culombe, 367 U.S. at 602, 81 S. Ct. at 1879    40

Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert denied, 368 So.2d 877 (Ala. 1979).   37, 38

Daniels v. State, 581 So.2d. 536 (Ala.Cr.App. 1990)writ denied;. 31

Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) 40

Ex parte Matthews, 601 So.2d 52, 54 (Ala. cert. denied, 505 U.S. 1206, 112 S. Ct. 2996, 120 L.Ed.2d 872 (1992);    39

Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988))    40

Faircloth v. State, 471 So.2d. 485, 488 (Ala.Cr.App. 1984), aff'd, 471 So.2d. 493 (Ala. 1985)).  34,36

Gaddy, 698 So.2d at 1154.........................40

Garrison v. State, 372 So.2d 55 (Ala.Cr.App. 1979)....43

Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.
1990).......................................31,39,40,41

McLeod v. State, 718 So.2d 727, 729-30 (Ala. 1998)
(footnote omitted).    41

Metzger v. State, 565 So.2d 291, 292 (Ala.Cr.App. 1990) 36

Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986);    42

Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied,
415 So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S.
Ct. 459, 74 L.Ed.2d 610 (1982)   42

Newsome v. State, 570 So.2d 703,710 (Ala.Cr.App. 1989). 36

Nunn v. State, 697 So.2d. 497, 498 (Ala.Cr.App. 1997)   34

O'Neal v. State, 602 So.2d 462, 464 (Ala.Cr.App. 1992)) 34

Palmer v. State, 401 So.2d 266, 268  (Ala.Cr.App.), cert.
denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S.
922, 102 S. Ct. 1280,71 L.Ed.2d 463 (1982).    43

Poole v. State, 645 So.2d. 330, 331 (Ala.Cr.App. 1994). 31

Powe v. State, 597 So.2d 721, 724 (Ala. 1992).31

Seaton v. State, 645 So.2d 341,343 (Ala.Cr.App. 1994);  31

Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert.
denied, 386 So.2d 1187 (Ala.  1980). 43

Thomas v. State, 363 So.2d. 1020 (Ala.Cr.App. 1978)34,35

Ward v. State, 557 So.2d 848, 850 (Ala.Cr.App. 1990).   35

Williams v. State, 695 So.2d 644 (Ala.Crim.App. 1996).  31

Willis v. State, 447 So.2d. 199 (Ala.Cr. App. 1983).    35

iv

Young v. State, 283 Ala. 676, 220 So.2d 843 (1969).     36

**STATUTES, RULES, AND CONSTITUTIONS**

§ 13A-8-41, Ala. Code 1975.   ........................ 31
§ 13A-8-43, Ala. Code 1975.   ........................ 32
Rule 20.2(a), Ala.R.Crim.P.   ........................ 37

§ 13A-3-2(e)(1), Ala. Code 1975. .................... 42

## STATEMENT OF THE CASE

The Grand Jury of Houston County, Alabama, January Term, 2005, issued an indictment charging the Defendant with Robbery in the First degree (CR 6-7). On the advice of his attorney, Eric Davis, the Defendant was formally arraigned, and pled not guilty and not guilty by reason of mental disease or defect. (CR 8).

A trial was held on the merits before a duly qualified, struck and empanelled jury, resulting in a verdict of Guilty as charged. Judgment was entered thereon by the Honorable Larry Anderson, and the case was continued for sentencing. (CR 32).

At the sentencing hearing, Judge Anderson sentenced the Defendant on Robbery in the First degree to imprisonment in the penitentiary for a term of 25 years, fine of $5,000 dollars, $100 dollars to the Alabama Forensic Sciences Trust Fund, and $1,000 dollars to the Victim's Compensation Assessment. (CR 45). The Defendant gave written Notice of Appeal on June 22, 2005, (CR 47). The Appellant's brief was filed October 31, 2005. This Honorable Court affirmed the Appellant's conviction on April 28, 2006. This Application For Rehearing follows.

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

## ON APPLICATION FOR REHEARING

I.   WHETHER THE TRIAL COURT ERRED IN DENYING THE
     DEFENDANT'S MOTION FOR JUDGMNET OF AQCUITTAL BASED
     UPON THE STATE'S FAILURE TO PROVE A PRIMA FACIE CASE
     OF ROBBERY IN THE FIRST DEGREE AGAINST THE DEFENDANT.
     <u>YES</u>


II.  WHETHER THE TRIAL COURT ERRED BY DENYING THE
     DEFENDANT'S "MOTION TO SUPPRESS"?
     <u>YES</u>

## MOTION TO ADOPT STATEMENT OF FACTS
## PURSUANT TO RULES 39(d)(5), 39(k) and 40(e)

### ALABAMA RULES OF APPELLATE PROCEDURE

**COMES NOW** the Appellant, Eric Saffold, by and through his undersigned counsel and hereby moves this Honorable Court pursuant to Rules 39(d)(5), 39(k) and 40(e) of the <u>Alabama Rules of Appellate Procedure</u> to adopt the Appellant's "Statement of Facts".

Respectfully submitted this the ____ day of May, 2006.


_____
Thomas K. Brantley
Ala. Bar #, (BRA049)
Brantley & Amason
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

## STATEMENT OF THE FACTS

This matter was tried before the Honorable Larry Anderson, Circuit Judge, on May 3rd, 2004. The Honorable David Atwell, Assistant District Attorney for the 20th Judicial District represented the State. The Honorable Eric Davis, Dothan, represented the Defendant Saffold at trial, and the Honorable Thomas K. Brantley, Dothan, represented the Defendant Saffold at the Sentencing hearing.

After a jury was duly struck and qualified, and opening statements made by the respective counsel, the following testimony of evidence was presented.

The State's first witness was Phillip Gradic, the owner of a local Dairy Queen located on South Alice Street in Dothan. Mr. Gradic owned the Dairy Queen for about a year and four months, and he was the owner on or about September 26th, 2004. (R 42). Mr. Gradic was working that night and he got off work about 10:00 p.m. Mr. Gradic then said that one of his employees, a Mr. Guerra, was the only other person there with him. (R 43). Mr. Gradic continued by saying that when he left the Dairy Queen he exited out of the side door and was headed towards his car. Then Mr. Gradic stated that when he came out of the building, he was looking around for

4

people because he had been robbed about six months before. (R 44).

Mr. Gradic said that he is very alert when he leaves the store and that he is always checking things out in order to make sure nobody is around. (R 44). Mr. Gradic also said that at this time Mr. Guerra was with him as they left the building. (R 44). Mr. Gradic then proceeded to explain that he was walking towards his car in the back of the store and as he went around the corner of the building where the cooler extends out he saw Mr. Saffold between the cooler and a bread rack. Mr. Gradic saw that Mr. Saffold was wearing a mask and a trench coat at this time. (R 45).

Mr. Gradic then testified that he and Mr. Guerra had been back and forth from the back door of the store to a building in the back a couple of times as they were working on changing the sign in front of the store. He also said that this was while they were closing up and they had not seen anyone out back of the store until they were leaving. (R 46). Mr. Gradic then identified the mask that the suspect was wearing, and it was admitted into evidence. (R 46-47).

When the State asked Mr. Gradic what he did when he saw
the man, Mr. Gradic stated that he had a 9-millimeter
pistol in his hand and he aimed it at the suspect before
the suspect saw him. (R 47). Mr. Gradic then continued to
say that when the suspect turned around and saw the gun
pointed at him he said, "I see you've got a gun, I'm not
going to try and rob you." (R 48). Mr. Gradic proceeded to
say that he told the suspect to take his mask off and lay
down on the ground while he called the police and that the
suspect complied with him. (R 49). Mr. Gradic then made the
suspect lay on his stomach with his hands out in front of
him while he called the police. (R 49). Mr. Gradic used his
cell phone to call the police and while he was waiting for
them to arrive he just kept watching the suspect because he
still did not know if he was armed or not. (R 50).

Mr. Gradic then told the jury that when the police
arrived they came up with their guns drawn and that the
suspect told them not to shoot because he was lying on a
gun. He told the jury that the police then handcuffed the
suspect and saw that he did have a gun on him so they
quickly took the gun away from him. (R 51). At this time
the gun was identified by Mr. Gradic and admitted into

evidence. (R 52). Mr. Gradic saw the police check the gun for bullets and he saw them unload the gun. (R 52). He then stated that the police put the suspect in a patrol car and hauled him away. (R 53).

On cross-examination Mr. Gradic stated that the only thing that drew his attention to the suspect was the fact that there was someone standing there and that he had been robbed before. (R 54). Mr. Gradic stated that the suspect did not make a sound or say anything. (R 55). Mr. Gradic said the suspect gave him no reason at all to believe that he was armed, and that he first found out he was armed when the police found the gun on him. (R 55).

Mr. Gradic then said that the suspect never pointed a gun at him or Mr. Guerra, he never said, "give me all of your money", he never said "give it up or I'll blow your head off" or anything like that. (R 56). Mr. Gradic the testified that the suspect never threatened any force or used any force against himself or Mr. Guerra. (R 56).

The state then called Kevin Guerra as their next witness. Mr. Guerra was employed as a cook at Dairy Queen, and he was working on the evening of September 26, 2004 with Mr. Gradic until the store closed. (R 59). Mr. Guerra

stated that when they closed up they left out of the side door and headed for Mr. Gradic's car, because he was going to give him a ride home. (R 60). Mr. Guerra then noticed the suspect standing between the bread rack and the cooler when Mr. Gradic pulled his gun on him and told him to lie down on the ground. (R 60). Mr. Guerra also stated that he did not notice anyone standing out there until he saw Mr. Gradic pull his gun out and then he first saw the suspect standing there with a mask on. (R 61).

Mr. Guerra then looked around for other people to make sure that no one else was hiding out there. Mr. Guerra also stated that the suspect complied with Mr. Gradic's order and did not try anything at all. (R 62). Mr. Guerra then stated that the suspect just lay there on the ground until the police came and took over. Mr. Guerra also said that he did not know the suspect was armed until the police arrived and located the gun on the suspect. (R 63). Mr. Guerra said that the suspect told them he was running and hiding from someone and that he was not going to rob them. (R 64).

Mr. Guerra was only a couple of feet away from Mr. Gradic when he first saw the suspect behind the store. When Mr. Guerra first saw the suspect he was facing them

and Mr. Gradic was telling him to get on the ground. (R 65). Mr. Guerra then said that the suspect did not use any force against them and that he simply complied with Mr. Gradic's orders. (R 65). Mr. Guerra said the suspect just kept saying that he was not going to rob them he was just running from somebody and he was trying to hide from somebody. (R 66). Mr. Guerra concluded his testimony by stating that the suspect never did threaten him at all. (R 66-67).

Corporal Jason DeVane was then called to testify for the state. Corporal DeVane was a member of the Dothan Police Department as a criminal investigator. He had been with the Dothan Police Department for six and one half years and three years as an investigator. Corporal Devane had been assigned to the specific unit on investigations dealing with violent crimes called the "Violent Crimes Unit". Corporal Devane had the occasion to go out to the Dairy Queen on South Alice Street on September 26, 2004 in response to a robbery call. (R-68) Corporal Devane and several officers were on the scene that night Officer Elkins and Officer Wise and Officer Collins were there for a short time. Corporal Devane then testified that Mr.

Gradic and another one of his employees that worked at the Dairy Queen were also present. (R-69).  Corporal Devane testified that the Defendant was in the back of a patrol unit when he arrived and that he took some evidence with regard to this case when he arrived on the scene. (R-69).

Corporal DeVane recognized the mask that was State's Exhibit #1 and he also identified State's Exhibit #2 as being the gun that was recovered from the Defendant. (R-70) Corporal DeVane tried to run down the serial numbers as far as ownership to the rifle but they were unable to locate any information that would lead them to the ownership of the rifle.  Corporal Devane was not able to run the serial number at that time and they could not find a good serial number to run it completely through the system.  (R-70) Corporal Devane then testified that there was a partial serial number that he believed was on the underside of the gun where the marking says J C. Higgins.  There was letter that he was unable to read and he would have to look at it again to find out exactly where it was at which Defense Counsel objected to the line of questioning stating that the guns serial number was not material to this robbery. Then the Court overruled the objection. (R-71).

Corporal Devane recognized the bullets located inside the rifle were the same as the ones he had retrieved from Officer Wise at the scene of the crime. Corporal Devane then testified that there was a tube on the gun where the bullets were loaded into and these were the same shells that had been recovered from the rifle at the scene of the crime. (R-71) Corporal Devane identified a box of Winchester Super-X ammunition that was also located at the scene, and stated that the box of shells had been removed from the suspect's pockets at the scene. When asked whether or not he actually unloaded the gun and secured it and secured the bullets Corporal Devane stated that he did not and that it was Officer Wise that unloaded the gun at the scene and that he retrieved the bullets from Officer Wise. (R-72). At this time the State moved to admit the bullets retrieved from the gun and the bullets that were taken from the Defendant as State's Exhibits #3 & #4 and the Court admitted these into evidence. (R-72).

Corporal Devane then testified that after the Defendant was placed in the patrol car he was transported down to the Police Department for an interview. Corporal Devane said that interview occurred in his office in the

Criminal Investigations Division at the Dothan Police Department.  Corporal Devane stated that when the interview was taking place that the Defendant was not under arrest at this point.  Defense counsel then approached the Judge and asked that their Motion to Suppress be held outside the jury at this time.  The Court then told the jury that the Court had to take care of this matter outside of their presence and for them to return to the jury deliberation room until these proceedings were done. (R-73).

The State resumed its examination or Corporal Devane outside the presence of the jury at this time.  Corporal Devane sat the Defendant down and advised him of his rights at this point and after advising him of his rights he took a piece of paper from his desk and he went over the rights as he read them to the Defendant. After he read his rights to the Defendant he explained the waiver of rights form to the Defendant. (R-74). Corporal Devane then proceeded to testify what rights he actually read the Defendant and how he explained the waiver of rights form to the Defendant. (R-75).  Corporal DeVane was under the impression that the Defendant acknowledged that he understood each and every one of these rights that he was just read.  Corporal DeVane

12

then stated that the Defendant made a statement at this time and he acknowledged this by signing the waiver of rights form that he understood that. (R-76).

Corporal Devane stated that on the waiver of rights form that he asked the Defendant to fill out his education level in the blank provided for it and the Defendant filled out that his highest level of education that he had completed was a 12th grade education. Corporal Devane then stated that it was apparent to him that the Defendant understood his rights as he read them to him and that he wanted to make a statement to Corporal Devane. (R-76). Corporal Devane then questioned the Defendant about the occurrence and the Defendant told him that he had arrived on the South side of Dairy Queen with the intent just to scare the people from the Dairy Queen to try and receive some money. Corporal Devane then stated that the Defendant talked in detail about how he planned to scare the people and he stated that he was just going to show them the gun in an attempt to get them scared enough to give him some money. At this time the Court interrupted and said that lets not get too far a field since this is only a foundation for a statement that needs to be laid and the

State concluded their examination their examination of

Corporal Devane and passed the witness to Defense Counsel.

(R-77-78).

Corporal Devane taped the statement with the

Defendant and the tape would actually be the best evidence

of what actually happened during the interview.  Defense

counsel then asked if he inquired as to whether or not the

Defendant has been drinking and Corporal Devane then stated

that he did.  The Defendant also stated that he had not

been drinking and Corporal Devane asked him whether or not

he was under the influence of any drugs and the Defendant

stated that he was not at this time. (R-78-79).  Corporal

Devane, in his experience as a police officer, has been

around people that he knew to be under the influence of

crack cocaine and the Defendant did not exhibit any of

these outward signs to him.  He also said that he did not

make him any promises or offer him any reward or inducement

to get him to make this statement. (R-79).  Corporal Devane

then stated that he told the Defendant that if he

cooperated and if they asked him whether or not he was

cooperative in giving a statement or uncooperative in

giving a statement he would tell them that he was cooperative in giving the statement. (R-79-80).

Defense Counsel then called the Defendant Eric Saffold to the stand to testify for the limited purposes of addressing the issue of his statement. (R-82). Mr. Saffold was under the influence of drugs at the time that he made the statement and specifically he was under the influence of cocaine (crack). (R-83). Mr. Saffold had been smoking crack all day long. Mr. Saffold explained to the Court that he lied to the police officer about being under the influence of any drugs because he wanted them to understand that he wanted to cooperate and he didn't want them to raise his bail so high that his family could not get him out. (R 83-84). Mr. Saffold said that there was a rewards or inducement made to him in order to get him to make the statement. (R-83). Mr. Saffold was told if he did cooperate that it would look good to the DA and the Judge if he cooperated and that by him signing the waiver of rights that it was part of the cooperation in order to give the statement.

Mr. Saffold remembered going over the rights form with Corporal Devane because it was his signature on it but he

doesn't remember too much about that night. Saffold had a
certificate and had actually walked at the graduation
ceremony but that he didn't actually have a 12th grade
education. In explaining further he stated that he went to
the graduation but he did not have a diploma. He graduated
with a certificate of attendance. Saffold did understand
what was being read to him for him to sign. Saffold was
nervous at the time he was reading it and he was so shook
up and scared that he was just ready to get out of there.
He was up there by himself and was just trying to cooperate
any way he could because he was told that if he cooperated
it was a possibility that things could go good for him and
that is all that he was trying to do. (R-85-86).

At this time the Court addressed the State and
Defense Counsel and stated that all statements were deemed
involuntary until such a time as there is proof that the
statement was given freely and voluntarily. Based on the
evidence before the Court he found that the statement was
freely and voluntarily given through his Miranda form it
basically an issue involving the credibility of the
statement. The Court then stated that the police Officer
testified that there were no threats, no coercion, on

offers or promises made and he had Mr. Saffold to testify

that he told him that he was not on drugs at the time but

he really was on drugs so it is hard to put a lot of

credibility into that.  The Court stated that Mr. Saffold

told the Officer that he was offered a reward but couldn't

really remember much about it but he identified State's

Exhibit 5 and he remembers that it was his signature on the

waiver of rights form and that he understood those rights

at the time and that the officer never really promised him

anything regarding his bond.  So in weighing and

considering all the evidence the Court found that the

officer complied with Miranda and that the said statement

was voluntary overcoming any presumption to the contrary.

(R-87-88)



offers or promises made and he had Mr. Saffold to testify
that he told him that he was not on drugs at the time but
he really was on drugs so it is hard to put a lot of
credibility into that.  The Court stated that Mr. Saffold
told the Officer that he was offered a reward but couldn't
really remember much about it but he identified State's
Exhibit 5 and he remembers that it was his signature on the
waiver of rights form and that he understood those rights
at the time and that the officer never really promised him
anything regarding his bond.  So in weighing and
considering all the evidence the Court found that the
officer complied with Miranda and that the said statement
was voluntary overcoming any presumption to the contrary.
(R-87-88).

The State then continued their examination with
Corporal Devane in the presence of the Jury.  Corporal
Devane had the Defendant in his office and that he
indicated to the Defendant that he wanted to speak with him
and before doing so he advised him of his Miranda Rights
and he read them to him.  He also stated that he went over
a waiver of rights form with the Defendant and he read each
statement of the waiver and asked him to sign it and if he

17

understood the statement and he agreed to give a statement.
(R-90).  Corporal Devane then proceeded to tell the jury
exactly what he reads to the Defendant in explaining his
Miranda rights and the waiver of rights form.  He told the
jury that he read the standardized Miranda warnings and
then he went over the waiver of rights form explaining each
of his rights and asked if he was willing to make a
statement and answer questions.  He acknowledged that he
did by signing the form. (R-91).  Corporal Devane stated
that the Defendant indicated to him that he freely
understood everything that was read to him and he indicated
to him that he had a proper education to understand what
was being read to him. (R-91).  Corporal Devane then told
the jury that he did not promise or coerce the Defendant in
any way to make the statement after signing the waiver of
rights form the Defendant voluntarily agreed to talk with
him about the incident that occurred at the Dairy Queen
that evening. (R-92).

Corporal Devane then stated that the Defendant did
make a statement regarding the incident that occurred at
the Dairy Queen that evening.  Corporal Devane said the
Defendant told him the reason he was there was that he just

wanted to scare the employees and try and get some money.
Corporal Devane said that the Defendant was wearing the
mask when he was standing on the corner waiting for the
employees to exit the store. (R-93).  Corporal Devane then
stated that the Defendant told him that he had the rifle
tied around his shoulder underneath his jacket and he said
that he was just going to use it to scare the employees
into giving him the money and he also testified that the
rifle was fully loaded at this time. (R-93-94).

At this time the State moved to admit State's
Exhibits 1 through 5 and the Court admitted them into
evidence.  The State rested.  The Judge then instructed the
jury that some matters had to be taken up outside of their
presence and asked them to return to the deliberation room
until they were notified to come back.

Defense Counsel moved for a Motion For Judgment of
Acquittal based on the fact that the State had failed to
prove a prima facie case of each of the elements of Robbery
1st or any other Robbery in any other degree. Specifically
the State failed to show that there was a use of force or
threat of imminent use of force.  Defense counsel stated
that all that they had factually was that Mr. Saffold was

facing the back of the of the Dairy Queen at the time that Mr. Gradic draws a gun down on him but Mr. Gradic and Mr. Guerra both testified that there was use of force against either one of them, there was no threat of force against either one of them and even if you take the statement of the Defendant in a light most favorable to the State there is no evidence of what may have been intended but it is not evidence of what happened. (R-95-96). Defense Counsel then proceeded to state that once Mr. Gradic had pointed his weapon at him and gotten Mr. Saffold on the ground any criminal offense on Mr. Saffolds part was over.  So there is absolutely no threat of force of use of force against either one of them therefore it cannot be Robbery in the first degree. (R-96).

The State then responded by stating that their position was that when this man armed himself with a firearm, placed a ski mask over his head and hid behind the Dairy Queen that that embraces acts which occurred in an attempt to commit and then it is obvious also from these actions what he was attempting to commit and it is further obvious by the fact that he gave a statement saying that in fact that his intent was to commit a robbery is sufficient

to prove a prima facie case in the first degree.    (R-97-98).

Defense counsel then responded that it was an enormous stretch from attempted theft even if by going by the evidence in the light most favorable to the State's arguably there might be an attempted theft but the attempt deals with the theft it is not an attempt to threaten anybody it is an attempt to commit theft.    He has got to threaten the use of force, threaten the imminent use of force or use force there is absolutely no way around that. The State is asking you to ignore that element altogether because it was an attempted theft.    The State uses the word "obvious" well it is not obvious it is their burden of proof.    Even the subsequent statement if you believe it and put it in a light most favorable to the State still has no threat.    The threat has got to be made to Mr. Gradic or another person present, which is Mr. Gareth.    They both said that there was no threat that there was no use of force.    This is a Robbery 1st degree.    This case has to fail because I think you referred to it as an element number 2 use of force or threatening eminent use of force. (R-98-

99).  Defense counsel then offered Ex parte James, 468
So.2d 889 in support of his argument.

After addressing both defense counsel and the State
regarding the elements of the crime of Robbery in the first
degree the Court found that there was evidence that a
robbery was committed in the light most favorable to the
State therefore Defendant's Motion For Judgment of
Acquittal was denied. (R-106). The State rested.

The Court then proceeded to go over the Defendant's
requested jury charges before the closing arguments were
given. (R-106).  The Defense then rested (R-111).

The Court then addressed the jury that they had heard
the evidence that they were going to hear in this case and
the only thing that remained was for the State and the
Defense to make their closing arguments to the jury.  At
this time the State began its closing argument.  The
Defense then gave their closing argument and the State then
made their final rebuttal closing argument. (R-112). During
the State's rebuttal closing argument Defense counsel
objected stating that is was not a perception of a threat
it is the use of force or threaten the eminent use of
force.  There is nothing in the law about perception of a

threat.  Then the Court stated to the attorneys that he

would address this issue by stating to the jury that what

the attorneys say is not the law.  The law is going to be

what they hear from me and what he charges them on. (R-113-

114). The Court then proceeded to charge the ladies and

gentlemen of the jury with the law in this case and the

reading of the indictment. (R-114-134). Court then

reconvened as all twelve jurors returned from their

deliberations at which time the foreperson of the jury

stated that the jury had unanimously reached a verdict.

(R-136-137).

The Court then proceeded to read the verdict to the

jury and he said that in the Circuit Court of Houston

County State of Alabama Plaintiff vs. Eric Saffold

Defendant Case Number CC-05-216 the verdict of the jury

reads as follows: We the Jury find the Defendant Eric

Saffold guilty of Robbery in the first degree as charged in

the indictment and it was signed by the foreperson of the

jury and then the jury was polled.  Defense counsel then

requested a sentencing hearing and a pre-sentence

investigation report be ordered and the Court addressed

that under the current law if either side requests a pre-

sentence investigation then the Court would order one and the sentencing hearing was set for June 10, 2005. (R-138-139).

On June 10, 2005 a sentencing hearing was held before the Honorable Judge Larry Anderson, Circuit Judge, Houston County Alabama. Mr. David Atwell represented the State and the Honorable Thomas K. Brantley represented the Defendant in the sentencing hearing. The Defendant called Reverend Paul Holman to the stand. (R-143). Reverend Holman is the pastor at Greater Beulah Baptist Church and he has been the pastor of Greater Beulah Baptist Church for about ten years. Reverend Holman knew the Defendant Eric Saffold because he had been in his church with his family ever since Reverend Holman had been there. Reverend Holman understood that Eric Saffold had been convicted of Robbery 1st degree and they were here at the sentencing hearing today to give him a sentence and the Defense had filed a motion to remit him to Teen Challenge Drug Program in Pensacola Florida, and Reverend Holman understood why they were in Court today. (R-143-144).

Reverend Holman stated that he was not here to try and get Mr. Saffold out of incarceration but he believes

that if you commit a crime you have got to do the crime.
He is not here to set him free because we do not believe in
that.  What we are here to do is to try and get him some
help because he believes that there was some brokenness in
his family.  Reverend Holman doesn't know if his mother is
here but he knows his mother moved away and abandoned him
and he has pretty much been living on his own ever since.
(R 145-146).  Reverend Holman believed that he had gotten
into some drugs and was trying to replace his mom and daddy
and just turned the wrong way.  Reverend Holman stated that
his parents had gotten a divorce and it was a tragic
situation. The kids had to choose between their mom and
daddy and he didn't really know who his biological father
was. His mother was trying to live her own life and didn't
care about him therefore he pretty much was having to raise
himself and at that point he was a member of the church but
his mother left him so he was by himself up there. (R-146).

Reverend Holman believed that Mr. Saffold was
receptive to spiritual counseling and that he believed that
he loved the Lord.  He had actually been to see him in jail
and they had prayed together but he thinks that drugs may
be the major factor here that Mr. Saffold turns to and

anything that he can do and try and help him get off the drugs will help him.  Reverend Holman understood the prison had a substance abuse program but he didn't think that the prison environment was the best place for him to get drug treatment.  Reverend Holman stated that prison could take a lot out of you and that he believed that what he was trying to do here in Court was trying to help this man get some help at Teen Challenge before he entered the total darkness of prison. (R 147-148).

Reverend Holman then agreed that the 12 month Teen Challenge Program of uninterrupted help would be the best thing for him.  He needed to be locked down at this time and he needed to be in a program where he can't have the influence of society on him or where he can think about what he has done. (R 154). He needs to pray about what he has done and get some real serious help that he hasn't ever had before.  Reverend Holman then stated that he believed Eric Saffold's behavior would change once he got the demon drugs out of him. He believes that if he was remitted to Teen Challenge based on his personal knowledge that it would be more of a benefit right now to Mr. Saffold for the

next twelve months rather than waiting in prison in order to enter the SAP Program. (R-155).

Defense counsel then asked the Court to remit the Defendant to Teen Challenge and stated that they had an affidavit from Reverend Paul Holman and letter from the Operations Director, Mr. Lipinsky, down from Teen Challenge stating that Eric has been accepted in the Teen Challenge Program. Defense counsel then asked that the Defendant not be sentenced today but to go on and send him down to Teen Challenge and then bring him back after he completes it and sentence him then or in the alternative sentence him and then remit him down to Teen Challenge before sending him to prison. (R 156). The Court then proceeded to sentence the Defendant.

The Court sentenced the Defendant to be imprisoned in the penitentiary of the State of Alabama for a term of 25 years. Additionally he was ordered to pay a fine of $5,000.00 and an assessment to the victim's compensation fund of $1,000.00 as well as cost of court. (R 165). The Court then told the Defendant he had 42 days from this date to appeal his decision if he so chooses. The Defendant appealed his conviction and this Honorable Court affirmed

Defendant's conviction on April 28, 2006.  This Application

For Rehearing follows.

## SUMMARY OF THE ARGUMENT

Mr. Saffold argues that the trial court abused its' discretion by denying his Motion of Judgment for Acquittal. Specifically, Mr. Saffold contends that the State failed to prove a prima facie case against him on the charge of Robbery in the First degree.  Mr. Saffold argues that the State failed to prove that he used force or threatened the imminent use of force with the intent to compel the owner or another person to acquiesce there property. The State offered no evidence that Mr. Saffold used any force or threatened the imminent use of force upon Mr. Gradic or Mr. Guerra, therefore this element of the crime fails and Mr. Saffold should have been acquitted of Robbery in the First Degree.

Mr. Saffold contends that the evidence presented at trial did not prove a prima facie case for the State and that the judge should have granted his Motion for Judgment of Acquittal.

## ARGUMENT

## ISSUE ONE

**WHETHER THERE WAS INSUFFICIENT EVIDENCE TO WARRANT A JUDGMENT OF ACQUITTAL OF ROBBERY IN THE FIRST DEGREE AS CHARGED IN THE INDICTMENT? <u>YES</u>**

The first issue presented for review by the Appellant concerns the sufficiency of the evidence warranting the Appellant's conviction for robbery in the first degree. The Appellant contends that there was insufficient evidence to sustain the conviction. After the State rested, defense counsel made a motion for judgment of acquittal based on the fact that the State failed to prove a prima facie case on the charge in the indictment. After the court denied the motion, the defense rested.

The Appellant argues that the State failed to prove the indictment, specifically, the part of the indictment that reads that the Appellant used force or threatened the imminent use of force against Phillip Jerome Gradic, or another person. The State offered no evidence to support this argument. Mr. Gradic himself stated that the Appellant did not use any force or threaten him with any force at all.

If the Appellant raises an argument that is based on a sufficiency of evidence issue, then the Court in reviewing that issue must view the evidence presented at trial in a light most favorable to the state. Seaton v. State, 645 So.2d 341,343 (Ala.Cr.App. 1994); Daniels v. State, 581 So.2d. 536 (Ala.Cr.App. 1990)writ denied; Poole v. State, 645 So.2d. 330, 331 (Ala.Cr.App. 1994).

Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust. Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985)." Powe v. State, 597 So.2d 721, 724 (Ala. 1992).

Williams v. State, 695 So.2d 644 (Ala.Crim.App. 1996).

The Appellant in this case was charged with robbery in the first degree as set out in § 13A-8-41, which states as follows;

### § 13A-8-41. Robbery in the first degree.

(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:

(1) Is armed with a deadly weapon or dangerous instrument; or

(2) Causes serious physical injury to another.

(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.

(c) Robbery in the first degree is a Class A felony.

The underlying offense of robbery is set out in § 13A-8-43, which states;

**§ 13A-8-43. Robbery in the third degree.**

(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.

(b) Robbery in the third degree is a Class C felony.

It is clear from the reading of the statute that the Appellant's motion for judgment of acquittal should have been granted based on the evidence that was before the court at the time the motion was made. The State failed to

prove that there was a use of force or the threat of imminent force. (R 95). Furthermore, the only evidence submitted to the court was the fact that the Appellant was standing behind the store when Mr. Gradic pulled his gun on him and made him get on the ground. (R 95). The defendant argued further that Mr. Gradic and Mr. Guerra both testified under oath that there was no use of force or threat of force against either one of them. (R 95).

There was insufficient evidence to support his conviction. The Appellant was convicted of robbery in the first degree. The State did not prove an essential element of the crime of robbery first degree. The testimony at trial even shows that there was no evidence of force or the threat of imminent force. (R 56-57) The evidence in this case was mostly circumstantial and there was no evidence offered to show that the appellant used any force or threatened any force at all. This Court has previously addressed the viewpoint an appellate must follow in reviewing a conviction based on sufficiency of the evidence.

"'In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the

evidence introduced by the State, accord all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.'" <u>Ballenger v. State</u>, 720 So.2d. 1033, 1034 (Ala.Cr.App. 1998); (quoting <u>Faircloth v. State</u>, 471 So.2d. 485, 488 (Ala.Cr.App. 1984), aff'd, 471 So.2d. 493 (Ala. 1985)). " The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." <u>Nunn v. State</u>, 697 So.2d. 497, 498 (Ala.Cr.App. 1997) (quoting <u>O'Neal v. State</u>, 602 So.2d 462, 464 (Ala.Cr.App. 1992)). It is clear in the present case that based on the facts a rational fact finder could not find the appellant guilty of robbery in the first degree because the State failed to prove the elements of the offense of robbery first degree.

The trial court's denial of a motion for judgment of acquittal must be reviewed by determining if there was legal evidence in existence before the jury at the time the motion was made, in which a jury, by fair inference, could have found the appellant guilty. <u>Thomas v. State</u>, 363

So.2d. 1020 (Ala.Cr.App. 1978). The appellate court, in reviewing the denial of a judgment of acquittal, will only determine if the legal evidence presented was such that a jury could have found the defendant guilty beyond a reasonable doubt. <u>Willis v. State</u>, 447 So.2d. 199 (Ala.Cr. App. 1983).

It is customary that when a defendant moves for a judgment of acquittal, that the trial court must examine the evidence in order to determine its sufficiency in light of the charges contained in the indictment. <u>Ward v. State</u>, 557 So.2d 848, 850 (Ala.Cr.App. 1990).

The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. <u>Thomas v.State</u>, 363 So.2d 1020 (Ala.Cr.App. 1978).

A motion for judgment of acquittal tests the sufficiency of the evidence to support a conviction, "when the evidence raises a question of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of

35

acquittal by the trial court does not constitute error.
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Cr.App.
1993); Young v. State, 283 Ala. 676, 220 So.2d 843 (1969).
This is not the case here because the evidence was
insufficient to prove that the appellant was guilty of the
offense he was charged with. However, such a determination
and ruling by a trial court would not prevent the appellate
court from reviewing the issue. Newsome v. State, 570 So.2d
703,710 (Ala.Cr.App. 1989). The review by an appellate
court requires that " in determining the sufficiency of the
evidence to sustain a conviction, the reviewing court must
accept as true all evidence introduced by the State, accord
the State all legitimate inferences therefrom, and consider
all evidence in a light most favorable to the prosecution."
Ballenger v. State, 720 So.2d. 1033, 1034 (Ala.Cr.App.
1998); (quoting Faircloth v. State, 471 So.2d. 485, 488
(Ala.Cr.App. 1984), aff'd, 471 So.2d. 493 (Ala. 1985)).
Furthermore, if an appellate court does discover that there
is the existence of conflicting evidence, then it will
prevent any appellate review of the evidence or its
sufficiency. Metzger v. State, 565 So.2d 291, 292
(Ala.Cr.App. 1990).

The Appellant understands that it is necessary to protect the record for review, and that to protect this record for review the defendant must file a motion for new trial or a motion for judgment of acquittal. Rule 20.2(a), Ala.R.Crim.P. In the case at bar, the Appellant filed a motion for judgment of acquittal. (R 95).

Therefore, the question to be answered is whether a jury might find that the evidence excluded every reasonable hypothesis except that of guilt? <u>Cumbo v. State</u>, 368 So.2d 871 (Ala.Cr.App. 1978), cert denied, 368 So.2d 877 (Ala. 1979). The Appellant contends that a jury could not reasonably do so here, and that the Appellant's case should be reversed and remanded with the appropriate instructions.

## **ISSUE 2**

### **WHETHER THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S "MOTION TO SUPPRESS"? YES**

The Appellant argues that the trial court erred in denying his "Motion to Suppress". During the testimony at the Suppression Hearing the Appellant stated that Corporal DeVane lead him to believe that it would be better for him if he would give a statement. Appellant further argues that

Corporal DeVane told him that by signing his waiver of rights form was simply part of his cooperation. Appellant also said that Corporal DeVane told him that it would look better to the DA and to the Judge if he cooperated, and that by him signing the waiver form was just part of his cooperation. (R 84). The Appellant also told the court during the Suppression Hearing that he was under the influence of crack cocaine and had been all day long, but he just gave the statement to cooperate so the police would not raise his bail so high that his family could not help him. (R 83).

The Appellant contends that the continuing questioning and pressure from Corporal DeVane that he should cooperate and it would look better for him induced him into making an incriminating statement.

"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S. Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S. Ct. at 1879, the Supreme Court of the United States explained that for a confession to be

voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his *will has been overborne*' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. *Id.* (emphasis added).

"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S. Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S. Ct. 189, 191, 19 L.Ed.2d 35 (1967).

Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S. Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by

pressures and circumstances swirling around him); <u>Eakes v. State</u>, 387 So.2d 855, <u>859</u> (Ala.Crim.App. 1978) (stating that the true test to be employed is `whether the defendant's will was *overborne* at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency. ".
. . .

    ". . . Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See <u>Gaddy</u>, 698 So.2d at 1154 (quoting <u>Ex parte Weeks</u>, 531 So.2d 643, 644 (Ala. 1988)); <u>Culombe</u>, 367 U.S. at 602, 81 S. Ct. at 1879; <u>Jackson,</u> 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to

be considered in determining [the defendant's]

susceptibility to police pressures.' <u>Jackson</u>, 562 So.2d at

1380-81 (citations omitted)."

<u>McLeod v. State</u>, 718 So.2d 727, 729-30 (Ala. 1998)

(footnote omitted).

It is clear in the present case that the Appellant gave

his statement to the police with the hope of favor that he

was told he could receive if he just cooperated with the

police. The Appellant clearly states at the Suppression

Hearing that the only reason he gave his statement was so

that the police would not raise his bail so high that his

family could not help him out. (R 83). The Appellant also

told the court that Corporal DeVane told him that if he

would cooperate and give a statement that it would look

better for his case to the DA and the Judge if he

cooperated. This is why Appellant cooperated and signed the

waiver of rights form because he hoped for a favor from the

police since he cooperated with them and gave them a

statement. (R 84).

The trial judge even acknowledged that the Appellant

testified that he was on drugs at the time of the statement

so it is hard to put a lot of credibility into it. (R 87).

The trial judge also stated that the Appellant testified that the officer offered him a reward to give his statement but that he could not remember the details of it. (R 87). The trial judge then essentially denied the "Motion to Suppress" stating that it was freely and voluntarily given. (R 88). The Appellant contends that this was error on the part of the trial judge due to the fact that he was on drugs at the time the statement was given and the fact that he only gave a statement in hope of a favor from the police based on statements the police that it would look better for him to cooperate and give a statement.

The Legislature has defined "intoxication" to include "A disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala. Code 1975.

"In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S. Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein.

`Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' <u>Tice v. State</u>, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980). See also <u>Palmer v. State</u>, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S. Ct. 1280,71 L.Ed.2d 463 (1982).

"The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. <u>Tice v. State</u>, supra; <u>Garrison v. State</u>, <u>372 So.2d 55</u> (Ala.Cr.App. 1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. <u>Tice v. State</u>, <u>386 So.2d at 1185</u>."

Therefore, due to the Appellant's admitted intoxication of crack cocaine at the time of the statement, the statements made to the Appellant about his cooperation and

the pressures and circumstances stemming from the interrogation by Corporal DeVane the Appellant was essentially induced to make an incriminating statement. The statements made by the Appellant during the interrogation are due to be suppressed. The Appellant respectfully requests that this court reverse the decision of the trial court.

**CONCLUSION**


Wherefore Appellant prays that this Honorable Court will reconsider its previous order in this matter and reverse its affirmation of the conviction in this matter and reverse and render a verdict of not guilty or in the alternative remand this case back to the trial court for a new trial.

Respectfully submitted, this the ⧸⧸ day of May, 2006.


Thomas K. Brantley, Attorney at Law
Ala. Bar #, (BRA049)
Brantley & Amason
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Application For Rehearing And Supporting Brief upon the Attorney General for the State of Alabama, Alabama State House, 11 South Union Street, Montgomery, Alabama 36310, by placing a copy of same in the U. S. Mail, postage prepaid and properly addressed, on this the ___11___ day of May, 2006.

_____
Thomas K. Brantley, Attorney at Law
Ala. Bar #, (BRA049)
Brantley & Amason
401 North Foster St.
Dothan, Alabama 36303
(334) 793-9009
ATTORNEY FOR APPELLANT

CR-04-2068

In the COURT of CRIMINAL APPEALS
of ALABAMA

◆

ERIC SAFFOLD,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

On Appeal From the Circuit Court of
Houston County
(CC-05-216)

## BRIEF IN OPPOSITION
## TO APPLICATION FOR REHEARING

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300*

May 18, 2006

EXHIBIT

F

PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case because "[t]he facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided" by an additional evaluation of the evidence and case law.  Ala. R. App. P. 34(a)(3).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF AUTHORITIES.................................... iii

STATEMENT OF THE CASE AND FACTS.......................... 1

ISSUE PRESENTED FOR REVIEW............................... 3

STANDARD OF REVIEW....................................... 4

SUMMARY OF THE ARGUMENT.................................. 5

ARGUMENT................................................. 6

Saffold's Application For Rehearing Should Be Denied
Because He Failed To Comply With Rule 40 Of The Alabama
Rules Of Appellate Procedure............................. 6

CONCLUSION............................................... 9

CERTIFICATE OF SERVICE.................................. 10

# TABLE OF AUTHORITIES

## Cases

Cox v. State, 380 So. 2d 384, 384 (Ala. Crim.
   App. 1980) ........................................... 6

De Graaf v. State, 37 So. 2d 130, 137 (Ala.
   App. 1948) ........................................... 6

Lassiter v. State, 189 So. 781, 783 (Ala. App. 1939)...... 7

Wilkerson v. State, 21 So. 2d 622, 623 (Ala. 1945)........ 7

## Rules

Alabama Rules of Appellate Procedure,

   Rule 40 ........................................... 6, 8

   Rule 40(b) ........................................... 6

   Rule 40(e) ........................................... 7

## STATEMENT OF THE CASE AND FACTS

The State moves this Court to deny Eric Saffold's application for rehearing based on his noncompliance with Rule 40 of the Alabama Rules of Appellate Procedure.

Saffold was indicted by a Houston County Grand Jury on January 28, 2005, and charged with one count of first-degree robbery in violation of Section 13A-8-41 of the Code of Alabama (1975). (C. 6-7) On March 16, 2005, Saffold was arraigned and entered a plea of not guilty and not guilty by reason of mental disease or defect. (C. 1)

On May 3, 2005, trial commenced and the jury found Saffold guilty of first-degree robbery. (C. 31; R. 137-38) On June 10, 2005, the trial court sentenced Saffold to twenty-five years' imprisonment. (C. 3) The trial court ordered Saffold to pay a fine of $5,000, $1,000 to the Alabama Crime Victim's Fund, and court costs. (C. 4) On June 22, 2005, Saffold filed a written notice of appeal citing objection to the trial court's denial of his motion for judgment of an acquittal. (C. 47, 57)

On April 28, 2006, this Court affirmed Saffold's conviction for first-degree robbery in a published opinion, holding that: (1) The trial court properly denied his

motion for judgment of acquittal because there was
sufficient evidence from which the jury could have inferred
that Saffold threatened the imminent use of force against
the victims; and, (2) the trial court did not err by
denying Saffold's motion to suppress statements made to law
enforcement officers. *See* Saffold v. State, CR-04-2068,
2006 WL 1121299 (Ala. Crim. App. Apr. 28, 2006). Saffold
filed the instant application for rehearing on May 11,
2006.

2

## ISSUE PRESENTED FOR REVIEW

Should this Court deny Saffold's application for rehearing based on his failure to comply with Rule 40 of the Alabama Rules of Appellate Procedure?

## STANDARD OF REVIEW

Strict compliance with the provisions of Rule 40 of the Alabama Rules of Appellate Procedure is necessary for this Court to review an application for rehearing.  *See* <u>Cox v. State</u>, 380 So. 2d 384 (Ala. Crim. App. 1980); <u>Wilkerson v. State</u>, 21 So. 2d 622, 623 (Ala. 1945); <u>Lassiter v. State</u>, 189 So. 781, 783 (Ala. App. 1939).  *See generally* <u>Fowler v. Employers Choice</u>, 658 So. 2d 452, 454 (Ala. Civ. App. 1994) ("application for rehearing is due to be dismissed for failure to comply with Rule 40").

4

## SUMMARY OF THE ARGUMENT

This Court should deny Saffold's application for rehearing based on his failure to comply with Rule 40(b) of the Alabama Rules of Appellate Procedure. He has failed to allege with particularity, any points of law or facts he believed this Court overlooked or misapprehended as required by Rule 40(b). Additionally, although his brief in support of the application contains a proposed statement of facts, Saffold has failed to present in his application for rehearing a proposed additional or corrected statement of facts as required by Rule 40(e) of the Alabama Rules of Appellate Procedure.

## ARGUMENT

**Saffold's Application For Rehearing Should Be Denied Because He Failed To Comply With Rule 40 Of The Alabama Rules Of Appellate Procedure.**

A party seeking this Court's review of a previous decision may file an application for rehearing. *See* Ala. R. App. Pro. 40. Rule 40 of the Alabama Rules of Appellate Procedure governs the procedure for filing an application for rehearing. When an application for rehearing fails to comply with the requirements of Rule 40, it should be stricken for noncompliance. *See* Cox v. State, 380 So. 2d 384, 384 (Ala. Crim. App. 1980). *See also* De Graaf v. State, 37 So. 2d 130, 137 (Ala. App 1948) (This Court "cannot permit them [the rules] to be ignored or entirely disregarded, however innocently, for they were framed and adopted to facilitate the business and be an aid to the court in its prompt and orderly disposition, a result which the profession and those whom it represents are greatly interested."). In this case, Saffold's application for rehearing substantially fails to conform to Rule 40; thus, it should be denied.

Rule 40(b) of the Alabama Rules of Appellate Procedure requires an application for rehearing to "state with

6

particularity the points of law or the facts the applicant

believes th[is C]ourt overlooked or misapprehended."

Saffold's application for rehearing simply provides:

> Saffold...moves this [] Court to grant him a
> rehearing in this cause and to reconsider, revise,
> reverse, and withdraw its judgment rendered on
> April 28, 2006 affirming the judgment of the
> [trial court] and to enter an order reversing said
> judgment. Submitted herewith is a brief and
> argument in support of said application.

Saffold's application does not indicate what part of

this Court's decision should be reversed or how this

Court's decision conflicts with existing law or facts.

Because Saffold has failed to allege any particular law or

facts with which this Court's decision conflicts, this

Court should deny his application for failure to comply

with Rule 40(b). *See* <u>Wilkerson v. State</u>, 21 So. 2d 622,

623 (Ala. 1945); <u>Lassiter v. State</u>, 189 So. 781, 783 (Ala.

App. 1939).

Furthermore, though Saffold's brief in support of his

application for rehearing contains a proposed statement of

facts, these facts may not be considered by this Court.

Rule 40(e) of the Alabama Rules of Appellate Procedure

provides that:

> If a court of appeals issues an
> opinion...containing a statement of facts and a

7

> party applying for rehearing is not satisfied may
> present in the application for rehearing a
> proposed additional or corrected statement of fact
> or the applicant's own statement of facts. **If the
> applicant does not present *in the application* an
> additional or corrected statement of facts or the
> applicant's own statement of facts, it will be
> presumed that the applicant is satisfied with the
> facts as stated in the court of appeals'
> opinion[.]**

Because Saffold's application for rehearing is void of a

statement of facts, this Court may not consider additional

facts submitted in Saffold's brief and must presume Saffold

is satisfied with the facts found in its published opinion.

For these reasons, the State requests that this Court

deny Saffold's application for rehearing because it fails

to satisfy the requirements of Rule 40 of the Alabama Rules

of Appellate Procedure.

8

## CONCLUSION

Based on Saffold's failure to comply with the requirements contained in Rule 40 of the Alabama Rules of Appellate Procedure, this Court should deny his application for rehearing.

Respectfully submitted,

Troy King
*Attorney General*

Audrey Jordan
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>18th</u> day of May, 2006, I did serve a copy of the foregoing on Saffold's attorney, by placing the same in the United States Mail,

> Thomas K. Brantley
> Brantley & Amason
> 401 North Foster Street
> Dothan, Alabama 36303

Audrey Jordan
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300


132868/83356

10

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

June 16, 2006

## CR-04-2068

Eric Saffold v. State of Alabama  (Appeal from Houston  Circuit Court: CC05-216)

### <u>NOTICE</u>

You are hereby notified that on June 16, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk
Court of Criminal Appeals**

cc: Hon. Judy Byrd, Circuit Clerk
    Thomas K. Brantley, Jr., Attorney
    Hon. Audrey Jordan, Asst. Attorney General

**EXHIBIT**

G

PENGAD 800-631-6989

# IN THE SUPREME COURT OF ALABAMA

---

## EX PARTE: ERIC SAFFOLD

---

**ERIC SAFFOLD,**
**PETITIONER**

**V.**

**STATE OF ALABAMA,**
**RESPONDENT**

**PETITION FOR WRIT OF CERTIORARI TO**
**THE SUPREME COURT OF ALABAMA**

---

AN APPEAL FROM THE CIRCUIT COURT OF

HOUSTON COUNTY, ALABAMA

CIRCUIT COURT CASE NO. CC-05-216

CRIMINAL APPEALS COURT NO. CR-04-2068

---

**THOMAS K. BRANTLEY**
**ATTORNEY FOR PETITIONER**
**BRANTLEY & AMASON**
**401 NORTH FOSTER STREET**
**DOTHAN, AL  36303**
**(334) 793-9009**



EXHIBIT

H

ERIC SAFFOLD,                          *

    PETITIONER,                       *

V.                                     *

STATE OF ALABAMA,                      *

    RESPONDENT.                       *

**TO THE SUPREME COURT OF ALABAMA:**

COMES NOW your petitioner, ERIC SAFFOLD, and petitions this Honorable Court for a Writ of Certiorari to issue to the Court of Criminal Appeals in the above styled cause, pursuant to Rule 39, <u>Alabama Rules of Criminal Procedure</u>, and as grounds for said petition shows as the following:

1.    The Petitioner, Eric Saffold was indicted by the Grand Jury of Houston County, Alabama, January Term, 2005 on a charge of Robbery 1st Degree(CR 6-7). On the advice of his attorney, Eric Davis, the Petitioner was formally arraigned, and plead not guilty and not guilty by reason of mental disease or defect. (CR 8).

A trial was held on the merits before a duly qualified, struck and empaneled jury, resulting in a verdict of Guilty as

2

charged. Judgment was entered thereon by the Honorable Larry Anderson, and the case was continued for sentencing. (CR 32).

At the sentencing hearing, Judge Anderson sentenced the Petitioner on Robbery in the First degree to imprisonment in the penitentiary for a term of 25 years, fine of $5,000 dollars, $100 dollars to the Alabama Forensic Sciences Trust Fund, and $1,000 dollars to the Victim's Compensation Assessment. (CR 45). The Petitioner gave written Notice of Appeal on June 22, 2005,(CR 47). The Petitioner's brief was filed October 31, 2005. The Alabama Court of Criminal Appeals affirmed the Petitioner's conviction on April 28, 2006.  The Petitioner filed an Application For Rehearing on May 11, 2006.  The Court of Criminal Appeals overruled Petitioner's Application For Rehearing on June 16, 2006.  This Petition For Writ of Certiorari follows.

2.   That Petitioner has attached a copy of the opinion of the Court of Criminal Appeals, which was provided to him as Exhibit "A".

3.   That the Petitioner has attached the order of the Court of Criminal Appeals denying his application for rehearing as Exhibit "B" to this petition;

4.   The basis of this petition for the writ is that the decision of the appellate court is in conflict with its prior decision on the same point of law.

In its opinion in the case at bar the Court of Criminal Appeals held:

> "The evidence presented in this case, viewed in the light most favorable to the State, indicated that Gradic saw Saffold hiding behind the building between the cooler and the bread racks; that even though it was a warm September evening, Saffold was wearing a mask and a trench coat; that Saffold was watching the back door of the Dairy Queen restaurant – which had been the door the employees had been using that evening while they were changing the letters on the advertising sign – waiting for the employees to leave after locking up for the evening; and that Gradic perceived at the time of his unexpected encounter with Saffold that, in light of Saffold's furtive presence at that time of night and the way he was dressed, Saffold intended to rob him and could use force to take his money."

> "Contrary to Saffold's contention, we do not think that it is relevant for purposes of our inquiry that Gradic and Guerra fortuitously saw Saffold before Saffold could expressly state his intentions or take any additional overt actions toward completion of the theft.  Saffold's attire and his actions signaled his obvious purpose – he was lying in ambush waiting for someone to exit the rear door of the restaurant so that he could commit a robbery – and the potential and dangerous threat he posed was immediately apparent to both Guerra and Gradic, who felt the need to immediately pull his gun for protection.  The threat posed by Saffold was in no way eliminated by the steps Gradic was able to take to apprehend Saffold and then to contact the police.  It is also significant, we think, that even after Gradic had pulled his weapon and required  Saffold to lie down on the ground on his

stomach with his arms extended, there was still a
threat of imminent force – Saffold attempted to pull
his arms under his chest where Gradic could have
reasonably (and, it turns out, correctly) believed he
had concealed a loaded gun under the trench coat, and
Saffold suggested Gradic and Geurra that there were
accomplices present at the scene who could have come to
Saffold's aid."

"In addition, Cpl. DeVane testified that Saffold
admitted during the statement he gave to Cpl. DeVane
that "he was wearing [a mask] when he was standing in
the corner awaiting the employees to exit the store"
(R. 93); that "he was there to scare the employees to
get them to give him money" (R.93); and that he had
been going to use the loaded rifle concealed under his
trench coat to scare the employees so that they would
give him money. (R.93)"

"The State presented sufficient evidence from
which the jury could have inferred that Saffold
threatened the imminent use of force against Gradic and
Guerra.  Therefore, we find no error in the trial
court's denial of Saffold's motion for a judgment of
acquittal."

The basis of the opinion in this case is in direct conflict

with this Honorable Court's previous opinions as set out in

Goodwin v. State, 641 So.2d 1289 (Ala.Crim.App 1994, Lewis v.

State, 469 So.2d 1291, 1298 (Ala.Crim.App. 1984), Baker v.

State, 344 So.2d 547, 549 (Ala.Crim.App. 1977), and Proctor v.

State, 391 So.2d 1092, 1093 (Ala.Crim.App. 1980), which state in

pertinent part as follows:

"Robbery in the first degree requires proof that a
person, in the course of committing a theft, threatens
the imminent use of force with intent to compel

acquiescence to the taking of the property, and while doing so is armed with a deadly weapon or a dangerous instrument or has something in his possession that the victim could reasonably believe is a deadly weapon or dangerous instrument, or makes any representation that he is
armed. § 13A-8-41, Code of Alabama 1975.

"This court has found, "as a matter of law, that brandishing the weapon constituted both the use of force and the threat of force." *Lewis v. State*, 469 So.2d 1291, 1298 (Ala.Cr.App.1984)."


"In robbery, the force or intimidation employed is the gist of the offense. The manner of taking is in the alternative; if force or violence is used, fear is not an essential ingredient. Conversely, if fear is used, there need be no violence.' *Baker v. State*, 344 So.2d 547, 549 (Ala.Cr.App. 1977)."


"*Proctor v. State*, 391 So.2d 1092, 1093 (Ala.Cr.App. 1980). "In order to sustain a conviction for first degree robbery, the test to be applied is a 'subjective' one which focuses on the 'reaction of the victim to the threats of the robber.' *State v. Hopson*, 122 Wis.2d 395, 362 N.W.2d 166, 169 (1984)." *Breedlove v. State, supra*, at 1281."


In the instant case the Petitioner used neither fear nor force. The Petitioner made no verbal threats or any implied threats toward the alleged victims. The victims both testified that Petitioner never said a word except to tell them that he was not going to rob them. The Petitioner never attempted to commit a theft. The Petitioner never brandished a gun, nor did

he make any suggestion that he had a gun. The Petitioner never made any overt acts toward committing a theft and the record clearly shows that all the Petitioner actually did was to stand in the shadows, which is not a crime. The victim testified that he had previously been robbed a few months before therefore he had a heightened fear that he was going to be robbed and this caused the victim to jump to conclusions about the intentions of the Petitioner. As the law states above the test to be applied is a comparative test, which compares the reaction of the victim against the threats of the robber. In the present case the petitioner made no threats, did not use any force, or any threat of any force, did not brandish a weapon or make any implication that he even had a weapon all of which was undisputed by the victim's testimony at trial. Therefore when the test is applied to the case at bar it is clear that the reaction of the victim was not caused by any action of the Petitioner but rather was caused from a previous incident. Therefore as a matter of law according to this comparative test the Petitioner could not possibly be guilty of Robbery first degree when there was no force used, no threats of force and no theft or attempted theft. Essentially, according to the Court of Criminal Appeals application of the statute, the Petitioner is being punished for

standing in the shadows looking suspicious, which in and of

itself is not a crime. Clearly the Court of Criminal Appeals has

misapplied the law in this case.

Petitioner contends that the dissenting opinion from the

Court of Criminal Appeals is the correct application of the law

as it pertains to this case.  Judge Baschab elaborates on this

point as follows:

> "To sustain a conviction for first-degree robbery
> pursuant to §§ 13A-8-41(a)(1) and 13A-8-43(a)(2), Ala.
> Code 1975, the State must establish that the defendant
> was armed and threatened to use force in the course of
> committing a theft. In this case, the State did not
> present any evidence that the appellant performed any
> actions that would constitute a theft or an attempted
> theft. In fact, both Gradic and Guerra specifically
> stated that the appellant did not say anything to them;
> that the appellant did not use or threaten to use force
> against them; and that they did not see the rifle until
> after law enforcement officers arrived. Also, the
> appellant specifically told Gradic and Guerra he was
> not going to rob them. The majority relies on the
> appellant's suspicious actions and his admission to
> officers that he intended to use the rifle to scare the
> employees so they would give him money to affirm the
> conviction. However, many conclusions as to intent —
> both criminal and noncriminal — could be drawn based on
> the appellant's suspicious behavior. Accordingly,
> because the State did not establish that the appellant
> was armed and threatened to use force in the course of
> committing a theft, I must respectfully dissent."

These statements of law are in conflict with the holding at

bar in that the state failed to prove that Petitioner ever used

any force or threatened the use of force during the commission

8

of a theft. The Petitioner submits that the trial court as well as the Court of Criminal Appeals misapplied the facts to the law and that the decision should follow this principle of law, which is clearly described in the dissenting opinion from the Court of Criminal Appeals in this case.

For the Court of Criminal Appeals to allow this man to remain convicted for standing in the shadows in mere preparation of a crime but not actually committing the crime or attempting to commit the crime is a slap in the face to the justice system. This would essentially allow the State to convict anyone at anytime for merely thinking about or preparing to commit a crime without actually effectuating that crime.  The Court of Criminal Appeals seems to base their decision on the theory that the Petitioner may have actually gone through with his plans and committed the crime. Therefore, according to the Court of Criminal Appeals interpretation of the law, the petitioner is still guilty of robbery simply because might have followed through with his plans. However, how can it be possible for you to be guilty of a crime that you have not yet committed? At best there was an attempt to commit a crime but was halted by the victim. There was never any robbery in this case and this Court should grant this petition. The Petitioner contends that if his

conviction is not overturned then the Court is sending the message that you can be convicted of a crime that you may have committed in the future but have not actually committed yet.

WHEREFORE, Petitioner respectfully requests that after a preliminary examination, the writ of certiorari be granted and that this Court proceed under its' rules to review the matters complained of, and to reverse the judgment of the Court of Criminal Appeals, and for such other relief as Petitioner may be entitled.

Respectfully submitted this the 29 day of June, 2006.


**BRANTLEY & AMASON**


**THOMAS K. BRANTLEY (BRA040)**
**ATTORNEY FOR PETITIONER**
**BRANTLEY & AMASON**
**401 NORTH FOSTER STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-9009**

10

## CERTIFICATE OF SERVICE

I certify that I have this day served copies of this Petition on all parties to the appeal in the Alabama Court of Criminal Appeals, to the Court of Criminal Appeals and upon the Attorney General for the State of Alabama, Alabama State House, 11 South Union Street, Montgomery, Alabama 36310, by placing a copy of same in the U. S. Mail, postage prepaid and properly addressed, on this the _29_ day of June, 2006.

**THOMAS K. BRANTLEY (BRA040)
ATTORNEY FOR PETITIONER
BRANTLEY & AMASON
401 NORTH FOSTER STREET
DOTHAN, ALABAMA 36303
(334)793-9009**



RELEASED

APR 28 2006

CLERK
ALA COURT CRIMINAL APPEALS

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CRIMINAL APPEALS

## OCTOBER TERM, 2005-2006

---

### CR-04-2068

---

### Eric Saffold

### v.

### State of Alabama

### Appeal from Houston Circuit Court
### (CC-05-216)

SHAW, Judge.

Eric Saffold was convicted of first-degree robbery, a violation of § 13A-8-41, Ala. Code 1975, and was sentenced to 25 years' imprisonment. On appeal, Saffold contends (1) that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to prove a prima

CR-04-2068

facie case of first-degree robbery, and (2) that the trial court erred in denying his motion to suppress the statement he made to the police.

Our review of the record reveals the following pertinent facts: At approximately 10:00 p.m. on September 26, 2004, Phillip Gradic, the owner of the Dairy Queen restaurant on South Alice Street in Dothan, and Kevin Guerra, who was employed as a cook at the Dairy Queen, were heading home after they had locked up for the evening. They exited the side door of the restaurant and headed toward Gradic's automobile. As they rounded the corner to the back of the building, Gradic, who testified that he had been robbed a few months earlier and tended to be more alert to his surroundings, saw someone standing in the area between where the walk-in cooler extended out of the back of the building and some bread racks, and this person was facing toward the back door of the building -- the door that they had used several times that evening while they were changing the letters on the advertising sign. At trial, both Gradic and Guerra identified Saffold as the person they saw that evening. Gradic testified that he noticed that Saffold had a mask pulled over his face and that he was

2

CR-04-2068

wearing a trench coat even though it was "T-shirt weather" that evening. (R. 45.)

Gradic had a 9mm. gun in his pocket, and he pulled it out and pointed it at Saffold. When Saffold turned around, he stated, "I see you've got a gun, I'm not going to rob you." (R. 48.) Gradic asked Saffold if he was armed, and Saffold told him that he was not. Gradic told Saffold to take off his mask, to lie down on the ground, and to place his hands where Gradic could see them. Saffold complied. Then Gradic telephoned the police on his cellular telephone. While Saffold was lying on the ground on his stomach, he kept trying to pull his hands under his chest, but Gradic told him to put his hands back where he could see them. Guerra looked around the area to make sure that there were not any other people waiting to help Saffold rob them because Saffold "had stated that there [were] other people watching him from around the buildings behind [the Dairy Queen]." (R. 50.) Although both Gradic and Guerra testified that Saffold made no oral threats against them, Guerra testified that he was afraid during the encounter:

> "Q. All right. So you're behind -- walking behind
>     Phillip?

3

CR-04-2068

"A.   Yes.

"Q.   Do you notice anybody standing back there?

"A.   Not at first, until Mr. Gradic pulled his gun
       out.   Then that's when I observed a man with a
       mask on.

"Q.   Okay.   So the first thing you know about it is
       when Phillip pulls out his gun?

"A.   Yeah.   Phillip pulls out his gun and he starts
       saying something.   And then when I looked to
       the side, I saw a man with a mask on.   So I'm
       like: Oh, my God, here we go again.

"Q.   Did it scare you?

"A.   Yeah, yeah.   Because, I mean, somebody with a
       mask on, so --

"Q.   Where do you see this man with the mask
       standing?

"A.   There's a bread rack and there's a cooler.   And
       he was standing like right there on the corner.
       So I told Phillip to go ahead and keep an eye
       on him and I'll go ahead check the store and
       make sure there's not more than one person.

"Q.   All right.   So you look around?

"A.   Yeah.

"....

Q.   Put it this way.   You didn't hear him threaten
      either one of you, did you?

"A.   The only thing I can tell you, Mr. Gradic told
       him to lie down, to lie down.   And I told
       Phillip, 'I'll watch your back, I'm going to

4

CR-04-2068

> check the store.' Then Eric was up there, kept on saying something about, 'I'm not going to rob you, I'm not going to rob you, I'm running from somebody, I'm trying to hide from somebody,' you know. So what I was doing was going around the building to make sure there wasn't nobody else.

"Q. So the answer to the question about whether he threatened you is no?

"A. Well, no, not really. But I was scared because I wasn't sure if there was more than one person.

"Q. Right. But he didn't threaten you? I'm not talking about anybody else anywhere on Alice Street or the blocks behind Fortner or anywhere else.

"A. He didn't say nothing to me."

(R. 61-62, 66-67.)

When the police officers arrived, Saffold told them, "Don't shoot me, I'm laying on a gun." (R. 51.) The police officers handcuffed Saffold and when they rolled him over, they discovered that Saffold had a loaded rifle concealed in his trench coat, which was somehow attached to him by a string.

Saffold was transported to the police station where Jason DeVane, a corporal with the Dothan Police Department, read

5

CR-04-2068

Saffold his <u>Miranda</u>[1] rights.    Cpl. DeVane testified that Saffold indicated that he understood his rights; that Saffold indicated that he had not been drinking alcohol and that he was not under the influence of drugs; that Saffold did not appear to be under the influence of drugs or alcohol; that no promises, inducements, or threats were made; and that Saffold signed the waiver-of-rights form and gave a statement regarding the incident at the Dairy Queen restaurant.    Cpl. DeVane stated that Saffold told him that "he was there to scare the employees to get them to give him money."    (R. 93.) Cpl. DeVane further testified that Saffold identified the mask (State's Exhibit 1) as the mask "he was wearing when he was standing in the corner awaiting the employees to exit the store" (R. 93); that Saffold also told him that the rifle (State's Exhibit 2) "was the rifle that he had tied around his shoulder underneath his jacket" (R. 93); and that Saffold told him that he had been going to use the rifle to scare the employees so that they would give him money.

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966).

6

CR-04-2068

## I.

Saffold argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to prove a prima facie case of first-degree robbery. Specifically, Saffold contends that "[t]he State offered no evidence that Mr. Saffold used any force or threatened the imminent use of force upon Mr. Gradic or Mr. Guerra; therefore, this element of the crime fails and Mr. Saffold should have been acquitted of Robbery in the First Degree." (Saffold's brief at p. 34.) In response, the State argues:

> "Saffold does not argue in his brief that he was not armed with a weapon; rather, the crux of his argument is because the victim did not give him the opportunity to brandish his weapon or verbally demand money, the State failed to establish a prima facie case of first-degree robbery. The evidence proved otherwise."

(State's brief at p. 11.)

"'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" <u>Ballenger v. State</u>, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting

7

CR-04-2068

Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978).

8

CR-04-2068

Section 13A-8-41, Ala. Code 1975, states:

"(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:

"(1) Is armed with a deadly weapon or dangerous instrument."

Section 13A-8-43, Ala. Code 1975, states:

"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

"(2) <u>Threatens the imminent use of force against the person of the owner or any person present</u> with intent to compel acquiescence to the taking of or escaping with the property."

(Emphasis added.)

Section 13A-8-40(b), Ala. Code 1975, states:

"'In the course of committing a theft' embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after the attempt or commission."

Section 13A-8-1(13), Ala. Code 1975, which is applicable to § 13A-8-43, see § 13A-8-40(a), Ala. Code 1975, defines "threat" in part as "[a] menace, <u>however communicated</u>, to ... [c]ause physical harm to the person threatened or to any other

9

CR-04-2068

person."    (Emphasis added.)    "Menace" is defined in the

Compact Oxford English Dictionary 1062 (2d ed. 1994) in part

as "[a] declaration or indication of hostile intention, or of

a probable evil or catastrophe" (emphasis added); Merriam-

Webster's Collegiate Dictionary 774 (11th ed. 2003), defines

"menace" in part as "a show of intention to inflict harm."

(Emphasis added.)

In Cook v. State, 582 So. 2d 592 (Ala. Crim. App. 1991),

this Court stated:

> "Section 13A-8-41 does not require that actual
> force be used to commit the theft; evidence of
> threatened or imminent force is sufficient.  The
> proper inquiry is how the victim reacted to and
> perceived the threat. Kent v. State, 504 So. 2d 373
> (Ala. Cr. App. 1987).    The statutory robbery
> provisions likewise do not require proof of an
> actual taking of property to support a conviction.
> Breedlove v. State, 482 So. 2d 1277 (Ala. Cr. App.
> 1985)."

582 So. 2d at 593-94 (emphasis added).  Likewise, consistent

with § 13A-8-1(13), this Court has held that evidence of a

verbal threat is not necessary to establish the "threat of

force" element necessary to support a robbery conviction, see,

e.g., Coleman v. State, 552 So. 2d 156 (Ala. Crim. App. 1988);

the actions of the defendant, even when the defendant does not

appear to possess a deadly weapon, may suffice to establish

CR-04-2068

the threat of force if it appears to the victim that the defendant has the intention, ability, and means to inflict harm, see, e.g., <u>Welch v. State</u>, 630 So. 2d 145 (Ala. Crim. App. 1993).

The evidence presented in this case, viewed in the light most favorable to the State, indicated that Gradic saw Saffold hiding behind the building between the cooler and the bread racks; that even though it was a warm September evening, Saffold was wearing a mask and a trench coat; that Saffold was watching the back door of the Dairy Queen restaurant -- which had been the door the employees had been using that evening while they were changing the letters on the advertising sign -- waiting for the employees to leave after locking up for the evening; and that Gradic perceived at the time of his unexpected encounter with Saffold that, in light of Saffold's furtive presence at that time of night and the way he was dressed, Saffold intended to rob him and could use force to take his money.

Contrary to Saffold's contention, we do not think that it is relevant for purposes of our inquiry that Gradic and Guerra fortuitously saw Saffold before Saffold could expressly state

11

CR-04-2068.

his intentions or take any additional overt actions toward completion of the theft. Saffold's attire and his actions signaled his obvious purpose -- he was lying in ambush waiting for someone to exit the rear door of the restaurant so that he could commit a robbery -- and the potential and dangerous threat he posed was immediately apparent to both Guerra and Gradic, who felt the need to immediately pull his gun for protection. The threat posed by Saffold was in no way eliminated by the steps Gradic was able to take to apprehend Saffold and then to contact the police. It is also significant, we think, that even after Gradic had pulled his weapon and required Saffold to lie down on the ground on his stomach with his arms extended, there was still a threat of imminent force -- Saffold attempted to pull his arms under his chest where Gradic could have reasonably (and, it turns out, correctly) believed he had concealed a loaded gun under the trench coat, and Saffold suggested to Gradic and Guerra that there were accomplices present at the scene who could have come to Saffold's aid.

In addition, Cpl. DeVane testified that Saffold admitted during the statement he gave to Cpl. DeVane that "he was

12

CR-04-2068

wearing [a mask] when he was standing in the corner awaiting the employees to exit the store" (R. 93); that "he was there to scare the employees to get them to give him money" (R. 93); and that he had been going to use the loaded rifle concealed under his trench coat to scare the employees so that they would give him money. (R. 93.)

The State presented sufficient evidence from which the jury could have inferred that Saffold threatened the imminent use of force against Gradic and Guerra. Therefore, we find no error in the trial court's denial of Saffold's motion for a judgment of acquittal.

## II.

Saffold also argues that the trial court erred in denying his motion to suppress his statement to the police. Specifically, Saffold argues that his statement to Cpl. DeVane should have been suppressed because, he says, he did not voluntarily and intelligently waive his rights. He argues that he was under the influence of crack cocaine at the time he signed the waiver-of-rights form and gave his statement and that he signed the waiver-of-rights form and gave a statement only because, he says, Cpl. DeVane said that the district

13

CR-04-2068

attorney and the trial court would look more favorably on his case if he cooperated.

At the suppression hearing, Cpl. DeVane testified that before he took Saffold's statement, he asked Saffold if he was under the influence of drugs or alcohol and that Saffold told him that he was not. Cpl. DeVane further testified that, based upon his experience, Saffold did not appear to be under the influence of drugs or alcohol. Saffold testified at the suppression hearing that he had been smoking crack cocaine the entire day before he appeared at the Dairy Queen restaurant, but that he did not tell Cpl. DeVane that he was under the influence of crack cocaine because, he said, he wanted to cooperate with the authorities so that his bail would be set at a reasonable amount.

Saffold also testified at the suppression hearing that he signed the waiver-of-rights form and gave a statement because, he said, Cpl. DeVane told him that "it would look good ... [to] the judge and the D.A. if [he] cooperated" (R. 84), but Saffold admitted that Cpl. DeVane "never promised [him] anything as to bond or anything of that nature." (R. 86.) Cpl. DeVane testified at the suppression hearing that he did

14

CR-04-2068

not make any promises or offer any rewards or inducements to

get Saffold to give a statement, but that he did tell Saffold

"that if he cooperated and they asked, [he] would tell them

whether [Saffold] was cooperative and gave a statement or

uncooperative in not giving a statement." (R. 80.)

In denying Saffold's motion to suppress the statement,

the trial court stated:

> "You have a police officer who testified that
> there are no threats, no coercions, no offers, no
> promises. And then you've got Mr. Saffold who
> testified that he told [Cpl. DeVane] he was not on
> drugs at the time, but he really was on drugs. So
> it's hard to put a lot of credibility into that.

> "Said that the officer offered him a reward, but
> couldn't really remember much about it. He
> identified State's Exhibit 5 [the waiver-of-rights
> form] and remembers it; that was his signature on
> the form. He understood the rights form at the time
> and the officer never promised anything regarding
> bond.

> "So, you know, weighing and considering all that
> evidence, the Court finds that the officer complied
> with <u>Miranda</u>, and that said statement was voluntary,
> overcoming any presumption to the contrary."

(R. 87-88.)

In <u>Eggers v. State</u>, 914 So. 2d 883 (Ala. Crim. App.

2004), this Court stated:

> "'"The question of whether a confession was
> voluntary is initially to be determined by the trial

15

CR-04-2068

court."' <u>Minor v. State</u>, 914 So. 2d 372, 388 (Ala. Crim. App. 2004), quoting <u>Jackson v. State</u>, 562 So. 2d 1373, 1381 (Ala. Crim. App. 1990). '[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' <u>Sheely v. State</u>, 629 So. 2d 23, 29 (Ala. Crim. App. 1993) (citations omitted). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion.' <u>Jackson v. State</u>, 589 So. 2d 781, 784 (Ala. Crim. App. 1991). 'When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be manifestly contrary to the great weight of the evidence."' <u>Ex parte Matthews</u>, 601 So. 2d 52, 53 (Ala. 1992), quoting <u>Williams v. State</u>, 456 So. 2d 852, 855 (Ala. Crim. App. 1984). '"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."' <u>Kennedy v. State</u>, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting <u>Bradley v. State</u>, 494 So. 2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 772 (Ala. 1986)."

914 So. 2d at 899.

We find no error in the trial court's denial of Saffold's motion to suppress his statement to Cpl. DeVane.

For the foregoing reasons, the judgment of the trial court is affirmed.

16

CR-04-2068

AFFIRMED.

McMillan, P.J., and Cobb and Wise, JJ., concur.  Baschab,
J., dissents, with opinion.

BASCHAB, JUDGE, dissenting.

To sustain a conviction for first-degree robbery pursuant
to §§13A-8-41(a)(1) and 13A-8-43(a)(2), Ala. Code 1975, the
State must establish that the defendant was armed and
threatened to use force <u>in the course of committing a theft</u>.
In this case, the State did not present any evidence that the
appellant performed any actions that would constitute a theft
or an attempted theft.  In fact, both Gradic and Guerra
specifically stated that the appellant did not say anything to
them; that the appellant did not use or threaten to use force
against them; and that they did not see the rifle until after
law enforcement officers arrived.  Also, the appellant
specifically told Gradic and Guerra he was not going to rob
them.  The majority relies on the appellant's suspicious
actions and his admission to officers that he intended to use

17

CR-04-2068

the rifle to scare the employees so they would give him money to affirm the conviction.   However, many conclusions as to intent -- both criminal and noncriminal -- could be drawn based on the appellant's suspicious behavior.   Accordingly, because the State did not establish that the appellant was armed and threatened to use force <u>in the course of committing a theft</u>, I must respectfully dissent.

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA



Lane W. Mann
  Clerk
Gerri Robinson
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

June 16, 2006

**CR-04-2068**

Eric Saffold v. State of Alabama  (Appeal from Houston  Circuit Court: CC05-216)

## <u>NOTICE</u>

You are hereby notified that on June 16, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Judy Byrd, Circuit Clerk
    Thomas K. Brantley, Jr., Attorney
    Hon. Audrey Jordan, Asst. Attorney General

# IN THE SUPREME COURT OF ALABAMA

83356
Jordan



September 29, 2006

**1051393**

Ex parte Eric Saffold.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS  (In re: Eric Saffold v. State of Alabama)   (Houston Circuit
Court: CC05-216; Criminal Appeals : CR-04-2068).

## <u>CERTIFICATE OF JUDGMENT</u>

## <u>Writ Denied</u>

The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

SMITH, J. -  Nabers, C.J., and See, Stuart, Bolin, and Parker, JJ., concur.
Lyons, Harwood, and Woodall, JJ., dissent.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 29th day of September, 2006

*Robert G. Esdale Sr.*

**Clerk, Supreme Court of Alabama**

EXHIBIT

I

/bb

FORM FOR USE IN APPLICATIONS

FOR HABEAS CORPUS UNDER 28 U.S.C. §2254

RECEIVED

2007 JUN 23   A 10: 52

Eric Saffold
_____
**Name**

AIS #241510
_____
**Prison Number**

Ventress Correctional Facility
_____

P.O. Box 767, Clayton, AL   36016-0767
_____
**Place of Confinement**


United States District Court _____Middle_____ District of ____Alabama____

Case No. __1:07cv598-MHT__
(To be supplied by Clerk of U. S. District Court)


_____Eric Saffold_____, PETITIONER
(Full name) (Include name under which you were convicted)


_____J. C. Giles, Warden_____, RESPONDENT
(Name of Warden, Superintendent, Jailor, or authorized person
having custody of Petitioner)


                                and


THE ATTORNEY GENERAL OF THE STATE OF ____Alabama____

_____Troy King_____, ADDITIONAL RESPONDENT


        (if petitioner is attacking a judgment which imposed a sentence to be
served in the future, petitioner must fill in the name of the state where the
judgment was entered.  If petitioner has a sentence to be served in the future
under a federal judgment which he wishes to attack, he should file a motion
under 28 U.S.C. §2255, in the federal court which entered the judgment.)

EXHIBIT
J

PENGAD 800-631-6989


PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN
STATE CUSTODY

INSTRUCTIONS--READ CAREFULLY

(1) This petition must be legibly handwritten or typewritten and signed by the
    petitioner under penalty of perjury.  Any false statement of a material
    fact may serve as the basis for prosecution and conviction for perjury.
    All questions must be answered concisely in the proper space on the form.

    The Judicial Conference of the United States has adopted, effective 1/1/83,
    the 8-1/2 x 11 inch paper size standard for use throughout the federal
    judiciary and directed the elimination of the use of legal size paper.  All
    pleadings, etc. filed after 12/31/82 must be on 8-1/2 x 11 inch paper.

(2) Additional pages are not permitted except with respect to the <u>facts</u> which you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

(3) Upon receipt of a fee of $5 your petition will be filed if it is in proper order.

(4) If you do not have the necessary filing fee, you may request permission to proceed <u>in forma pauperis</u>, in which event you must execute the declaration on the last page, setting forth information establishing your inability to prepay the fees and costs or give security therefor. If you wish to proceed <u>in forma pauperis</u>, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

(5) Only judgments entered by one court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

(6) Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the petition you file seeking relief from any judgment of conviction.

(7) When the petition is fully completed, <u>the original and two copies must be</u> mailed to the Clerk of the United States District Court whose address is
<u>P. O. Box 711, Montgomery, Alabama  36101</u>

(8) Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

*If you are proceeding in forma pauperis, only the original petition needs to be filed with the Court.                   PETITION

1. Name and location of court which entered the judgment of conviction under attack   Houston County Circuit Court, Dothan, AL

2. Date of judgment of conviction   May 3, 2005

3. Length of sentence   25 years   Sentencing Judge   Larry K. Anderson

4. Nature of offense or offenses for which you were convicted:
   First Degree Robbery

5. What was your plea?  (check one)
   (a) Not guilty  ( X )
   (b) Guilty      (   )
   (c) Nolo contendere  (   )
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. Kind of trial: (Check one)
   (a) Jury (X )
   (b) Judge only ( )

7. Did you testify at the trial? Yes ( )  No (X)

8. Did you appeal from the judgment of conviction? Yes ( X) No ( )

9. If you did appeal, answer the following:
   (a) Name of court __Alabama Court of Criminal Appeals__
   (b) Result __Affirmed__
   (c) Date of result __April 28, 2006__
   If you filed a second appeal or filed a petition for certiorari in the
   Supreme Court, give details: __In the Alabama Supreme Court Writ of Certiorari__
   __Denied__

10. Other than a direct appeal from the judgment of conviction and sentence, have
    you previously filed any petitions, applications, or motions with respect
    to this judgment in any court, state or federal? Yes ( X) No ( )

11. If your answer to 10 was "yes", give the following information:
    (a)(1) Name of court __Houston County Circuit Court, Dothan, AL__
       (2) Nature of proceeding __Motion for Split Sentence__

       (3) Grounds raised __Court ordered Substance Abuse Program (SAP) and Crime__
       __Bill. Motion for Reconsideration of Sentence after completion of__
       __Programs. Be brought back to court after completion, be placed on a__
       __20 year split to time served. Be released on probation and pay fines.__

       (4) Did you receive an evidentiary hearing on your petition, application
       or motion? Yes ( ) No (X)
       (5) Result _____
       (6) Date of result _____
    (b) As to any second petition, application or motion give the same infor-
        mation:
        (1) Name of court_____
        (2) Nature of proceeding_____

        (3) Grounds raised_____

       (4) Did you receive an evidentiary hearing on your petition, application
       or motion? Yes ( ) No ( )
       (5) Result_____
       (6) Date of result_____

(c) As to any third petition, application or motion, give the same infor-
mation:
   (1) Name of court _____
   (2) Nature of proceeding _____
      _____
   (3) Grounds raised_____
      _____
      _____
      _____
      _____
      _____
   (4) Did you receive an evidentiary hearing on your petition, application
or motion? Yes ( ) No ( )
   (5) Result_____
   (6) Date of result_____
(d) Did you appeal to the highest state court having jurisdiction the result
of any action taken on any petition, application or motion:
   (1) First petition, etc.        Yes ( ) No ( )
   (2) Second petition, etc.     Yes ( ) No ( )
   (3) Third petition, etc.      Yes ( ) No ( )
(e) If you did not appeal from the adverse action on any petition, applica-
tion or motion, explain briefly why you did not: _____
_____
_____
_____
_____
_____
_____

12.  State concisely every ground on which you claim that you are being held
unlawfully.  Summarize briefly the facts supporting each ground.

     CAUTION:  In order to proceed in the federal court, you must ordinarily first
exhaust your state court remedies as to each ground on which you
request action by the federal court.  As to all grounds on which you
have previously exhausted state court remedies, you should set them
forth in this petition if you wish to seek federal relief.  If you
fail to set forth all such grounds in this petition, you may be
barred from presenting them at a later date.

    For your information, the following is a list of the most frequently raised
grounds for relief in habeas corpus proceedings.  Each statement preceded by
a letter constitutes a separate ground for possible relief.  You may raise
any grounds which you may have other than those listed if you have exhausted
all your state court remedies with respect to them.  However, you should
raise in this petition all available grounds (relating to this conviction)
on which you base your allegations that you are being held in custody unlaw-
fully.

    If you select one or more of these grounds for relief, you must allege
facts in support of the ground or grounds which you choose.  Do not check
any of the grounds listed below.  The petition will be returned to you
if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, [where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim].

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, [where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim].

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: The State failed to prove every element of the crime of Robbery First Degree, therefore, the Petitioner is factually innocent.

Supporting FACTS (tell your story briefly without citing cases or law): The facts at the Petitioner's trial failed to prove that there was any intent on his part to commit the crime of robbery first degree. There was insufficient evidence to prove that a crime was committed and/or that the Petitioner had any intention to commit a crime. The Petitioner is factually innocent of the charge of Robbery First Degree and is therefore incarcerated unconstitutionally.

B. Ground two: None.

Supporting FACTS (tell your story briefly without citing cases or law):

C. Ground three: None

Supporting FACTS (tell your story briefly without citing cases or law): 

D. Ground four: None

Supporting FACTS (tell your story briefly without citing cases of law): 

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal state briefly what grounds were not so presented, and give your reasons for not presenting them: All grounds herein stated were argued and raised at all levels of the State proceedings.

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? Yes ( ) No ( X )

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a) At preliminary hearing
    (b) At arraignment and plea

(c) At trial Eric Davis, P.O. Box 1103, Dothan, AL 36302

(d) At sentencing Thomas Brantley, 401 N. Foster St., Dothan, AL 36303

(e) On appeal Thomas Brantley, 401 N. Foster St., Dothan, AL 36303

(f) In any post-conviction proceeding None

(g) On appeal from any adverse ruling in a post-conviction proceeding: None

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ( ) No (X)

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ( ) No (X)
(a) If so, give name and location of court which imposed sentence to be served in the future:

(b) And give date and length of sentence to be served in the future:

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ( ) No ( )

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare ( or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on _06/21/07_.
(date)

_____
Signature of Petitioner

Eric Saffold
AIS #241510, Dorm D1
Ventress Correctional Facility
P.O. Box 767
Clayton, AL  36016-0767











United States District Court
For the Middle District of Alabama
Clerk's Office
P.O. Box 711
Montgomery, AL  36101-0711

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

Eric Saffold, AIS# 241510,     *
                               *
        Petitioner,            *
                               *
    v.                         *        Case No. _____
                               *
J.C. Giles, Warden,            *        1:07CV598-MHT
                               *
        Respondent.            *

**BRIEF AND ARGUMENT**
**IN SUPPORT OF**
**PETITION FOR WRIT OF HABEAS CORPUS**
**UNDER 28 U.S.C. §2254**

Comes now the Petitioner, Eric Saffold, AIS #241510, acting pro se, and respectfully submits this separate memorandum in the form of a Brief and Argument in support of his petition for a Writ of Habeas Corpus under 28 U.S.C. §2254. Petitioner asks for this Court's indulgence and that this Honorable Court accept this filing as a separate memorandum to the Petition.

**JURISDICTION**

This Honorable Court has the jurisdiction to consider this Petition due to the fact that the Petitioner has exhausted all the remedies available to him in the State courts. 28 U.S.C. §2254(b)(1):

>        An application for a writ of habeas corpus
>        on behalf of a person in custody pursuant to
>        the judgment of a State court shall not be
>        granted unless it appears that--
>
>        (A)  The applicant has exhausted the remedies
>             available in the courts of the State; or

Furthermore, 28 U.S.C. §2254 provides this Court with the jurisdiction under Section (d)(2), which states:

 (d) An application for a writ of habeas corpus
    on behalf of a person in custody pursuant to
    the judgment of a State court shall not be
    granted with respect to any claim that was
    adjudicated on the merits in State court
    proceedings unless the adjudication of the
    claim--

  (2) resulted in a decision that was based on an
    unreasonable determination of the facts
    in light of the evidence presented in the
    State court proceeding.

Further, 28 U.S.C. §2254(d)(1) states:

  A 1-year period of limitation shall apply to an
  application for a writ of habeas corpus by a
  person in custody pursuant to the judgement of a
  State court. The limitation period shall run from
  the latest of--

 (A) the date on which the judgement became final
    by the conclusion of direct review or the
    expiration of the time for seeking such review;...

The Petitioner in this case filed for a Writ of Certiorari to the Alabama
Supreme Court on 29 June, 2006. Therefore, his 1 year time frame is good
up to and including June 29, 2007.

**ARGUMENT**

 The State failed to prove there was <u>any</u> intent on the part of this
Petitioner to rob the alleged victim, Phillip Jerome Gradic. Alabama case
law is replete with court decisions that state unequivocally that "intent"
must be proven in order to convict a person of the crime of robbery.

 "Robbery in the first degree requires proof that a person, in the course
of committing a theft, threatens the imminent use of force with <u>intent</u> to
compel acquiescence to the taking of that property, and while doing so is
armed with a deadly weapon or a dangerous instrument or has something in
his possession that the victim could reasonably believe is a deadly weapon
or dangerous instrument, or make any representation that he is armed."
Quoting Section 13A-8-41, **Code of Alabama**, 1975.

Black's Law Dictionary defines the word "imminent" as "near at hand; ... impending; ... on the point of happening; ... Something which is threatening to happen at once, something close at hand."

In the case at hand, the State failed to show that any crime was "imminent" and did not present enough evidence from which the jury could infer that the Petitioner threatened the "imminent" use of force against the alleged victim. At no time was a verbal threat made; no conversation occurred or was exchanged between the Petitioner and the victim prior to the victim pulling a gun out and pointing it at the Petitioner, nor was the Petitioner visibly armed. No weapon was ever shown or brandished prior to the alleged victim pulling out his pistol. In fact, the only words exchanged at all were when the Petitioner actually told the alleged victim he was not going to rob them. The victim's own testimony at trial actually bolstered this contention that no robbery was "imminent."

"Specific intent is a slippery concept that eludes a precise, universal definition. If nothing else, however, the label 'specific intent' connotes some kind or degree of criminal mens rea over and above the requirement that the defendant knowingly and voluntarily perform some proscribed act." United States v. Phillips, 19 F. 3d 1565, 1577-78 (11th Cir. 1994).

Therefore, under the intent criteria espoused in §13A-8-41, Code of Alabama, 1975, no robbery occurred. As shown in Petitioner's request for a Writ of Certiorari to the Alabama Supreme Court, in the dissenting opinion of Judge Baschab, the correct application of law was not applied:

> "To sustain a conviction for first-degree robbery pursuant to §§13A-8-41 (a) (1) and 13A-8-43 (a) (2), Ala. Code 1975, the State must establish that the defendant was armed and threatened to use force in the course of committing a theft. In this case, the State did not present any evidence that the appellant performed any actions that would constitute a theft or an attempted theft. In fact, both Gradic and Guerra specifically state that the appellant did not say anything to them;

(3)

that the appellant did not use or threaten to use force against them; and that they did not see the rifle until after law enforcement officers arrived. Also, the appellant specifically told Gradic and Guerra he was not going to rob them. The majority relies on the appellant's suspicious actions and his admission to officers that he intended to use the rifle to scare the employees so they would give him money to affirm the conviction. However, many conclusions as to intent – both criminal and noncriminal – could be drawn based on the appellant's suspicious behavior. Accordingly, because the State did not establish that the appellant was armed and threatened to use force in the course of committing a theft. I must respectfully dissent." See **Saffold v. State**, 2006 Ala. Crim. App. LEXIS 56.

## CONCLUSION

Petitioner alleges that the Trial Court violated his Fourteenth Amendment right to due process because the evidence submitted at trial, and the victim's own testimony, were insufficient to convict him of robbery first degree. To satisfy the constitutional requirement of due process in a criminal trial, the State must prove every fact that constitutes an essential element of the crime charged against the defendant. It is contrary to the law and principles of justice that this conviction should stand. To allow a man to be convicted without taking any step towards committing the crime for which he stands convicted is a manifest injustice. To allow a man to be convicted merely for standing around sets a dangerous precedent. The Trial Court's conclusion that the evidence was sufficient to convict the Petitioner of robbery first degree was contrary to, and an unreasonable application of the law, and simply cannot be left standing.

Respectfully submitted this 21st day of June, 2007.

Eric Saffold, Petitioner, pro se
AIS #241510, Dorm D1
Ventress Correctional Facility
P.O. Box 767
Clayton, AL 36016-0767